1  NIALL P. McCARTHY (SBN 160175)
   nmccarthy@cpmlegal.com
2  JUSTIN T. BERGER (SBN 250346)
   jberger@cpmlegal.com
3  ERIC J. BUESCHER (SBN 271323)
   ebuescher@cpmlegal.com
4  **COTCHETT, PITRE & McCARTHY, LLP**
   840 Malcolm Road
5  Burlingame, CA  94010
   Tel: (650) 697-6000 / Fax:  (650) 692-3606
6
   *Attorneys for Plaintiffs*
7
8         **IN THE UNITED STATES DISTRICT COURT**
9       **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10            **SAN JOSE DIVISION**

**C 12       5847**

| | |
|---|---|
| 11  RHEUMATOLOGY DIAGNOSTICS LABORATORY, INC., a California corporation; PACIFIC BREAST PATHOLOGY MEDICAL CORPORATION, a California corporation; HUNTER LABORATORIES, LLC, a California corporation; SURGICAL PATHOLOGY ASSOCIATES, a California partnership,<br><br>                 Plaintiffs,<br><br>          vs.<br><br>BLUE SHIELD OF CALIFORNIA LIFE & HEALTH INSURANCE COMPANY, a California corporation; BLUE CROSS AND BLUE SHIELD ASSOCIATION, an Illinois corporation; AETNA, INC., a Pennsylvania corporation; QUEST DIAGNOSTICS INCORPORATED, a Delaware corporation; QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., a Delaware corporation; and DOES 1-100, inclusive,<br><br>                 Defendants. | Case No. _____<br><br>**COMPLAINT FOR DAMAGES, RESTITUTION, AND INJUNCTIVE RELIEF**<br><br>(1)   Violation of California's Cartwright Act;<br><br>(2)   Violation of California's Unfair Competition Law.<br><br>(3)   Violation of California's Unfair Practices Act<br><br>(4)   Intentional Interference with Prospective Economic Advantage<br><br>(5)   Negligent Interference with Prospective Economic Advantage<br><br>(6)   Section Two of the Sherman Act - Monopolization or Attempted Monopolization<br><br>(7)   Section One of the Sherman Act - Bilateral Conspiracies to Restrain Trade and Monopolize<br><br>(8)   Section Two of the Sherman Act - Bilateral Conspiracies to Monopolize and Attempt to Monopolize<br><br>**DEMAND FOR JURY TRIAL** |

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**COMPLAINT**                                              **ORIGINAL**

# TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.   Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.   Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.     FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.   Relevant Product and Geographic Markets . . . . . . . . . . . . . . . . . . 7

    B.   The Blue Card Association Conspired with Quest Diagnostics
       to Suppress Competition Through Changes to the Blue Card
       Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.   Quest Engages in Below Cost CApitated Contracts . . . . . . . . . . . . . . 14

    D.   Aetna Conspired with Quest to Exclude Four Hundred
       Regional Labs from Aetna's Network in Exchange for
       Discounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    E.   Aetna and Quest Have Implemented Bonus Pool Agreements . . . . . . . . 19

    F.   Blue Shield of California Accepted a Ten (10) Percent
       Discount on Lab Testing from Quest in Exchange for the
       Exclusion of Westcliff and Hunter Labs from In-Network . . . . . . . . . . . 20

    G.   Quest has Illegally Waived out of Network Co-Pay or
       Deductible Obligations for Competitive Advantage . . . . . . . . . . . . . . 21

    H.   Defendants' Conduct Limits Competition and Increases
       Quest's Monopoly Power . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

V.      CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

FIRST CAUSE OF ACTION
(Against All Defendants)
Violation of the California Cartwright Act,
Cal. Bus. & Prof. Code § 16700 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . 23

SECOND CAUSE OF ACTION
(Against All Defendants)
Violation of California's Unfair Competition Law,
Cal. Bus.& Prof. Code § 17200 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . 25

THIRD CAUSE OF ACTION
(Against QUEST)
Violation of Unfair Practices Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**FOURTH CAUSE OF ACTION**
(Against All Defendants)
Intentional Interference with Prospective Economic Advantage . . . . . . . . . . . . 27

**FIFTH CAUSE OF ACTION**
(Against All Defendants)
Negligent Interference with Prospective Economic Advantage . . . . . . . . . . . . . . 29

**SIXTH CAUSE OF ACTION**
(Against All Defendants)
Monopolization or Attempted Monopolization -
Section Two of the Sherman Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**SEVENTH CAUSE OF ACTION**
(Against All Defendants)
Bilateral Conspiracies to Restrain Trade and Monopolize -
Section One of the Sherman Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**EIGHTH CAUSE OF ACTION**
(Against All Defendants)
Bilateral Conspiracies to Monopolize and Attempt to Monopolize -
Section Two of the Sherman Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

VI.   **PRAYER FOR RELIEF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**DEMAND FOR JURY TRIAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**COMPLAINT**                                                                    ii

Plaintiffs RHEUMATOLOGY DIAGNOSTICS LABORATORY, INC., PACIFIC BREAST PATHOLOGY MEDICAL CORPORATION, HUNTER LABORATORIES, LLC, and SURGICAL PATHOLOGY ASSOCIATES LLC, allege as follows:

## I.   INTRODUCTION

1.      Diagnostic testing represents less than two percent of spending by health plans, but nonetheless influences seventy (70) percent of all medical decisions. Prevention, cost reduction, and chronic disease control are among the central health reform goals that lab testing helps achieve.  A few dollars spent on a simple blood test can avoid lengthy hospitalizations and expensive, invasive medical procedures as well as expensive drugs that molecular testing may show as ineffective for a particular disease. As but one example, heart disease, the number one killer in the United States, can almost always be prevented if a person's specific risks can be detected early enough with newly developed, inexpensive tests.  To ensure that the highest quality, most advanced, and best priced testing is available to physicians and their patients, it is critical to preserve competition for the provision of these diagnostic services.

2.      In a threat to competition, health care providers, and patients, Defendants BLUE SHIELD OF CALIFORNIA and AETNA have conspired with Defendant QUEST DIAGNOSTICS ("QUEST") to monopolize and otherwise restrain competition in the sale of routine, molecular, and speciality testing services in California.  Among other conduct, QUEST systematically contracts with physician groups on a loss-leader, below-cost capitated basis.  QUEST uses the discounted capitated rates in order to lock out competition, and induce referral of Medicare and Medi-Cal pull-through business, in violation of the anti-kickback statutes.  QUEST provides the capitated prices as an inducement to its customers to refer all of their lab testing business to QUEST, including Medi-Cal and Medicare business, which QUEST charges on a lucrative, Fee-for-Service basis.  Because QUEST's competitors, including Plaintiffs, are unwilling to violate the law by offering such loss-leader capitated rates, QUEST's capitated discounts have the effect of eliminating competition from the markets at issue in this Complaint.  QUEST's

loss-leader capitated contracts are specifically designed to injure competitors and destroy competition, and violate the Sherman Act, California's Cartwright Act, and the explicit prohibitions of California Business and Professions Code section 17043 (California's Unfair Practices Act).

3. Moreover, QUEST has worked in concert with the BLUE CROSS AND BLUE SHIELD ASSOCIATION ("BLUE CARD ASSOCIATION") and member Blue Plans to promote a change in the national Blue Card policy that will eliminate from the market hundreds of molecular and specialty labs operating from single locations but marketing across the United States. These labs are the most innovative in the county, developing new tests with major impacts on patient health care and long-term health. The change in Blue Card policy will devastate this competitive force.

4. The BLUE CARD ASSOCIATION licenses the Blue Cross and Blue Shield names to each of the Blue Plans in the Association, including BLUE SHIELD OF CALIFORNIA. Since 2004, each Blue Plan has been permitted by the terms of the Licensing Agreement to contract with independent clinical labs located within or outside of the Blue Plan's state or territory.

5. The BLUE CARD ASSOCIATION has conspired with QUEST to promote a new, exclusionary Licensing Agreement that requires labs to submit Blue Card members' claims to the Blue Plan provider in whose region the patient is insured. The Blue Plans must be billed by the lab which performs the test; if the patient is not insured in the region where the lab services are performed, then the Plan in the patient's region will *not* adjudicate the claim. Implementation of this new policy harms competition by molecular, anatomic pathology and other specialty labs to the benefit of QUEST, as physicians are likely to steer business to QUEST and away from what would now be more expensive out-of-network providers under the Blue Plans.

