1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

7 RHEUMATOLOGY DIAGNOSTICS
LABORATORY, INC, et al.,                           Case No.  12-cv-05847-JST

8                    Plaintiffs,

9        v.                                        **ORDER GRANTING MOTIONS TO
                                                   DISMISS**

10 AETNA, INC., et al.,                            Re: Dkt. Nos. 44, 45, 46, 47

11                    Defendants.

12

13        In this antitrust case, four medical diagnostic testing laboratories bring suit against three

14 health insurers and Quest Diagnostics, Inc. for conspiring to exclude them and other labs from the

15 diagnostic testing market through a series of contracts that make it more difficult or impossible for

16 labs to participate in the insurers' preferred networks.  Plaintiffs also bring suit against Quest for

17 attempting to monopolize the market for diagnostic testing services, and against the three insurers

18 for conspiring with Quest to do it.

19        Defendants have each moved to dismiss Plaintiff's Complaint.

20 **I.    FACTS ALLEGED BY THE COMPLAINT**

21        For purposes of resolving each Defendant's Motion to Dismiss, all the "material

22 allegations of the complaint are accepted as true, as well as all reasonable inferences to be drawn

23 from them."  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).

24        **A.    Parties and the Relevant Product and Geographic Markets**

25        Plaintiffs Rheumatology Diagnostics Laboratory, Inc. ("RDL"), Pacific Breast Pathology

26 Medical Corp. ("PBP"), Hunter Laboratories, LLC, and Surgical Pathology Associates ("SPA")

27 are all California medical diagnostic laboratories engaged in the "commercial reference laboratory

28 business."  Compl., ECF No. 1 ¶¶ 10–13.  The Complaint identifies five product and geographic

United States District Court
Northern District of California

markets in which Plaintiffs are variously engaged.

       1.     The <u>Routine Clinical Laboratory Testing</u> market is the market for routine chemical analysis of bodily fluids ordered by physicians for outpatient diagnosis and analysis.  <u>Id.</u> ¶ 26(a). It is a high-volume market where tests are performed by automated equipment.  Results are typically reported electronically within 24 hours of the time the physician ordered the test.  <u>Id.</u> Physicians prefer to use diagnostic labs located near the site of the specimen to avoid the need for air transport and to ensure timely results.  <u>Id.</u>  Consequently, the Complaint alleges that the pertinent geographic market for Routine Clinical Laboratory Testing is regional, and for purposes of this action, the "Northern California" region from Fresno, California to the Oregon border.  <u>Id.</u>

       2.     The <u>Anatomic Pathology Laboratory Testing</u> market consists of labs that analyze tissue samples in connection with the diagnosis of disease.  <u>Id.</u> ¶ 26(b).  For the reasons discussed above, the Complaint alleges a regional market, the pertinent one in this action being the Northern California region.  <u>Id.</u>

       3.     The <u>Specialty Rheumatologic Laboratory Testing</u> market is the market for specialized diagnostic testing ordered by rheumatologists in diagnosing and treating autoimmune disorders and diseases.  <u>Id.</u> ¶ 26(c).  Unlike the routine testing markets, specialty diagnosis markets typically operate nationwide.  <u>Id.</u>

       4.     The <u>Advanced Lipid Testing</u> market is another specialized testing market in which physicians order tests to diagnose and treat coronary heart disease.  <u>Id.</u> ¶ 26(d).  Advanced Lipid tests produce more detailed information than routine testing does.  Like the Rheumatologic Laboratory Testing Market, the Advanced Lipid Testing market is national.  <u>Id.</u>

       5.     The <u>Specialty Breast Pathology Testing</u> market focuses on the specialized analysis of breast biopsy tissue for diagnosis and treatment of breast cancer.  <u>Id.</u> ¶ 26(e).  Plaintiffs allege that physicians in California typically order breast pathology tests from labs throughout California and therefore allege that the pertinent market for purposes of this action is California.  <u>Id.</u>

       Plaintiffs bring claims against three health insurers — Blue Shield of California Life & Health Insurance Co. ("BSC"), Blue Cross and Blue Shield Association ("BCBSA"), and Aetna, Inc. ("Aetna") — and one competitor, Quest Diagnostics, Inc. ("Quest"), alleging each Defendant

violated state and federal antitrust laws as well as committed the common law torts of intentionally and negligently interfering with prospective economic advantage.

**B.     The BCBS/Quest Agreement**

The first agreement challenged by the Complaint is one that resulted in a change in policy that allegedly affected the Advanced Lipid Testing and Specialty Rheumatologic Laboratory Testing markets, in which Plaintiffs Hunter and RDL are engaged.[1]  Id. ¶ 27.

Blue Cross and Blue Shield Association ("BCBS") is a national organization that licenses the Blue Cross and Blue Shield names and marks to insurance plans in the Association, known as "Blue Plans," including Defendant Blue Shield of California.  Id. ¶ 28.  The Association's member plans cover thirty-two percent of Americans.  Id. ¶ 71.  The Licensing Agreement governs certain aspects of how Blue Plans reimburse physicians and other medical services providers.

Since 2004, the Licensing Agreement has permitted each Blue Plan to contract with diagnostic testing labs within or without the Blue Plan's state or territory.  Id. ¶ 28.  Historically, labs who tested specimens from BCBS members from other states would submit a claim to the Blue Plan located in the lab's territory, not the patient's home Blue Plan.  The lab's local Blue Plan would then work with the patient's home Blue Plan to adjudicate the claim.  Id. ¶ 29.  The patient's cost-sharing amount was calculated as though the lab was in-network, based on the lab's provider status and the local Blue Plan to which the claim was submitted.  Id.

The revised Licensing Agreement requires labs to submit claims to the patients' home Blue Plan.  The Agreement prohibits the lab's local Blue Plan from adjudicating the claim, but permits labs to contract with the Blue Plans of each state so such claims can be adjudicated, regardless of where the lab is located.  Id. ¶ 30.  To accomplish this, diagnostic testing labs must develop claims submission processes for each Blue Plan in the nation and "cross-reference each patient to the appropriate Blue Plan coverage area, regardless of where the patient's sample was drawn or the lab is located."  Id.  The Complaint alleges that "it is impossible for independent laboratories such

---

[1] Plaintiffs' Opposition also claims Plaintiff SPA participates in the Advanced Lipid Testing market, but the Complaint does not.  Compare Opp., ECF No. 55 p. 5 with Compl., ¶¶ 27–42.  The Court therefore cannot address Plaintiff SPA's claims.

