UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RHEUMATOLOGY DIAGNOSTICS
LABORATORY, INC., et al.,

          Plaintiffs,

    v.

AETNA, INC., et al.,

          Defendants.

Case No.  12-cv-05847-WHO

**ORDER GRANTING IN PART AND
DENYING IN PART MOTIONS TO
DISMISS FIRST AMENDED
COMPLAINT**

Re:  Dkt. Nos. 96, 97, 98, 99

**INTRODUCTION**

Plaintiffs Rheumatology Diagnostics Laboratory, Inc. ("RDL"), Pacific Breast Pathology Medical Corporation ("PBP"), Hunter Laboratories, Inc. ("Hunter"), and Surgical Pathology Associates LLC ("SPA") bring suit against defendants California Physicians' Services, Inc., d/b/a Blue Shield of California ("BSC"), Blue Cross and Blue Shield Association ("BCBSA"),[1] Aetna, Inc., Quest Diagnostics Incorporated, and Quest Diagnostics Clinical Laboratories, Inc.[2]  The plaintiffs' First Amended Complaint ("FAC") alleges various violations of the federal Sherman Act and California's Cartwright Act, Unfair Competition Law, and Unfair Practices Act.  Dkt. No. 94.  It also alleges intentional and negligent interference with prospective economic advantage. The defendants move to dismiss the plaintiffs' FAC.  Dkt. Nos. 96-99.

Based on the parties' briefs and arguments, and for the reasons below, the Motions to Dismiss are GRANTED IN PART and DENIED IN PART.

---

[1] BCBSA is not an insurer.  However, for the sake of convenience, unless otherwise indicated, the Court will refer to the non-Quest defendants as "insurers."
[2] This Order collectively refers to Quest Diagnostics Incorporated and Quest Diagnostics Clinical Laboratories, Inc., as "Quest."

United States District Court
Northern District of California

1

## FACTUAL BACKGROUND

For purposes of the Motions to Dismiss, the Court accepts as true the following factual allegations in the FAC.

## I.  THE PARTIES AND RELEVANT MARKETS

The plaintiffs are all "engaged in the commercial reference laboratory business" in California.  FAC ¶¶ 10-13.  Defendant Quest is also a provider of clinical laboratory services and competes with the plaintiffs.  FAC ¶¶ 2, 18.  Defendants Aetna and BSC are health insurance companies.  FAC ¶¶ 14-15.  Defendant BCBSA licenses the "Blue Cross" and "Blue Shield" names to health insurance companies across the country ("Blue Plans"), such as BSC, and Blue Plans are governed by the "Blue Card policy" or licensing agreement.  FAC ¶¶ 3-5.

BCBSA is owned by its members and the 38 Blue Plans fund it.  FAC ¶ 29.  "Blue Cross and Blue Shield insure approximately 32% of the U.S. population."  FAC ¶ 28.  More than 91 percent of providers and 96 percent of hospitals in the United States contract directly with Blue Plans, which insure more Californians than any other insurer.  FAC ¶ 28.  "Historically, each Blue Plan has been permitted by the terms of the Agreement to contract with independent clinical labs located within or outside of the BluePlan's state or territory."  FAC ¶ 29.

The FAC alleges five product and geographic markets:

The Routine Clinical Laboratory Testing market is the market for routine chemical analysis of bodily fluids ordered by physicians for outpatient diagnosis and analysis.  FAC ¶ 26(a).  It is a high-volume market where tests are performed by automated equipment.  Results are typically reported electronically within 24 hours after the physician ordered the test.  Physicians prefer to use diagnostic labs near the site of the specimen to avoid air transport and to ensure timely results.  Consequently, the relevant geographic market for Routine Clinical Laboratory Testing is regional, and here, it is the "Northern California region," which runs from Fresno, California, to the Oregon border.

The Anatomic Pathology Laboratory Testing market consists of labs that analyze tissue samples for diagnosing disease.  FAC ¶ 26(b).  The relevant geographic market is the Northern California region.

The Specialty Rheumatologic Laboratory Testing market is the market for highly specialized testing ordered by rheumatologists for diagnosing and treating autoimmune disorders and diseases.  FAC ¶ 26(c).  The relevant geographic market is the entire United States.

The Advanced Lipid Testing market is the market for highly specialized testing to diagnose and treat coronary heart disease.  FAC ¶ 26(d).  The relevant geographic market is the entire United States.

The Specialty Breast Pathology Testing is the market for highly specialized analysis of breast biopsy tissue for diagnosis and prognosis of breast cancer.  FAC ¶ 26(e).  Physicians in California typically order breast pathology tests from labs throughout California.  The relevant geographic market is California.

## II.     THE BCBSA-QUEST AGREEMENT

Changes to the "BlueCard" policy, announced in May 2010, but implemented around October 2012, created barriers preventing smaller independent labs from providing services to patients across the country.  FAC ¶ 27.  This conduct affected Hunter in the Advanced Lipid Testing market and RDL in the Specialty Rheumatological Laboratory Testing market.  FAC ¶ 27.

In the past, labs submitted claims for services provided to Blue Card members from another state to the Blue Plan where the performing lab is located.  FAC ¶ 30.  The local Blue Plan then worked with the member's own Blue Plan to adjudicate the claim, and the member's cost-sharing amount was calculated at the in-network rate based on the performing lab's provider status with the Blue Plan to which the claim was submitted.  FAC ¶ 30.

Now, under changes supported by Quest, the performing laboratory must submit claims to the *patient's* Blue Plan even though the lab may not be an in-network provider for that particular Blue Plan.  FAC ¶ 31.  If the patient is not insured where the laboratory services were performed, then the Blue Plan in the laboratory's region will not adjudicate the claim.  Thus, BSC refuses to accept claims for Blue Plan patients from outside of California for tests the plaintiffs perform.  FAC ¶ 31.

This change is "drying up new business and leading to client terminations," as well as creating "staggering administrative costs."  FAC ¶ 32.  "[I]t is impossible for independent

3

laboratories such as Plaintiffs to obtain in-network status with each BluePlan" with patients that might be served by those laboratories, especially because the "vast majority of BluePlans have been denying applications" from out-of-state laboratories, if they even respond at all.  FAC ¶ 31. Quest "acts in concert" with BCBSA "to prevent competitors from gaining in-network status." FAC ¶ 33.  Because of their size, only Quest and one other national laboratory—Labcorp—are able to join all Blue Plan networks across the country, and independent laboratories lose business to them.  FAC ¶¶ 33 & 37.

Under the new Blue Card policy, when an out-of-network laboratory submits a claim to the relevant Blue Plan, the Blue Plan "commonly pays the patient directly," rather than the laboratory that has obtained the assignment of benefits from the patient," in violation of California law.  FAC ¶ 34.  Paying the patients directly confuses them, and patients often spend the money without realizing that they were supposed to forward it to the laboratory.  FAC ¶ 34.

Under the policy change, claims cannot be made electronically, nor can providers electronically check on the status of submitted claims.  FAC ¶ 35.

The new policy "harms competition by molecular, anatomic pathology, and other specialty labs to the benefit of" Quest because physicians steer business to Quest away from out-of-state specialty labs, which are out-of-network and thus more expensive.  FAC ¶ 36.  This policy "drive[s] the BluePlans into nearly exclusive arrangements with [Quest] (and Labcorp) for specialty and molecular tests" because specialty labs in one physical location cannot contract with 38 Blue Plans to maintain in-network status even though they may perform services from several local Blue Plan areas.  FAC ¶ 37.  "A substantial share of the market is now foreclosed to specialty labs . . . ."  FAC ¶ 38.  A majority of Blue Plans will not contract with labs outside their area, will not add additional labs, and a few have exclusive contracts with Quest.  FAC ¶ 37.  RDL unsuccessfully attempted to get in the Blue Plan networks of many states and has had to hire more employees to deal with the new policy's reimbursement changes even though it has not had a "significant new client" for over four months.  FAC ¶¶ 39-41.  Hunter has been similarly unsuccessful in trying to get in Blue Plan networks or new clients.  FAC ¶¶ 46 & 49.

Distinguished labs "are seeing dramatic reductions in revenue due to this change as they

1   are out-of-network for almost all BluePlan regions," and customers and providers complain that

2   labs like RDL, which is allegedly higher quality, are being kept out of network.  FAC ¶¶ 38 & 42.

3   Hunter's "HunterHeart program"—"a nationwide program" which relies on in-network processing

4   through the BlueCard program—has lost over 90 percent of its clients outside of California.  FAC

5   ¶ 43.  BSC's termination of Hunter in 2009 led to a decrease in its surgical pathology volumes, as

6   did Aetna's termination of Hunter on September 15, 2012.  FAC ¶ 51.

7        In a June 2012 investor presentation, the CEO of Quest, Steve Rusckowski, stated that

8   health insurers "want[] to narrow their networks" and "there should be more consolidation in the

9   volumes around fewer suppliers of laboratory testing services and that plays nicely into what we

10   are all about and what this industry is all about."  FAC ¶ 24.  He further states, "We do have an

11   opportunity with some of our health plan partners to help them narrow the network.  We're

12   working together with the health plans to get more volume and they see an opportunity in their

13   cost structure, and we see an opportunity with our volumes to do that with them."  FAC ¶ 24.

14        Quest "acted in concert" with BCBSA "to promote the exclusionary change in BlueCard

15   Policy."  Members of the American Clinical Laboratory Association ("ACLA"), which represents

16   clinical laboratories, expressed concern about the Blue Card change, so the ACLA drafted a letter

17   to BCBSA protesting it.  FAC ¶ 54.  However, Quest, the largest contributor to ACLA's funding,

18   vetoed the letter.  Quest thus "manipulated a trade association to exclude competition from

19   independent regional labs and indirectly to harm patient care" even though it "was well aware of

20   the anti-competitive nature of the change in policy and the devastating effect it would have on

21   competitors."  FAC ¶ 54.  Quest knew that the policy change meant that no independent lab could

22   compete with it because only Quest and Labcorp have a "physical national presence."  FAC ¶ 54.

23        Similarly, in response to an April 5, 2012, letter from the California Clinical Laboratory

24   Association to BCBSA expressing concern about the policy changes, BCBSA responded that the

25   laboratories should contact Jim Barkach "to discuss national partnership Agreements."  FAC ¶ 55.

