1

2

3

4                   UNITED STATES DISTRICT COURT

5                 NORTHERN DISTRICT OF CALIFORNIA

6

7   RHEUMATOLOGY DIAGNOSTICS                  Case No. 12-cv-05847-WHO
    LABORATORY, INC., et al.,

8                 Plaintiffs,

9          v.                                 ORDER GRANTING IN PART AND
                                              DENYING IN PART MOTIONS TO
10  AETNA, INC., et al.,                      DISMISS SECOND AMENDED
                                              COMPLAINT
11                Defendants.
                                              Re:  Dkt. Nos. 130, 132, 133, 134

12

13                              INTRODUCTION

14        Plaintiffs Rheumatology Diagnostics Laboratory, Inc. ("RDL"), Pacific Breast Pathology

15  Medical Corporation ("PBP"), Hunter Laboratories, Inc. ("Hunter"), and Surgical Pathology

16  Associates LLC ("SPA") bring suit against defendants California Physicians' Services, Inc., d/b/a

17  Blue Shield of California ("BSC"), Blue Cross and Blue Shield Association ("BCBSA"),[1] Aetna,

18  Inc., Quest Diagnostics Incorporated, and Quest Diagnostics Clinical Laboratories, Inc.[2]  The

19  plaintiffs' Second Amended Complaint ("SAC") alleges violations of the federal Sherman Act and

20  California's Cartwright Act, Unfair Competition Law, and Unfair Practices Act.  It also alleges

21  intentional interference with prospective economic advantage.  Dkt. No. 122.  The defendants

22  move to dismiss the plaintiffs' SAC.  Dkt. Nos. 130, 132, 133, 134.

23        Based on the parties' briefs and arguments, and for the reasons below, the Motions to

24  Dismiss are GRANTED in part and DENIED in part.

25

26

27  _____
    [1] BCBSA is not an insurer.  However, for the sake of convenience, unless otherwise indicated, the
    Court will sometimes refer to the non-Quest defendants as "insurers."
28  [2] This Order collectively refers to Quest Diagnostics Incorporated and Quest Diagnostics Clinical
    Laboratories, Inc., as "Quest."

United States District Court
Northern District of California

**FACTUAL BACKGROUND**

For purposes of the Motions to Dismiss, the Court accepts as true the following factual allegations in the SAC.

## I.       THE PARTIES AND RELEVANT MARKETS

The plaintiffs are all "engaged in the commercial reference laboratory business" in California.  SAC ¶¶ 11-14.  Plaintiff RDL offers Specialty Rheumatological Diagnostic Testing across the country.  SAC ¶ 11.  Plaintiff PBP offers Specialty Breast Pathology Testing throughout California.  SAC ¶ 12.  Plaintiff Hunter previously offered Routine Clinical Laboratory Testing throughout Northern California and Advanced Lipid Testing across the country.  SAC ¶ 13. Plaintiff SPA offers Surgical and Clinical Pathology throughout California, as well as Anatomic Pathology Testing.  SAC ¶ 14.  SPA was affiliated with Hunter, which used to send its biopsy and cytology specimens to SPA for pathology interpretation; approximately 50 percent of SPA's revenue depended on Hunter.  SAC ¶ 14.

Defendant Quest is also a provider of clinical laboratory services and competes with the plaintiffs, operating in all five relevant markets alleged in the SAC.  SAC ¶¶ 2-3, 18-20. Defendants Aetna and BSC are health insurance companies that serve customers throughout California.  SAC ¶¶ 15-17.  Defendant BCBSA licenses the "Blue Cross" and "Blue Shield" names to health insurance companies across the country ("Blue Plans"), such as BSC, and Blue Plans are governed by the "Blue Card policy" or licensing agreement.  SAC ¶¶ 4-6.  92 percent of primary care physicians are "in-network" with Blue Plans.  SAC ¶ 6.

BCBSA is owned by its members and the 38 Blue Plans fund it.  SAC ¶ 30.  "Blue Cross and Blue Shield insure approximately 32% of the U.S. population."  SAC ¶ 29.  More than 91 percent of providers and 96 percent of hospitals in the United States contract directly with Blue Plans, which insure more Californians than any other insurer.  SAC ¶ 29.  "Historically, each Blue Plan has been permitted by the terms of the Agreement to contract with independent clinical labs located within or outside of the BluePlan's state or territory."  SAC ¶ 30.

The SAC alleges five product and geographic markets:

The Routine Clinical Laboratory Testing market is the market for routine chemical analysis

of bodily fluids ordered by physicians for outpatient diagnosis and analysis.  SAC ¶ 27(a).  It is a high-volume market where tests are performed by automated equipment.  Results are typically reported electronically within 24 hours after the physician ordered the test.  Physicians prefer to use diagnostic labs near the site of the specimen to avoid air transport and to ensure timely results.  Consequently, the relevant geographic market for Routine Clinical Laboratory Testing is regional, and here, it is the "Northern California region," which runs from Fresno, California, to the Oregon border.  Quest, with an estimated $562 million in annual revenue, has an estimated 76 percent market share of physicians' offices.  SAC ¶ 125.  Hunter had a market share of approximately three percent in 2012, and LabCorp has a 16 percent market share.  SAC ¶ 125.

The Anatomic Pathology Laboratory Testing market consists of labs that analyze tissue samples for diagnosing disease.  SAC ¶ 27(b).  The relevant geographic market is the Northern California region.  Quest is estimated to have a market share over 30 percent, and SPA has an estimated market share of less than three percent.  LabCorp also participates in this market.  SAC ¶ 126.

The Specialty Rheumatologic Laboratory Testing market is the market for highly specialized testing ordered by rheumatologists for diagnosing and treating autoimmune disorders and diseases.  SAC ¶ 27(c).  The relevant geographic market is the entire United States.  Upon information and belief, Quest has an estimated 47 percent of the market and LabCorp has an estimated 23 percent.  SAC ¶ 127.  RDL estimates that its market share is approximately 25 percent.  SAC ¶ 127.

The Advanced Lipid Testing market is the market for highly specialized testing to diagnose and treat coronary heart disease.  SAC ¶ 27(d).  The relevant geographic market is the entire United States.  Hunter estimates that it has less than one percent of this market, of which Quest is a participant.  SAC ¶ 128.

The Specialty Breast Pathology Testing is the market for highly specialized analysis of breast biopsy tissue for diagnosis and prognosis of breast cancer.  SAC ¶ 27(e).  Physicians in California typically order breast pathology tests from labs throughout California.  The relevant geographic market is California.  Quest is a market participant, but PBP is not.  SAC ¶ 129.

United States District Court
Northern District of California

## II.      THE BCBSA-QUEST AGREEMENT

Changes to the "BlueCard" policy, announced in May 2010, but implemented around October 2012, created barriers preventing smaller specialized labs from providing services to patients across the country.  SAC ¶ 28.  This conduct affected Hunter in the Advanced Lipid Testing market and RDL in the Specialty Rheumatological Laboratory Testing market.  SAC ¶ 28.

In the past, labs submitted claims for services provided to Blue Card members from another state to the Blue Plan where the performing lab is located.  SAC ¶ 31.  The local Blue Plan then worked with the member's own Blue Plan to adjudicate the claim, and the member's cost-sharing amount was calculated at the in-network rate based on the performing lab's provider status with the Blue Plan to which the claim was submitted.  SAC ¶ 31.

Now, under changes supported by Quest, the performing laboratory must submit claims to the *patient's* Blue Plan even though the lab may not be an in-network provider for that particular Blue Plan.  SAC ¶ 32.  If the patient is not insured where the laboratory services were performed, then the Blue Plan in the laboratory's region will not adjudicate the claim.  Thus, BSC refuses to accept claims for Blue Plan patients from outside of California for tests the plaintiffs perform.  SAC ¶ 32.