6. Furthermore, AETNA and BLUE SHIELD OF CALIFORNIA have been successfully persuaded by QUEST to terminate the in-network status of QUEST's smaller competitors in exchange for QUEST offering financial and other incentives. These

1 practices have effectively foreclosed substantial distribution opportunities to large

2 portions of the market. These terminations effectively price labs out of the market, since

3 physicians are likely to steer testing away from independent labs to save patients out-of-

4 network fees. As but one example, QUEST has successfully offered BLUE SHIELD OF

5 CALIFORNIA a ten (10) percent discount on lab testing as an incentive for it to take

6 Westcliff (then, before its acquisition by LabCorp, the largest privately owned lab in

7 California) and Plaintiff Hunter Labs out-of-network. This has had the effect of

8 substantially lessening Hunter Labs' competitive position while leaving practitioners and

9 consumers with fewer choices for quality lab testing.

10     7.     AETNA has also conspired with QUEST to eliminate competition within

11 California from independent regional labs. In or about October, 2012, QUEST and

12 AETNA entered into a contract whereby AETNA agreed to terminate four hundred (400)

13 regional contacts across the United States. These terminations have increased QUEST's

14 dominance in multiple regional markets, including California. In California, the

15 terminations included Hunter Labs, the only remaining substantial in network full-service

16 independent lab competitor of QUEST in Northern California.

17     8.     These practices, in addition to others described herein, have resulted in an

18 unreasonable restraint on competition, in violation of federal and California law, and

19 constitute unlawful, unfair, and/or fraudulent business practices under California law.

20     9.     This is an action for violation of the Sherman Act, California's Cartwright

21 Act, violation of California's Unfair Competition Law, violation of California's Unfair

22 Practices Act, Intentional Interference with Prospective Economic Advantage, and

23 Negligent Interference with Prospective Economic Advantage, to recover treble damages,

24 injunctive relief, and attorneys' fees and costs for Plaintiffs.

25

26

27

28     / / /

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**COMPLAINT**     3

## II.  PARTIES

### A.  Plaintiffs

10.  Plaintiff RHEUMATOLOGY DIAGNOSTICS LABORATORY, INC. ("RHEUMATOLOGY DIAGNOSTICS" or "RDL") is a corporation organized and existing under the laws of California that is engaged in the commercial reference laboratory business.

11.  Plaintiff PACIFIC BREAST PATHOLOGY, MEDICAL CORPORATION ("PACIFIC BREAST PATHOLOGY") is a corporation organized and existing under the laws of California that is engaged in the commercial reference laboratory business.

12.  Plaintiff HUNTER LABORATORIES, INC. ("HUNTER") is a corporation organized and existing under the laws of California that is engaged in the commercial reference laboratory business.

13.  Plaintiff SURGICAL PATHOLOGY ASSOCIATES ("SURGICAL PATHOLOGY") is a partnership organized and existing under the laws of California that is engaged in the commercial reference laboratory business in Northern California. SURGICAL PATHOLOGY is affiliated with HUNTER, and as such is directly impacted by the conduct described herein that negatively impacts HUNTER.

### B.  Defendants

14.  Defendant BLUE SHIELD OF CALIFORNIA LIFE & HEALTH INSURANCE COMPANY ("BLUE SHIELD OF CALIFORNIA") is a California corporation presently headquartered at 50 Beale St., San Francisco, California 94105.  At all times relevant hereto, BLUE SHIELD OF CALIFORNIA conducted business in the Northern District of California.

15.  Defendant BLUE CROSS AND BLUE SHIELD ASSOCIATION ("BLUE CARD ASSOCIATION") is an Illinois Corporation presently headquartered at 225 N. Michigan Ave., Chicago, Illinois 60601.  At all relevant times hereto, BLUE CARD ASSOCIATION conducted business in the Northern District of California.

16.  Defendant AETNA, INC., ("AETNA") is a Pennsylvania corporation

presently headquartered at 151 Farmington Ave., Hartford, Connecticut 06156. At all relevant times hereto, AETNA, INC. conducted business in California, including but not limited to providing health insurance to California residents. At all times relevant hereto, AETNA conducted business in the Northern District of California.

17.     Defendant QUEST DIAGNOSTICS INCORPORATED, f/k/a Corning Clinical Laboratories, Inc., f/k/a Met Path, Inc. ("QUEST-DE") (NYSE: DGX) is a Delaware corporation with its principal place of business at 1290 Wall Street West, Lyndhurst, New Jersey. At all times relevant hereto, QUEST-DE conducted business in the Northern District of California, including but not limited to providing clinical laboratory services to the general public in California.

18.     Defendant QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., f/k/a SmithKline Beecham Clinical Laboratories, Inc., f/k/a SmithKline Bioscience Laboratories, Inc., f/k/a SmithKline Clinical Laboratories, Inc., f/k/a Laboratory Procedure, Inc. ("QUEST CLINICAL") (Cal. Corp. No. C0763619) is a Delaware corporation with its principal place of business at 1290 Wall Street West, Lyndhurst, New Jersey. At all times relevant hereto, QUEST CLINICAL conducted business in the Northern District of California, including but not limited to providing clinical laboratory services to the general public in California. QUEST CLINICAL is a wholly owned subsidiary of Quest Diagnostics Holdings Incorporated, a wholly-owned subsidiary of QUEST-DE.

19.     As used herein, QUEST means and includes, individually and collectively, QUEST-DE and QUEST CLINICAL. Plaintiffs sues the QUEST entities, and each of them, as participants, alter egos of one another, agents of one another, and conspirators with one another in the improper acts, plans, schemes, and transactions that are the subject of this Complaint.

/ / /

III.    **JURISDICTION AND VENUE**

20.    Plaintiffs bring this action under sections 1 and 2 of the Sherman Act to obtain injunctive relief and to recover damages, including treble damages, costs of suit and reasonable attorneys' fees, premised on Defendants' violation of the Sherman Act, 15 U.S.C. §§ 1, 2.

21.    This Court has subject matter jurisdiction of this action pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, and 28 U.S.C. §§ 1331, 1337, and 1367.

22.    Venue is proper pursuant to 28 U.S.C. §§ 1391(b),(c) and (d) in this district as each of the Defendants is a resident of the State of California and/or of this judicial district. Additionally, venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, as the Defendants transact business or are inhabitants of this judicial district.

23.    **Intradistrict Assignment:** Assignment to the San Jose Division is appropriate because the action arises in Santa Clara County, as both Plaintiff HUNTER and SURGICAL PATHOLOGY are based in Santa Clara County.

IV.    **FACTUAL BACKGROUND**

24.    A June 2012 investor presentation given by the Chief Executive Officer of QUEST, Mr. Steve Rusckowski, and reported in *Laboratory Economics*, neatly summarizes Defendants' conduct which is the basis of this complaint. Mr. Rusckowski reported that health insurance companies are "wanting to narrow their networks." "Therefore, *there should be more consolidation in the volumes around fewer suppliers* of laboratory testing services and *that plays nicely into what we are all about* and what this industry is all about." As to smaller lab competitors "[w]e do have an opportunity with some of our health plan partners to help them narrow the network. We're working together with the health plans to get more volume and they see an opportunity in their cost structure, and we see an opportunity with our volumes to do that with them." As this quote reflects and the facts below show, QUEST, by and through conspiracies with the other named Defendants, has aggressively and illegally implemented a successful


LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**COMPLAINT**                                                                                    6

1    "narrowing" of the networks by insurance companies to significantly limit its

2    competitors' distribution opportunities.

3         25.    As discussed in the following sections, Defendants have limited

4    competition through several means, each of which is independently illegal, and which,

5    when compounded, threaten to devastate competition, and significantly diminish the

6    quality of patient care.

7         A.    **Relevant Product and Geographic Markets**

8         26.    There are five relevant product markets that are impacted by Defendants'

9    conduct as alleged in this complaint.  Each of those markets has a distinct geographic

10   market.  The relevant product markets and corresponding geographic markets are as

11   follows:

12              a.    Routine Clinical Laboratory Testing:  Routine clinical laboratory

13                    testing generally involves the chemical analysis of bodily fluids.

14                    Routine clinical laboratory tests include thousands of individual

15                    procedures in the areas of hematology, blood chemistry, urine

16                    chemistry, endocrinology, and microbiology, among others.

17                    Commonly ordered tests include red and white blood cell counts,

18                    blood chemistry panels, urinalyses, microbiology cultures, HIV

19                    screening tests, and pregnancy tests.  Most of these high-volume

20                    tests are performed by automated equipment and the results are

21                    generally reported electronically to the physician within a 24-hour

22                    period.  As physicians tend to prefer to have routine testing

23                    specimens performed in laboratories that do not require air

24                    transportation of specimens to the laboratory, the relevant geographic

25                    markets for routine diagnostic testing services are regional in nature.