United States District Court
Northern District of California

1  as Plaintiffs to obtain in-network status with each Blue Plan in which a specimen is drawn.  As a

2  result, independent laboratories will lose business to the only two in-network laboratories for all

3  Blue Plans, the largest of which is [Defendant] Quest." <u>Id.</u>

4     The new BCBS Licensing Agreement also changes how claims are paid.  Under the new

5  policy, when out-of-network labs submit claims to Blue Plans, the Blue Plan pays patients directly

6  rather than paying the lab that "obtained the assignment of the benefits from the patient." <u>Id.</u> ¶ 32.

7  Patients are required to forward the payment to the lab, and if they fail to, the labs must initiate a

8  collection process to recover the payment from the patient.  <u>Id.</u>

9     The alleged effect of the change in policy is to drive the Blue Plans in every state or

10  territory into nearly exclusive arrangements with Quest, which has a national presence, because

11  specialty labs that are located in other states are unable to negotiate in-network status with all

12  thirty-eight Blue Plans. <u>Id.</u> ¶ 34.  Plaintiffs allege that many Blue Plans "simply refuse to add

13  additional labs" as in-network labs, and "a few of the plans have exclusive contracts with Quest."

14  <u>Id.</u>

15     Plaintiffs allege specialty labs will lose business under the new policy in one of two ways.

16  First, specialty labs will be unable or unwilling to contract with out-of-state Blue Plans because

17  they either will not be considered "in-network," or because they do not have the resources to set up

18  the claims processing system required to sustain a national presence in the market.  Second, a

19  physician will order a specialty diagnostic test, and in so doing, will choose the lab that is cheapest

20  for the patient.  <u>Id.</u> ¶ 34–36.  Invariably, that lab will be Quest or its major national competitor,

21  and not a regional or independent lab that does not have in-network status.  <u>Id.</u>

22     The Complaint alleges that BCBS did not initiate this change in policy on its own.  Instead,

23  Quest "acted in concert with" BCBS "to promote this exclusionary change." <u>Id.</u> ¶ 41.  The

24  American Clinical Laboratory Association (ACLA), at the behest of its independent lab members,

25  drafted an opposition to the change in policy, but Quest, the largest contributor to the Association,

26  vetoed the transmittal of the letter of protest.  <u>Id.</u>  Plaintiffs allege Quest's veto demonstrates that it

27  "was well aware of the anti-competitive nature of the change in policy and its potentially

28  devastating effect on competitors." <u>Id.</u>  Similarly, the California Clinical Laboratory Association

1    wrote BCBS a letter in April 2012 expressing concern regarding the policy change.  BCBS

2    responded by directing the trade association to Jim Barkach "to discuss national partnership

3    Agreements."  Id. ¶ 42.  Plaintiff Hunter Labs attempted to contact Mr. Barkach independently and

4    through the CEO of an unidentified company that negotiates insurance contracts for laboratories

5    nationwide.  When the CEO reached Mr. Barkach on his cell phone, Mr. Barkach told him that

6    "no laboratories could match the 'deal' that [BCBS] had with Quest and hung up."  Id.  Based

7    only on these facts, Plaintiffs allege that BCBS and Quest conspired to restrain Plaintiffs and other

8    small labs from negotiating or discussing providing service nationally to BCBS members on an in-

9    network basis.  Id.

10        C.    The Aetna/Quest Agreement

11            Plaintiffs allege that Defendant Aetna, Inc., and Quest entered into an agreement that

12    eliminates or excludes regional labs in each of the five markets alleged in the Complaint from

13    Aetna's provider network in violation of antitrust law.

14            Aetna is one of the three largest American health plans in terms of number of plan

15    members.  Id. ¶ 53.  It covers approximately nine percent of Americans.  Id. ¶ 71.  Plaintiffs allege

16    that Quest and Aetna entered into an agreement that names Quest as a "preferred national

17    provider," which results in low or no deductibles or co-payments for patients whose specimens are

18    sent to Quest.  Id. 52–54.  Quest then leveraged its preferred national provider status to pressure

19    Aetna to refuse similar status to regional labs.  Id.  For example, Plaintiffs PBP, Hunter, and RDL

20    have each been dropped from in-network status or refused in-network status.  Id.

21            In October 2011, Quest pushed Aetna for an exclusive nationwide contract in exchange for

22    steep discounts.  Aetna refused, but agreed to terminate 400 regional lab contracts across the

23    country, including Plaintiff Hunter Labs, Quest's "only remaining substantial in-network

24    competitor" in Northern California.  Id. ¶ 56.

25            Plaintiffs also allege that Quest bargained for a right of first refusal from Aetna via which

26    Quest controls which labs are allowed in-network status, a right Plaintiffs allege Quest has

27    repeatedly exercised.  Id. 57–59.

28            Aetna itself has allegedly pressured physicians and patients not to use Quest' out-of-

United States District Court
Northern District of California

5

network competitors even though the patients' policies allow for it.  Id. ¶ 60.

In addition, Plaintiffs allege that Quest and Aetna have created "physician bonus pools" to further induce physicians to refer all of their lab tests to Quest.  The bonus pools are funded by Aetna and distributed to physicians after out-of-network testing expenses are deducted from it; the less out-of-network testing the physicians order, the more bonus money they receive.  Id. ¶ 62.

Just as with BCBS, Plaintiffs allege that the agreement between Aetna and Quest illegally excludes regional labs from the markets identified in the Complaint because, as out-of-network labs, they cannot compete with Quest's reimbursement rates.

### D.      The BSC/Quest Agreement

Plaintiffs allege Quest also entered into an agreement with Defendant BSC wherein Quest offered, and BSC accepted, a ten percent discount on lab testing on the condition that it exclude Westcliff, a lab that, at the time, was the largest privately owned lab in California, as well as Plaintiff Hunter Labs from the BSC network.  Id. ¶ 65.  Shortly after termination, Westcliff went bankrupt and was acquired by LabCorp, the only other national diagnostic testing laboratory.  Id. ¶ 66.  The Complaint alleges that this agreement substantially impacted competition in the Routine Clinical Laboratory Testing market because BSC is the third largest insurer in California, with approximately three million members.  Id. ¶ 65–66.