26   However, Barkach never responded to the repeated phone calls and emails from the CEO of

27   Hunter or the CEO of a company that negotiates insurance contracts for laboratories nationwide.

28   FAC ¶ 55.  When the latter CEO reached Barkach on his personal cell phone, Barkach said that

1   "no laboratories could match the 'deal' that [BCBSA] had with [Quest] and hung up."  FAC ¶ 55.

2   BCBSA and Quest "have conspired to restrain Plaintiffs and other small laboratories from

3   even negotiating or discussing the opportunity to continue providing service to [BCBSA's]

4   members on an in-network basis."  FAC ¶ 56.  The new policy "pursuant" to BCBSA's

5   "agreement with Quest functions as a boycott of Plaintiffs" because Blue Card plans nationwide

6   "instruct physicians to utilize only in-network diagnostic services and pay in-network providers

7   (i.e., [Quest]) more and in a different manner than the newly out-of-network Plaintiffs."  FAC

8   ¶ 56.  The Blue Plans "have been very overt in their efforts to cut off business to labs" like Hunter

9   "and to instead steer business to" Quest, its "partner."  FAC ¶ 57.  The FAC attaches a letter from

10   Blue Cross Blue Shield of Florida to physicians who use Hunter, stating that services provided to

11   out-of-state labs will be treated as out-of-network.  FAC ¶ 57, Ex. 6.  Thus, out-of-pocket

12   expenses to patients may be higher and the physicians should refer to in-network labs, "such as

13   Quest Diagnostics."  FAC ¶ 57.  These changes have driven business away from smaller

14   independent labs to Quest.  FAC ¶ 58.

15   **III.    BELOW-COST SALES**

16   A "requisition" is a group of tests, ordered at one time, for a single patient.  FAC ¶ 59.

17   Because one patient may have multiple tests, a requisition usually includes two or three lab tests.

18   FAC ¶ 59.  Quest's Securities and Exchange Commission ("SEC") filings contain information

19   allowing for a "simple calculation of fully-allocated cost per requisition," which ranged from

20   $30.79 in 2004 to $42.53 in 2011, increasing at a "generally consistent pace."  FAC ¶ 59.  Because

21   of the higher cost of labor, real estate, and other costs in California, the cost of performing

22   laboratory tests for patients in California tends to be higher than the national average.  FAC ¶ 60.

23   Thus, Quest's "average cost per requisition in California will be slightly higher than the amounts

24   reported in its SEC filings."  FAC ¶ 60.

25   Quest "routinely and knowingly provides its customers in California with capitated

26   contracts that result in revenues far below its reported costs."  FAC ¶ 61.  In one example from

27   2005, James Clayton, the contracting manager for Physicians Medical Group of Santa Cruz, told

28   Hunter that his group entered into a five-year exclusive capitated contract for laboratory services

6

United States District Court
Northern District of California

1   with Quest.  FAC ¶ 61.  The rate was $0.45 per member per month which, based on standard

2   utilization rates, amounts to less than $5.00 in revenue per requisition—less than 20 percent of

3   Quest's average cost per requisition.  FAC ¶ 61.  Quest's average revenue per requisition on its

4   capitated contracts are "far below" its average costs as reported to the SEC, and "there are no cost

5   savings that could possibly allow the capitated contracts [Quest] enters into to be profitable."

6   FAC ¶ 62.

7       Quest heavily discounts services to providers and IPAs.  FAC ¶ 64.  Quest's own reports

8   show that its revenue from these sources is "far below [Quest's] costs as reported in its SEC

9   filings."  FAC ¶ 65.  Quest enters such agreements "to force and keep competition out of the

10   market," and it "recoups its losses by illegally inducing the referral of higher-paying 'pull-

11   through' government and other business."  FAC ¶ 65.  One Quest report "shows that in most cases

12   [Quest's] capitated rates are so low that [Quest] loses money on them."  FAC ¶ 66.  While Quest

13   "lost money on the discounted capitated rates paid" by "almost every [IPA] customer," it "made

14   up for those losses with the [fee-for-service] pull-through business, which is paid for by the

15   government and other third-party payers."  FAC ¶ 67.  Of the 68 IPA customers listed in that

16   report, Quest reported a loss on the capitated rates of 46 of those customers, whereas it reported

17   "substantial profits on the pull-through business" of all 68.  FAC ¶ 68.  From 2004-2008, Quest's

18   SEC filings "show that [its] revenue per requisition on its capitated accounts is far less than its

19   average cost per requisition," but "there is no significant cost-savings associated with capitated

20   accounts that would allow these rates to be profitable."  FAC ¶ 70.

21       Indeed, in addition to below-cost capitated rates, Quest "routinely offers [] below-cost"

22   fee-for-service rates to physicians and clinics that are billed directly.  FAC ¶ 71.  Quest's annual

23   10-K filings with the SEC reflect that Quest lost money on such clients for at least the last nine

24   years.  FAC ¶ 72.  From 2004-2008, Quest lost even more money on capitated contracts.  FAC

25   ¶ 72.

26       In 2009, both a suit filed by the State of California and a federal *qui tam* suit alleged that

27   Quest's capitated contracts were priced below cost to "pull through" government business in

28   violation of federal and state kickback laws.  FAC ¶ 73.  After the suits became public, Quest

stopped reporting its requisition volume for capitated contracts in its 10-K filings.  FAC ¶ 73.

Quest's prices for specific tests are also "far below cost."  FAC ¶ 74.  For example, while Quest's average cost (derived based on information from Quest's 10-K filings, "standard industry price-points, and Plaintiffs' costs") for performing a complete-blood-count test in California is approximately $9.04, it charges certain clients between $1.42 and $2.75 per test, leaving the plaintiffs and other laboratories unable to compete.  FAC ¶¶ 74-75.  In 2005, Quest billed providers below cost for 42 of the most commonly ordered tests.  FAC ¶ 76.

Quest's conduct forecloses new entrants from the market, such as PBP.  FAC ¶ 78.  It also forces competitors to sell their businesses to Quest, such as Dignity Healthcare, whose CEO said that Quest was "'killing Dignity's outreach business' with loss-leading capitation agreements throughout the state."  FAC ¶ 79.

## IV.     THE AETNA-QUEST AGREEMENT

Aetna, which insures approximately nine percent of the United States population, conspired with Quest to eliminate or exclude 400 regional laboratories from Aetna's provider network in exchange for discounts.  FAC 27, ¶ 81.  Hunter and PBP have been denied in-network status with Aetna, while SPA "is *de facto* denied [Aetna] network status for approximately 50% of its business because [Hunter] is denied network status."  FAC ¶ 80.  Quest "publicly states that it has a 'preferred national provider' contract with [Aetna] to serve [Aetna's] HMO-based, point-of-service, and physician office members."  FAC ¶ 81.  Under this agreement, Aetna steers its physicians' lab testing to Quest and away from Hunter, PBP, and SPA.  FAC ¶ 81.

Hunter, PBP, SPA, and other regional labs that are outside Aetna's network are "at a tremendous competitive disadvantage."  FAC ¶ 84.  Dr. Henry Hamilton, the manager of a physician's office in northern California, "recently" told a vice president at Hunter that patients do not pay deductibles or co-payments for Quest's services because Quest is the only "preferred laboratory vendor" for Aetna.  FAC ¶ 82.

In October 2011, Quest approached Aetna and "pushed for an exclusive nationwide contract in exchange for steep discounts."  FAC ¶ 85.  Although Aetna refused to enter into an exclusive contract, it agreed to terminate four hundred regional-lab contracts by letting them lapse.

United States District Court
Northern District of California

FAC ¶ 85 & n.4.  Hunter—"the only remaining substantial in-network competitor" of Quest in northern California—was terminated on September 15, 2012.  FAC ¶ 85.  Aetna has rejected multiple requests for independent laboratories to be added to its network, "based specifically on [Quest's] refusal to allow such new additions."  FAC ¶ 86.

Quest "bargained for right-of-first-refusal contracts with [Aetna] under which Quest controls entry into markets."  FAC ¶ 87.  Aetna must get Quest's approval before Aetna contracts with a lab, including ones that may want to launch a new network of hospital labs.  FAC ¶ 87.  Aetna refuses to even consider negotiating with laboratories:  in one instance, it rejected Hunter's offer of a 90 percent discount to remain in-network, which Hunter offered "in order to demonstrate [Aetna] and [Quest's] exclusionary behavior."  FAC ¶ 88.

"Aetna has also engaged in wide-spread harassment and intimidation of patients and physicians to steer business to [Quest] and to stop [them] from sending laboratory work" to out-of-network laboratories, such as the plaintiffs, even though Aetna's contracts with patients allow them to go out-of-network.  FAC ¶ 89.  Aetna sent letters to its customers encouraging them to use Quest and stating that Hunter is more expensive.  FAC ¶ 90, Exs. 8 & 9.

In addition, Quest and Aetna created "physician bonus pools" to induce physicians to refer all of their lab tests to Quest.  FAC ¶ 92.  HMOs, including Aetna, create "bonus pools," from which out-of-network testing costs are deducted, then any surplus is shared with the physicians.  FAC ¶ 92.  Physician groups have an incentive to refer "lucrative" fee-for-service Medicare business to Quest, but not its regional lab competitors.  FAC ¶ 93.  This arrangement caused Quest's Medicare revenue to grow by hundreds of millions of dollars in all five product markets, to the detriment of regional labs such as Hunter.  FAC ¶ 94.

## V.  THE BSC-QUEST AGREEMENT

In 2009, Hunter was Quest's largest private competitor in northern California, and Westcliff was the largest private laboratory in California and Quest's second largest competitor in southern California.  FAC ¶ 96.  Quest threatened not to renew its contract with BSC unless BSC agreed not to renew its contracts with Westcliff and Hunter; to further induce BSC, Quest offered a 10 percent discount that "forced" BSC to accept.  FAC ¶ 96.  (Hunter learned that BSC's

9

1    agreement with Quest required Hunter's termination from a BSC senior network manager around

2    April 29, 2010.  FAC ¶ 99.)  Within three months, Westcliff entered bankruptcy.  FAC ¶ 96.  BSC

3    terminated its contract with Hunter, after which Quest sales representatives told physicians that

4    Hunter was expensive out-of-network, that Quest "would soon drive" Hunter into bankruptcy, and

5    that they should send patients to Quest to "avoid service disruptions from imminent bankruptcy."