This change is "foreclosing markets across the United States to specialized labs and foreclosing access to current clients," as well as creating "staggering administrative costs."  SAC ¶ 33.  "[I]t is impossible for independent laboratories such as Plaintiffs to obtain in-network status with each BluePlan" with patients that might be served by those laboratories, especially because the "vast majority of BluePlans have been denying applications" from out-of-state laboratories, if they even respond at all.  SAC ¶ 33.  Quest "acts in concert" with BCBSA "to prevent competitors from gaining in-network status."  SAC ¶ 34.  Because of their size, only Quest and one other national laboratory—LabCorp—are able to join all Blue Plan networks across the country, and hundreds of specialized laboratories lose business to them.  SAC ¶¶ 34 & 38.  This forecloses approximately 94 percent of the market to specialty labs in California since those labs are only able to obtain in-network status with Blue Plans in California.  SAC ¶ 38.

Under the new Blue Card policy, when an out-of-network laboratory submits a claim to the

4

relevant Blue Plan, the Blue Plan "commonly pays the patient directly," rather than the laboratory that has obtained the assignment of benefits from the patient." SAC ¶ 35. Paying the patients directly confuses them, and patients often spend the money without realizing that they were supposed to forward it to the laboratory. SAC ¶ 35.

Under the policy change, claims cannot be made electronically, nor can providers electronically check on the status of submitted claims. SAC ¶ 36.

The new policy "harms competition in the Specialty Rheumatological and Advanced Lipid Testing Markets to the benefit of" Quest because physicians steer business to Quest away from out-of-state specialty labs, which are out-of-network and thus more expensive. SAC ¶ 37. The policy "effectively forecloses competition from hundreds of specialty laboratories." SAC ¶ 37. It "drive[s] the BluePlans into nearly exclusive arrangements with [Quest] (and Labcorp) for specialty and molecular tests" because specialty labs in one physical location cannot contract with 38 Blue Plans to maintain in-network status even though they may perform services from several local Blue Plan areas. SAC ¶ 38. "This forecloses a substantial share of the market, (approximately 94%) to specialty labs in California, as they are only able to obtain in-network status with the BluePlans in California." SAC ¶ 38. A majority of Blue Plans will not contract with labs outside their area, will not add additional labs, and a few have exclusive contracts with Quest. SAC ¶ 38. RDL unsuccessfully attempted to get in the Blue Plan networks of many states and has had to hire more employees to deal with the new policy's reimbursement changes. SAC ¶¶ 41-43. Hunter has been similarly unsuccessful in trying to get in Blue Plan networks or new clients. SAC ¶¶ 48 & 51.

Distinguished labs "are seeing dramatic reductions in revenue due to this change as they are out-of-network for over 90% of BluePlan regions," and customers and providers complain that labs like RDL, which is allegedly higher quality, are being kept out of network. SAC ¶¶ 38 & 44. Hunter's "HunterHeart program"—"a nationwide program" which relies on in-network processing through the BlueCard program—has lost over 90 percent of its clients outside of California. SAC ¶ 45. BSC's termination of Hunter in 2009 led to a decrease in its surgical pathology volumes, as did Aetna's termination of Hunter on September 15, 2012. SAC ¶ 53.

United States District Court
Northern District of California

1         In a June 2012 investor presentation, the CEO of Quest, Steve Rusckowski, stated that

2   health insurers "want[] to narrow their networks" and "there should be more consolidation in the

3   volumes around fewer suppliers of laboratory testing services and that plays nicely into what we

4   are all about and what this industry is all about."  SAC ¶ 25.  He further states, "We do have an

5   opportunity with some of our health plan partners to help them narrow the network.  We're

6   working together with the health plans to get more volume and they see an opportunity in their

7   cost structure, and we see an opportunity with our volumes to do that with them."  SAC ¶ 25.

8         Quest "acted in concert" with BCBSA "to promote the exclusionary change in BlueCard

9   Policy."  SAC ¶ 56.  Members of the American Clinical Laboratory Association ("ACLA"), which

10  represents clinical laboratories, expressed concern about the Blue Card change, so the ACLA

11  drafted a letter to BCBSA protesting it.  SAC ¶ 56.  However, Quest, the largest contributor to

12  ACLA's funding, vetoed the letter.  Quest thus "manipulated a trade association to exclude

13  competition from independent regional labs and indirectly to harm patient care" even though it

14  "was well aware of the anti-competitive nature of the change in policy and the devastating effect it

15  would have on competitors."  SAC ¶ 56.  Quest knew that the policy change meant that no

16  independent lab could compete with it because only Quest and Labcorp have a "physical national

17  presence."  SAC ¶ 56.

18        Similarly, in response to an April 5, 2012, letter from the California Clinical Laboratory

19  Association to BCBSA expressing concern about the policy changes, BCBSA responded that the

20  laboratories should contact Jim Barkach "to discuss national partnership Agreements."  SAC ¶ 57.

21  However, Barkach never responded to the repeated phone calls and emails from the CEO of

22  Hunter or Michael Snyder, the CEO of a company that negotiates insurance contracts for

23  laboratories nationwide.  SAC ¶ 57.  When Snyder reached Barkach on his personal cell phone,

24  Barkach said that "no laboratories could match the 'deal' that [BCBSA] had with [Quest]" and

25  hung up.  SAC ¶ 57.

26        BCBSA and Quest "have conspired to prevent Plaintiffs and other small laboratories from

27  even negotiating or discussing the opportunity to continue providing service to [BCBSA's]

28  members on an in-network basis."  SAC ¶ 58.  The new policy "pursuant" to BCBSA's

United States District Court
Northern District of California

"agreement with Quest functions as a boycott of Plaintiffs" because Blue Card plans nationwide "instruct physicians to utilize only in-network diagnostic services and pay in-network providers (*i.e.*, [Quest]) more and in a different manner than the newly out-of-network Plaintiffs."  SAC ¶ 58.  The Blue Plans "have been very overt in their efforts to cut off business to labs" like Hunter "and to instead steer business to" Quest, its "partner."  SAC ¶ 59.  The SAC attaches a letter from Blue Cross Blue Shield of Florida to physicians who use Hunter, stating that services provided to out-of-state labs will be treated as out-of-network.  SAC ¶ 59, Ex. 6.  Thus, out-of-pocket expenses to patients may be higher and the physicians should refer to in-network labs, "such as Quest Diagnostics."  SAC ¶ 59.  Because 92 percent of primary care physicians are in Blue Plans, "a substantial share of the relevant market is effectively foreclosed to hundreds of specialized laboratories across the United States.  SAC ¶ 6.  These changes have driven business away from smaller independent labs to Quest.  SAC ¶ 60.

## III.    BELOW-COST SALES

A "requisition" is a group of tests, ordered at one time, for a single patient.  SAC ¶ 61.  Because one patient may have multiple tests, a requisition usually includes two or three lab tests.  SAC ¶ 61.  Quest's Securities and Exchange Commission ("SEC") filings contain information allowing for a "simple calculation of fully-allocated cost per requisition," which ranged from $30.79 in 2004 to $42.53 in 2011, increasing at a "generally consistent pace."  SAC ¶ 61.  Because of the higher cost of labor, real estate, and other costs in California, the cost of performing laboratory tests for patients in California tends to be higher than the national average.  SAC ¶ 62.  Thus, Quest's "average cost per requisition in California will be slightly higher than the amounts reported in its SEC filings."  SAC ¶ 62.