26                    Physicians can reasonably turn to laboratories in these regional areas

27                    for needed routine diagnostic testing.  The Routine Clinical

28                    Laboratory Testing market does not include laboratory testing for

hospital inpatients conducted by in-hospital laboratories. The pertinent geographic market for Routine Clinical Laboratory Testing, for purposes of the conduct alleged in this Complaint, is the Northern California region (Fresno to the Oregon border).

b.      Anatomic Pathology Laboratory Testing:  Anatomic pathology laboratories generally analyze tissue samples in connection with the diagnosis of disease.  As with routine Clinical Laboratory Testing, the relevant geographic markets for routine anatomic pathology testing services are regional in nature.  The pertinent geographic market for Anatomic Pathology Laboratory Testing, for purposes of the conduct alleged in this Complaint, is the Northern California region.

c.      Specialty Rheumatological Laboratory Testing:  Several sub-specialties of modern medicine rely for diagnosis and treatment on specialized laboratory tests that are performed less frequently and require more sophisticated and specialized knowledge or equipment not provided by most Routine Clinical Laboratory Testing companies.  One category of such specialty or "esoteric" testing is Specialty Rheumatological Laboratory Testing, which includes highly specialized tests utilized by rheumatologists in diagnosing and treating disorders of the autoimmune system.  Physicians ordering specialized laboratory tests commonly do so from laboratories far outside of their geographic area, and the pertinent geographic market for Specialty Rheumatological Laboratory Testing, for purposes of the conduct alleged in this Complaint, is the entire United States.

d.      Advanced Lipid Testing:  Advanced Lipid Testing is another form of specialized, esoteric laboratory testing, requiring sophisticated and

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**COMPLAINT**                                                                                    8

1    specialized knowledge or equipment not provided by most Routine

2    Clinical Laboratory Testing companies.  Advanced lipid Testing

3    helps identify coronary heart disease risk factors that standard

4    cholesterol and other basic blood tests do not, and provides more

5    information to guide the most efficacious course of therapy to

6    prevent or reverse heart disease.  The pertinent geographic market

7    for Advanced Lipid Testing, for purposes of the conduct alleged in

8    this Complaint, is the entire United States.

9    e.    Specialty Breast Pathology Testing:  Breast Pathology focuses on

10    highly specialized analysis of breast biopsy tissue for the diagnosis

11    and prognosis primarily of breast cancer.  Physicians in California

12    ordering specialized Breast Pathology tests commonly do so from

13    laboratories throughout California, and the pertinent geographic

14    market for Specialty Breast Patholgy Testing, for purposes of the

15    conduct alleged in this Complaint, is California.

16    **B.**   **The Blue Card Association Conspired with Quest Diagnostics to**

17    **Suppress Competition Through Changes to the Blue Card Policy**

18    27.    The first category of conduct by which Defendants are harming competition

19    is through changes to the "Blue Card" policy.  This conduct impacts Plaintiffs HUNTER

20    and RDL, in the Advanced Lipid Testing market and the Specialty Rheumatological

21    Laboratory Testing market, respectively, described above.

22    28.    Blue Cross and Blue Shield insure approximately 32% of the U.S.

23    population.  The BLUE CARD ASSOCIATION licenses the Blue Cross and Blue Shield

24    names and marks to each of the Blue Plans in the Association, including BLUE CROSS

25    AND BLUE SHIELD OF CALIFORNIA.   Each Licensing Agreement contains certain

26    requirements and restrictions regarding the Blue Plans' operations, including enrollment

27    and plan governance requirements.  Since 2004, each Blue Plan has been permitted by the

28    terms of the Agreement to contract with independent clinical labs located within or

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

1  outside of the Blue Plan's state or territory.

2      29.    The new Licensing Agreement fundamentally changes the way that

3  independent regional laboratories must submit claims for patients covered by a Blue Plan.

4  Historically, these laboratories have submitted claims for services furnished to Blue Card

5  members from a different state to the Blue Plan where the performing laboratory is

6  located (with respect to Plaintiffs, for example, BLUE SHIELD OF CALIFORNIA). The

7  local Blue Plan then has worked with the member's own Blue Plan to adjudicate the

8  claim, and the member's cost-sharing amount was calculated at the in-network rate based

9  on the provider status of the performing laboratory and the Plan to which the claim was

10  submitted.

11      30.    The new, revised Licensing Agreement requires laboratories to submit Blue

12  Card members' claims to the Blue Plan provider in whose region the patient is insured.

13  They must be billed by the laboratory which performs the test. If the patient is not

14  insured in the region where the laboratory services are performed, then the Blue Plan in

15  the laboratory's region will not adjudicate the claim.

16      31.    Under these changes, the performing laboratory must now submit a claim to

17  the Blue Plan for that patient's region, even though the laboratory may not be a contracted

18  provider for that particular Blue Plan. With respect to tests performed by Plaintiffs, for

19  example, BLUE SHIELD OF CALIFORNIA will refuse to accept claims for Blue Plan

20  patients outside of California. This change requires laboratories to develop completely

21  new claims submission processes that cross reference each patient to the appropriate Blue

22  Plan coverage area, regardless of where the patient's sample was drawn or the lab is

23  located. For example, if a patient insured with the Blue Card in Arizona is on vacation in

24  California and needs laboratory testing, BLUE CROSS AND BLUE SHIELD OF

25  CALIFORNIA will not pay for the test performed in California on a blood specimen

26  collected in California. As Defendants know, it is impossible for independent

27  laboratories such as Plaintiffs to obtain in-network status with each Blue Plan in which a

28  specimen is drawn. As a result, independent laboratories will lose business to the only

1   two in-network laboratories for all Blue Plans, the largest of which is QUEST. Moreover,

2   the Blue Plan may be a primary or secondary to another insurance who will reject the

3   claim because of the change in point-of-service field on the claim form.

4       32.    The new Blue Card Policy also alters the payment structure for laboratories

5   that are out-of-network. Under the Blue Card Policy, when an out-of-network laboratory

6   submits a claim to the relevant Blue Plan, the Blue Plan, in violation of California law,

7   now pays the patient directly, rather than the laboratory who has obtained the assignment

8   of the benefits from the patient. This practice is confusing to patients as they often do not

9   know that they are required to forward such payments to the laboratory which performed

10  the test. The practice of paying patients directly, rather than laboratories that have

11  obtained the assignment of benefits from the patients is disastrous to the independent

12  laboratories' billing process, as when out-of-network labs attempt to collect the money

13  from patients, the patients have often spent the money unaware that it was to be

14  forwarded to the laboratory.

15      33.    Implementation of the new Blue Card policy harms competition by

16  molecular, anatomic pathology, and other specialty labs to the benefit of QUEST. Due to

17  this change, physicians are likely to steer business to QUEST and away from out-of-state

18  specialty labs, which would be more expensive out-of-network providers under the Blue

19  Plans. QUEST will continue to be an in-network provider (wherever a specimen is

20  collected), and will gain new, substantial advantages over its competitors.

21      34.    The effect of the change in the Blue Card policy is to drive the Blue Plans

22  into nearly exclusive arrangements with QUEST. Specialty labs which receive specimens

23  from several local Plan service areas, but perform the services in one physical location

24  cannot contract with thirty-eight (38) Blue Plans to maintain in-network status. A

25  substantial share of the market will be foreclosed to speciality labs; indeed, the majority

26  of these Plans will not consider entering into such contracts because the labs do not have

27  a physical presence in the Plan's state or territory, many of the Plans simply refuse to add

28  additional labs, and a few of the plans have exclusive contracts with QUEST. Even the

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**COMPLAINT**                                                                                              11

1  most distinguished reference labs in the country will see dramatic reductions in revenue

2  due to this change as they are out-of-network for almost all Blue Plan regions.

3      35.      Hundreds of molecular and specialized labs that have developed cutting

4  edge technology will perish in short order under the Blue Card change. For example,

5  Plaintiff RDL's MYOMARKER™ test for Myositis is so unique that a prominent national

6  clinic refers this test to RDL. Although QUEST offers a somewhat similar test, it does

7  not include important components that are clinical markers for cancer and lung disease, as

8  RDL's test does. Furthermore, there are a number of other examples of other test assays

9  only performed by RDL. The Blue Card change will severely constrain competition in

10  the Specialty Rheumatological Laboratory Testing market.

11      36.      Similarly, with the termination of the Blue Card Program, Hunter's

12  HunterHeart program will have much greater difficulty competing with QUEST's

13  Berkeley Heart Cardiovascular program in the Advanced Lipid Testing market simply

14  because Berkeley Heart is in-network and HunterHeart is not. Outside of Hunter Lab's

15  local plan area, many physician clients will quickly transfer all of their specialized

16  cardiovascular testing to QUEST's Berkeley Heart lab to secure a lower price for their

17  patients. Physicians do not like responding to patient complaints that they were charged

18  more money because the physician did not use an in-network lab.