### E.      Quest's Alleged Predatory Pricing Practices

The Complaint alleges that Quest has engaged in conduct aimed at monopolizing all five alleged markets.  First, Quest is contracting with physician groups on a "loss leader" capitated basis — a fixed price charged by Quest for all lab tests, per patient, on a monthly basis.  Id. ¶ 43.  Such rates are commonly offered to Independent Physician Associations (IPAs), which pay a monthly fee for testing services based on how many patients they have, regardless of the rate of utilization of those services.  Id.  Plaintiffs allege that Quest discounts the capitated rates in order to exclude competition from the lab testing markets, which results in Quest receiving Medicare, Medi-Cal, and other "pull-through" business that is charged on a fee-for-service (FFS) basis.  Id. ¶ 44.  Quest often loses money on the capitated rates, but makes up the difference because physicians and IPAs agree to refer all their lab testing business, including the lucrative FFS

6

patients, to Quest.  Id.  Plaintiffs allege this arrangement violates anti-kickback statutes, and that Plaintiffs' unwillingness to violate those laws leaves them at a competitive disadvantage.  Id. ¶ 44–45.

Plaintiffs allege that Quest executives pressure Quest's sales force to induce HMO physicians to refer FFS pull-through business to Quest and have pressured HMOs to tell physicians that the discounted capitation rates are offered in return for referral of FFS work.  Id. ¶ 46.  If a physician fails to refer enough pull-through FFS business, Quest discontinues the discounted capitation rates.  Id. ¶ 48.  Plaintiffs allege Quest conceals this practice because it knows the loss-leader pull-through scheme is illegal.  Id.

In addition, Plaintiffs allege that Quest illegally caps patient obligations and waives co-pays and deductibles, again in exchange for FFS patient referrals.  Id. ¶ 67–68.

### F.    Alleged Effects of Anticompetitive Conduct

Plaintiffs allege that Quest's agreements with BCBS, BSC, and Aetna, in addition to its independent predatory pricing practices, result in antitrust injury.  In particular, Plaintiffs allege that Quest dominates the five markets identified in the Complaint, that the monopolization leads to lower quality medical care and decreased consumer choice, and that Quest excludes competitors from entering the market entirely, even when those competitors offer innovative or specialized products or services that Quest does not offer.  Id. ¶¶ 70–74.  Plaintiffs allege that Quest's conduct has allowed it to capture seventy percent of the Northern California physician outpatient market. Id. ¶ 74.  Finally, Plaintiffs allege that Quest does not need to achieve a large market share in order to monopolize the diagnostic testing markets identified in the Complaint because a large percentage of physicians cease referring any patients to labs that are out-of-network for ten percent or more of their patients.  Id. ¶ 71.

## II.    LEGAL STANDARDS

On a motion to dismiss, the Court accepts the material facts alleged in the complaint, together with reasonable inferences to be drawn from those facts, as true.  Navarro, supra, 250 F.3d at 732.  However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory

1    statements." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  To be entitled to the presumption of

2    truth, a complaint's allegations "must contain sufficient allegations of underlying facts to give fair

3    notice and to enable the opposing party to defend itself effectively." Starr v. Baca, 652 F.3d 1202,

4    1216 (9th Cir. 2011), cert. den'd, ___ U.S. ___, 132 S.Ct. 2101 (2012).

5         In addition, to survive a motion to dismiss, a plaintiff must plead "enough facts to state a

6    claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570

7    (2007).  Plausibility does not mean probability, but it requires "more than a sheer possibility that a

8    defendant has acted unlawfully." Iqbal, 556 U.S. at 678.  "A claim has facial plausibility when the

9    plaintiff pleads factual content that allows the court to draw the reasonable inference that the

10   defendant is liable for the misconduct alleged." Id.  In the Ninth Circuit, "[i]f there are two

11   alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of

12   which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).

13   Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is

14   so convincing that plaintiff's explanation is implausible." Starr, 652 F.3d at 1216 (original

15   emphasis).

16   **III.    ANALYSIS**

17        Plaintiffs allege eight causes of action.  The third cause of action for violation of

18   California's Unfair Practices Act, Bus. & Prof. Code §§ 17043, 17044, is alleged as to Quest

19   alone.  The remainder are alleged as to all Defendants: (1) violation of California's Cartwright

20   Act, Bus. & Prof. Code § 16700, et seq., (2) violation of California's Unfair Competition Law,

21   Bus. & Prof. Code § 17200, et seq., (4) intentional and (5) negligent interference with prospective

22   economic advantage, (6) monopolization or attempted monopolization in violation of section two

23   of the Sherman Act, 15 U.S.C. § 2, (7) bilateral conspiracies to restrain trade and monopolize in

24   violation of section one of the Sherman Act, 15 U.S.C. § 1, and (8) bilateral conspiracies to

25   monopolize and attempt to monopolize, in violation of section two of the Sherman Act, Id. § 2.

26   Because the Cartwright Act was modeled after the Sherman Act, the Court's analysis addresses

27   both statutes together pursuant to federal antitrust law.  See, e.g., Cnty. of Tuolumne v. Sonora

28   Comm'y Hosp., 236 F.3d 1148, 1160 (9th Cir. 2001).

United States District Court
Northern District of California

8

**A.       Agreements in Restraint of Trade**

Section one of the Sherman Act prohibits any contract, combination, or conspiracy constituting an "unreasonable restraint" of trade.  State Oil Co. v. Khan, 522 U.S. 3, 10 (1997).  In order to state a section one claim, antitrust plaintiffs must claim more than parallel conduct and a conclusory allegation of agreement.  Allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  Twombly, supra, 550 U.S. at 570.

However, a "co-conspirator need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy."  Beltz Travel Serv. Inc. v. Int'l Air Transp. Ass'n, 620 F.2d 1360, 1366–67 (9th Cir. 1980) ("Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result.").  Nor should courts indulge antitrust defendants who move to dismiss by "'tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'"  In re High-Tech Employee Antitrust Litig., 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012) (quoting Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962)).  "[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."  Id.