6    FAC ¶ 97.  Hunter's business began to suffer after the termination but "was not able to survive."

7    FAC ¶¶ 98 & 100.

8        Hunter, "which averaged 45% annual growth in Northern California for five years, could

9    no longer compete for market share" after BSC's termination.  FAC ¶ 101.  A chart in the FAC

10   reflects that Hunter had rapid growth from 2005—apparently its first year with revenue—to 2009.

11   Its 2009 revenue was about $21 million, after which BSC terminated its contract with Hunter.

12   Hunter's revenue then dropped to about $19 million.  In 2011, it went back up to about $21

13   million.  After Aetna terminated its contract as well, Hunter's revenue dropped to about $20

14   million in 2012.  FAC 33.  Hunter "could never get back to pre-termination annual revenue and

15   operating losses ballooned to $15.4 million."  FAC ¶ 101.  Hunter lost accounts totaling $1.3

16   million.  FAC ¶ 101.

17       On February 14, 2013, Hunter "received an unsolicited application" from BSC to join its

18   network and to sign an Allied and Ancillary Provider Agreement.  FAC ¶ 102, Ex. 10.  After

19   Hunter sent in its application, BSC told Hunter "through counsel that under no circumstances

20   would [Hunter] be permitted back in-network and that it should cease all efforts to apply."  FAC

21   ¶ 102 (original emphasis).

22       In August 2013, Hunter sold a "majority of its laboratory testing business at a deep

23   discount."  FAC ¶ 103.  SPA's business was affected because approximately 50 percent of SPA's

24   business is "tied" to Hunter.  FAC ¶ 104.

25   **VI.   WAIVING CO-PAYS AND DEDUCTIBLES**

26       Quest capped patient obligations or waived all patient co-pays and deductibles to prevent

27   physicians from using competitor labs.  FAC ¶ 105.  Quest may lose money by doing this, but "it

28   makes up the losses with 'pull through'" government business.  FAC ¶ 105.  Physicians can

provide these waivers, but doing so to obtain Medicare and Medicaid business is prohibited by anti-kickback laws.  FAC ¶ 106.

## VII.    ANTICOMPETITIVE EFFECTS

The conduct described above has affected all five product markets.  FAC ¶ 108.  Because BCBSA covers 32 percent of the United States population, and Aetna covers nine percent, exclusion from those two networks "effectively precludes Plaintiffs . . . from serving over 40% of the population."  FAC ¶ 109.  And because most physicians prefer to use a laboratory that can service "a significant portion" of its patients on an in-network basis, loss of in-network status for "as little as 10% of a physician's patients can cause a laboratory to be dropped" by the physician completely.  FAC ¶ 109.

Quest is the largest laboratory in the world even though it may have questionable quality. FAC ¶¶ 110-112.  Barriers to entry and expansion in the regional relevant markets for the sale of specialty testing are also high.  FAC ¶ 113.  Quest is estimated to have a 46 percent share of the "independent lab market in California," which is followed by Labcorp with a 20 percent share. FAC ¶ 116.  In particular, it has a 73 percent market share of the "[n]orthern California physician outpatient market" based on figures that are partially estimated by Hunter.  FAC ¶ 117.

## PROCEDURAL HISTORY

On June 25, 2013, the Honorable Jon Tigar dismissed the plaintiffs' original Complaint with leave to amend.  Dkt. No. 85 ("Order").  Judge Tigar found that the plaintiffs failed to adequately plead the existence of a horizontal agreement between the insurer defendants or a vertical agreement between BCBSA and Quest.  Order 12.  While Judge Tigar found that the plaintiffs adequately pleaded vertical agreements between Aetna and Quest, and BSC and Quest— which he assessed to see whether they were illegal exclusive-dealing contracts—he concluded that the plaintiffs failed to adequately plead foreclosure of the relevant markets and did not provide sufficient allegations showing how competition was adversely affected by the defendants' actions. Order 15-19.  For the same reasons, and because the plaintiffs did not adequately plead a "dangerous probability of recoupment" or an agreement, the plaintiffs' monopolization, attempted monopolization, and conspiracy to monopolize cause of action failed.  Order 19-22.  With regard

United States District Court
Northern District of California

1    to the Unfair Practices Act claim against Quest, Judge Tigar found that the plaintiffs failed to

2    allege Quest's prices or costs, and with regard to the interference with prospective economic

3    advantage claims, Judge Tigar found that the plaintiffs did not sufficiently allege an underlying

4    wrongful act or that the defendants owed them a duty of care.  Order 22-24.  For all the reasons

5    above, Judge Tigar also found that the plaintiffs' Unfair Competition Law cause of action failed.

6    Order 24.

7         On August 9, 2013, the plaintiffs filed their FAC asserting the same causes of action.  Dkt.

8    No. 94.  The plaintiffs bring the following causes of action against all of the defendants:  (1)

9    violation of California's Cartwright Act, CAL. BUS. & PROF. CODE §§ 16700 *et seq.*; (2) violation

10   of California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE §§ 17200 *et seq.*; (4)

11   intentional interference with prospective economic advantage; (5) negligent interference with

12   prospective economic advantage; (6) monopolization or attempted monopolization in violation of

13   the Sherman Act, 15 U.S.C. § 2; (7) bilateral conspiracies to restrain trade and monopolize in

14   violation of the Sherman Act, 15 U.S.C. § 1; and (8) bilateral conspiracies to monopolize and

15   attempt to monopolize in violation of the Sherman Act, 15 U.S.C. § 2.  The plaintiffs' Third Cause

16   of Action for a violation of California's Unfair Practices Act ("UPA"), CAL. BUS. & PROF. CODE

17   §§ 17043, 17044, is brought against Quest only.  The plaintiffs seek treble damages and injunctive

18   and other relief.  The defendants now move to dismiss the FAC.[3]

19                                    **LEGAL STANDARD**

20        A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the

21   pleadings fail to state a claim upon which relief can be granted.  FED. R. CIV. P. 12(b)(6).  The

22   Court must "accept factual allegations in the complaint as true and construe the pleadings in the

23   light most favorable to the nonmoving party," *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519

24

25   _____

26        [3] On August 20, 2013, the Court held a case management conference.  Pursuant to Judge
     Tigar's April 29, 2013, order denying a stay of discovery requested by the defendants, the Court
27   ordered discovery to continue in this case.  Dkt. No. 95.  The Court also instructed the parties to
     inform the Court by August 29, 2013, if the parties are unable to agree to a reasonable scope for
28   discovery; no such notice was given.

United States District Court
Northern District of California

1   F.3d 1025, 1031 (9th Cir. 2008), drawing all "reasonable inferences" from those facts in the

2   nonmoving party's favor, *Knievel v. ESPN*, 393 F.3d 1068, 1080 (9th Cir. 2005).  A complaint

3   may be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its

4   face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility

5   when the pleaded factual content allows the court to draw the reasonable inference that the

6   defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

7   However, "a complaint [does not] suffice if it tenders naked assertions devoid of further factual

8   enhancement," *id.* (quotation marks and brackets omitted), and the court need not "assume the

9   truth of legal conclusions merely because they are cast in the form of factual allegations," *W. Min.*

10  *Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).  If a motion to dismiss is granted, a court

11  should normally grant leave to amend unless it determines that the pleading could not possibly be

12  cured by allegations of other facts.  *Cook, Perkiss & Liehe v. N. Cal. Collection Serv., Inc.*, 911

13  F.2d 242, 247 (9th Cir. 1990).

## DISCUSSION[4]

14

## I.   SECTION 1

15

16         Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust

17  or otherwise, or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  Despite the literal

18  language of the statute, only "unreasonable" restraints of trade are unlawful.  *State Oil Co. v.*

19  *Khan*, 522 U.S. 3, 10 (1997).  Where an agreement is "so plainly anticompetitive that no elaborate

20  study of the industry is needed to establish their illegality," the court should find it per se illegal.

21  *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978).  Otherwise, the Supreme

22  Court "presumptively applies rule of reason analysis, under which antitrust plaintiffs must

23  demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive

24  before it will be found unlawful."  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

25         To survive a motion to dismiss in a Section 1 case, "an allegation of parallel conduct and a

26

27  _____

28  [4] Because California's Cartwright Act mirrors the federal Sherman Act, the Court analyzes them jointly according to federal law.  *Cnty of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 265 (Ct. App. 1983).

United States District Court
Northern District of California

bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556.  Rather, "claimants must

plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove:

(1) a contract, combination or conspiracy among two or more persons or distinct business entities;

(2) by which the persons or entities intended to harm or restrain trade or commerce [ ]; (3) which

actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

"In addition to these elements, plaintiffs must also plead (4) that they were harmed by the

defendant's anti-competitive contract, combination, or conspiracy, and that this harm flowed from

an 'anti-competitive aspect of the practice under scrutiny.'  This fourth element is generally

referred to as 'antitrust injury' or 'antitrust standing.'"  *Brantley v. NBC Universal, Inc.*, 675 F.3d

1192, 1197 (9th Cir. 2012) (citations omitted).  "The Ninth Circuit [ ] held that . . . a Section 1

claim should 'answer the basic questions: who, did what, to whom (or with whom), where, and

when?'"  *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1116 (N.D. Cal. 2012)

(citation omitted).

"Restraints imposed by agreement between competitors have traditionally been

denominated as horizontal restraints, and those imposed by agreement between firms at different

levels of distribution as vertical restraints."  *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717,

730 (1988).  "[A] group of competitors may act in concert to harm another competitor or exclude

that competitor from the market," thus forming a horizontal agreement.  *Brantley*, 675 F.3d at

1198.  "Vertical agreements that foreclose competitors from entering or competing in a market can

injure competition by reducing the competitive threat those competitors would pose. . . . [but]

[o]ther types of vertical agreements do not necessarily threaten an injury to competition."  *Id.*

"[A] vertical restraint is not illegal *per se* unless it includes some agreement on price or price

levels."  *Bus. Elecs. Corp.*, 485 U.S. at 735-36.