Quest "routinely and knowingly provides its customers in California with capitated contracts that result in revenues far below its reported costs."  SAC ¶ 63.  In one example from 2005, James Clayton, the contracting manager for Physicians Medical Group of Santa Cruz, told Hunter that his group entered into a five-year exclusive capitated contract for laboratory services with Quest.  SAC ¶ 63.  The rate was $0.45 per member per month which, based on standard utilization rates, amounts to less than $5.00 in revenue per requisition—less than 20 percent of

1    Quest's average cost per requisition.  SAC ¶ 63.  Quest's average revenue per requisition on its

2    capitated contracts are "far below" its average costs as reported to the SEC, and "there are no cost

3    savings that could possibly allow the capitated contracts [Quest] enters into to be profitable."

4    SAC ¶ 64.

5         Quest heavily discounts services to providers and IPAs.  SAC ¶ 66.  Quest's own reports

6    show that its revenue from these sources is "far below [Quest's] costs as reported in its SEC

7    filings."  SAC ¶ 67.  Quest enters such agreements "to force and keep competition out of the

8    market," and it "recoups its losses by illegally inducing the referral of higher-paying 'pull-

9    through' government and other business."  SAC ¶ 67.  One Quest report "shows that in most cases

10   [Quest's] capitated rates are so low that [Quest] loses money on them."  SAC ¶ 68.  While Quest

11   "lost money on the discounted capitated rates paid" by "almost every [IPA] customer," it "made

12   up for those losses with the [fee-for-service] pull-through business, which is paid for by the

13   government and other third-party payers."  SAC ¶ 69.  Of the 68 IPA customers listed in that

14   report, Quest reported a loss on the capitated rates of 46 of those customers, whereas it reported

15   "substantial profits on the pull-through business" of all 68.  SAC ¶ 70.  From 2004-2008, Quest's

16   SEC filings "show that [its] revenue per requisition on its capitated accounts is far less than its

17   average cost per requisition," but "there is no significant cost-savings associated with capitated

18   accounts that would allow these rates to be profitable."  SAC ¶ 72.

19        Indeed, in addition to below-cost capitated rates, Quest "routinely offers [] below-cost"

20   fee-for-service rates to physicians and clinics that are billed directly.  SAC ¶ 73.  Quest's annual

21   10-K filings with the SEC reflect that Quest lost money on such clients for at least the last nine

22   years.  SAC ¶ 74.  From 2004-2008, Quest lost even more money on capitated contracts.  SAC

23   ¶ 74.

24        In 2009, both a suit filed by the State of California and a federal *qui tam* suit alleged that

25   Quest's capitated contracts were priced below cost to "pull through" government business in

26   violation of federal and state kickback laws.  SAC ¶ 75.  After the suits became public, Quest

27   stopped reporting its requisition volume for capitated contracts in its 10-K filings.  SAC ¶ 75.

28        Quest's prices for specific tests, including tests offered by the plaintiffs, are also "far below

United States District Court
Northern District of California

8

cost." SAC ¶ 76.  For example, while Quest's average cost (derived based on information from Quest's 10-K filings, "standard industry price-points, and Plaintiffs' costs") for performing a complete-blood-count test in California is approximately $9.04, it charges certain clients between $1.42 and $2.75 per test, leaving the plaintiffs and other laboratories unable to compete.  SAC ¶¶ 76-77.  In 2005, Quest billed providers below fully allocated cost for 55 tests.  SAC ¶ 78.  The plaintiffs and other laboratories cannot compete with Quest.  SAC ¶ 77.

RDL offers competing services with at least nine tests for which Quest billed below fully allocated cost.  SAC ¶ 79.  Hunter currently offers at least 15 such tests, 10 of which Quest charges less than Hunter's costs.  SAC ¶ 79.  Prior to Hunter's sale, Hunter offered at least 30 tests which competed with Hunter's, and for nearly all of those tests, Quest's prices were below Hunter's costs.  SAC ¶ 79.  SPA offers at least one test that competes with Quest, for which Quest charges below SPA's costs.  SAC ¶ 79.

Quest's "below cost and loss leader pricing has harmed Plaintiffs" and it "uses below cost pricing in order to eliminate competitors from the market by driving them out of business."  SAC ¶ 80.  Quest's conduct forecloses new entrants from the market, and market participants such as PBP cannot compete with Quest's below-cost pricing.  SAC ¶ 80.  The market for laboratory testing services in California is harmed because Quest's conduct also forces competitors to sell their businesses to Quest, such as Dignity Healthcare, whose CEO said that Quest was "'killing Dignity's outreach business' with loss-leading capitation agreements throughout the state."  SAC ¶ 81.  Dignity ended up selling its "outreach business" to Quest.  SAC ¶ 81.

**IV.    THE AETNA-QUEST AGREEMENT**

Aetna insures approximately nine percent of the United States population and 15 percent of the Northern California population.  SAC ¶ 82.  Across the country, 47.8 percent of primary care physicians are in Aetna's network; in California, 85 percent of California's primary care physicians are in Aetna's network, and the percentage rises to 90 percent in Northern California.  SAC ¶ 82.

Aetna conspired with Quest to eliminate or exclude 400 regional laboratories from Aetna's provider network in exchange for discounts.  SAC 29, ¶ 83.  Hunter and PBP have been

United States District Court
Northern District of California

terminated and denied in-network status with Aetna, while SPA "is *de facto* denied [Aetna] network status for approximately 50% of its business because [Hunter] is denied network status." SAC ¶¶ 8 & 82.  Quest "publicly states that it has a 'preferred national provider' contract with [Aetna] to serve [Aetna's] HMO-based, point-of-service, and physician office members."  SAC ¶ 83.  Under this agreement, Aetna steers its physicians' lab testing to Quest and away from Hunter, PBP, and SPA.  SAC ¶ 83.

Hunter, PBP, SPA, and other regional labs that are outside Aetna's network are "at a tremendous competitive disadvantage."  SAC ¶ 86.  Dr. Henry Hamilton, the manager of a physician's office in northern California, "recently" told a vice president at Hunter that patients do not pay deductibles or co-payments for Quest's services because Quest is the only "preferred laboratory vendor" for Aetna.  SAC ¶ 84.  Physicians have "no opportunity to deal with a California owned independent clinical laboratory."  SAC ¶ 8.

In October 2011, Quest approached Aetna and "pushed for an exclusive nationwide contract in exchange for steep discounts."  SAC ¶ 87.  Although Aetna refused to enter into an exclusive contract, it agreed to terminate four hundred regional-lab contracts by letting them lapse.  SAC ¶ 87 & 30 n.7.  The contract between Aetna and Quest does the following:



[3] SAC ¶ 87 (citing SAC Ex. 9).

Hunter—"the only remaining substantial in-network competitor" of Quest in northern

---

[3] The contracts between Aetna and Quest, and BSC and Quest, have been filed under seal, which explains the redactions in this Order.

1    California—was terminated on September 15, 2012.  SAC ¶ 88.  Aetna has rejected multiple

2    requests for independent laboratories to be added to its network, "based specifically on [Quest's]

3    refusal to allow such new additions."  SAC ¶ 89.

4          Quest "bargained for right-of-first-refusal contracts with [Aetna] under which Quest

5    controls entry into markets."  SAC ¶ 90.  Aetna must get Quest's approval before Aetna contracts

6    with a lab, including ones that may want to launch a new network of hospital labs.  SAC ¶ 90.

7    Aetna refuses to even consider negotiating with laboratories.  SAC ¶ 91.

8          "Aetna has also engaged in wide-spread harassment and intimidation of patients and

9    physicians to steer business to [Quest] and to stop [them] from sending laboratory work" to out-of-

10   network laboratories, such as the plaintiffs, even though Aetna's contracts with patients allow

11   them to go out-of-network.  SAC ¶ 92.  Aetna sent letters to its customers encouraging them to use

12   Quest and stating that Hunter is more expensive.  SAC ¶ 93, Exs. 10 & 11.  In one letter to a

13   doctor, Aetna wrote, "Your Physician Agreement with us requires you to use participating

14   network providers" and touts Quest.  SAC ¶ 93, Ex. 12.  "[C]orrespondence templates" from

15   Aetna to doctors state that "referrals to out-of-network providers"[4] can result in "[t]he end of your

16   participation with us [Aetna]."  SAC ¶ 93, Ex. 13.