19      37.      As a result, patient care will suffer. For example, Hunter is the only lab

20  with a personalized algorithm for preventing and managing cardiovascular disease, which

21  USA Today reported results in direct costs to the country $131 billion annually. Today,

22  heart disease is preventable in just about all people if their risks are identified early

23  enough with the right tests, and they take advantage of newer personalized therapies for

24  their risks. The HunterHeart algorithm can save billions of dollars each year in costs for

25  heart attacks and strokes that can be prevented.

26      38.      Similarly, Hunter Labs provides the most accurate test for HPV on the

27  market for women under age thirty. HPV causes more than 99% of all cervical cancers.

28  The HPV DNA tests offered by QUEST and other labs are not recommended nor cleared

by the FDA for women under 30 because their predictive value is so poor.  Hunter's HPV test, in contrast, is effective in all age groups, and reduces unnecessary, expensive and invasive procedures that can scar the cervix and, in some cases, render women unable to conceive.  Women under 30 will be left without access to this important test if Defendants continue the conduct described herein.

39.     Innovative molecular and speciality labs across the country will face the same fate.  With this exclusionary tactic, QUEST will be able to effectively lock-out many molecular and specialty lab competitors offering superior diagnostic tests and services.  Molecular testing is a $5 billion industry that has been reported to save $40 billion a year by more appropriately directing health care. Unfortunately, most molecular labs are not yet profitable.  This anti-competitive tactic is forcing labs to sell to QUEST and is the primary way QUEST has grown, since it is not able to compete based on service.  The Blue Card termination could decimate the entire molecular industry in a matter of months.

40.     More importantly, it is the patient and the physician, not the health insurance company, that are impacted by the suppression of crucial testing choice and access to innovation that can better identify disease and/ or appropriate treatment.

41.     Upon information and belief, QUEST acted in concert with the BLUE CARD ASSOCIATION to promote this exclusionary change in Blue Card Policy. Members of the American Clinical Laboratory Association ("ACLA") have expressed deep concern about the Blue Card change.  The ACLA represents the nation's national and regional clinical laboratories on key issues of common concern. At the behest of independent labs, the ACLA drafted a thoughtful and strong protest to the BLUE CARD ASSOCIATION, however, as QUEST is the largest contributor to the ACLA's funding, QUEST vetoed the transmittal of the letter of protest.  Thus, QUEST manipulated a trade association to exclude competition from independent regional labs and indirectly to harm patient care.  This conduct demonstrates that QUEST was well aware of the anti-competitive nature of the change in policy and its potentially devastating effect on

1    competitors.

2        42.    In response to concerns expressed by the California Clinical Laboratory

3    Association to the BLUE CARD ASSOCIATION in an April 5, 2012 letter about the

4    effects of this termination on California laboratories and patient care, the Association

5    responded that laboratories could contact Jim Barkach to discuss national partnership

6    Agreements.  Mr. Barkach never responded to the repeated phone calls and emails from

7    the CEO of Hunter Labs, or the CEO of a company that negotiates insurance contracts for

8    laboratories across the county.  When the latter CEO was able to secure Mr. Barkach's

9    personal cell phone number and was finally able to speak with Mr. Barkach, he was told

10   that no laboratories could match the "deal" that the Association had with QUEST and

11   hung up.  The BLUE CARD ASSOCIATION and QUEST have thus conspired to restrain

12   Plaintiffs and other small laboratories from even negotiating or discussing the opportunity

13   to continue providing service to the BLUE CARD ASSOCIATION's members on an in-

14   network basis.

15       **C.    Quest Engages in Below Cost Capitated Contracts**

16       43.    One of the principal illegal means used by QUEST to exclude competition

17   from all five of the markets at issue in this complaint, is contracting with physician

18   groups on a "loss-leader" capitated basis.  A capitated rate is a fixed price charged by

19   QUEST, for all lab test services, per patient, usually on a monthly basis.  In the lab

20   setting, these capitated rates are commonly offered by labs to Independent Physician

21   Associations ("IPAs").  Thus, for example, a given IPA may have 1,000 patient members.

22   QUEST will offer the IPA a capitated rate of $1.00.  The IPA therefore pays QUEST

23   $1,000 per month ($1.00 per member x 1000 members), for **all** the lab tests that the IPA's

24   physicians order for those member patients in any given month.

25       44.    As with FFS discounts, QUEST uses the discounted capitated rates in order

26   to lock out competition, and induce referral of Medicare, Medi-Cal, and other pull-

27   through business, in violation of the anti-kickback statutes.  The capitated rates offered by

28   QUEST are, in most cases, so low that QUEST loses money on the capitated

arrangements. QUEST provides the capitated prices, however, as an inducement to its customers to refer all of their lab testing business to QUEST, which QUEST charges on a lucrative, FFS basis. If a customer who received discounted capitated rates is not referring enough pull-through business to QUEST, QUEST will "pull," or threaten to pull, the discounted capitated rates from that customer.

45. Because QUEST's competitors, including Plaintiffs, are unwilling to violate the law by offering such loss-leader capitated rates, QUEST's capitated discounts have the effect of eliminating competition from each of the five markets at issue in this Complaint.

46. The capitated discounts not only preclude competition with respect to the tests covered by the capitated arrangement, but also preclude competition with respect to the FFS business that QUEST requires capitated customers to refer to QUEST in exchange for the capitated discounts. The FFS business is a highly profitable segment of the testing business, and the denial of such business to independent regional labs significantly weakens them competitively. For example, Medicare pull-through business, which is usually reimbursed on a FFS basis, is highly attractive because:

    (A)    Medicare reimburses for laboratory tests at substantially higher rates than discounted FFS or capitated plans.

    (B)    Medicare business typically represents higher specimen volumes than other payers, because older patients tend to make more doctor visits are require more lab tests. A "specimen" in the terminology of the independent clinical laboratory industry, is the individual blood sample taken from a patient.

    (C)    Medicare reimburses for laboratory tests more quickly than most other payers;

    (D)    All Medicare business is billed electronically, with no costly paperwork involved and few costly collection efforts; and

    (E)    Physicians are familiar with the uniform methods for coding and payment used by Medicare, and therefore relatively few claims are disputed by Medicare.

Top-level QUEST executives have demanded that QUEST's sales force induce HMO physicians to refer Medicare and other FFS pull-through business to QUEST, and

1   have prevailed upon HMOs to make clear to their network physicians that QUEST's

2   low-cost capitation pricing is only sustainable in return for their physicians' referral of

3   Medicare and other FFS work.  These executives have actively and directly participated in

4   "anti-leak initiatives" and prepared monthly spreadsheet reports tracking the lab ordering

5   activities of the managed care physicians.

6       47.    QUEST actively tracks the "loss leading" contribution to margin from

7   capitated accessions and the associated profitable "pull-through" Medicare, Medicaid,

8   and other FFS business. QUEST thus provides loss-leader discounts to its customers

9   using capitated rates in order to induce the referral of pull-through business paid for by

10   Medicare, Medicaid, and other third party payers.  QUEST does not offer the same

11   discounts to Medicare, Medicaid, and others, and is therefore able to make great profits

12   on the pull-through, and make up for the losses on the discounted capitated rate.

13       48.    If a customer does not refer enough Medicare, Medicaid, and other

14   pull-through business to QUEST, QUEST does not offer, or discontinues, the discounted

15   rates.  Because it knows the loss-leader pull-through is illegal, QUEST conceals its

16   practices.

17       49.    Providing kickbacks in the form of exclusive loss-leader capitated discounts

18   had been, and continues to be, at the core of QUEST's exclusionary business models.  As

19   Louis Tzoumbas (a former Sales Manager for both QUEST and LabCorp) noted at a

20   national meeting of laboratory executives in 2007, labs can be "locked out" of markets by

21   capitation contracts.

22       50.    This is exactly what has happened to PACIFIC BREAST PATHOLOGY,

23   which was incorporated in June 2011.  After receiving its license in September 2011,

24   PACIFIC BREAST PATHOLOGY found itself locked out of the market due to the

25   combination of exclusive arrangements described below and illegal below cost capitated

26   contracting by QUEST.  Since January 2, 2012, PACIFIC BREAST PATHOLOGY has

27   been effectively blocked from the market as a result of Defendants' conduct, as it cannot

28   obtain contracts with insurers due to QUEST's practice of illegal below cost exclusive

1  capitated contracting, and deeply discounted FFS contracting for PPO contracts that

2  require exclusion of other labs in exchange for the discounts. Further, HUNTER LABS,

3  SURGICAL PATHOLOGY, and other competitors of QUEST have also lost substantial

4  amounts of business as a direct result of these illegal, exclusive capitated contracts.