The Ninth Circuit's recent decision in Starr v. Baca is instructive.  The Starr court identified two principles for purposes of testing the legal sufficiency of a complaint after Twombly.  First, the complaint "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively.  Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  Starr, supra, 652 F.3d at 1216.  In evaluating plausibility, the Ninth Circuit made clear that the "standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable."  Id. at 1217.  If the plaintiff and defendant each advance a plausible explanation for the factual allegations in the complaint, the plaintiff's complaint will survive a motion to dismiss.  Id.

at 1216.  Dismissal based on <u>Twombly</u> is merited only if the defendant's "alternative explanation is so convincing that plaintiff's explanation is *im*plausible."  <u>Id.</u> (original emphasis).

In the antitrust context, bare recitals of the elements of a Sherman Act claim coupled with conclusory allegations of conspiracy are not sufficient to survive a motion to dismiss.  The Supreme Court in <u>Twombly</u> held that, to plausibly plead conspiracy, an antitrust plaintiff must allege "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties."  <u>Twombly</u>, 550 U.S. at 556, n.4 (<u>quoting</u> 6 Areeda & Hovenkamp, Antitrust Law § 1425, at 167–185 (2d ed. 2003)).

Plaintiffs here allege two types of agreements in violation of section one of the Sherman Act.  First, Plaintiffs allege three vertical, bilateral agreements between each of the insurers and Quest.  Second, Plaintiffs allege that the insurer Defendants entered into a horizontal conspiracy with one another, in concert and common purpose with Quest — an arrangement known as a hub-and-spoke conspiracy, wherein the vertical agreements position Quest as the hub and the insurers as the spokes.

### i.   Horizontal Agreement

To be actionable, a hub-and-spoke conspiracy must have a "rim," which requires some kind of agreement or understanding between and among the spokes that the other spokes would cooperate in the conspiracy.  <u>In re Nat'l Ass'n of Music Merchants, Musical Instruments and Equip. Antitrust Litig.</u>, 2011 WL 3702453 (S.D.Cal. Aug.22, 2011) (reviewing relevant caselaw).  Plaintiffs' Complaint, however, does not allege that any insurer knew of the others' contracts with Quest.  The only connection between any two insurers is the fact that BCBS licenses the Blue Shield name to BSC, but the Complaint contains nothing more by way of factual allegations to connect the BCBS/Quest agreement and the BSC/Quest agreement.  There is no allegation of horizontal agreement or understanding between or among any insurer defendants.

Plaintiffs rely on <u>In re High-Tech Employee Antitrust Litig.</u>, 856 F. Supp. 2d 1103, 1116 (N.D. Cal. 2012), for the proposition that the insurers could conspire in violation of the Sherman Act by virtue of a "joint desire to 'narrow networks' by decreasing the number of viable labs

1    doing business." Opp., ECF No. 55 p. 19.  High-Tech is inapposite.  There, the plaintiffs alleged

2    "much more than parallel conduct" that gave rise to the inference that the six bilateral agreements

3    at issue formed an overarching conspiracy.  The plaintiffs "alleged a 'larger picture' of senior

4    executives from closely connected high-tech companies in Northern California

5    contemporaneously negotiating and enforcing six bilateral 'Do Not Cold Call' agreements.  The

6    fact that all six identical bilateral agreements were reached in secrecy among seven Defendants in

7    a span of two years suggests that these agreements resulted from collusion, and not from

8    coincidence." Id. at 1120.  There are no such allegations here.

9        Plaintiffs' reliance on Impro Prods., Inc. v. Herrick, 714 F.2d 1267, 1279 (8th Cir. 1983) is

10   also unhelpful.  Plaintiffs appear to rely on that court's recognition that a "rimless wheel"

11   conspiracy could violate the Sherman Act when it satisfies the following test:

12            (1) that there is an overall-unlawful plan or "common design" in
             existence;  (2) that knowledge that others must be involved is
13            inferable to each member because of his knowledge of the unlawful
             nature of the subject of the conspiracy but knowledge on the part of
14            each member of the exact scope of the operation or the number of
             people involved is not required, and (3) there must be a showing of
15            each alleged member's participation.

16   Id. (quoting Elder-Beerman Stores Corp. v. Federated Department Stores, Inc., 459 F.2d 138, 146–

17   147 (6th Cir.1972)).  The problem for Plaintiffs here, as it was for the plaintiffs in Impro at

18   summary judgment, is that Plaintiffs do not allege any Defendants communicated with any of the

19   others concerning the alleged conspiracy, or that any of the corporate defendants knew of the other

20   agreements.  Id.

21        Plaintiffs have not alleged that there was a "common design" among the three insurer

22   Defendants, nor have they alleged facts giving rise to an inference that the insurers each knew the

23   others were party to the conspiracy.  This is not a case where parallel, silent conduct nevertheless

24   constitutes a section one Sherman Act conspiracy; there simply is no allegation of parallel

25   conduct, much less interdependent conduct.  Instead, the Complaint clearly alleges three "bilateral

26   agreements," executed by each insurer and Quest, wholly independent from one another.

27   Consequently, Plaintiffs have failed to state a claim of horizontal conspiracy in violation of the

28   Sherman and Cartwright) Acts upon which relief can be granted.

United States District Court
Northern District of California

11

Plaintiffs' first, seventh, and eighth causes of action for violation of California and federal antitrust law, insofar as they relate to an alleged horizontal conspiracy among the insurers, is hereby DISMISSED with leave to amend.

### ii.   Vertical Agreement

In contrast, Plaintiffs' allegations of vertical agreement between Aetna and Quest, and BSC and Quest, are clearly and sufficiently stated, and those Defendants do not contest the allegations for purposes of their motions to dismiss.

Where Plaintiffs fall short is their allegation of a vertical agreement between BCBS and Quest. The Complaint alleges, in great detail, the change in BCBS' Licensing Agreement that Plaintiffs claim unreasonably restrains trade. But to state a section one claim, Plaintiffs must allege that the change in policy resulted from a contract, combination, or conspiracy. To that end, the Complaint alleges that the change in policy was not implemented by BCBS independently, but that instead, BCBS "acted in concert with" Quest "to promote this exclusionary change." Compl., ¶ 41. The only factual allegation to support that claim is that Quest vetoed a letter protesting the policy change drafted by members of the American Clinical Laboratory Association. Id. Per Plaintiffs, the veto demonstrates that Quest "was well aware of the anti-competitive nature of the change in policy and its potentially devastating effect on competitors." Id. Even if the allegation is true, it does not serve to impute knowledge of or participation in Quest's conduct to BCBS. If anything, Quest's alternative explanation — that it acted independently and in its own interests in vetoing the letter — "is so convincing that plaintiff's explanation is *im*plausible." Starr, 652 F.3d at 1216. The Complaint offers nothing else to suggest that BCBS' decision to change its Licensing Agreement was anything more than a unilateral one. Absent something more, Plaintiffs have failed to allege a vertical agreement between BCBS and Quest that can form the basis of a section one claim.