The plaintiffs appear to allege both horizontal and vertical agreements in violation of

Section 1 of the Sherman Act.  They allege three separate vertical agreements between each of the

insurers and Quest.  FAC ¶¶ 56, 87, 96.  They also appear to allege that the defendants are all part

of a single overarching conspiracy.  *See, e.g.*, FAC ¶¶ 119 & 120.  Judge Tigar characterized the

overarching conspiracy as a horizontal agreement in the form of a "hub and spoke" arrangement.

United States District Court
Northern District of California

1   Order 10.  The plaintiffs do not dispute that characterization, so the Court will also treat it as such.

2         **A.  The Plaintiffs Do Not Adequately Allege A Horizontal Agreement.**

3         The Court is unaware of any Ninth Circuit cases dealing with hub-and-spoke conspiracies

4   in the antitrust context, but other courts and commentators have addressed them.  A hub-and-

5   spoke conspiracy involves "a series of vertical agreements between each individual competitor and

6   a common [entity]."  1 ANTITRUST LAW DEVELOPMENTS 20 (Am. Bar Ass'n Section of Antitrust

7   Law ed., 7th ed. 2012) ("ALD").  The common entity is the "hub," and it enters into individual

8   agreements with other entities that compete with each other, which form the "spokes."  *Id.*  Such

9   agreements may be perfectly legal.  "The series of agreements becomes an actionable horizontal

10  conspiracy, however, when there is some set of facts showing a connecting agreement among the

11  horizontal competitors that form the spokes."  *Id.* (citing *In re Microsoft Corp. Antitrust Litig.*, 127

12  F. Supp. 2d 728, 733 (D. Md. 2001), *aff'd sub nom. Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th

13  Cir. 2002)).  This horizontal agreement is the "rim" that connects the "hub" and "spokes" into a

14  wheel.  *Id.*; *see also In re Nat'l Ass'n of Music Merchants, Musical Instrums. & Equip. Antitrust*

15  *Litig.*, 2011 WL 3702453, at \*5 (S.D. Cal. Aug. 22, 2011).

16        Judge Tigar dismissed this aspect of the Complaint because the plaintiffs "did not allege

17  that any insurer knew of the others' [alleged] contracts with Quest."  Order 10.  In other words, the

18  plaintiffs did not adequately plead an agreement that formed the "rim" connecting the "spokes."

19  The FAC suffers the same infirmity.  Not only does the FAC lack any allegation about an actual

20  agreement between all the defendants, it does not even allege any evidence of parallel conduct that

21  might "raise[] a suggestion of a preceding agreement."  *Twombly*, 550 U.S. at 557.  The only

22  pleaded connection between any of the insurers is the fact that BCBSA licenses the "Blue Shield"

23  name to BSC, but as with the Complaint, the FAC fails to show how BSC's and BCBSA's

24  respective alleged agreements with Quest are connected by "either an agreement or understanding

25  that [these] 'spokes' would cooperate in [a] conspiracy."  *In re Nat'l Ass'n of Music Merchants*,

26  2011 WL 3702453, at \*5 (citing *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 931-36 (7th Cir.

27  2000)).  Beyond that, the FAC only alleges individual agreements between each insurer and Quest.

28  There is no sufficiently pleaded horizontal agreement.

United States District Court
Northern District of California

The separate subsections of the "Factual Background" portions of the plaintiffs' briefs opposing Aetna, BSC, and BCBSA's Motions to Dismiss that detail the "Amendments," "Additional Allegations," and "New Allegations" in the FAC do not reflect any new facts to support the existence of a "rim." Opp'n to Aetna 4-5; Opp'n to BSC 3-4; Opp'n to BCBSA 4. The same is true of the "Factual Background" portion of the plaintiffs' brief opposing Quest's Motion to Dismiss. Opp'n to Quest 2-10. The plaintiffs' briefs do not even attempt to baldly assert the existence of a "rim" which connects the three alleged vertical agreements. *See, e.g.*, Opp'n to Quest 13-14 (listing agreements FAC alleged). While the plaintiffs repeatedly state that "BCBSA exists solely for the benefit of the BluePlans and to facilitate their concerted action," *id.*, which may show a "rim" between BCBSA and BSC, these are "only ultimate facts . . . and legal conclusions. They fail[ ] to plead the necessary evidentiary facts to support those conclusions." *Kendall*, 518 F.3d at 1047-48. But even accepting those conclusory assertions as true, concerted action alone is insufficient to establish a Section 1 violation. The plaintiffs still fail to plead facts showing a horizontal agreement, *Twombly*, 550 U.S. at 556, or any common design or scheme, and they make no legal argument that absolves their need to do so.

The Motions to Dismiss the plaintiffs' First, Seventh, and Eighth Causes of Action are GRANTED WITH LEAVE TO AMEND to the extent that they relate to a horizontal agreement between the defendants.

**B. The Plaintiffs Do Not Adequately Allege An Unreasonable Vertical Agreement.**

**1. BCBSA-Quest**

The plaintiffs fail to adequately plead the existence of an agreement between BCBSA and Quest to change the Blue Card policy to keep the plaintiffs and other laboratories out of Blue Plan networks. The FAC alleges that Quest "supported" these changes and that Quest "act[ed] in concert" with BCBSA to prevent competitors from getting into the network. FAC ¶¶ 31, 33 & 54. The plaintiffs also allege that Jim Barkach of BCBSA told Hunter's CEO over the phone that no laboratory could match the "deal" that BCBSA had with Quest and hung up. FAC ¶ 55. The sole remaining allegation linking Quest to BCBSA's Blue Card changes is that Quest vetoed ACLA's sending a letter to BCBSA protesting the changes to the Blue Card policy. FAC ¶ 54. Based on

these exact facts, Judge Tigar found that the plaintiffs failed to adequately plead a vertical agreement between BCBSA and Quest.  Indeed, he concluded that Quest's explanation for why it vetoed the letter—namely, that it acted independently and in its own interests—"is so convincing that plaintiffs' explanation"—that BCBSA and Quest agreed to drive Quest's competitors out of business—"is *im*plausible."  Order 12 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

The Court finds no reason to conclude differently when it is presented with the same facts as the original Complaint.  The Court also notes that the plaintiffs' argument that Quest and BCBSA had an actual agreement is also implausible because the plaintiffs do not explain why Quest would bother vetoing a protest letter *to BCBSA* if it indeed had an agreement with BCBSA.  Such an effort appears futile and further shows the implausibility of the plaintiffs' theory.

The plaintiffs state, "The FAC contains sufficient allegations to plausibly allege an agreement.  Quest and BCBSA entered into an agreement designed to drive business to Quest and drive Quest's competitors out of business."  Opp'n to BCBSA 7.  In addition, "The change to the BlueCard plan was made by BCBSA and Quest acting together . . . ."  Opp'n to BCBSA 8.  Finally, "The question before the Court is whether it is plausible that BCBSA and Quest agreed to implement the change.  The answer is yes."  Opp'n to BCBSA 9.  But repeating the same conclusion over and over without giving any *facts* to support it is insufficient to state a claim— Rule 8 cannot be worn down by brute force.  As the Ninth Circuit instructs, a plaintiff must "plead the necessary evidentiary facts to support those conclusions."  *Kendall*, 518 F.3d at 1047-48. Here, the plaintiffs provide nothing but conclusions.

The Motions to Dismiss the plaintiffs' First, Seventh, and Eighth Causes of Action are GRANTED WITH LEAVE TO AMEND to the extent that they relate to a vertical agreement between BCBSA and Quest.

### 2.  BSC-Quest

Judge Tigar found that the plaintiffs adequately pleaded the existence of a vertical agreement between BSC and Quest, and analyzed whether it constituted an unreasonable exclusive dealing arrangement.  Order 12-13.  He concluded that the agreement as alleged in the original

17

1   Complaint was not illegal.  Order 16.  The Court will analyze the agreement as pleaded in the

2   FAC.

3          "Exclusive dealing" is an arrangement whereby a seller of a product or service prevents a

4   buyer from purchasing that product or service from any other seller.  *Allied Orthopedic Appliances*

5   *Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010).  Because there are "well-

6   recognized economic benefits to exclusive dealing arrangements," *Omega Envtl., Inc. v. Gilbarco,*

7   *Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997), "an exclusive-dealing arrangement does not constitute a

8   per se violation of section 1," *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676

9   F.2d 1291, 1303-04 (9th Cir. 1982).  "Under the antitrust rule of reason, an exclusive dealing

10  arrangement violates Section 1 only if its effect is to 'foreclose competition in a substantial share

11  of the line of commerce affected.'"  *Allied Orthopedic Appliances*, 592 F.3d at 996 (citation

12  omitted).  Although not the exclusive or primary factor, courts typically look (at least initially) to

13  the percentage share of the relevant market foreclosed by the challenged agreement to determine

14  whether the agreement is unreasonable.[5]  ALD 215-16.  Different courts have required different

15  levels of foreclosure before finding that an agreement is anticompetitive, *id.* n.1370-1372, but the

16  Ninth Circuit does not appear to have clearly established such a threshold.

17         Here, as with their original Complaint, the plaintiffs provide no allegations sufficient to

18  show whether the BSC-Quest agreement "foreclose[d] competition in a substantial share" of the

19  relevant markets, nor do they provide any indicia that competition has been harmed.  While the

20  FAC alleges that Hunter was Quest's "largest privately owned competitor operating a full-service

21  laboratory in Northern California" and "Westcliff was the largest privately owned laboratory in

22  California and Quest's second largest competitor in Southern California," FAC ¶ 96, this is not

23  enough to show the size of the relevant markets, let alone the magnitude of foreclosure.  Nor are

24  Hunter's revenues from 2003 to 2012 and the allegation that it "averaged 45% annual growth in

25  Northern California for five years" enough.  FAC ¶¶ 100 & 101.  The FAC does not state which of

26  the five relevant markets it identifies in the FAC is affected by the BSC-Quest agreement; how

27  

28  _____

[5] Judge Tigar found the plaintiffs' alleged product and geographic markets adequately pleaded, and those same markets are pleaded here.

United States District Court
Northern District of California

large that market is; what market participants there are; how the agreement affected the plaintiffs' shares, Quest's share, or any other market participant's share; whether there are other purchasers in the relevant market to which market participants may turn aside from BSC; or how competition has been harmed.  "Proving injury to competition in a rule of reason case almost uniformly requires a claimant to . . . show the effects upon competition within [the relevant] market."  *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988).  Without providing *any* of this information, the plaintiffs' claim fails.