17         In addition, Quest and Aetna created "physician bonus pools" to induce physicians to refer

18   all of their lab tests to Quest.  SAC ¶ 95.  HMOs, including Aetna, create "bonus pools," from

19   which out-of-network testing costs are deducted, then any surplus is shared with the physicians.

20   SAC ¶ 95.  Physician groups have an incentive to refer "lucrative" fee-for-service Medicare

21   business to Quest, but not its regional lab competitors.  SAC ¶ 96.  This arrangement caused

22   Quest's Medicare revenue to grow by hundreds of millions of dollars in all five product markets,

23   to the detriment of regional labs such as Hunter.  SAC ¶ 97.

24   **V.     THE BSC-QUEST AGREEMENT**

25         In 2009, Hunter was Quest's largest private competitor in northern California, and

26   Westcliff was the largest private laboratory in California and Quest's second largest competitor in

27

28   ─────────────
     [4] The SAC incorrectly quotes the letter as saying "referrals to out-of-network labs."

United States District Court
Northern District of California

United States District Court
Northern District of California

1   southern California.  SAC ¶ 99.  Quest threatened not to renew its contract with BSC unless BSC

2   agreed not to renew its contracts with Westcliff and Hunter; to further induce BSC, Quest offered

3   a 10 percent discount that "forced" BSC to accept.  SAC ¶ 99.  Quest thus forced BSC to terminate

4   the Hunter and Westcliff contracts.  SAC ¶ 99.  (Hunter learned that BSC's agreement with Quest

5   required Hunter's termination from a BSC senior network manager around April 29, 2010.  SAC

6   ¶ 103.)  Within three months, Westcliff entered bankruptcy.  SAC ¶ 99.  Quest's contract with

7   BSC required BSC to ████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████████

9   ████████████████████████████████.  SAC ¶ 100, Ex. 14 at CPS0000002-03.  BSC terminated

10  its contract with Hunter, after which Quest sales representatives told physicians that Hunter was

11  expensive out-of-network, that Quest "would soon drive" Hunter into bankruptcy, and that they

12  should send patients to Quest to "avoid service disruptions from imminent bankruptcy."  SAC ¶

13  101.  Hunter's business began to suffer after the termination but "was not able to survive."  SAC

14  ¶¶ 102 & 104.

15          Hunter, "which averaged 45% annual growth in Northern California for five years, could

16  no longer compete for market share" after BSC's termination.  SAC ¶ 105.  Hunter "could never

17  get back to pre-termination annual revenue and operating losses ballooned to $15.4 million."  SAC

18  ¶ 105.  Hunter lost accounts "at least a dozen major accounts that equate to annual revenue of

19  more than $1.3 million."  SAC ¶ 105.  The plaintiffs provide a chart listing 12 Hunter clients, their

20  annual revenue for Hunter, and the "Month Lost," which spans from July 2010 to March 2012.

21  SAC ¶ 105.  With regard to accounts Hunter has maintained, the plaintiffs allege that Hunter "has

22  experienced decreased business from at least ten accounts that equate to annual revenue of more

23  than $1 million."  SAC ¶ 106.  The plaintiffs provide a chart listing 10 Hunter clients, Hunter's

24  average annual cash collections prior to termination, and Hunter's current annual cash collections.

25  SAC ¶ 106.

26          On February 14, 2013, Hunter "received an unsolicited application" from BSC to join its

27  network and to sign an Allied and Ancillary Provider Agreement.  SAC ¶ 108, Ex. 15.  After

28  Hunter sent in its application, BSC told Hunter "through counsel that <u>under no circumstances</u>

would [Hunter] be permitted back in-network and that it should cease all efforts to apply."  SAC ¶ 108 (original emphasis).

In August 2013, Hunter sold a "majority of its laboratory testing business at a deep discount."  SAC ¶ 109.  SPA's business was affected because approximately 50 percent of SPA's business is "tied" to Hunter.  SAC ¶ 110.

## VI.   WAIVING CO-PAYS AND DEDUCTIBLES

Quest capped patient obligations or waived all patient co-pays and deductibles to prevent physicians from using competitor labs.  SAC ¶ 111.  Quest may lose money by doing this, but "it makes up the losses with 'pull through'" government business.  SAC ¶ 111.  Physicians can provide these waivers, but doing so to obtain Medicare and Medicaid business is prohibited by anti-kickback laws.  SAC ¶ 112.

## VII.   ANTICOMPETITIVE EFFECTS

The conduct described above has affected all five product markets.  SAC ¶ 114.  Because BCBSA covers 32 percent of the United States population, and Aetna covers nine percent, exclusion from those two networks "effectively precludes Plaintiffs . . . from serving over 40% of the population" and "92% of primary care physicians in the United States are 'in-network' with one or more of the Payer Defendants."  SAC ¶ 115.  And because most physicians prefer to use a laboratory that can service "a significant portion" of its patients on an in-network basis, loss of in-network status for "as little as 10% of a physician's patients can cause a laboratory to be dropped" by the physician completely.  SAC ¶ 115.

Quest is the largest laboratory in the world even though it may have questionable quality.  SAC ¶¶ 116-118.  Barriers to entry and expansion in the regional relevant markets for the sale of specialty testing are also high.  SAC ¶ 119.  Quest is estimated to have a 46 percent share of the "independent lab market in California," which is followed by Labcorp with a 20 percent share.  SAC ¶ 122.  In particular, it has a 73 percent market share of the "[n]orthern California physician outpatient market" based on figures that are partially estimated by Hunter.  SAC ¶ 123.

### PROCEDURAL HISTORY

On October 18, 2013, the Court issued its Order Granting in Part and Denying in Part

United States District Court
Northern District of California

1    Motions to Dismiss First Amended Complaint ("FAC").  Dkt. No. 113 ("Order").  In the Order,

2    the Court dismissed with prejudice all of Hunter's causes of action against Quest for all claims

3    prior to the effective date of a settlement agreement between them.  The Court denied Quest's

4    motion to dismiss Hunter, PBP, and SPA's claims under California's Unfair Practices Act

5    ("UPA"), CAL. BUS. & PROF. CODE §§ 17043, 17044, and the "unlawful" and "unfair" prongs of

6    California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE §§ 17200 *et seq.*  The

7    remaining causes of action were dismissed with leave to amend.

8        On October 31, 2013, Quest filed a Request for Leave to File a Motion for Reconsideration

9    or Clarification.  Dkt. No. 120.  On November 1, 2013, after addressing the issues raised for

10   clarification, the Court denied leave to file a motion for reconsideration because Quest did not

11   show that it met the standard for seeking reconsideration under Civil Local Rule 7-9(b).  Dkt. No.

12   121.

13       On August 9, 2013, the plaintiffs filed their SAC asserting the following causes of action

14   against all defendants:  (1) violation of California's Cartwright Act, CAL. BUS. & PROF. CODE

15   §§ 16700 *et seq.*; (2) violation of the UCL; (4) intentional interference with prospective economic

16   advantage; and (5) bilateral conspiracies to restrain trade and monopolize in violation of the

17   Sherman Act, 15 U.S.C. § 1.  The plaintiffs' Third Cause of Action for a violation of the UPA is

18   brought against Quest only.  The plaintiffs seek treble damages and injunctive and other relief.