5      51.  QUEST's loss-leader capitated contracts are specifically designed to injure

6  competitors and destroy competition, and violate the explicit prohibitions of California

7  Business and Professions Code § 17043.

8      **D.**  **Aetna Conspired with Quest to Exclude Four Hundred Regional Labs**

9          **from Aetna's Network in Exchange for Discounts**

10      52.  The next category of conduct by which Defendants have illegally

11  constrained competition is through the elimination or exclusion of regional laboratories

12  from AETNA's provider network. This conduct impacts Plaintiffs in all five markets

13  described above.

14      53.  QUEST has a "preferred national provider" contract with AETNA to serve

15  AETNA's HMO-based, point-of-service, and physician office members. AETNA is one

16  of the three largest health plans in the United States in terms of plan members. Under this

17  agreement, which applies in the relevant geographic markets, AETNA steers its

18  physicians' lab testing to QUEST.

19      54.  The manager of a Northern California physician's office, that of Dr. Henry

20  Hamilton, recently told a Hunter Labs Vice President that, because QUEST is the only

21  "preferred laboratory vendor" for AETNA, patients would not pay deductibles and

22  co-payments for QUEST services. Likewise, PACIFIC BREAST PATHOLOGY has

23  similarly found itself excluded from procuring AETNA in-network status. This places

24  HUNTER LABS, PACIFIC BREAST PATHOLOGY, and other regional labs at a

25  tremendous competitive disadvantage.

26      55.  Plaintiff RHEUMATOLOGY DIAGNOSTICS also found itself in a similar

27  position several years ago, as AETNA dropped RHEUMATOLOGY DIAGNOSTICS

28  from in-network status, which directly resulted in a substantial loss of business.

1  RHEUMATOLOGY DIAGNOSTICS has several proprietary tests which are better

2  quality and more comprehensive than QUEST's, but has been unable to compete due to

3  QUEST's conspiracy with the other named Defendants.  These anti-competitive tactics

4  employed by Defendants harm the quality of testing availably, which directly impacts the

5  quality of patient care, as diseases are missed by QUEST's inferior testing services and

6  patients suffer as a result.

7        56.    Worse still, upon information and belief, QUEST approached AETNA in

8  October 2011, and pushed for an exclusive nationwide contract in exchange for steep

9  discounts.  While AETNA refused to enter into the exclusive contract, AETNA did agree

10  to terminate four hundred (400) regional lab contracts across the United States, including

11  in California.  These terminations increased QUEST's dominance in multiple regional

12  markets including New York City, New Jersey, Philadelphia, and California.  In

13  California this has included the termination of Hunter Labs, the only remaining

14  substantial in-network competitor of QUEST in Northern California.

15        57.    AETNA has since rejected multiple requests for independent laboratories to

16  be added to its network, based on QUEST's refusal to allow such new additions.

17  Furthermore, upon information and belief, QUEST and CareCore, a QUEST healthcare

18  management company and consultant, are working together on behalf of AETNA as

19  agents or consultants.

20        58.    QUEST has bargained for right-of-first refusal contracts with AETNA

21  under which QUEST controls entry into markets. These contracts require the plans to

22  contact QUEST before entering a new contract.  For example, if a regional lab wants to

23  launch a new network of hospital labs (including outreach labs) in a regional market,

24  AETNA will not consider contracting with that network until they vet the plan with

25  QUEST.  QUEST thus restrains laboratories from even negotiating with AETNA to

26  become preferred providers.

27        59.    Moreover, due to its relationship with QUEST, AETNA refuses even to

28  negotiate with or consider contracting with other laboratories.  For example, HUNTER

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**COMPLAINT**                                              18

1   offered AETNA a 90% discount to remain in network, which was rejected. QUEST has

2   co-opted AETNA to the detriment of AETNA's patients and serving physicians by

3   increasing AETNA's profits with greatly reduced pricing at the cost of suppressing

4   competition, which harms patients who suffer from a reduction in the quality of

5   laboratory testing and innovation, while paying monopolistic pricing through insurance

6   premiums and co-payments.

7          60.    AETNA has gone so far as to harass and coerce physicians and patients not

8   to use out-of-network competitors of QUEST, even though AETNA patient contracts

9   allow such use. Thus, QUEST has offered price incentives to AETNA substantial enough

10  to make AETNA willing to violate hundreds of its own patient contracts.

11         61.    The exclusion of QUEST's competitors with AETNA's assistance has

12  strongly suppressed competition. As out-of-network compensation for patients is

13  significantly less, the excluded labs immediately become substantially less competitive.

14  Further, AETNA strongly discourages patients and physicians from using out-of network

15  services and requires patients to pay significantly more for using out-of-network services.

16         **E.**    **Aetna and Quest Have Implemented Bonus Pool Agreements**

17         62.    As part of the exclusive capitation contracting scheme detailed above,

18  AETNA and QUEST have created physician bonus pools to induce participating

19  physicians to refer all of their lab tests to QUEST. The basic scheme is as follows:

20  amounts are added by the HMOs (including AETNA) to the bonus pools, but the money

21  is held until expenses incurred for out-of-network testing are deducted. Surpluses in the

22  bonus pools are then shared with physicians.

23         63.    These bonus pools induce physician groups to refer lucrative FFS Medicare

24  pull-through business to QUEST, not its regional lab competitors. The doctors are urged

25  by AETNA to do so, and they know that their bonus payments will be reduced by leakage

26  elsewhere.

27         64.    As a results of AETNA's and QUEST's concerted and coercive action, the

28  pools steer much of the physician lab business to QUEST, both capitated and

1  FFS/Medicare business. When the bonus pool arrangement between AETNA and

2  QUEST was implemented, QUEST's Medicare revenue grew by hundreds of millions of

3  dollars nationwide, to the detriment of independent regional lab competitors such as

4  Hunter Labs, who lost business as a result of these practices. This practice threatens

5  competition in all five of the product markets described in this complaint.

6  **F.**     **Blue Shield of California Accepted a Ten (10) Percent Discount on Lab**

7            **Testing from Quest in Exchange for the Exclusion of Westcliff and**

8            **Hunter Labs from In-Network**

9      65.    QUEST's cooperation with AETNA to eliminate its regional competitors

10  mirrors prior QUEST conduct with BLUE SHIELD OF CALIFORNIA. QUEST

11  successfully offered BLUE SHIELD OF CALIFORNIA a ten (10) percent discount on

12  lab testing on the condition that it exclude Westcliff (then, before its acquisition by

13  LabCorp, the largest privately owned lab in California with annual revenue of

14  approximately $90 million) and Hunter Labs from its network. This has had the effect of

15  substantially lessening Hunter Labs' competitive position in the Routine Clinical

16  Laboratory Testing market, since BLUE SHIELD OF CALIFORNIA is the number three

17  provider of health care in California, with approximately three million enrollees.

18      66.    Shortly after termination, Westcliff went into bankruptcy and was acquired

19  by LabCorp. QUEST sales representatives immediately approached physicians to inform

20  them how much more money their patients would pay if they used Hunter Labs

21  out-of-network and threatened that QUEST would soon drive Hunter Labs into

22  bankruptcy, just like QUEST did to Westcliff. In addition, QUEST recommended that

23  Hunter Lab clients avoid service disruptions from imminent bankruptcy by sending their

24  patients to QUEST. Due to these threats and coercion, Hunter Labs has lost physician

25  business to QUEST. Hunter Labs has therefore had increasing difficulty selling new

26  accounts, and it believes that the Blue Card policy change and the AETNA termination

27  could force it from the market in the near future.

28

**G.     Quest has Illegally Waived out of Network Co-Pay or Deductible Obligations for Competitive Advantage**

67.     In furtherance of the conspiracy to monopolize routine, molecular, and speciality testing services in California, QUEST has been illegally capping patient obligations or waiving all patient co-pay and deductible charges.  This is simply a form of illegal remuneration, which QUEST has engaged in, in furtherance of its conspiracy to prevent physicians from using competitor labs.  These patient costs can amount to hundreds of dollars per lab invoice.  For patients with chronic diseases, such as heart disease, that require frequent tests, these co-pays and deductibles can amount to thousands of dollars a year.  Though QUEST may lose money on such patients, it makes up the losses with "pull-through" business paid for by Medicare, Medicaid, and other third-party insurance, discussed above.

68.     Because waiving these deductibles and co-pays is a significant benefit that a physician can provide to their patients, waiving patients payments to obtain physician Medicare and Medicaid business is prohibited by federal and state anti-kickback laws. The illegal nature of waiver of patient obligations is clear if the benefits are conferred as inducements for physicians to refer Medicare and Medicaid pull-through to QUEST.

69.     Because other laboratory providers, such as Plaintiffs, are unwilling to violate the law by waiving or capping deductibles and co-pays, QUEST's conduct has the effect of limiting competition in all five of the product markets at issue in this Complaint.