For the reasons stated above, the Court hereby DISMISSES, with leave to amend, Plaintiffs' first, seventh, and eighth causes of action for violation of California and federal antitrust law against BCBS and Quest based on their alleged agreement to change BCBS' Licensing Agreement.

United States District Court
Northern District of California

### iii.    Unreasonable Restraint of Trade

Antitrust plaintiffs may prosecute section one claims under one of two theories of liability. First, the "accepted standard for testing whether a practice restrains trade" is the rule of reason, which endeavors to examine the anticompetitive effects and procompetitive justifications of particular agreements.  Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885 (2007).  Second, antitrust plaintiffs can allege that a restraint is so inherently anticompetitive so as to be illegal per se.  Khan, 522 U.S. at 10.

Plaintiffs' remaining section one claims allege vertical agreements between buyers and sellers of diagnostic laboratory testing services, in contrast to the archetypal section one claim for horizontal price-fixing.  Generally speaking, "a vertical restraint is not illegal per se unless it includes some agreement on price or price levels."  Bus. Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 735–36 (1988).  Accordingly, the Court will evaluate Plaintiffs' surviving section one claims pursuant to the rule of reason.  See Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 58–59 (1977) (vertical non-price restraints subject to rule of reason).

There are "four classical, subsidiary" questions courts ask in evaluating a restraint of trade under the rule of reason: "(1) What is the specific restraint at issue?  (2) What are its likely anticompetitive effects?  (3) Are there offsetting procompetitive justifications?  (4) Do the parties have sufficient market power to make a difference?"  California Dental Ass'n v. F.T.C., 526 U.S. 756, 782 (1999) (Breyer, J., concurring in part, dissenting in part).

The core of Plaintiffs' claim concerning the Aetna/Quest and BSC/Quest agreements is that they constitute unreasonable restraints of trade in the form of partial or complete exclusive dealing arrangements.  "Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor."  Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LLP, 592 F.3d 991, 996 (9th Cir. 2010).  "There are 'well-recognized economic benefits to exclusive dealing arrangements, including the enhancement of interbrand competition.'"  Id. (quoting Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1162 (9th Cir. 1997)).  See also United States v. Colgate & Co., 250 U.S. 300, 307 (1919) (The Sherman Act does not "restrict the long recognized right of trader or manufacturer engaged in an

United States District Court
Northern District of California

entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."). Consequently, to succeed on an exclusive dealing claim under the rule of reason, antitrust plaintiffs must allege, and ultimately prove, that the arrangement's effect is to "'foreclose competition in a substantial share of the line of commerce affected.'" Allied Orthopedic, 592 F.3d at 996 (quoting Omega, 127 F.3d at 1162). See also Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 45 (1984) (O'Connor, J. concurring) ("Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal.").

To determine whether a foreclosure of competition affects a substantial share of the relevant market, "it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein." Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 328–29 (1961). An exclusive dealing claim will not succeed unless the plaintiff alleges, and ultimately proves that "the opportunities for other traders to enter into or remain" in the market is "significantly limited." Id. at 328.

In Barry v. Blue Cross of California, 805 F.2d 866, 871 (9th Cir. 1986), the Ninth Circuit affirmed summary judgment in favor of the insurer where the plaintiffs alleged a vertical conspiracy between the insurer and physicians to exclude physicians who did not become preferred providers. Upon a "[c]lose examination of the vertical agreements" at issue in that case, the court concluded that summary judgment was appropriate because the insurer's physician agreements did not have impermissible anticompetitive consequences. Id. Indeed, in that case, the court observed that: "a consumer still enjoys complete freedom to seek treatment from a nonparticipating physician; moreover, a Plan physician can refer any or all of his patients to a nonparticipating physician. Ordinary competitive market forces — lower prices — have simply reduced the demand for the nonparticipating physician's services." Id. In evaluating the effects of the insurer's agreements with physicians, the Barry court also identified several pro-competitive

14

benefits: "By demanding lower prices from participating physicians, Blue Cross injects an element of competition into the market for physician services that otherwise might not be present.  The Plan also requires that physicians agree to utilization review — oversight by Blue Cross to see that physicians provide the proper kind and level of care.  It therefore offers consumers the added choice of health care services subject to a sort of central 'quality control.'"  Id. at 872–73.

Defendants argue that Barry requires dismissal of Plaintiffs' section one claims.  But the agreements at issue in Barry differed in two respects from the agreements at issue here.  First, while in Barry, the insurer was "willing to purchase services from all physicians on equal terms," id. at 873, Plaintiffs here allege that the vertical agreements prevent other laboratories from competing to be part of the insurers' networks.  Second, while in Barry the agreements did not affect the overall market for physicians, Plaintiffs here allege that each agreement independently has resulted or will result in the exclusion of other laboratories from the market because of the unique dynamics of the laboratory testing market.  See, e.g., Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 66 (1st Cir. 2004) ("If an exclusive dealing contract cuts off stores like Walgreen from an unduly large portion of the available market for its goods . . . the Sherman Act may condemn the agreement as unreasonable.").

The distinction is really one of degree.  The agreements in Barry did not "foreclose competition in a substantial share of the line of commerce affected."  But Plaintiffs here allege that the agreements at issue do substantially foreclose competition, and their claim must be considered in light of the economic plausibility of their particular allegations.

### a.  BSC/Quest Agreement

The first agreement Plaintiffs challenge is the alleged agreement between BSC and Quest.  Plaintiffs allege Quest offered BSC a ten percent discount in exchange for the exclusion of two of its competitors from BSC's network: Westcliff, at the time the largest privately owned lab in California, and Plaintiff Hunter Labs.  Plaintiffs allege that after Westcliff's termination, it went bankrupt and was acquired by LabCorp, the only other national diagnostic testing laboratory.  According to the Complaint, Quest currently has a seventy percent market share in Northern California in the outpatient testing market; it does not allege that Quest's market share grew to this

1    level because of any particular act or occurrence alleged in the Complaint.