While recognizing that Judge Tigar held that the "original Complaint did not sufficiently allege foreclosure of market opportunities," the plaintiffs argue, "The FAC rectifies this problem." Opp'n to BSC 7-8.  It does not.  The plaintiffs merely contend that the agreement foreclosed Hunter, Westcliff, and SPA from opportunities.  *Id.*  Assuming that is true, the plaintiffs must still provide the Court with enough allegations to determine whether a "substantial share" of the relevant market was foreclosed.  The plaintiffs point out that Judge Tigar quoted the Ninth Circuit as stating that a court should not engage in "blind reliance upon market share, divorced from commercial reality."  *Id.* 8 (quoting Order 19).  Even ignoring the fact that Judge Tigar's statement comes from his discussion about Section 2 and market power, and accepting that the Court should not unduly rely on market shares, the plaintiffs' FAC is nonetheless completely devoid of any context in which to evaluate their claims.  It may very well be that Hunter, Westcliff, and SPA constitute a "substantial share" of the relevant market or markets, but with only what the plaintiffs present, the Court cannot tell.  All that can be said is that three of Quest's alleged competitors were injured, but the antitrust laws are meant to protect competition, not competitors.  As the Ninth Circuit has said, a "claimant [must] demonstrate harm to the economy beyond the claimants' own injury."  *Oltz*, 861 F.2d at 1448.  The plaintiffs have not given the Court sufficient information to determine whether competition generally has been harm, and thus they have not sufficiently pleaded that the BSC-Quest agreement is unreasonable under Section 1.

The Motions to Dismiss the plaintiffs' First and Seventh Causes of Action are DISMISSED WITH LEAVE TO AMEND to the extent that they relate to a vertical agreement between BSC and Quest.

**C. Aetna-Quest**

Judge Tigar found that the plaintiffs adequately pleaded the existence of a vertical agreement between Aetna and Quest, and analyzed whether it constituted an unreasonable exclusive dealing arrangement. Order 12-13. He concluded that the agreement as alleged in the original Complaint was not illegal. Order 18-19. The Court will analyze the agreement as pleaded in the FAC. The agreement allegedly covers (1) steep discounts from Quest in exchange for the termination from Aetna's network of 400 regional labs across the United States; (2) a right of first refusal for Quest before Aetna enters into a new contract with Quest's competitors in a certain area; (3) "wide-spread harassment and intimidation of patients and physicians to steer business" to Quest; and (4) "bonus pools" from which physicians are paid the remainder of money previously set aside that has not been spent out-of-network.

The plaintiffs' claims concerning the Aetna-Quest agreement fail for substantially the same reasons their claims concerning the BSC-Quest agreement failed:  the plaintiffs do not sufficiently allege anticompetitive effects in a relevant market, whether through substantial foreclosure or otherwise. Here, the plaintiffs allege that Aetna "insures approximately 9% of the U.S. population." FAC ¶ 81. However, they do not state Aetna's market share in any of the five product and geographic markets identified in the FAC, three of which are not national. Even assuming that the nine percent figure is an adequate proxy for Aetna's share in each of the pleaded markets, and assuming that those shares represent the shares of the markets foreclosed from Quest's competitors—and these are bold assumptions—the foreclosure is insufficient to find an anticompetitive effect. In his Order, Judge Tigar held that "with respect to 'exclusive dealing, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent.'" Order 18 (citing *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 66 (1st Cir. 2004) (Boudin, J.)). Many other cases are in accord with this level. ALD 215-16. On this basis, Judge Tigar found the original Complaint lacking. The nine percent figure has not changed from the original Complaint to the FAC. Because the plaintiffs do not plead materially new facts, the Court also finds the FAC lacking in this regard.

As with the BSC-Quest agreement, the plaintiffs do not provide the Court with any other

United States District Court
Northern District of California

context in which to judge whether there has been substantial foreclosure or any other indicia of anticompetitive effects.  They allege harm to "other competitors" and "independent laboratories," Opp'n to Aetna 9; FAC ¶ 86, but do not say who.  They claim that 400 laboratories were wrongfully excluded from Aetna's network, but do not say where these laboratories are or in which markets they operate, as well as their positions in those markets.  The plaintiffs assert that the alleged right of first refusal allows Quest to determine its competitors, but do not claim that Quest ever exercised that right.[6]  In addition, the plaintiffs argue that "[t]he FAC alleges harm to the market is [sic] several ways."  Opp'n to Aetna 8.  They claim that "Plaintiffs and other small labs are being forced out of business" and cite to paragraphs 96, 100, and 103 of the FAC.  However, those paragraphs refer to harm that *BSC* allegedly caused—they have nothing to do with Aetna's alleged agreement.  The plaintiffs also cite to Exhibits 8 and 9 of the FAC to show Aetna's "coercion" and "harassment" of physicians to use Quest.  Opp'n to Aetna 8.  However, these letters only state, "Hunter Laboratories will soon be out of network for Aetna members . . . we want to make you aware that our agreement with them will end . . . Our members pay much more to use out-of-network providers.  You can help your patients save money by referring them to in-network laboratories," and other apparently accurate, non-harassing statements.  The plaintiffs' arguments are belied by the evidence they present.

Rebutting Aetna's argument that it does not make economic sense for a purchaser to conspire with a supplier to give that supplier market power, the "Plaintiffs agree with Aetna and Quest's contention that it is not in the long-term economic interest of Aetna . . . to conspire with Quest to drive competitors out of business.  However, Aetna's failure to put their long term business interests ahead of short term gains is certainly not implausible."  Opp'n to Aetna 9.  In response to an identical argument, the *Stop & Shop* court wrote that "courts tend to be skeptical of such claims."  *Stop & Shop*, 373 F.3d at 66.  It continued that "an excluded supplier remains free to offer evidence that, in the individual instance, the anti-competitive consequences of an exclusive contract outweigh the benefits . . . [t]his almost always requires a showing of injury to

---

[6] The FAC only states that Quest "has bargained for" a right of first refusal—it never says that Aetna ever agreed to it.

United States District Court
Northern District of California

competition." *Id.*  Here, the plaintiffs have not presented any plausible injury to competition—only injury to themselves.  *See Brantley*, 675 F.3d at 1198 (stating that an injury to competition must be "beyond the impact on the plaintiffs themselves").  Thus, their argument cannot be accepted.

The plaintiffs argue that "[b]ecause of how the market for independent clinical lab testing operates, foreclosure of as little as ten percent of the market prevents a lab from offering any services to a physician, meaning that the agreement between Quest and Aetna has significant anticompetitive effects."  Opp'n to Aetna 10.  Judge Tigar has already rejected the plaintiffs' attempts "merely to repeat [this] claim."  Order 18.  The Court also finds the plaintiffs' argument conclusory and wholly unsupported:  the plaintiffs have not explained why this is true in theory and have not sufficiently pleaded that this has actually led to substantial foreclosure in a relevant market.[7]  In any event, the heart of the plaintiffs' complaints is that they are not part of Aetna's network—that is quite different from Aetna's foreclosing them from the *market*.  While the plaintiffs argue that the defendants' actions limit consumer choice, the Ninth Circuit has explicitly held that "allegations that an agreement has the effect of reducing consumers' choices . . . does not sufficiently allege an injury to competition."  *Brantley*, 675 F.3d at 1202.

With regard to the right of first refusal, the plaintiffs cite *Hahn v. Oregon Physicians' Services*, 868 F.2d 1022, 1029 (9th Cir. 1988), for the proposition that the Sherman Act prohibits network agreements in which one provider can determine which other providers can compete against it.  Opp'n to Aetna 10.  Judge Tigar also already rejected that argument, Order 16 n.2, and the Court finds no reason to expend additional judicial resources addressing resurrected arguments.

Finally, the plaintiffs cite to *Perinatal Medical Group, Inc. v. Children's Hospital Central California*, No. 09-cv-1273-LJO, 2010 WL 1525511, at *9 (E.D. Cal. April 15, 2010), as further support for its argument that the Sherman Act does not permit market participants to choose its

---

[7] The plaintiffs' argument appears to stem from the allegation in their FAC that "loss of in-network status with respect to as little as 10% of a physician's patients can cause a laboratory to be dropped from use by the physician, completely."  FAC ¶ 109.  This assertion is quite different than the argument the plaintiffs make in their opposition briefs.

United States District Court
Northern District of California

competitors.  Opp'n to Aetna 10.  Concerning a vertical agreement between a hospital and a group of physicians, the court held, "Under certain factual circumstances, an exclusive contract between a hospital and specialty group of physicians, that requires every patient treated at the hospital to use the services of that firm of physicians, may violate Section 1 of the Sherman Act."  *Perinatal Med. Grp.*, 2010 WL 1525511, at *9.  That case is distinguishable, however, because it involves an exclusive contract, which ultimately is not what is present here—as the plaintiffs state, Aetna "refused to enter into the exclusive contract."  FAC ¶ 85.  Indeed, the plaintiffs never allege that Aetna members are not allowed to go out of the network, and Exhibits 8 and 9 to the FAC suggest that they can.  Thus, no cases the plaintiffs cite help them.

The Motions to Dismiss the plaintiffs' First and Seventh Causes of Action are GRANTED WITH LEAVE TO AMEND to the extent they relate to a vertical agreement between Aetna and Quest.

## II.        SECTION 2

Section 2 of the Sherman Act makes it unlawful for anyone to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."  15 U.S.C. § 2.  The plaintiffs allege that Quest has monopolized and attempted to monopolize the relevant markets, and that the defendants all conspired to monopolize the relevant markets.

### A.  The Plaintiffs Do Not Adequately Allege Monopolization.

To establish liability for a monopolization claim, a plaintiff must demonstrate "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 480 (1992).  A private plaintiff must also demonstrate antitrust injury by "prov[ing] that his loss flows from an anticompetitive aspect or effect of the defendant's behavior."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995).  "Market share is evidence from which the existence of monopoly power may be inferred, but it should not be equated with monopoly power.  Blind reliance upon market share, divorced from commercial

23

reality, could give a misleading picture of a firm's actual ability to control prices or exclude competition." *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980). "The second element of a successful monopolization claim requires that the conceded monopolist have engaged in 'willful' acts directed at establishing or retaining its monopoly." *Calif. Computer Prods., Inc. v. Int'l Bus. Machines Corp.*, 613 F.2d 727, 735 (9th Cir. 1979). "The test of willful maintenance or acquisition of monopoly power is whether the acts complained of unreasonably restrict competition." *Drinkwine v. Federated Publ'ns, Inc.*, 780 F.2d 735, 739 (9th Cir. 1985).