19   The defendants move to dismiss the SAC.

20                                   **LEGAL STANDARD**

21       A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the

22   pleadings fail to state a claim upon which relief can be granted.  FED. R. CIV. P. 12(b)(6).  The

23   Court must "accept factual allegations in the complaint as true and construe the pleadings in the

24   light most favorable to the nonmoving party," *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519

25   F.3d 1025, 1031 (9th Cir. 2008), drawing all "reasonable inferences" from those facts in the

26   nonmoving party's favor, *Knievel v. ESPN*, 393 F.3d 1068, 1080 (9th Cir. 2005).  A complaint

27   may be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its

28   face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility

United States District Court
Northern District of California

14

1    when the pleaded factual content allows the court to draw the reasonable inference that the

2    defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

3    However, "a complaint [does not] suffice if it tenders naked assertions devoid of further factual

4    enhancement," *id.* (quotation marks and brackets omitted), and the court need not "assume the

5    truth of legal conclusions merely because they are cast in the form of factual allegations," *W. Min.*

6    *Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).  If a motion to dismiss is granted, a court

7    should normally grant leave to amend unless it determines that the pleading could not possibly be

8    cured by allegations of other facts.  *Cook, Perkiss & Liehe v. N. Cal. Collection Serv., Inc.*, 911

9    F.2d 242, 247 (9th Cir. 1990).

**DISCUSSION**

**I.    SHERMAN ACT SECTION 1 AND CARTWRIGHT ACT**[5]

12        Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust

13   or otherwise, or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  Despite the literal

14   language of the statute, only "unreasonable" restraints of trade are unlawful.  *State Oil Co. v.*

15   *Khan*, 522 U.S. 3, 10 (1997).  Where an agreement is "so plainly anticompetitive that no elaborate

16   study of the industry is needed to establish their illegality," the court should find it per se illegal.

17   *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978).  Otherwise, the Supreme

18   Court "presumptively applies rule of reason analysis, under which antitrust plaintiffs must

19   demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive

20   before it will be found unlawful."  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

21        To survive a motion to dismiss in a Section 1 case, "an allegation of parallel conduct and a

22   bare assertion of conspiracy will not suffice."  *Twombly*, 550 U.S. at 556.  Rather, "claimants must

23   plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove:

24   (1) a contract, combination or conspiracy among two or more persons or distinct business entities;

25   (2) by which the persons or entities intended to harm or restrain trade or commerce [ ]; (3) which

---

[5] Because California's Cartwright Act mirrors the federal Sherman Act, the Court analyzes them
jointly according to federal law.  *Cnty of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160
(9th Cir. 2001); *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 265 (Ct. App. 1983).

United States District Court
Northern District of California

actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). "In addition to these elements, plaintiffs must also plead (4) that they were harmed by the defendant's anti-competitive contract, combination, or conspiracy, and that this harm flowed from an 'anti-competitive aspect of the practice under scrutiny.' This fourth element is generally referred to as 'antitrust injury' or 'antitrust standing.'" *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (citations omitted). "The Ninth Circuit [ ] held that . . . a Section 1 claim should 'answer the basic questions: who, did what, to whom (or with whom), where, and when?'" *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1116 (N.D. Cal. 2012) (citation omitted).

"Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints."[6] *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988). "Vertical agreements that foreclose competitors from entering or competing in a market can injure competition by reducing the competitive threat those competitors would pose. . . . [but] [o]ther types of vertical agreements do not necessarily threaten an injury to competition." *Brantley*, 675 F.3d at 1198. "[A] vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels." *Bus. Elecs. Corp.*, 485 U.S. at 735-36.

The plaintiffs allege three separate vertical agreements between each of the insurers and Quest. SAC ¶¶ 58, 90, 99.

### 1. BCBSA-Quest

The plaintiffs again "fail to adequately plead the existence of an agreement between BCBSA and Quest to change the Blue Card policy to keep the plaintiffs and other laboratories out of Blue Plan networks." Order 16. In its Order, the Court noted that "Judge Tigar found that the plaintiffs failed to adequately plead a vertical agreement between BCBSA and Quest" in their original complaint. Order 17. In particular, Judge Tigar rejected the contention that an alleged veto of the ACLA's letter and an alleged phone call between the CEO of an unknown company

---

[6] The plaintiffs state that they are not alleging a horizontal agreement between the insurer defendants. Opp'n 3. Accordingly, the Court does not address any such theory.

and a BCBSA representative were evidence of a vertical agreement.  Because the FAC contained

virtually identical allegations as the original complaint, the Court stated that it "finds no reason to

conclude differently when it is presented with the same facts as the original Complaint."  Order

17.

The SAC's material allegations concerning the purported vertical agreement between

BCBSA and Quest are virtually identical to those in the FAC.  To be sure, the plaintiffs have

added a few more allegations.  The plaintiffs allege that changes to the Blue Card policy "in the

Specialty Rheumatological and Advanced Lipid Testing Markets" "forecloses a substantial share

of the market, (approximately 94%) to specialty labs in California, as they are only able to obtain

in-network status with the BluePlans in California."  SAC ¶¶ 37 & 38.  "Instead of physicians

being able to refer their business to the lab of their choice . . . physicians are forced to use" Quest.

SAC ¶ 55.  The plaintiffs have also identified Michael Snyder as the "CEO of a [still unnamed]

company that negotiates insurance contracts for laboratories across the country," whose "repeated

phone calls and emails" to a BCBSA representative were never returned.  SAC ¶ 57.

None of these additions saves the plaintiffs claim because these allegations still fail to

plead the existence of any agreement between BCBSA and Quest.  A CEO's name of an unnamed

company does not do so.  Nor does an allegation of foreclosure that is not the product of a

"contract, combination or conspiracy."  *Kendall*, 518 F.3d at 1047.  The plaintiffs' opposition brief

makes bare assertions of an agreement without providing citations to the SAC, but in any case, the

Court's own review of the SAC reveals little support for those assertions.  Opp'n 16.  Without

providing the first element of a Section 1 violation, the plaintiffs fail to state a claim.

The Motions to Dismiss the plaintiffs' First and Fifth Causes of Action are GRANTED to

the extent that they relate to a vertical agreement between BCBSA and Quest.

### 2.  BSC-Quest

The plaintiffs plead that BSC and Quest engaged in an exclusive dealing arrangement.  *See*

Opp'n 13.  "Exclusive dealing" is an arrangement whereby a seller of a product or service

prevents a buyer from purchasing that product or service from any other seller.  *Allied Orthopedic*

*Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010).  Because there

United States District Court
Northern District of California

17

are "well-recognized economic benefits to exclusive dealing arrangements," *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997), "an exclusive-dealing arrangement does not constitute a per se violation of section 1," *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1303-04 (9th Cir. 1982).  "Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its effect is to 'foreclose competition in a substantial share of the line of commerce affected.'"  *Allied Orthopedic Appliances*, 592 F.3d at 996 (citation omitted).

The plaintiffs adequately pleaded the existence of a vertical agreement between BSC and Quest in their FAC.[7]  Order 17.  However, the Order noted that "the plaintiffs provide no allegations sufficient to show whether the BSC-Quest agreement foreclosed competition in a substantial share of the relevant markets, nor do they provide any indicia that competition has been harmed."  Order 18 (internal punctuation omitted).  The plaintiffs did not "show the size of the relevant markets, let alone the magnitude of foreclosure," or "which of the five relevant markets it identifies in the FAC is affected."  Order 18.  Similarly, the plaintiffs did not allege "what market participants there are; how the agreement affected the plaintiffs' share, Quest's share, or any other market participant's share; whether there are other purchasers in the relevant market to which market participants may turn aside from BSC; or how competition has been harmed."  Order 19.  While the plaintiffs do not need to provide *all* of this information to state a claim, "[w]ithout providing *any* of this information, the plaintiffs' claim fails."  Order 19.