**H.     Defendants' Conduct Limits Competition and Increases Quest's Monopoly Power**

70.     The combined effect of the above-described conduct has been disastrous for competition in all five of the product markets at issue.

71.     The BLUE CARD ASSOCIATION affiliates provide healthcare coverage for approximately 32% of the entire population of the United States.  AETNA provides healthcare coverage to another 9% of the population.  Exclusion from the BLUE CARD and AETNA networks thus effectively precludes Plaintiffs and other independent

laboratories from serving over 40% of the population. The impact, however, extends even further. When a lab is unable to serve a significant portion of a physician's patients on an in-network basis, most physicians will quickly turn **all** of their business to a laboratory than can – in this case, QUEST. Accordingly, loss of in-network status with respect to as little as 10% of a physician's patients can cause a laboratory to be dropped from use by the physician, completely.

72.     This decrease in competition ultimately leads to a decrease in the quality of patient care. There is considerable variability in the quality and responsiveness of routine and specialty testing among competitors. In particular, QUEST is driven by the achievement of testing volumes, not quality and innovation. The continued suppression of specialty testing competition and innovation resulting from the conduct alleged herein sets back improvement in patient care for years and creates untold and unnecessary deterioration in patient health.

73.     QUEST is the largest laboratory in the world, and its market power is demonstrated by its ability to maintain dominance over relevant regional markets of concern even though it has been known to offer inferior or fraudulent service.

- In April 2009, QUEST pled guilty to a criminal felony for incorrect parathyroid test results and paid a criminal fine of $40 million in addition to civil fines of $262 million to the federal government. These incorrect test results led to thousands of patients having unnecessary and life-changing surgery to remove their parathyroid gland;

- In January 2009 QUEST was forced by regulatory agencies into the largest recall in industry history for inaccurate Vitamin D test results;

- Last year QUEST was forced to pay $241 million to the State of California to settle false claims resulting from fraudulent billing; and

- In the last ten years QUEST has been fined two times by the federal government for its deceptive billing practices and in 2003 was ordered by the New York Attorney General to cease double billing for tests.

73.     Physicians often complain about the poor routine testing service of QUEST, but are forced by QUEST's exclusionary practices with Defendant health insurance companies and others. Physicians continue to utilize QUEST because they are directed by QUEST's co-conspirators to do so.

74.     The barriers to entry and expansion facing QUEST's competitors in the regional relevant markets for the sale of specialty testing are also high.  By their very nature, cutting-edge and complex speciality testing services involve proprietary processes and technologies which are costly and difficult to replicate by new entrants.  QUEST's speciality testing competitors do not enjoy the same nationwide advantages of QUEST when it comes to testing referrals needed to generate testing volume and reduce average cost and pricing.  For example, QUEST's exclusive preferred provider status with AETNA creates a large volume of referrals to QUEST not enjoyed by its competitors.  Also, QUEST's conduct aimed at obtaining exclusivity over routine testing enables QUEST to enjoy advantages not enjoyed by other competitors as to specialty testing referrals.  Physicians often prefer "one stop shopping" for all clinical testing.  Fueled by QUEST's exclusionary contracting and acquisitions, the company has captured a 70% market share of the Northern California physician outpatient market.

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (Against All Defendants)

### Violation of the California Cartwright Act,

### Cal. Bus. & Prof. Code § 16700 *et seq.*

74.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

75.     As set forth herein, Defendants created, operated, aided, or abetted a trust, combine, or monopoly of molecular, specialty, and routine diagnostic testing by fixing, controlling, or maintaining prices in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*  Defendants' unlawful conduct had the following effects:

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**COMPLAINT**                                                                                 23

1   (1) the suppression of routine, molecular, and other specialty lab competition through

2   conspiratorial changes to the Blue Card Policy; (2) AETNA's termination of four hundred

3   laboratories from AETNA's network in exchange for discounts from QUEST; (3) BLUE

4   SHIELD OF CALIFORNIA's termination of Hunter Labs' in-network status as a result

5   incentives from QUEST; and (4) the locking out of regional laboratories from the market

6   through capitated contracts, bonus pool agreements, and the illegal waiver of co-pay or

7   deductible obligations.

8       76.    Defendants conspired to suppress competition for routine, molecular, and

9   specialty testing. Defendants agreed not to divulge the existence of the conspiracy,

10  conducted meetings and conversations in secret, confined the plan to a small group of

11  high-level officials, and avoided the creation of documents. United by their common

12  interests, Defendants colluded to substantially limit, lessen, and exclude competition.

13  Defendants reduced the provision of molecular and routine testing, which prevented and

14  restrained trade and commerce. With the ability to preclude free and unrestricted

15  competition, Defendants reduced the provision of molecular and routine testing services.

16  Defendants exclusionary acts amount to a substantial foreclosure of competitors' business

17  opportunities by a firm with market power.

18      77.    Plaintiffs have suffered an ascertainable loss of money or property from the

19  loss of business.

20      78.    Defendants' conduct is a substantial factor in Plaintiffs' loss. The loss was

21  a direct and proximate result of Defendants' willful conspiracy to restrain trade and lessen

22  competition.

23      79.    As Defendants created, operated, aided, or abetted a trust with the purpose

24  of lessening competition for molecular and routine laboratory testing in violation of the

25  California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, Plaintiffs,

26  accordingly, seek damages and injunctive relief pursuant to Cal. Bus. & Prof. Code §

27  16750.

28

80.     As a direct and legal result of the acts of Defendants and their unnamed co-conspirators, Plaintiffs were required to file this action, resulting in ongoing attorneys' fees, costs, and other expenses for which they seek recovery according to proof.

81.     Pursuant to the Cartwright Act, Plaintiffs are authorized to recover three times the damages they sustained plus interest and reasonable attorneys' fees, costs, and expenses.

## SECOND CAUSE OF ACTION

### (Against All Defendants)

### Violation of California's Unfair Competition Law,

### Cal. Bus.& Prof. Code § 17200 *et seq.*

82.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in this Complaint.

83.     The actions of Defendants and the unnamed co-conspirators as alleged herein constituted unlawful, unfair, and/or fraudulent business practices in violation of California Business and Professions Code § 17200 *et seq.*

84.     Defendants committed and continue to commit acts of unfair competition, as defined by § 17200 *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

85.     This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

86.     Defendants' conduct as alleged herein violated § 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code § 17200 *et seq.*, including, but not limited to violations of the Cartwright Act, and Business and

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

1 | Professions Code § 17043, as set forth above.

2 |      87.    Defendants' acts, omissions, misrepresentations, practices, and non-

3 | disclosures, as described above, whether or not in violation of § 16700 *et seq.* of the

4 | California Business and Professions Code, and whether or not concerted or independent

5 | acts, are otherwise unfair, unlawful, and/or fraudulent.

6 |      88.    Defendants' acts or practices are unfair to consumers of diagnostic testing

7 | and are unfair to competitors of QUEST as the practices threaten an incipient violation of

8 | state anti-trust laws.

9 |      89.    Plaintiffs are entitled to full restitution of all revenues, earnings, profits,

10 | compensation, and benefits that may have been obtained by defendants as a result of such

11 | business acts or practices and at the expense of Plaintiffs.

12 |      90.    The illegal conduct alleged herein is continuing and there is no indication

13 | that defendants will not continue such activity into the future

14 |      91.    The unlawful and unfair business practice of Defendants, and each of them,

15 | as described above, have caused and continue to cause damages to Plaintiffs due to: (1)

16 | the suppression of routine, molecular, and other specialty lab competition  through

17 | conspiratorial changes to the Blue Card Policy;  (2) AETNA's termination of four

18 | hundred laboratories from AETNA's network in exchange for discounts from QUEST;

19 | (3) BLUE SHIELD OF CALIFORNIA's termination of Hunter Labs' in-network status

20 | as a result incentives from QUEST; and (4) the locking out of regional laboratories from

21 | the market through capitated contracts, bonus pool agreements, and the illegal waiver of

22 | co-pay or deductible obligations.

23 |      92.    The conduct of Defendants as alleged in this Complaint violates § 17200 of

24 | the California Business and Professions Code.

25 |      93.    As alleged in this Complaint, Defendants and their co-conspirators have

26 | been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair

27 | competition.  Plaintiffs are accordingly entitled to equitable relief including restitution of

28 | all revenues, earnings, profits, compensation, and benefits that may have been obtained by

1    Defendants as a result of such business practices and at the expense of Plaintiffs, pursuant

2    to the California Business and Professions Code, §§ 17203 and 17204.

3                              **THIRD CAUSE OF ACTION**

4                                  **(Against QUEST)**

5                          **Violation of Unfair Practices Act**

6         94.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and

7    every allegation set forth in the preceding paragraphs of this Complaint.