2         Plaintiffs do not specify how Quest's market share has changed over time in relation to the

3    execution of the BSC agreement.  Nor do they describe, even in general terms, how the BSC

4    agreement affected competitors in California other than Westcliff and Hunter Labs.  Plaintiffs do

5    not identify the market share those two labs enjoyed prior to the agreement, or how their market

6    share changed over time.  Finally, the Complaint does not explain, at least with respect to BSC,

7    what effect its agreement with Quest had or will have on the diagnostic testing markets identified

8    in the Complaint.

9         From these allegations, the Court cannot evaluate whether the BSC agreement foreclosed

10   competition in a substantial share of the line of commerce affected.  It is unclear whether there are

11   other labs in California, whether they can contract with other insurers, or whether the BSC

12   agreement resulted in the wholesale adoption of Quest as the preferred laboratory chosen by

13   physicians.  Plaintiffs do not point to any decision wherein a court has found that a vertical

14   agreement for a discounted rate in exchange for the termination of certain competitors, without

15   any detail as to the effect those terminations had on the relevant market, constitutes a violation of

16   section one of the Sherman Act.[2]  The Court therefore DISMISSES, with leave to amend,

17   Plaintiffs' first and seventh causes of action for violation of California and federal antitrust law

18   based on the alleged agreement between BSC and Quest to exclude certain competitors from the

19   relevant markets.

20              b.  *Aetna/Quest Agreement*

21        Next, the Court considers Plaintiffs' allegations concerning the agreements between Aetna

22   and Quest.  Plaintiffs allege that Aetna, which covers nine percent of Americans, agreed to name

23   Quest a "preferred national provider," which results in low or no deductibles or co-payments for

24   patients whose lab work is referred to Quest by their treating physicians.  Based on the Ninth

_____

26   [2] Plaintiffs' citations to Hahn v. Oregon Physicians' Serv., 868 F.2d 1022, 1029 (9th Cir. 1988),
     and Va. Acad. Of Clinical Psychologists v. Blue Shield of Va., 624 F.2d 476 (4th Cir. 1980), do
27   not settle the issue; those decisions considered *horizontal* agreements that constituted group
     boycotts, which are treated differently under the antitrust law.  There is no allegation here that the
28   BSC/Quest agreement is a horizontal restraint among competitors to exclude another competitor
     form the relevant market.

1    Circuit's decision in Barry, Plaintiffs concede this allegation alone does not constitute a Sherman

2    Act violation.  However, Plaintiffs further allege that Aetna granted Quest a right of first refusal

3    that allows Quest to reject labs applying for in-network status, and that, in exchange for

4    discounted pricing from Quest, Aetna agreed to terminate four hundred regional lab contracts

5    throughout the country, including its contract with Plaintiff Hunter Labs.  Finally, Plaintiffs allege

6    that Aetna pressures physicians and patients to use Quest and not competing out-of-network labs,

7    including by setting up physician bonus pools that compensate physicians based on how few out-

8    of-network referrals they make.  The effect of these agreements and practices, according to

9    Plaintiffs, is the wholesale exclusion of independent laboratories from the diagnostic testing

10   markets.

11        Aetna and Quest move to dismiss on the grounds that Plaintiffs fail adequately to plead

12   product and geographic markets and market power.

13        Federal courts routinely examine the relevant market in order to perform a threshold

14   inquiry into the defendant's market power.  See Rothery Storage & Van Co. v. Atlas Van Lines,

15   Inc., 792 F.2d 210 (D.C. Cir. 1986); Graphic Products Distributors v. Itek Corp., 717 F.2d 1560,

16   1568 (11th Cir. 1983) (requiring, "at the threshold, that a plaintiff attacking vertical restrictions

17   establish the market power of the defendant")).  That inquiry may proceed in one of two ways:

18   "through direct evidence of anticompetitive effects," or "by proving relevant product and

19   geographic markets and by showing that the defendant's share exceeds whatever threshold is

20   important for the practice in the case."  Toys 'R Us, Inc. v. F.T.C., 221 F.3d 928, 937 (7th Cir.

21   2000) (citing FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 460–61 (1986)).  The latter method

22   requires an examination of the interchangeability of the products at issue and the cross-elasticity of

23   demand.  See Omega, 127 F.3d at 1163–64; Oltz v. St. Peter's Community Hospital, 861 F.2d

24   1440, 1446 (9th Cir. 1988).

25        Here, Defendants argue that Plaintiffs have failed to allege plausible product and

26   geographic markets, but "[t]here is no requirement that these elements of the antitrust claim be

27   pled with specificity."  Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1045 (9th Cir.

28   2008).  "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent

United States District Court
Northern District of California

17

from the facts of the complaint that the alleged market suffers a fatal legal defect. And since the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." Id. The Court finds that Plaintiffs' alleged product and geographic markets are sufficiently plausible to survive a motion to dismiss.

Of greater moment, Aetna has only nine percent of the national health insurance market, and Plaintiffs do not allege a higher market share in any of the other markets identified in the Complaint. Typically, with respect to "exclusive dealing, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent." Stop & Shop, 373 F.3d at 68. Plaintiffs allege, however, that the exclusionary effect of Aetna's agreement with Quest is magnified because "loss of in-network status with respect to as little as 10% of a physician's patients can cause a laboratory to be dropped from use by the physician completely." Compl., ¶ 71. By virtue of this dynamic, Plaintiffs allege that Aetna's exclusion of Quest's competitors can, by itself, lead to their complete exclusion from the diagnostic testing market.

Relying on the Fourth Circuit's decision in Dickson v. Microsoft Corp., 309 F.3d 193, 210 (4th Cir. 2002), Aetna argues that it cannot be held liable for the conduct of physicians, even if Aetna's agreement leads to the substantial foreclosure of competition. In Dickson, the court observed that "[t]he relevant focus of the § 1 inquiry . . . is the anticompetitive effects of the conspiracy qua conspiracy; therefore, the plaintiff must demonstrate that the conspiratorial agreement *itself* affected competition in ways that would not have obtained absent the agreement." Id. (citations omitted) (emphasis added). Plaintiffs do not respond to this argument, choosing instead merely to repeat their claim that "because of how Quest bills for services and due to the existence of bonus pools and other anticompetitive actions and agreements, foreclosure of as little as ten percent of the market prevents a lab from offering any services to a physician, meaning that even 'small' conspiracies between Quest and the Payer Defendants have large anticompetitive effects." Opp., ECF No. 55, p. 21.