With regard to the first element, the plaintiffs allege that Quest has "an estimated 73% market share of the Northern California physician outpatient market" based on Hunter's "experience in this industry" and publicly available information, that Quest "has a 46% share of the independent lab market in California," and that its "website boasts that 'Quest Diagnostics is the world's leading provider of diagnostic information services.'" FAC ¶¶ 114, 116 & 117. What is fatal for the plaintiffs' monopolization claim is that neither the "Northern California physician outpatient market" nor the "independent lab market in California" is one of the five product and geographic markets alleged in the FAC. The same is true of the world market for "diagnostic information services." To state a claim, the plaintiffs must allege "monopoly power *in the relevant market*," and not just any market. *Eastman Kodak*, 504 U.S. at 480 (emphasis added). Judge Tigar previously rejected the plaintiffs' monopolization claim based on their earlier allegation that Quest had "70% market share of the Northern California physician outpatient market" because that was not one of the alleged relevant markets, yet the plaintiffs persist in making a nearly identical claim. Order 20; Compl. ¶ 74. Quest rightly points out the plaintiffs' second failing in this regard, Quest Br. 15, but the plaintiffs make no attempt whatsoever in their opposition brief to respond to this important point.

With regard to the second element, the plaintiffs fail to establish that Quest's alleged actions "unreasonably restrict competition" for the same reason their Section 1 vertical-agreement claims fail, namely, the plaintiffs do not provide any context against which the Court may evaluate the extent to which competition has been restricted. As the Ninth Circuit has said, "The defendant's acts [under the second element] are properly analyzed analogously to contracts,

24

combinations and conspiracies under [Section 1] of the Sherman Act . . . ."  *Calif. Computer Prods.*, 613 F.2d at 735-36.  To begin, the plaintiffs do not describe the dynamics over time of any of the five alleged relevant markets.  Within those markets, the plaintiffs do not say how Quest has grown or maintained its market position or how competition generally has fared relative to Quest.  The plaintiffs do not explain how Quest's alleged actions have "unreasonably restricted competition."  The FAC does allege that "[s]ince January 1, 2002, an estimated 49% of [Quest's] revenue has come from acquisitions" and "[o]ver the last eleven years[, Quest] has only added $600 million from internal growth and annual fee increases (approximately 8% of revenue growth) versus $3.15 billion from acquisitions."  FAC ¶ 115.  However, the plaintiffs' monopolization claims are completely belied by their conclusion that "[Quest] is only able to grow through acquisitions."  *Id.*  But the defendants' monopolization claims are not based on anticompetitive acquisitions.  Without alleging facts showing that Quest's challenged conduct "unreasonably restricts competition," the monopolization claims fail.

With regard to the final element, the plaintiffs fail to show antitrust injury.  "First, a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs."  *Weyerhaeuser co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 318 (2007) (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 211 (1993)).  The Ninth Circuit has suggested that the "appropriate measure" is marginal cost.  *Rebel Oil*, 51 F.3d at 1433.  Second, a plaintiff must show "a dangerous probability of recoupment of losses" by "demonstrat[ing] that there is a likelihood that the predatory scheme alleged would cause a rise in prices above a competitive level that would be sufficient to compensate for the amounts expended on the predation."  *Weyerhaeuser*, 549 U.S. at 318, 320.  As with the original Complaint, the plaintiffs fail to adequately plead "a dangerous probability of recoupment."  Judge Tigar already rejected the plaintiffs' theory that recoupment occurred through "pull-through" business from government and other fee-for-service billings.  Order 21.  However, the FAC reasserts that same claim.  In addition, the FAC fails to allege that such business is priced above a competitive level, or that Quest's alleged scheme will lead to its raising the prices of laboratory diagnostic services above

supra-competitive levels.  Without these allegations, the plaintiffs cannot support their causes of action for monopolization.

The plaintiffs fail to adequately plead that Quest monopolized any relevant market.

**B.  The Plaintiffs Do Not Adequately Allege Attempted Monopolization.**

"To establish a Sherman Act § 2 violation for attempted monopolization, a private plaintiff seeking damages must demonstrate four elements:  (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving 'monopoly power'; and (4) causal antitrust injury." *Rebel Oil*, 51 F.3d at 1432-33.  The requirements for monopolization and attempted monopolization are similar, "differing primarily in the requisite intent and the necessary level of monopoly power." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997).

"[A] specific intent to destroy competition or build monopoly is essential to guilt for the mere attempt." *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 626 (1953).  Such an intent may be "shown indirectly by proof of illegal conduct and, where necessary, market power." *Calif. Computer Prods.*, 613 F.2d at 737.  Demonstrating a dangerous probability of monopolization "requires inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993).  Market power can be shown by actual harm to competition inflicted by the defendant, such as restricted output or supracompetitive prices, or by the defendant's dominant market share and barriers to entry in the relevant market. *Rebel Oil*, 51 F.3d at 1434.

Here, the Court need not go into a detailed inquiry into whether the plaintiffs fail to sufficiently allege attempted monopolization—they do.  As discussed above, while the plaintiffs allege five relevant markets, they do nothing to explain the dynamics of those markets, let alone Quest's place in those markets.  They have not adequately alleged how big Quest is in each market or whether it has market power, what harm to competition has occurred, whether prices have exceeded or will exceed competitive levels, and how other competitors are affected.  Without such information, the plaintiffs fail to plead intent or a dangerous probability of achieving monopoly power.  And for the same reasons they do not adequately plead injury from monopolization, they

United States District Court
Northern District of California

1    also fail to do so here.

2         The plaintiffs fail to adequately plead that Quest attempted to monopolize any relevant

3    market.

4    ### C.  The Plaintiffs Do Not Adequately Allege A Conspiracy To Monopolize.

5         "To prove a conspiracy to monopolize in violation of § 2, [a plaintiff] must show four

6    elements:  (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in

7    furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust

8    injury."  *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).  "The

9    aggregation of market shares of several rivals is justified if the rivals are alleged to have conspired

10   to monopolize."  *Rebel Oil*, 51 F.3d at 1437.

11        As discussed above, the plaintiffs fail to plead any agreement or conspiracy, specific intent,

12   or antitrust injury.  Further, the insurers do not even compete in the same market as the plaintiffs,

13   and "[i]t is axiomatic in antitrust law that a defendant may not be found liable under the Sherman

14   act for monopolizing or attempting or conspiring to monopolize a market unless that defendant is a

15   competitor in the relevant market and his conduct creates a dangerous probability that he will gain

16   a dominant share of the market."  *Transphase Sys., Inc. v. S. Calif. Edison Co.*, 839 F. Supp. 711,

17   717 (C.D. Cal. 1993); *see also Mercy-Peninsula Ambulance, Inc. v. Cnty. of San Mateo*, 791 F.2d

18   755, 759 (9th Cir. 1986).  Thus, the plaintiffs fail to adequately plead that the defendants

19   conspired to monopolize any relevant market.

20        The plaintiffs repeatedly cite to *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d

21   at 1118, for the proposition that "[a] co-conspirator need not know of the existence or identity of

22   the other members of the conspiracy or the full extent of the conspiracy."  Rather, they argue,

23   "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the

24   various factual components and wiping the slate clean after scrutiny of each. . . . [T]he character

25   and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts,

26   but only by looking at it as a whole. . . ."  *Id.* (citation omitted).  The problem for the plaintiffs,

27   however, is that these portions of *In re High-Tech Employee Antitrust Litigation* only refer to the

28   element of intent.  Here, perhaps except for the overt-act element (which the Court does not

27

decide), the plaintiffs fail to adequately plead any other element of conspiracy to monopolize.

Indeed, the plaintiffs provide no argument that they have established intent except for their

conclusory assertion that "Plaintiffs meet this standard."  Opp'n to Quest 22.  The seeming

liberality of *In re High-Tech Employee Antitrust Litigation* does not save the FAC from its other

deficiencies.

The Motions to Dismiss the plaintiffs' First, Sixth, Seventh, and Eighth Causes of Action

for monopolization, attempted monopolization, and conspiracy to monopolize are GRANTED

WITH LEAVE TO AMEND.

## III.   UNFAIR PRACTICES ACT

The plaintiffs bring a cause of action under the UPA against Quest only.  Under the UPA,

"It is unlawful for any person . . . to sell any article or product at less than the cost thereof to such

vendor, or to give away any article or product, for the purpose of injuring competitors or

destroying competition."  CAL. BUS. & PROF. CODE § 17043.  It is also unlawful "to sell or use any

article or product" at less than cost.  CAL. BUS. & PROF. CODE § 17044.  A violation of the UPA is

unlike a violation of the Sherman Act for predatory pricing because the Sherman Act "looks to the

ultimate monopolistic impact and threatened harm produced by the pricing scheme—that is, the

probability of recoupment through future supracompetitive pricing upon elimination of

competitors."  *Bay Guardian Co. v. New Times Media LLC*, 187 Cal. App. 4th 438, 455-56 (Ct.

App. 2010).  On the other hand, "section 17043 does not require an anticompetitive impact" or

showing a dangerous probability of recoupment.  *Id.* at 456.  "The Sherman Act . . . seek[s] to

prevent anticompetitive acts that impair competition or harm competitors, whereas the UPA

reflects a broader legislative concern not only with the maintenance of competition, but with the

maintenance of *fair and honest* competition."  *Id.* (citations, brackets, and quotation marks

omitted).

In order to adequately plead a claim under the UPA, "a plaintiff must allege, in other than

conclusionary terms, the defendant's sales price, costs in the product, and cost of doing business."

*Fisherman's Wharf Bay Cruise Corp. v. Super. Ct. of the City and Cnty. of San Francisco*, 114

Cal. App. 4th 309, 322 (2003).  The element of "purpose" is shown through a "desire" to injure

competitors or destroy competition. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 169 (1999).