The material differences between the SAC and the FAC are (1) the plaintiffs attach the actual BSC-Quest agreement, SAC Exs. 9 & 14; (2) the SAC includes a list of a dozen clients Hunter has allegedly lost due to BSC's termination of it, along with the month each client was lost and its annual revenue for Hunter (though the list does not say for what year), totaling more than $1.3 million, SAC ¶ 105; and (3) the SAC includes a list of ten clients with whom Hunter "has experienced decreased business," along with the average annual cash collections prior to

---

[7] Contrary to the plaintiffs' assertion, Judge Tigar and the Court did *not* "previously agree[ ] that . . . [the] vertical agreement between BSC and Quest . . . operates as a *de facto* exclusive dealing arrangement."  Opp'n 13.

United States District Court
Northern District of California

termination and the current annual cash collections, SAC ¶ 106.

The plaintiffs have also newly alleged that BSC's termination of Hunter has harmed its and SPA's "ability to compete in their respective markets, as well as competition generally."  SAC ¶ 131.  Hunter competed in the Routine Clinical Laboratory Testing Market in Northern California, where the plaintiffs allege that Quest had a 76 percent share, LabCorp had a 16 percent share, and Hunter had a three percent share.  SAC ¶¶ 13, 125.  SPA competes in the Anatomic Pathology Testing Market in California, where the plaintiffs allege that Quest has a 30 percent share, which "rapidly increased," and SPA has a less than three percent share; LabCorp is also a market participant, though its share is unspecified.  SAC ¶¶ 14, 126.  In the United States Advanced Lipid Testing Market, Hunter "estimates that it has less than 1% of the market."  SAC ¶ 128.

As Quest concedes, the SAC "arguably contain some facts the Court asked for—such as identification of some of the participants in the five markets at issue"; the plaintiffs, however, "still have not made any allegations regarding how market shares changed as a result of the agreement."  Quest Br. 7.  Quest is correct.  For each of the relevant markets, the plaintiffs still do not allege the extent of foreclosure, what size each market is, or how the agreement affected each market or its participants' shares.  As an example, for the Routine Diagnostic Testing Market, while the plaintiffs allege that Quest, LabCorp, and Hunter are participants and the plaintiffs provide their market shares, there is no allegation about how their shares were actually affected by the BSC-Quest agreement.  Similarly, though the plaintiffs allege that Hunter had a three percent market share for the Routine Clinical Laboratory Testing Market, SAC ¶ 125, they do not say how the share was affected by the agreement.  Rather, the plaintiffs only provide a static picture of shares in each market, but do not even say for what timeframe those shares are or whether there are other participants.  The Court cannot determine whether a substantial foreclosure occurred.

The plaintiffs argue that the SAC sufficiently alleges that this agreement "foreclosed a substantial share of the market" and has had "a substantial negative impact on competitors and competition as a result of the agreement."  Opp'n 13.  But the antitrust laws protect competition, not competitors, so it does not matter that competitors suffered a negative impact.  *See, e.g.*, Order

1    22.  Without showing any changes in shares, the Court cannot determine whether a "substantial"

2    foreclosure has occurred or, indeed, whether foreclosure occurred at all.  Despite having a second

3    opportunity to amend, the plaintiffs still fail to resolve the deficiencies which the Order (and Judge

4    Tigar) identified.

5           The plaintiffs attach the BSC-Quest agreement to their SAC.  Though the agreement also

6    states that it ████████████," it contains provisions which could conceivably have

7    anticompetitive effects, ████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ████████████████████████████████████████."  SAC Ex. 9 at

10   AET0000186-87.  Whatever the contract requires, the plaintiffs must still show that "its effect is to

11   'foreclose competition in a substantial share of the line of commerce affected.'"  *Allied*

12   *Orthopedic Appliances*, 592 F.3d at 996 (citation omitted).  The Order already assumed the

13   substance of the agreement as alleged.  Order 18.  But though the plaintiffs now provide the actual

14   agreement with its SAC, they still fail to show an actionable exclusive dealing arrangement

15   because they provide no allegations indicating a substantial foreclosure in the relevant markets.

16          The plaintiffs argue that "[t]he consequence of the agreement between BSC and Quest was

17   that the largest competitors in both the northern and southern California diagnostic testing markets

18   were no longer able to compete with Quest in those markets.  This is on its face a factual and

19   substantial foreclosure of markets from competitors of Quest's . . . ."[8]  Opp'n 13-14.  The

20   plaintiffs point to Westcliff's termination and bankruptcy as a harm to competition.  Also, "Hunter

21   alleged that it lost more than $2.5 million worth of business as a result."  Opp'n 14.  Attempting to

22   rebut BSC's criticism that over half of these accounts were lost well after termination occurred,

23   the plaintiffs state, without factual support, that this is "an indication [that the] quality of Hunter's

24

25   _____

     [8] The plaintiffs assert, "Realizing it would be suspect to actually name Hunter and Westcliff in the
26   contract, BSC and Quest instead attempted to disguise their intention to remove Quest's two
     biggest competitors from the markets in California.  Therefore, instead of naming them, they
27   instead required that the network be reduced by two laboratories and a specific number of units of
     service.  In reality, the only practical way to achieve this reduction was to kick out Hunter and
28   Westcliff – the goal and result of the agreement."  Opp'n 13.  No plausible allegations are made
     that remotely support this conjecture.

United States District Court
Northern District of California

services and products were exceeding high, and that its business was generally successful and well run."[9]  Opp'n 14 n.1.  The plaintiffs also argue that the fact that BSC insures 25 percent of Blue Plan covered lives in California, which "is significantly more than necessary to result in the absolute elimination of a lab from a doctor's office."  Opp'n 14.

This may all be true, but none of it is sufficient to show substantial foreclosure.  Westcliff may have been forced into bankruptcy, but the plaintiffs do not say what percentage of the market Westcliff constituted or even what markets it was in.  Hunter also may have lost $2.5 million in business, but the plaintiffs do not say in what market it lost that amount of business.  In the Northern California Routine Clinical Laboratory Testing Market, where Quest allegedly has $562 million in revenue and "enjoys an estimated 76% market share (physician office market share)," the Court deduces that the market is approximately $740 million in size.  But even if the Court were to fully allocate the full $2.5 million of foreclosure (which amounts to approximately 10 percent of Hunter's revenue based on its three percent market share) to that market and assume that "physician office market share" was an appropriate way to calculate market share, the foreclosure would amount to 0.3 percent—hardly a "substantial" one.  Finally, with regard to the fact that BSC allegedly insures 25 percent of Blue Plan enrollees in California and that that amount may result in Hunter's exclusion from physicians' offices, Judge Tigar and the Court have already rejected that argument.  Order 22.  And the plaintiffs do not explain how the number of plan enrollees correlates with the market for laboratory services.

The Motions to Dismiss the plaintiffs' First and Fifth Causes of Action are GRANTED to the extent that they relate to a vertical agreement between BSC and Quest.

### 3.  Aetna-Quest

The Order stated, "The plaintiffs' claims concerning the Aetna-Quest agreement fail for substantially the same reasons their claims concerning the BSC-Quest agreement failed:  the

---

[9] BSC points out that while the plaintiffs how allege that Hunter lost approximately $2.3 million in business since its BSC termination in April 2010, more than half the business attributable to lost "major accounts" is from accounts that Hunter did not lose until December 2011, more than a year and a half after its termination.  BSC Br. 3 (citing SAC ¶¶ 105-06).  The plaintiff's rebuttal, that the delay is attributable to Hunter's quality, is unsupported and unpersuasive.