8         95.    Defendant QUEST sold, and continues to sell, laboratory services below

9    cost, on a loss leader, capitated basis to induce valuable FFS pull through, in violation of

10   Cal. Bus. & Prof. Code §§ 17043, 17044.

11        96.    Defendant QUEST performed the above-mentioned acts for the purpose of

12   injuring Plaintiffs and destroying competition.

13        97.    As a proximate result of the above mentioned acts of Defendant, Plaintiffs

14   have been deprived of the patronage of a large number of their actual and potential

15   customers.  Defendant's conduct has in fact proximately caused damages to Plaintiffs in

16   an amount to be proved at trial.

17        98.    Defendant threatens to, and unless restrained, will continue to contract with

18   healthcare providers for laboratory testing services on a loss leader capitated basis.

19                             **FOURTH CAUSE OF ACTION**

20                              **(Against All Defendants)**

21       **Intentional Interference with Prospective Economic Advantage**

22        99.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and

23   every allegation set forth in the preceding paragraphs of this Complaint.

24        100.   A prospective economic advantage exists between out-of-network

25   laboratories and AETNA and BLUE SHIELD OF CALIFORNIA members, as well as

26   between out of network laboratories and AETNA and BLUE SHIELD OF

27   CALIFORNIA's in-network physicians, both of which contain the probability of future

28   economic benefits to out-of-network laboratories that have not been realized due to

1  Defendants' misconduct. Plaintiffs are informed and believe that AETNA and BLUE

2  SHIELD OF CALIFORNIA physicians want to refer patients to out-of-network

3  laboratories, but are prevented from doing so through the enactment of the Blue Plan and

4  through the practice of exclusive, illegal, below cost capitated contracts. The established

5  track record before Defendants' actions shows that out-of-network laboratories almost

6  certainly would have received more AETNA and BLUE SHIELD OF CALIFORNIA

7  members utilizing out-of-network laboratories absent the interference.

8       101.    Defendant QUEST at all relevant times knew of the existence of the

9  prospective economic relationship between out-of-network laboratories and patients

10  enrolled in AETNA and BLUE SHIELD OF CALIFORNIA health plans, as well as the

11  existence of the prospective economic relationship between out-of-network laboratories

12  and AETNA and BLUE SHIELD OF CALIFORNIA contracted physicians. Indeed,

13  Plaintiffs are informed and believe that the reason why Defendants conspired to change

14  the Blue Plan and engaged in the illegal practice of below cost, exclusive capitated

15  contracting is to reduce the number of AETNA and BLUE SHIELD OF CALIFORNIA

16  members using out-of-network laboratory services.

17       102.    Defendants' misconduct alleged above is independently wrongful, it

18  violates several statutes and regulations set forth above.

19       103.    Defendants have damaged Plaintiffs by: (a) engaging in illegal, below cost

20  capitated contracting to divert business to QUEST and away from Plaintiffs; (b)

21  conspiring to change the Blue Plan as to preclude Plaintiffs from maintaining in-network

22  status; and (c) conspiring to exclude Plaintiffs from in-network status.

23       104.    The foregoing conduct of Defendants is the result of willful and malicious

24  or intentionally deceptive conduct, or conduct that manifests a knowing and reckless

25  indifference toward, and disregard of, the rights of Plaintiffs.

26       105.    Defendants' wrongful acts were designed to interfere with Plaintiffs'

27  prospective economic relationships with patients and physicians, and Defendants engaged

28  in these wrongful acts knowing that the interference was certain or substantially certain to

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**COMPLAINT**                                                                      28

1  occur as a result of its actions.

2      106.    Defendants' conduct has actually disrupted Plaintiffs' relationships with

3  patients and physicians.

4      107.    Defendants' conduct has in fact proximately caused damages to Plaintiffs in

5  an amount to be proved at trial.

6      108.    Plaintiffs also seek an injunction prohibiting Defendants' ongoing conduct

7  in interfering with Plaintiffs' prospective economic advantage.  Plaintiffs' legal remedies

8  are inadequate in that Defendants' conduct is ongoing and will continually injure

9  Plaintiffs, including out-of-network laboratories' reputation and business good will in the

10  community.  Repeated litigation to correct this injury is inefficient for the parties and the

11  Court.

12      109.    The foregoing conduct of Defendants is the result of willful and malicious

13  or intentionally deceptive conduct, or conduct that manifests a knowing and reckless

14  indifference toward, and disregard of, the rights of Plaintiffs.  Defendants acted in

15  conscious disregard of the rights of Plaintiffs, patients, and their physicians. Plaintiffs

16  therefore are entitled to punitive damages.

17                      **FIFTH CAUSE OF ACTION**

18                      (Against All Defendants)

19          **Negligent Interference with Prospective Economic Advantage**

20      110.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and

21  every allegation set forth in the preceding paragraphs of this Complaint.

22      111.    A prospective economic advantage exists between out-of-network

23  laboratories and AETNA and BLUE SHIELD OF CALIFORNIA members, as well as

24  between out of network laboratories and AETNA and BLUE SHIELD OF

25  CALIFORNIA's in-network physicians, both of which contain the probability of future

26  economic benefits to out-of-network laboratories that have not been realized due to

27  Defendants' misconduct.  Plaintiffs are informed and believe that AETNA and BLUE

28  SHIELD OF CALIFORNIA physicians want to refer patients to out-of-network

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**COMPLAINT**                                                           29

1  laboratories, but are prevented from doing so through the enactment of the Blue Plan and

2  through the practice of exclusive below cost capitated contracts. The established track

3  record before Defendants' actions shows that out-of-network laboratories almost certainly

4  would have received more AETNA and BLUE SHIELD OF CALIFORNIA members

5  utilizing out-of-network laboratories absent the interference.

6  112.  Defendants at all relevant times knew of the existence of the prospective

7  economic relationship between out-of-network laboratories and patients enrolled in

8  AETNA and BLUE SHIELD OF CALIFORNIA health plans, as well as the existence of

9  the prospective economic relationship between out-of-network laboratories and AETNA

10  and BLUE SHIELD OF CALIFORNIA contracted physicians. Indeed, Plaintiffs are

11  informed and believe that the reason why Defendants conspired to change the Blue Plan

12  and engaged in the illegal practice of below cost, exclusive capitated contracting is to

13  reduce the number of AETNA and BLUE SHIELD OF CALIFORNIA members using

14  out-of-network laboratory services.

15  113.  Defendants' misconduct alleged above is independently wrongful, it

16  violates several statutes and regulations set forth above.

17  114.  Defendants have damaged Plaintiffs by: (a) engaging in illegal, below cost

18  capitated contracting to divert business to QUEST and away from Plaintiffs; (b)

19  conspiring to change the Blue Plan as to preclude Plaintiffs from maintaining in-network

20  status.

21  115.  The foregoing conduct of Defendants is the result of negligent deceptive

22  conduct, or conduct that manifests a negligent indifference toward, and disregard of, the

23  rights of Plaintiffs.

24  116.  It was reasonably foreseeable that Defendants' wrongful acts would

25  interfere with Plaintiffs' prospective economic relationships with patients and physicians,

26  and Defendants' engagement in these wrongful acts was negligent. Defendants knew or

27  should have known that the interference was certain or substantially certain to occur as a

28  result of its actions, but nonetheless failed to exercise reasonable care to avoid such

1  disruption.

2  117.  Defendants' conduct has actually disrupted Plaintiffs' relationships with

3  patients and physicians.

4  118.  Defendants' conduct has in fact proximately caused damages to Plaintiffs in

5  an amount to be proved at trial.

6  119.  Plaintiffs also seek an injunction prohibiting Defendants' ongoing conduct

7  in interfering with Plaintiffs' prospective economic advantage.  Plaintiffs' legal remedies

8  are inadequate in that Defendant's conduct is ongoing and will continually injure

9  Plaintiffs, including out-of-network laboratories' reputation and business good will in the

10  community.  Repeated litigation to correct this injury is inefficient for the parties and the

11  Court.

12  ### SIXTH CAUSE OF ACTION

13  ### (Against All Defendants)

14  **Monopolization or Attempted Monopolization - Section Two of the Sherman Act**

15  120.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and

16  every allegation set forth in the preceding paragraphs of this Complaint.

17  121.  QUEST has monopolized the relevant markets for routine and specialty

18  testing services.

19  122.  QUEST has willfully acquired or maintained market power in the above

20  listed regional relevant markets; QUEST has engaged in anti-competitive conduct to

21  obtain or maintain market power in the relevant regional markets for routine testing

22  services.  As an alternative basis for liability, QUEST, through its conduct, also has the

23  dangerous probability of obtaining market power.