Plaintiffs fail to explain how the alleged agreement *itself* affects competition, however. In addition, although they claim that "loss of in-network status with respect to as little as 10% of a

18

1   physician's patients *can* cause a laboratory to be dropped by the physician . . . completely,"

2   Compl., ECF No. 1 ¶ 7, Plaintiffs fail to quantify the *actual* market effect of this alleged activity –

3   i.e., the percentage of physicians who drop other laboratories, or the percentage of laboratories

4   who are foreclosed from the market -- even in gross terms.  Plaintiffs must plausibly allege the

5   substantial foreclosure of competition in the line of commerce affected, and they have not done so.

6          For the foregoing reasons, the Court hereby DISMISSES, with leave to amend, Plaintiffs'

7   first and seventh causes of action for violation of California and federal antitrust law insofar as it

8   relates to vertical agreements between Aetna and Quest.

9          **B.     Monopoly, Attempted Monopolization, and Conspiracy to Monopolize**

10          Section two of the Sherman Act applies to "[e]very person who shall monopolize, or

11   attempt to monopolize, or combine or conspire with any other person or persons, to monopolize

12   any part of the trade or commerce among the several States."  15 U.S.C. § 1.  To state a section

13   two monopolization claim, antitrust plaintiffs must allege that (1) the defendant has monopoly

14   power in the relevant market, (2) that the monopoly power was willfully acquired or maintained,

15   and (3) that the plaintiff sustained antitrust injury.  United States v. Grinnell Corp., 384 U.S. 563,

16   570–71 (1966).  The willful acquisition or maintenance of monopoly power must be

17   "distinguished from growth or development as a consequence of a superior product, business

18   acumen, or historic accident."  Id.  Whether monopoly power exists is a question of fact.  "Market

19   share is evidence from which the existence of monopoly power may be inferred, but it should not

20   be equated with monopoly power.  Blind reliance upon market share, divorced from commercial

21   reality, could give a misleading picture of a firm's actual ability to control prices or exclude

22   competition."  Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc., 627 F.2d 919, 924 (9th Cir. 1980),

23   cert den'd, 450 U.S. 921 (1981).

24          To state a claim for attempted monopolization, antitrust plaintiffs must allege

25   (1) anticompetitive conduct, (2) a specific intent to monopolize, and (3) a dangerous probability of

26   success.  Id. at 925.  The elements are the same for a claim for conspiracy to monopolize, except

27   "no particular level of market power or 'dangerous probability of success' has to be alleged or

28   proved in a conspiracy claim where the specific intent to monopolize is otherwise apparent from

United States District Court
Northern District of California

19

1    the character of the actions taken." Id.  Defendants move to dismiss Plaintiffs' section two claims

2    on the grounds that Plaintiffs fail to allege that Quest has monopoly power, or that its conduct

3    produced antitrust injury.

4        Monopoly power is the power to "control prices or exclude competition." Cost Mgmt.

5    Servs., Inc. v. Washington Natural Gas Co., 99 F.3d 937, 950 (9th Cir. 1996) (quoting Grinnell

6    Corp., 384 U.S. at 571).  "[M]arket share, at least above some level, could support a finding of

7    market power in the absence of contrary evidence.  Where such an inference is not implausible on

8    its face, an allegation of a specific market share is sufficient, as a matter of pleading, to withstand

9    a motion for dismissal." Id. (quoting Hunt-Wesson Foods, 627 F.2d at 925).

10       Here, the Complaint alleges that Quest has a seventy percent market share of the outpatient

11   testing market in Northern California, and that nationally it is the dominant diagnostic testing

12   laboratory.  In addition, according to the Complaint, Quest has sufficient market power to induce

13   Aetna and BSC to agree to terminate diagnostic testing providers at its behest.  The Court finds

14   that those allegations, by themselves, are insufficient to establish that Quest has monopoly power

15   in the relevant markets identified in the Complaint.  Plaintiffs' only market share allegation does

16   not establish Quest's market share in the actual markets defined by the Complaint.

17       In addition, Plaintiffs fail to allege that Quest willfully acquired or maintained its

18   monopoly power, because there are no allegations regarding Quest's position in the relevant

19   markets over time.  For similar reasons, Plaintiffs have failed to allege that Quest's allegedly

20   anticompetitive conduct presents a "dangerous probability of success" in monopolizing the

21   relevant markets.  Consequently, Plaintiffs' section two claims against Quest for monopolization

22   and attempted monopolization are insufficiently stated.  See Rick-Mik Enterprises, Inc. v. Equilon

23   Enterprises LLC, 532 F.3d 963, 972 (9th Cir. 2008) ("statistics indicating [defendant] is an

24   important player in the petroleum industry" are insufficient to establish market power at pleading

25   stage).

26       Plaintiffs' section two claim against Quest also fail as a matter of law because Plaintiffs

27   have not adequately alleged antitrust injury.  The Complaint alleges that Quest engaged in

28   predatory "loss-leader" pricing by charging capitated rates for physicians below cost in exchange

United States District Court
Northern District of California

for more lucrative fee-for-service business.  In order to state a claim for predatory pricing in violation of the Sherman Act, antitrust plaintiffs must allege (1) that "the prices complained of are below an appropriate measure of its rival's costs," and (2) that the predator had "a dangerous probabilit[y] of recouping its investment in below-cost prices."  Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc., 549 U.S. 312, 318 (2007) (quoting Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 211 (1993)).  The first prong aims to prevent "allowing recovery for above-cost price cutting because allowing such claims could, perversely, 'chil[l] legitimate price cutting,' which directly benefits consumers."  Id. (quoting Brooke Group., 509 U.S. at 223–24).  The second prong recognizes that "[i]n order to recoup their losses, [predators] must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess profits what they earlier gave up in below-cost prices."  Brooke Group, 509 U.S. at 225–26.  "These prerequisites to recovery are not easy to establish, but they are not artificial obstacles to recovery; rather, they are essential components of real market injury."  Id. at 226.