"California § 17043 uses a 'fully allocated cost' or 'average total cost' method to determine whether goods are sold below cost." *Blue Sky Color of Imagination, LLC v. Mead Westvaco Corp.*, No. 10-cv-02175-DDP, 2010 WL 4366849, at *5 (C.D. Cal. Sept. 23, 2010). "The concept of fully allocated cost has been equated with average total cost, which reflects that portion of the firm's total costs—both fixed and variable—attributable on an average basis to each unit of output." *Turnbull & Turnbull v. ARA Transp., Inc.*, 219 Cal. App. 3d 811, 820 (Ct. App. 1990) (citation and quotation marks omitted). In other words, "a fair allocation of all fixed or variable costs associated with production of the article or product." *Pan Asia Venture Capital Corp. v. Hearst Corp.*, 74 Cal. App. 4th 424, 432 (Ct. App. 1999). "To be legally acceptable, the allocation of indirect or fixed overhead costs to a particular product or service must be reasonably related to the burden such product or service imposes on the overall cost of doing business." *Turnbull*, 219 Cal. App. 3d at 822.

The plaintiffs adequately plead a claim under the UPA. The plaintiffs allege that Quest's Securities and Exchange Commission ("SEC") filings from 2004 to 2012 "report its total costs, and its total number of requisitions." FAC ¶ 59. They allege that "revenue, costs, and profits are often measured and reported on a per-requisition" basis in the laboratory industry. FAC ¶ 59. Using the total costs and total number of requisitions reported in the SEC filings, the plaintiffs derive a "fully-allocated cost per requisition," FAC ¶ 59, which corresponds with the "costs in the product." The plaintiffs also derive revenues per requisition, FAC ¶ 72, which corresponds with the "sales price," for both capitated contracts and fee-for-service accounts from the SEC filings. Based on these non-"conclusionary" numbers incorporated into the chart in paragraph 72 of the FAC, the plaintiffs show that Quest has been underpricing its requisitions from 2004 to 2012. The plaintiffs also identify particular tests that are allegedly priced below cost. *See, e.g.*, FAC ¶¶ 74, 76 & 77. In addition, the plaintiffs allege that Quest priced below cost "for the purpose of injuring Plaintiffs and destroying competition." FAC ¶ 140.

Quest argues that the plaintiffs' UPA claim fails because they must show prices and costs

29

United States District Court
Northern District of California

on a product-by-product basis and cites to *Fisherman's Wharf Bay Cruise Corporation v. Superior Court of the City and County of San Francisco* to support that proposition.  Quest Br. 18-19 (citing 114 Cal. App. 4th at 326).  *Fisherman's Wharf* says no such thing—it merely held that a plaintiff must plead *a* below-cost sale "without regard to whether other above-cost sales on identical or similar products made the overall enterprise profitable."  Furthermore, it did not prohibit the calculation method used by the plaintiffs.  Indeed, the allegation that the defendants' costs-per-requisition has been consistently below revenue-per-requisition makes it plausible that at least one product was priced below cost.

To be sure, California courts have suggested that it is acceptable to aggregate figures rather than attempt to precisely define costs and revenue on a product-by-product basis.  *See Turnbull*, 219 Cal. App. 3d at 821-23; *see also W. Union Fin. Servs., Inc. v. First Data Corp.*, 20 Cal. App. 4th 1530, 1537 (Ct. App. 1993).  There is no need to "only measure[] such costs which are causally related to the service or product in question."  *Turnbull*, 219 Cal. App. 3d at 821 (citing *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1115, 1122 (7th Cir. 1983)).  This is not to say that aggregating costs is persuasive.  As the court in *Turnbull* and the Seventh Circuit recognize, average total cost "is a quite arbitrary allocation of costs among different classes of service. . . . Despite trenchant criticism on economic grounds, [it] continues to be widely used for regulatory purposes, *inter alia*, because of its ease of application in dividing an authorized total revenue requirement among individual products or services—much as a pie is divided into slices. But [it] cannot purport to identify those costs which are *caused* by a product or service, and this is fundamental to economic cost determination."  *Turnbull*, 219 Cal. App. 3d at 821 (citing *MCI Commc'ns Corp.*, 708 F.2d at 1116)).  But the method has been deemed acceptable.

As one court noted, "the concept of cost may appear simple, but can often prove deceptively hard to grasp in the real world."  *Pan Asia Venture Capital*, 74 Cal. App. 4th at 435. This is especially true in an industry such as the one here, where patients may be covered by capitated or fee-for-service contracts, and may order combinations of tests dissimilar from those of other patients and be charged by requisition rather than by test, and where providers operate under

individually negotiated contracts that may contain varied terms, such as volume discounts.[8]  Using average total cost can avoid manipulation or distortion by a multi-product supplier (as Quest is) who can allocate certain costs from one product to another, thus giving the appearance of above-cost pricing on a disputed product.  *See Turnbull*, 219 Cal. App. 3d at 822.

The UPA "appears to be a painstaking endeavor by the legislature to combat the abuses which the business interests have deemed unfair practices in the competitive field."  *ABC Int'l Traders, Inc. v. Matsushita Elec. Corp.*, 14 Cal. 4th 1247, 1256 (1997) (quoting *Max Factor & Co. v. Kunsman*, 5 Cal. 2d 446, 478 (1936) (Shenk, J., dissenting)).  To require the plaintiffs to plead with an unreasonable degree of specificity would undermine the UPA's admonition that the statute "shall be liberally construed that its beneficial purposes may be subserved."  CAL. BUS. & PROF. CODE § 17002.  Much of the information that must be pleaded—Quest's costs and the prices it charges by product—is in Quest's hands and not easily accessed by the plaintiffs.  The Court does not "forget that proceeding to [ ] discovery can be expensive" or that the plaintiffs must meet their burden under Federal Rule of Civil Procedure 8.  *Twombly*, 550 U.S. at 558.  However, even in a case where the plaintiff "fail[ed] to allege a definite cost of doing business," the California Court of Appeal held that "it would serve no useful purpose to require a speculative allegation of cost which adds nothing to the notice given by the pleadings in their present state.  Accordingly, we view the present pleadings as sufficient under section 17043 and find error in sustaining the demurrer thereto."  *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 275 (Ct. App. 1983).

In sum, "the determination of cost is best approached on a case-by-case basis."  *Id.*  So long as the method used was not "arbitrary or irrational," it is sufficient for pleading purposes.  *See Turnbull*, 219 Cal. App. 3d at 822-23.  Finding that the plaintiffs adequately plead their UPA claim based on the information alleged in the FAC does not mean that the information or calculations provided are necessarily correct or even that the plaintiffs are likely to succeed in

---

[8] As the California Court of Appeal stated, "Having in mind the incredibly complex nature of the package being offered by defendants . . . proof of their costs will undoubtedly become a lawyer's nightmare, though it may turn out to be a C.P.A.'s dream.  All the same we find nothing in the Act's definition of 'costs' which compels a holding that plaintiffs can never prove what they allege."  *Paramount Gen. Hosp. Co. v. Nat'l Med. Enters., Inc.*, 42 Cal. App. 3d 496, 504 (Ct. App. 1974) (citations omitted).

United States District Court
Northern District of California

1    proving their claim.  Quest may dispute the details of the calculation method later to the trier of

2    fact.  However, the purpose of pleading is to put a defendant on sufficient notice of its alleged

3    wrongdoing, and the plaintiffs have done so here.  *G.H.I.I.*, 147 Cal. App. 3d at 276.

4        Quest argues that at least some of the plaintiffs' claims are barred by one-year and three-

5    year statutes of limitations.  Quest Br. 20.  That may be true.  The FAC alleges underpricing from

6    2004 to 2012.  However, "It is only when a complaint shows on its face that it is necessarily

7    barred, rather than possibly, that a demurrer on such grounds will be sustained. . . . [W]hile the

8    statute of limitations may preclude [the plaintiffs] from recovering some damages, it does not

9    provide a reason for sustaining [a] demurrer."  *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 279

10   (Ct. App. 1983) (citation omitted).  The FAC does not show on its face that the UPA claim is

11   "necessarily barred."  Dismissing any portion of this cause of action now is unwarranted.

12       Quest also argues that "Plaintiffs' UPA claim fails because it does not allege that [Quest]

13   acted with the purpose of injuring *Plaintiffs* as opposed to competitors generally" and cites to

14   *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1153-54 (9th Cir. 2008), in support.

15   Quest Br. 20 (original emphasis).  However, *Sybersound* only states that the plaintiff there failed

16   to plead *purpose*—it did not hold that a plaintiff must plead that the defendant acted with the

17   purpose of injuring the plaintiff specifically.  Here, however, the plaintiffs allege that Quest

18   underpriced "for the purpose of injuring Plaintiffs and destroying competition," FAC ¶ 140, which

19   meets "the purpose [requirement], i.e., the desire, of injuring competitors or destroying

20   *competition*" and addresses Quest's concern that the plaintiffs did not plead that it intended to

21   injure them.  *Cel-Tech Commc'ns*, 20 Cal. 4th at 169 (emphasis added).

22       Quest argues that none of the underpricing is alleged to have affected RDL.  Quest Reply

23   7.  The Court agrees and GRANTS WITH LEAVE TO AMEND Quest's Motion to Dismiss the

24   plaintiffs' Third Cause of Action to the extent that it relates to RDL.

25       Quest argues that the original Complaint stated that PBP did not come into existence until

26   2011, and thus PBP cannot have any claims predating that year.  Quest Reply 7.  However,

27   because such an allegation is not present in the FAC, the Court finds dismissal based on an

28   allegation in a non-operative pleading inappropriate.

United States District Court
Northern District of California

1  Except with regard to RDL, Quest's Motion to Dismiss the plaintiffs' Third Cause of

2  Action is DENIED.

3  **IV.    UNFAIR COMPETITION LAW**

4  The plaintiffs bring a cause of action under the UCL against all defendants.  The UCL

5  prohibits "any unlawful, unfair or fraudulent business act or practice."  CAL. BUS. & PROF. CODE §

6  17200.  "Each of these three adjectives captures a separate and distinct theory of liability."  *Rubio*

7  *v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quotation marks omitted).