United States District Court
Northern District of California

plaintiffs do not sufficiently allege anticompetitive effects in a relevant market, whether through substantial foreclosure or otherwise." Order 20.  While the plaintiffs allege in the FAC that Aetna "insures approximately 9% of the U.S. population," FAC ¶ 81, "they do not state Aetna's market share in any of the five product and geographic markets identified in the FAC, three of which are not national." Order 20.  Without holding that nine percent is an accurate measure of market share, the Order (and Judge Tigar) found that nine percent foreclosure is not "substantial" enough to find an unlawful exclusive dealing arrangement.  Order 20.  The Order notes that "the plaintiffs do not provide the Court with any other context in which to judge whether there has been substantial foreclosure or any other indicia of anticompetitive effects."  Order 20-21.

The SAC adds some detail to what was pleaded in the FAC.  The plaintiffs allege that 47.8 percent of primary care physicians in the United States are in Aetna's network, with 85 percent of California primary care physicians and 90 percent of Northern California primary care physicians in Aetna's network.  SAC ¶ 82.  The plaintiffs re-allege that approximately nine percent of the United States population is covered by Aetna, rising up to 15 percent of the Northern California population.  SAC ¶ 82.  The plaintiffs also attach the Aetna-Quest agreement to the SAC.  SAC ¶ 87, Ex. 9.  The SAC includes letters from Aetna discouraging physicians from referring patients outside of the Aetna network "without justification" or if "unwarranted," stating that doing so could "end [ ] your participation with us [Aetna]."  SAC Exs. 12 & 13.

The plaintiffs have not cured the defects in their FAC and thus their claim fails.  Fifteen percent still falls far short of the 30 or 40 percent that Judge Tigar indicated is necessary to show sufficient foreclosure.  Dkt. No. 85 at 18.  The plaintiffs also fail to explain of what relevance the proportion of physicians that are in Aetna's network have to their allegations.  Those proportions need not correlate with the number of patients covered by Aetna, as the plaintiffs appear to recognize by alleging that only 15 percent of Northern Californians are covered by Aetna.  The plaintiffs do not explain how the percentages of physicians in Aetna's network relate to the amount of foreclosure in the relevant markets.  As Aetna correctly observes, "The mere fact that a doctor is in-network with Aetna does not mean that all of his or her patients are insured by Aetna or are foreclosed from using labs other than Quest."  Aetna Br. 5.  The plaintiffs do not say what

United States District Court
Northern District of California

1   portion of physicians is in Aetna's network only or serve only Aetna patients.  Aetna Br. 5-6.

2   Rather, the central issue is the percentage of Aetna-covered patients who use lab services, i.e., the

3   patients the plaintiffs allege are barred from using non-Quest laboratories.  But the plaintiffs do

4   not provide this information.

5       The plaintiffs argue that Aetna and Quest engaged in an "illegal vertical agreement causing

6   substantial market foreclosure" because the agreement "causes a substantial amount of revenue,

7   number of patients and number of doctors to be transferred directly from Quest's competitors to

8   Quest, and because Quest has a right to refuse to allow new entrants into Aetna's network."

9   Opp'n 15.  The Court has already rejected this contention.  As it stated in its order, "the heart of

10  the plaintiffs' complaint is that they are not part of Aetna's network—that is quite different from

11  Aetna's foreclosing them from the *market*."  Order 22.

12      The plaintiffs continue to argue that a payer's "insuring even just 10% of a doctors'

13  patients is sufficient to for [sic] that payer to coerce, threaten or cause that doctor to cease using a

14  lab entirely if the lab is out of the payer's network."  Opp'n 12.  "Accordingly," the plaintiffs

15  argue, "there is no need for the Court to resort to analyzing percentage market share and making

16  hypothetical assumptions about the impact of the Defendants' conduct on those markets or the

17  impact on competition and Quest's competitors."  This argument has been rejected twice already

18  and there is no need to addresss it again.  Order 37-38.

19      The plaintiffs argue that "given the reality of the economics of the healthcare industry and

20  the diagnostic testing markets alleged . . . the more relevant consideration is the proportion of

21  doctors who are in network with the Insurer Defendants, because the Insurer Defendants are able

22  to influence the decisions those doctors make."  Opp'n 13.  As explained above, the relevant

23  question is what percentage of patients using lab services are covered by Aetna, not the number of

24  doctors who are in Aetna's networks—a doctor may be in Aetna's network, but his presence in the

25  network is irrelevant in determining foreclosure if none of the doctor's patients require lab

26  services.

27      The fact that the plaintiffs attach the Aetna-Quest agreement to the SAC does not save

28  their claim.  Regardless of any provisions therein that may cause anticompetitive effects, the

United States District Court
Northern District of California

United States District Court
Northern District of California

plaintiffs still fail to carry their burden of proving substantial foreclosure.  They do not point to any specific market and explain how it was harmed.  For example, while the plaintiffs allege that the agreement "████████████████████████████████████████████████████████████ ████████," SAC ¶ 87, without knowing which markets were affected and how, the ██████████ figure is meaningless.  Similarly, though the plaintiffs attach letters to the SAC which purportedly show Aetna coercing doctors to avoid using out-of-network competitors, as Aetna correctly notes, the letters may "go to whether Aetna engaged in exclusive dealing with Quest," but "do not address the point of whether any such exclusive arrangement is lawful . . . ."  Aetna Br. 5. Because the plaintiffs do not plead sufficient facts about the markets and their participants, or how the markets have changed due to the agreement, the Court cannot determine the agreement's impact on competition.

The Motions to Dismiss the plaintiffs' First and Fifth Causes of Action are GRANTED to the extent that they relate to a vertical agreement between Aetna and Quest.

## II.   INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

The elements of an interference with prospective economic advantage claim are "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant."  *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1108 (9th Cir. 2007) (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003)).  A plaintiff must "allege an act that is wrongful independent of the interference itself."  *Id.* (citing *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal 4th 376, 392-93 (1995)).  "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  *Korea Supply*, 29 Cal. 4th at 1159.

To show an economic relationship, "the cases generally agree that it must be reasonably

24

1    probable the prospective economic advantage would have been realized but for defendant's

2    interference." *Youst v. Longo*, 43 Cal. 3d 64, 71 (1987).  Any alleged relationship cannot be based

3    upon "overly speculative expectancies," and a seller of some good must show "an existing

4    relationship with an identifiable buyer." *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal.

5    App. 4th 507, 522, 527 (Ct. App. 1996).  Alleged relationships with "potential customers" are

6    insufficient because they are nothing more than "speculative economic relationship[s]." *Silicon*

7    *Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303, 1312 (N.D. Cal. 1997).  Not requiring

8    an allegation of an existing relationship "allows recovery no matter how speculative the plaintiff's

9    expectancy.  It assumes what normally must be proved, i.e., that it is reasonably probable the

10   plaintiff would have received the expected benefit had it not been for the defendant's

11   interference." *Westside Ctr. Assocs.*, 42 Cal. App. 4th at 523.

12        The plaintiffs have made a single change to their allegations related to this cause of action:

13   deleting "market share and monopoly power" and replacing it with "market power."  *Compare*

14   SAC ¶ 159 *with* FAC ¶ 147.  Without seriously amending their SAC, the Court finds no reason to

15   allow this cause of action to go forward.

16        The plaintiffs argue that Hunter lost $2.5 million in business "as a result of [the

17   defendants'] interference" and that "those clients are identified specifically in the SAC."  Opp'n

18   17.  However, the plaintiffs fail to allege the existence of an independent wrongful act committed

19   by Aetna, BCBSA, or BSC.  As for Quest, though the Court has found that Hunter, PBP, and SPA

20   have adequately stated a UPA claim against it, the plaintiffs attribute the $2.5 million loss to

21   BSC's network termination, not Quest's alleged below-cost pricing.  *See* SAC ¶¶ 105 & 106.  This

22   argument therefore fails.