24  123.  QUEST has engaged in a conspiracy with the above defendants, as well as

25  unilateral conduct that, taken as a whole, has the effect of excluding or suppressing

26  competition, in a market which has substantial barriers to entry and expansion.

27  124.  QUEST's conduct has suppressed innovation, quality, and price

28  competition for the sale of routine and specialty diagnostic testing. This has had the effect

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**COMPLAINT**                                                                           31

1    of harming patients, who suffer from a decrease in the quality of testing. QUEST's

2    conduct has further had the effect of harming competition. There is no compelling

3    competitive business justification for QUEST's conduct.

### SEVENTH CAUSE OF ACTION

#### (Against All Defendants)

**Bilateral Conspiracies to Restrain Trade and Monopolize -**

**Section One of the Sherman Act**

8    125. Plaintiffs incorporate and reallege, as though fully set forth herein, each and

9    every allegation set forth in the preceding paragraphs of this Complaint.

10   126. QUEST has unlawfully conspired to monopolize or restrain the regional

11   relevant markets for the sale of routine and specialty testing by entering into bilateral

12   conspiracy with Defendant BLUE SHIELD OF CALIFORNIA.

13   127. QUEST has conspired separately with Defendant AETNA to monopolize or

14   restrain the regional relevant markets for the sale of routine and specialty testing by

15   entering into bilateral conspiracy.

16   128. Further, Defendant QUEST has unlawfully conspired with Defendant

17   BLUE CARD ASSOCIATION to monopolize the relevant markets for the sale of routine

18   and speciality testing though a bilateral conspiracy evidence by the formation of the Blue

19   Plan.

20   129. In furtherance of each separate, bilateral conspiracy, QUEST and its

21   relevant conspirators have committed several overt acts as set out herein.

22   130. These separate, bilateral conspiracies have injured competition in the

23   regional relevant markets at issue by having the effect of suppressing innovation, quality,

24   and price competition in these markets and, as a consequence, have harmed patients and

25   consumers.

26   131. The conspirators are jointly and severally liable for all damages caused by

27   their conspiracy, at any time during the damage period, and by each member of the

28   conspiracy, with no right of contribution against the other members of the conspiracy.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**COMPLAINT**

132.   These conspiracies are unlawful under Section One of the Sherman Act, 15 U.S.C. § 1.

## EIGHTH CAUSE OF ACTION

### (Against All Defendants)

**Bilateral Conspiracies to Monopolize and Attempt to Monopolize -**

**Section Two of the Sherman Act**

133.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

134.   QUEST has unlawfully conspired to monopolize or restrain the regional relevant markets for the sale of routine and specialty testing by entering into bilateral conspiracy with Defendant BLUE SHIELD OF CALIFORNIA.

135.   QUEST has conspired separately with Defendant AETNA to monopolize or restrain the regional relevant markets for the sale of routine and specialty testing by entering into bilateral conspiracy.

136.   Further, Defendant QUEST has unlawfully conspired with Defendant BLUE CARD ASSOCIATION to monopolize the relevant markets for the sale of routine and speciality testing though a bilateral conspiracy evidence by the formation of the Blue Plan.

137.   In furtherance of each separate, bilateral conspiracy, QUEST and its relevant conspirators have committed several over acts as set out herein.

138.   These separate, bilateral conspiracies have injured competition in the regional relevant markets at issue by having the effect of suppressing innovation, quality, and price competition in these markets and, as a consequence, have harmed patients and consumers.

139.   The conspirators are jointly and severally liable for all damages caused by their conspiracy, at any time during the damage period, and by each member of the conspiracy, with no right of contribution against the other members of the conspiracy.

140. These conspiracies are unlawful under Section One of the Sherman Act, 15 U.S.C. § 2.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in its favor and against Defendants as follows:

1. That judgment be entered in favor of Plaintiffs RHEUMATOLOGY DIAGNOSTICS LABORATORY, PACIFIC BREAST PATHOLOGY, HUNTER LABORATORIES, and SURGICAL PATHOLOGY, and against Defendants BLUE SHIELD OF CALIFORNIA, BLUE CROSS AND BLUE SHIELD ASSOCIATION, QUEST, and AETNA, INC., according to proof, as follows:

    a. On the First Cause of Action (Violation of the Cartwright Act) damages as provided by § 16700 *et seq.*, in the amount of:

        i. Triple the amount of damages sustained by Plaintiffs;

        ii. Recovery of costs, attorneys' fees, and expenses;

        iii. Pre- and post-judgment interest;

        iv. That Defendants be enjoined from continuing their participation in the alleged conspiracy;

        v. Such other and further relief as the Court deems just and proper.

    b. On the Second Cause of Action (Violation of California's Unfair Competition Law) damages as provided by § 17200 *et seq.*, in the amount of:

        i. Restitution as provided by law.

        ii. Pre- and post-judgment interest;

        iii. That Defendants be enjoined from continuing their participation in the alleged conspiracy;

        iv. Such other and further relief as the Court deems just and proper.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

c.     On the Third Cause of Action (Violation of California's Unfair Practices Act) damages as provided by § 17000 *et seq.*, in the amount of:

    i.     Triple the amount of damages sustained by Plaintiffs, .

    ii.     Recovery of costs, attorneys' fees, and expenses;

    iii.     Pre- and post-judgment interest;

    iv.     That Defendant be enjoined from continuing to contract on a loss leader capitated basis;

    v.     Such other and further relief as the Court deems just and proper.

d.     On the Fourth Cause of Action (Intentional Interference with Prospective Economic Advantage):

    i.     Damages sustained by the Plaintiffs;

    ii.     Exemplary and Punitive Damages;

    iii.     Pre- and post-judgment interest;

    iv.     That Defendant be enjoined from continuing to contract on an illegal, loss leader capitated basis;

    v.     Such other and further relief as the Court deems just and proper.

e.     On the Fifth Cause of Action (Negligent Interference with Prospective Economic Advantage):

    i.     Damages sustained by Plaintiffs;

    ii.     Pre- and post-judgment interest;

    iii.     That Defendant be enjoined from continuing to contract on an illegal, loss leader capitated basis;

    iv.     Such other and further relief as the Court deems just and proper.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

f.    On the Sixth Cause of Action (Section Two of the Sherman Act - Monopolization or Attempted Monopolization):

      i.    This Court declare that Defendants' conduct constitutes Violations of Section Two of the Sherman Act, 15 U.S.C. § 2.

      ii.    Triple the damages sustained by Plaintiffs;

      iii.    Recovery of costs, attorneys' fees, and expenses;

      iv.    Pre- and post-judgment interest;

      v.    That Defendant be enjoined from continuing to contract on an illegal, loss leader capitated basis;

      vi.    Such other and further relief as the Court deems just and proper.

g.    On the Seventh Cause of Action (Section One of the Sherman Act - Bilateral Conspiracies to Restrain Trade and Monopolize):

      i.    This Court declare that Defendants' conduct constitutes Violations of Section One of the Sherman Act, 15 U.S.C. § 1.

      ii.    Triple the amount of damages sustained by Plaintiffs;

      iii.    Recovery of costs, attorneys' fees, and expenses;

      iv.    Pre- and post-judgment interest;

      v.    That Defendant be enjoined from continuing to contract on an illegal, loss leader capitated basis;

      vi.    Such other and further relief as the Court deems just and proper.

h.    On the Eighth Cause of Action (Section Two of the Sherman Act - Bilateral Conspiracies to Monopolize and Attempt to Monopolize):

      i.    This Court declare that Defendants' conduct constitutes Violations of Section Two of the Sherman Act, 15 U.S.C. § 2.

      ii.    Triple the amount of damages sustained by Plaintiffs;

      iii.    Recovery of costs, attorneys' fees, and expenses;

iv.   Pre- and post-judgment interest;

v.    That Defendant be enjoined from continuing to contract on an illegal, loss leader capitated basis;

vi.   Such other and further relief as the Court deems just and proper.

Dated: November 14, 2012          **COTCHETT, PITRE & McCARTHY, LLP**

By: _____

NIALL P. McCARTHY
*Attorneys for Plaintiffs*

**COMPLAINT**                                                                    37

## DEMAND FOR JURY TRIAL

Plaintiffs HUNTER LABORATORIES, PACIFIC BREAST PATHOLOGY MEDICAL CORPORATION, SURGICAL PATHOLOGY ASSOCIATES LLC, and RHEUMATOLOGY DIAGNOSTICS LABORATORY, INC. hereby demand a jury trial on all issues so triable.

Dated: November 14, 2012          **COTCHETT, PITRE & McCARTHY, LLP**

By: _____
     NIALL P. McCARTHY
     *Attorneys for Plaintiffs*

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**COMPLAINT**                                                                    38