    As to the first prong, Plaintiffs' describe Quest's prices as "below cost" without any further detail.  The Court need not decide whether this allegation meets the first prong of the Brooke Group test, however, because Plaintiff's allegations certainly do not meet the second prong: Plaintiffs provide nothing upon which the Court could rest a finding of "dangerous probability of recoupment."  Rather than alleging that Quest will eventually recoup its losses from below-cost pricing by setting higher than competitive prices, Plaintiffs allege that Quest is recouping its losses contemporaneously by inducing the referral of Medicare, Medi-Cal, and other "pull-through" business that is charged on a fee-for-service (FFS) basis.  Compl., ECF No. 1, ¶ 44.  While this alleged arrangement may violate a different law – a determination the Court does not reach here – Plaintiffs have not shown how it produces antitrust injury of the kind that the Sherman Act was designed to avoid:  the eventual raising of prices above competitive levels.  To the contrary, there is no allegation that Quest is able to raise prices on its FFS business, and the effect of the alleged arrangement on "loss-leader" services would be to keep prices low.

The Court finds that Plaintiffs' allegations are insufficient to state a claim for predatory pricing.

United States District Court
Northern District of California

1    Plaintiffs' section two claims against the alleged co-conspirator insurers also fall short of

2    stating a claim.  First, because the attempted monopolization and monopolization claims cannot be

3    sustained, a claim for conspiracy to violate section two necessarily fails.  Second, although

4    Plaintiffs adequately allege that Aetna and BSC each entered into agreements with Quest, nothing

5    in the Complaint or in Plaintiffs' Opposition attempts to allege a specific intent to monopolize on

6    the part of the insurers.  Third, as discussed above, because Plaintiffs have failed to allege

7    anticompetitive effects arising out of the agreements between insurers and Quest, their section two

8    conspiracy claims, which necessarily require a showing of anticompetitive conduct and market

9    power, must fail.

10    For the foregoing reasons, the Court hereby DISMISSES, with leave to amend, Plaintiffs'

11    first, sixth, seventh, and eighth causes of action for monopolization, conspiracy to monopolize,

12    and attempt to monopolize with respect to all Defendants.

### C.    Unfair Practices Act

14    Plaintiffs' third cause of action alleges Quest violated California's Unfair Practices Act

15    (UPA), which prohibits (1) selling a product at less than cost for the purpose of injuring

16    competitors or destroying competition, Cal. Bus. & Prof. Code § 17043 (West 2012), and

17    (2) selling a product as a "loss leader," Id. § 17044, which is defined in part as selling a product at

18    less than cost to "induce, promote or encourage the purchase of other merchandise," or to "divert

19    trade from or otherwise injure competitors."  Id. § 17030.

20    Quest moves to dismiss Plaintiffs' third cause of action, arguing that Plaintiffs' allegation

21    that Quest engages in "loss leader" pricing on capitated contracts in exchange for more lucrative

22    fee-for-service business is too conclusory to state a plausible UPA claim.  In order to survive a

23    motion to dismiss, a plaintiff asserting a UPA claim must allege "facts tending to show" that a sale

24    in violation of the Act occurred.  Indep. Journal Newspapers v. United W. Newspapers, Inc., 15

25    Cal. App. 3d 583, 587 (Cal. Ct. App. 1971).  "[T]o satisfy the pleading requirements of section

26    17043, the plaintiff must allege defendant's sales price, its cost in the product and its cost of doing

27    business."  G.H.I.I. v. MTS, Inc., 147 Cal. App. 3d 256, 275 (1983), cited with approval,

28    Fisherman's Wharf Bay Cruise Corp. v. Superior Court, 114 Cal. App. 4th 309, 322 (2003).

United States District Court
Northern District of California

22

The Court finds that Plaintiffs have failed to allege the basic elements of their UPA claim. As stated above, the Complaint makes no attempt to allege Quest's sales prices, costs, or cost of doing business.  Instead, it merely alleges that Quest's capitated rate contracts are provided at "below cost."  That allegation alone is insufficient to state a UPA claim.  Plaintiffs' third cause of action is hereby DISMISSED, with leave to amend.

### D.     Interference with Prospective Economic Advantage

Defendants move to dismiss Plaintiffs' fourth and fifth causes of action for intentional and negligent interference with prospective economic advantage.

To state a claim for intentional interference with prospective economic advantage, plaintiffs must allege "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant."  Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1153 (Cal. 2003) (internal quotations omitted).  To succeed on that claim, Plaintiffs must plead and prove that Defendants' conduct was "wrongful by some legal measure other than the fact of interference itself."  Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376, 393 (Cal. 1995).  "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  Korea Supply, 29 Cal. 4th at 1159.

The fourth cause of action identifies three acts that form the basis of their intentional interference claim: (1) Quest's alleged predatory and "loss leader" pricing, (2) the alleged conspiracy between Quest and BCBS to change the Blue Plan, and (3) the alleged conspiracy to exclude Plaintiffs from in-network status.  As discussed above, Plaintiffs fail adequately to allege the first two predicate unlawful acts.  The third simply is not a cognizable claim.  Plaintiffs fail to identify which alleged co-conspirators are responsible for excluding it from in-network status. And even if they did, Plaintiffs' failure to state their claims for violations of antitrust law and the UPA requires dismissal of their intentional interference claim as well, absent the identification of

United States District Court
Northern District of California

1    some other unlawful predicate act.  Plaintiffs identify none.

2            The fifth cause of action is identical to the fourth except that it asserts negligent, rather

3    than intentional, interference.  Thus, for the same reasons identified here, it fails to state a claim.

4    It also must fail because Plaintiffs' Complaint does not allege that any Defendant owed them a

5    duty of care.

6            Accordingly, Plaintiffs' fourth and fifth causes of action are hereby DISMISSED, with

7    leave to amend.

8        **E.    Unfair Competition Law**

9            Plaintiffs' second cause of action for violation of California's Unfair Competition Law,

10   Cal. Bus. & Prof. Code § 17200, *et seq.*, depends on its substantive antitrust and UPA claims.

11   Plaintiffs' second cause of action is therefore DISMISSED, with leave to amend.

12   **IV.    CONCLUSION**

13           For the foregoing reasons, Plaintiffs' Complaint is hereby DISMISSED in its entirety, with

14   leave to amend consistent with the terms of this Order.  Plaintiffs shall file their First Amended

15   Complaint within forty-five days of the date of this Order.

16           **IT IS SO ORDERED**.

17   Dated: June 25, 2013

18

19                                        _____

20                                                JON S. TIGAR
                                          United States District Judge
21

22

23

24

25

26

27

28

United States District Court
Northern District of California

24