8  **A.  "Fraudulent" Prong**

9  The "fraudulent" prong of the UCL "requires a showing [that] members of the public are

10  likely to be deceived."  *Wang v. Massey Chevrolet*, 97 Cal. App. 4th 856, 871 (2002).  The

11  plaintiffs do not allege that the defendants engaged in any fraudulent conduct that is likely to

12  deceive the public.  Thus, the Motion to Dismiss the plaintiffs' Second Cause of Action under the

13  "fraudulent" prong of the UCL is GRANTED WITH LEAVE TO AMEND.

14  **B.  "Unlawful" Prong**

15  The "unlawful" prong of the UCL "borrows violations of other laws and treats them as

16  independently actionable."  *Daugherty v. Am. Honda Motor Co., Inc.*, 51 Cal. Rptr. 3d 118, 128

17  (Ct. App. 2006).  Because the Court has found that Hunter, PBP, and SPA adequately state a claim

18  against Quest under the UPA, Quest's Motion to Dismiss their Second Cause of Action under the

19  "unlawful" prong of the UCL is DENIED.  Because the plaintiffs fail to adequately plead any

20  other cause of action, the Motions to Dismiss all other claims under the "unlawful" prong of the

21  UCL are GRANTED WITH LEAVE TO AMEND.

22  **C.  "Unfair" Prong**

23  Courts have employed two tests under the "unfair" prong of the UCL.  Some courts have

24  held that the "unfair" prong requires alleging a practice that "offends an established public policy

25  or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," and

26  the policy must be "tethered to specific constitutional, statutory or regulatory provisions."  *Bardin*

27  *v. Daimlerchrysler Corp.*, 39 Cal. Rptr. 3d 634, 642, 645 (Ct. App. 2006) (quotations omitted).

28  Other courts have held that the court must apply a balancing test that "weigh[s] the utility of the

United States District Court
Northern District of California

33

United States District Court
Northern District of California

1    defendant's conduct against the gravity of the harm to the alleged victim." *Schnall v. Hertz Corp.*,

2    93 Cal. Rptr. 2d 439, 456 (Ct. App. 2000).

3         A violation of the UPA undoubtedly "offends an established public policy." Because the

4    Court has found that Hunter, PBP, and SPA adequately state a claim against Quest under the UPA,

5    Quest's Motion to Dismiss their Second Cause of Action under the "unfair" prong of the UCL is

6    DENIED. Because the plaintiffs fail to adequately plead any other conduct that may be unfair, the

7    Motions to Dismiss all other claims under the "unfair" prong of the UCL are GRANTED WITH

8    LEAVE TO AMEND.

9    **V.**      **INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

      **A. The Plaintiffs Do Not Adequately Allege Intentional Interference With**
10          **Prospective Economic Advantage.**

11         The elements of an interference with prospective economic advantage claim are "(1) an

12    economic relationship between the plaintiff and some third party, with the probability of future

13    economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional

14    acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the

15    relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the

16    defendant." *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1108 (9th Cir.

17    2007) (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003)). A

18    plaintiff must "allege an act that is wrongful independent of the interference itself." *Id.* (citing

19    *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal 4th 376, 392-93 (1995)). "[A]n act is

20    independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional,

21    statutory, regulatory, common law, or other determinable legal standard." *Korea Supply*, 29 Cal.

22    4th at 1159.

23         To show an economic relationship, "the cases generally agree that it must be reasonably

24    probable the prospective economic advantage would have been realized but for defendant's

25    interference." *Youst v. Longo*, 43 Cal. 3d 64, 71 (1987). Any alleged relationship cannot be based

26    upon "overly speculative expectancies," and a seller of some good must show "an existing

27    relationship with an identifiable buyer." *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal.

28    App. 4th 507, 522, 527 (Ct. App. 1996). Alleged relationships with "potential customers" are

insufficient because they are nothing more than "speculative economic relationship[s]." *Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303, 1312 (N.D. Cal. 1997). Not requiring an allegation of an existing relationship "allows recovery no matter how speculative the plaintiff's expectancy. It assumes what normally must be proved, i.e., that it is reasonably probable the plaintiff would have received the expected benefit had it not been for the defendant's interference." *Westside Ctr. Assocs.*, 42 Cal. App. 4th at 523.

The plaintiffs fail to sufficiently plead the existence of an economic relationship with a third party. The FAC only contains vague allegations of "Plaintiffs' [prospective] relationships with patients and physicians," *see, e.g.*, FAC ¶¶ 149 & 150, but do not say who the patients or physicians are. The plaintiffs appear to be referring to all Aetna- and BSC-contracted patients and physicians. *See* FAC ¶¶ 144 & 145. However, claiming that each of the universe of such individuals has an "identifiable" and "existing" economic *relationship* with the plaintiffs is simply too speculative and hypothetical. As *Westfield Center Associates* correctly reasons, to say that the plaintiffs have an economic relationship with all Aetna- and BSC-contracted patients and physicians is assuming what needs to be proved.[9]

Even if such a relationship was cognizable, the plaintiffs have not adequately pleaded that the alleged prospective economic advantage "would have been realized *but for* defendant's interference." *Youst*, 43 Cal. 3d at 71 (emphasis added).

The plaintiffs fail to adequately plead that the defendants intentionally interfered with a prospective economic advantage. The Motions to Dismiss the plaintiffs' Fourth Cause of Action are GRANTED WITH LEAVE TO AMEND.

### B. The Plaintiffs Do Not Adequately Allege Negligent Interference with Prospective Economic Advantage.

"The tort of negligent interference with economic relationship arises only when the defendant owes the plaintiff a duty of care." *Silicon Knights*, 983 F. Supp. at 1313. Because the

---

[9] Aetna and BSC argue that the plaintiffs are barred from bringing interference with prospective economic advantage claims because they are not strangers to the alleged relationships. Aetna Br. 14; BSC Br. 20. Because the Court finds that the plaintiffs have not adequately pleaded any relationship, there is no need to address Aetna and BSC's argument.

United States District Court
Northern District of California

1   plaintiffs fail to allege that any of the defendants owe them a duty of care, their claim for negligent

2   interference with prospective economic advantage fails.  In addition, because the other elements of

3   a claim for negligent interference with prospective economic relationship are identical to those for

4   intentional interference with prospective economic advantage, the plaintiffs' claim here fails for

5   the same reasons their intentional claim failed.

6          The Motions to Dismiss the plaintiffs' Fifth Cause of Action are GRANTED WITH

7   LEAVE TO AMEND.

8   **VI.    HUNTER SETTLEMENT AGREEMENT**

9          Quest argues that a settlement agreement between it and Hunter releases Quest from all

10  claims predating the effective date of the agreement.  Quest Reply 7.  The settlement agreement in

11  *State of California ex rel. [Relator] v. Quest Diagnostic Laboratories, Inc., et al.*, No. CIV 34-

12  2009-00048406, in the Superior Court of California, County of Sacramento, states that Hunter

13  "covenant[s] not to sue and release[s] the Quest Releasees from any and all claims, rights,

14  demands, suits, matters, issues, actions or causes of action, liabilities, damages, losses, obligations,

15  and judgments of any kind or nature whatsoever, from the beginning of time through the Effective

16  Date of this Settlement Agreement, whether known or unknown, contingent or absolute, suspected

17  or unsuspected, disclosed or undisclosed, matured or unmatured, for damages, injunctive relief, or

18  any other remedy . . . ."  Sandrock Decl. Ex. A at 15 (Dkt. No. 99-2).  The effective date, which is

19  defined as the "date of signature of the last signatory," appears to be May 19, 2011.  Sandrock

20  Decl. Ex. A at 19-21.

21         The settlement agreement is broad enough to encompass the claims in this suit, and the

22  plaintiffs do not dispute this (except that the plaintiffs argue that Quest has not explicitly provided

23  the effective date).  Opp'n to Quest 25.  The Court takes judicial notice of the settlement

24  agreement, which is a court document, as well as the effective date of May 19, 2011, as defined by

25  the agreement and its signatures.  *Pappas v. Bank of Am. 401(k) Plan for Legacy Cos.*, No. 11-

26  55570, 2013 WL 2303521, at *3 (9th Cir. May 28, 2013) (holding that settlement agreements are

27  judicially noticeable).  Based on the settlement agreement, all causes of action by Hunter against

28  Quest barred by the agreement are DISMISSED WITH PREJUDICE.

United States District Court
Northern District of California

1     In a single sentence, Quest argues that SPA's claims against it should also be dismissed

2  "due to the close connection" between Hunter and SPA alleged in the FAC.  SPA is not a party to

3  the settlement agreement, and Quest provides no persuasive argument why the Court should treat

4  it as if it were.  Quest's Motion to Dismiss SPA's causes of action based on Quest's settlement

5  agreement with Hunter is DENIED.

## CONCLUSION

7     At the August 20, 2013, case management conference, the Court stated that it was

8  cognizant of the potentially burdensome and expensive nature of discovery in complex cases such

9  as this one.  Dkt. No. 95.  Given Judge Tigar's previous order denying a stay of discovery,

10  however, the Court allowed limited discovery.  At oral argument, plaintiffs asserted that discovery

11  has provided additional information to include in an amended complaint.  Because the FAC had

12  already been filed prior to the August 20th case management conference, and the plaintiffs did not

13  have the benefit of the subsequent discovery while drafting their FAC, it is fair and just to allow

14  them to amend their allegations one more time.

15     Based on the foregoing, Quest's Motion to Dismiss Hunter, PBP, and SPA's Second Cause

16  of Action under the "unlawful" and "unfair" prongs of the UCL and Third Cause of Action is

17  DENIED.  Quest's Motion to Dismiss all of Hunter's causes of action against it is GRANTED

18  WITH PREJUDICE for all claims prior to the effective date of the settlement agreement.  The

19  defendants' Motions to Dismiss all other causes of action are GRANTED WITH LEAVE TO

20  AMEND.

21     The plaintiffs shall file any amended complaint within 30 days from the date of this Order.

22  The Court advises the plaintiffs to carefully consider the deficiencies in their pleadings identified

23  by Judge Tigar's detailed Order and this Order in amending their pleading.  In addition, the Court

24  notes that the plaintiffs' time and resources—as well as those of the Court—are not well-spent in

United States District Court
Northern District of California

37

1    addressing arguments that have already been rejected absent newly-discovered facts or law.

2        **IT IS SO ORDERED.**

3    Dated: October 18, 2013                    

4                                               _____

5                                               WILLIAM H. ORRICK
                                                United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California