23        The plaintiffs fail to adequately plead that the defendants intentionally interfered with a

24   prospective economic advantage.  The Motions to Dismiss the plaintiffs' Fourth Cause of Action

25   are GRANTED.

26   **III.   UNFAIR PRACTICES ACT**

27        In its Order, the Court denied Quest's motion to dismiss Hunter, PBP, and SPA's UPA

28   claim against it.  Quest obviously disagreed.  Without meeting the requirements of Civil Local

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Rule 7-9(b), which governs motions for reconsideration, Quest moved for leave to file a motion

2    for reconsideration.  Dkt. No. 120.  Finding that "Quest has not shown that it meets the standard

3    for reconsideration" and that, in any event, Quest's arguments lacked merit, the Court denied the

4    motion on both procedural and substantive grounds.  Dkt. No. 121.  But now, for a third time and

5    again without complying with the procedural or substantive requirements of Civil Local Rule 7-

6    9(b), Quest essentially asks the Court to reconsider its Order and spends nine pages of its 20-page

7    motion brief (and six pages of its nine-page reply brief) re-arguing the merits of the UPA claim

8    even though the SAC allegations' relevant to the UPA claim have not materially changed.  Quest

9    Br. 1.  Again, the request is DENIED.

10           Quest is advised to review the "Prohibition Against Repetition of Argument."  CIVIL L.R.

11   7-9(c).  The Court is aware that Quest thinks the Court erred in allowing the UPA claim to

12   proceed; indeed, it assumes that all litigants on the losing side of an argument feel that way.  The

13   Court is also aware of its potential fallibility.  But having reviewed Quest's most recent motion, it

14   remains unconvinced by Quest's arguments and is unaware of any basis for continued re-argument

15   of the same points.

16           Giving consideration to Quest's renewed attacks on the plaintiffs' UPA claim in the SAC

17   would allow Quest to circumvent the strict standards for a motion to reconsider—an

18   "extraordinary remedy"—under the guise of a motion to dismiss.  *See Kona Enters., Inc. v. Estate*

19   *of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (quoting 10 JAMES WM. MOORE ET AL., MOORE'S

20   FEDERAL PRACTICE § 54.151[1] (3d ed. 2000)); *see also Amaretto Ranch Breedables, LLC v.*

21   *Ozimals, Inc.*, No. 10-cv-5696-CRB, 2011 WL 2690437, at *2 (N.D. Cal. July 8, 2011) (finding a

22   motion to dismiss "is really an unauthorized motion for reconsideration" where court had

23   previously found claim "plausibly alleged" and denying the motion).  No court's order denying in

24   part a motion to dismiss would be settled if a defendant could simply raise from the dead on a

25   subsequent motion to dismiss its arguments against the very causes of action which the court has

26   already allowed to go forward.  This issue is settled for purposes of the pleadings.[10]

27   _____

28   [10] Although Quest's earlier motion to reconsider did not request reconsideration of the Court's
     denial of Quest's motion to dismiss Hunter, PBP, and SPA's "unlawful" and "unfair" claims under

IV.     **UNFAIR COMPETITION LAW**

The plaintiffs bring a cause of action under the UCL against all defendants.  The UCL prohibits "any unlawful, unfair or fraudulent business act or practice."  CAL. BUS. & PROF. CODE § 17200.  "Each of these three adjectives captures a separate and distinct theory of liability." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quotation marks omitted).

A.  **"Fraudulent Prong"**

The "fraudulent" prong of the UCL "requires a showing [that] members of the public are likely to be deceived."  *Wang v. Massey Chevrolet*, 97 Cal. App. 4th 856, 871 (2002).  The plaintiffs do not allege that the defendants engaged in any fraudulent conduct that is likely to deceive the public.  Thus, the Motions to Dismiss the plaintiffs' Second Cause of Action under the "fraudulent" prong of the UCL is GRANTED.

B.  **"Unlawful" Prong**

The "unlawful" prong of the UCL "borrows violations of other laws and treats them as independently actionable."  *Daugherty v. Am. Honda Motor Co., Inc.*, 51 Cal. Rptr. 3d 118, 128 (Ct. App. 2006).  Because the Court previously found that Hunter, PBP, and SPA adequately state a claim against Quest under the UPA, Quest's Motion to Dismiss their Second Cause of Action under the "unlawful" prong of the UCL is DENIED.  Because the plaintiffs fail to adequately plead any other cause of action, the Motions to Dismiss all other claims under the "unlawful" prong of the UCL are GRANTED.

C.  **"Unfair" Prong**

Courts have employed two tests under the "unfair" prong of the UCL.  Some courts have held that the "unfair" prong requires alleging a practice that "offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," and the policy must be "tethered to specific constitutional, statutory or regulatory provisions."  *Bardin*

---

the UCL, the Court also denies reconsideration of those claims for the same reason:  Quest does not meet the standard for seeking reconsideration and only makes arguments it did raise or should have raised in its prior motion to dismiss.  *See Kona Enters.*, 229 F.3d at 890 (holding that a motion for reconsideration "may *not* be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation").

United States District Court
Northern District of California

United States District Court
Northern District of California

*v. Daimlerchrysler Corp.*, 39 Cal. Rptr. 3d 634, 642, 645 (Ct. App. 2006) (quotations omitted). Other courts have held that the court must apply a balancing test that "weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim."  *Schnall v. Hertz Corp.*, 93 Cal. Rptr. 2d 439, 456 (Ct. App. 2000).

Because the Court previously found that Hunter, PBP, and SPA adequately state a claim against Quest under the UPA, Quest's Motion to Dismiss their Second Cause of Action under the "unfair" prong of the UCL is DENIED.  Because the plaintiffs fail to adequately plead any other conduct that may be unfair, the Motions to Dismiss all other claims under the "unfair" prong of the UCL are GRANTED.

## CONCLUSION

Based on the foregoing, Quest's Motion to Dismiss Hunter, PBP, and SPA's Second Cause of Action under the "unlawful" and "unfair" prongs of the UCL and Third Cause of Action is DENIED.  Having reviewed the SAC's new allegations concerning RDL related to the plaintiffs' UPA cause of action, and finding the claims plausible, Quest's Motion to Dismiss RDL's Second Cause of Action under the "unlawful" and "unfair" prongs of the UCL and Third Cause of Action is also DENIED.  Because the plaintiffs have had three opportunities to plead, and the Court concludes that further pleading would be futile, the defendants' Motions to Dismiss all other causes of action are GRANTED WITH PREJUDICE.[11]

At the hearing, Quest requested that the Court order the plaintiffs to file a narrower complaint containing only the allegations relevant to the remaining UPA and companion UCL causes of action, and to allow briefing based on the narrower complaint.  Quest's counsel justified this request based on the need for clarity and to control the scope of discovery.

Neither a narrower complaint nor additional briefing is necessary.  The Court intends to manage this case so that discovery does not exceed the scope of the remaining causes of action and defenses.

The Court will hold a case management conference on Tuesday, March 4, 2013, at 2 p.m.

---

[11] The Court previously granted with prejudice Quest's Motion to Dismiss all of Hunter's causes of action against it for all claims prior to the effective date of the settlement agreement.

in Courtroom 2.  The plaintiffs and Quest shall meet and confer concerning the appropriate scope of discovery based upon this Order and should be prepared to discuss how this case will proceed at the conference.  They shall file a joint case management statement on or before February 26, 2014.

**IT IS SO ORDERED.**

Dated:  February 6, 2014



_____
WILLIAM H. ORRICK
United States District Judge

United States District Court
Northern District of California

29