UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RHEUMATOLOGY DIAGNOSTICS
LABORATORY, INC, et al.,

        Plaintiffs,

      v.

AETNA, INC., et al.,

        Defendants.

Case No. 12-cv-05847-WHO

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 216, 252, 258, 259, 260

## INTRODUCTION

Plaintiffs in this case, four California-based providers of clinical laboratory services, accuse defendants Quest Diagnostics Incorporated and Quest Diagnostics Clinical Laboratories Incorporated (collectively, "Quest") of selling lab tests at below-cost prices in violation of California's Unfair Practices Act ("UPA"). There are material factual disputes over plaintiff Hunter Laboratories, Inc.'s ("Hunter's") claim that it was harmed by Quest's below-cost sales of individual tests to Aetna, Inc., and over plaintiff Surgical Pathology Associates' (SPA's") claim that it was harmed by Quest's below-cost capitated contract with Partnership Health Plan. Those claims may proceed. The rest of plaintiffs' claims, however, are either barred by the settlement agreement that Hunter entered into with Quest in a prior case in 2011, or based on damages theories that plaintiffs have failed to show are more than speculation and guesswork. Quest is entitled to summary judgment on those claims. Accordingly, Quest's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.    FACTUAL BACKGROUND

The parties are all providers of clinical laboratory services. Quest is a national laboratory with operations in California. Moverley Decl. ¶ 4. Plaintiffs Hunter, Surgical Pathology Associates ("SPA"), Rheumatology Diagnostics Laboratory, Inc. ("RDL"), and Pacific Breast Pathology Medical Corp. ("PBP") are smaller, California-based laboratories. Plaintiffs describe themselves as "regional" laboratories. Plaintiffs accuse Quest of violating California's Unfair

1    Practices Act ("UPA") and Unfair Competition Law ("UCL") by selling its laboratory services

2    below-cost "for the purpose of injuring plaintiffs and destroying competition."  SAC ¶¶ 151-52.

3    Plaintiffs allege that as a result of Quest's below-cost sales, they have been "deprived of . . . a

4    large number of their actual and potential customers."  SAC ¶ 153.

5         Plaintiffs charge Quest with three particular methods of below-cost pricing: (i) entering

6    below-cost capitated contracts with Independent Physician Associations ("IPAs")[1] for the purpose

7    of securing lucrative fee-for-service business from physicians belonging to the IPAs;

8    (ii) undercutting plaintiffs in the general fee-for-service market by selling lab tests at below-cost

9    prices; and (iii) using below-cost sales to secure "network narrowing" contracts with major health

10   insurance providers, such as Aetna, Inc. ("Aetna") and California Physicians' Services, Inc. dba

11   Blue Shield of California ("Blue Shield").  Opp. 5.

12        The parties made voluminous evidentiary submissions in connection with this motion.  The

13   following is a summary.

14        **A.    Moverley Declaration**

15        Quest submits a declaration by Robert Moverley, Quest's Regional Vice President of

16   Operations for the West Region, stating the following: The clinical laboratory market in California

17   is "highly competitive."  Moverley Decl. ¶ 4.  Laboratory Corporation of America ("LabCorp"),

18   another national laboratory, is Quest's biggest competitor, at least in the market for capitated

19   business.  *Id.* at ¶¶ 4, 10.  Quest also competes with BioReference Laboratories, which purchased

20   Hunter's assets in 2013, as well as with other California-based independent laboratories, out-of-

21   state laboratories, and in-hospital laboratories.  *Id.*

22        There are four "elements of competition" in the market for laboratory services: price,

23

24   [1] IPAs are "large groups of independent physicians who practice medicine in separate medical
     groups [but] come together to share financial risk under HMO contracts."  Moverley Decl. ¶ 15.
25   IPAs are generally paid by insurance providers on a "capitated" basis.  *Id.*  This means that instead
     of receiving fee-for-service payments from an insurance provider, an IPA generally accepts a per-
26   member, per-month payment from in exchange for providing or arranging all medical services
     needed by the insurance provider's members.  *Id.*  IPAs in turn generally seek out labs that will
27   accept payment on a capitated basis themselves.  *Id.*  It is undisputed that plaintiffs do not
     currently offer their services on a capitated basis and do not currently compete for capitated
28   contracts.  *See, e.g., id.* at ¶¶ 16, 23.

United States District Court
Northern District of California

quality, ease of access to "draw facilities," and participation in the networks of insurance providers. *Id.* at ¶¶ 4-8. Quest is in-network with a number of major insurers, including Aetna and Blue Shield. *Id.* at ¶ 8. Regional laboratories like plaintiffs "struggle to compete" with laboratories that are in-network with major insurers. *Id.*

Quest's "strategy [is not] to price below cost to any customer," and its purpose in pricing its tests in California "has never been to target competitors or destroy competition." *Id.* at ¶¶ 10, 13. Further, Quest's pricing strategy has been focused on competition with LabCorp, not plaintiffs. *Id.* With the exception of Hunter, Moverley had never heard of plaintiffs until this litigation. *Id.* at ¶ 12.

Capitated business usually generates lower profit margins[2] than fee-for-service business. *Id.* at ¶ 19. In addition, profit margins on capitated business are uncertain because payments do not adjust according to fluctuations in testing volume. *Id.* Certain of Quest's accounts with IPAs have yielded negative contribution margins on some occasions. *Id.* But negative contribution margins on capitated business are not a "deliberate strategy." *Id.* When they have occurred, Quest has "strived to bring the account into the black as quickly as practicable." *Id.* Quest's current policy is to obtain at least a ██ percent contribution margin on all capitated accounts, and it has ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

Capitated contracts "give a laboratory the opportunity to display the quality and reliability

---

[2] Quest uses three different measures of profit margins relevant to this motion. First, net revenue minus "cost of testing" equals the "gross margin." Lambrinos Decl. Ex. 9 at 1512. Quest defines "cost of testing" to include the "direct costs" related to performing a test, such as lab supplies and direct labor. Lambrinos Decl. Ex. 11 at 1558. Second, the gross margin minus "other variable costs" equals the "contribution margin." Lambrinos Decl. Ex. 9 at 1512. Third, the contribution margin minus fixed costs equals the operating margin. *Id.* The UPA employs a "fully allocated cost approach" to determine whether a sale is below-cost, "an approach which reflects that portion of the [defendant's] total costs attributable on an average basis to each unit of output." *W. Union Fin. Servs., Inc. v. First Data Corp.*, 20 Cal. App. 4th 1530, 1537 (1993) (internal quotation marks omitted).

1    of its work to the IPA's physician members, some of whom may be able to refer other business . . .

2    to the laboratory." *Id.* at ¶ 18.

3            Apart from its business with IPAs, Quest offers discounted pricing to certain physicians

4    and hospitals. *Id.* at ¶ 24. These arrangements are governed by Quest's "Client Pricing Policy,"

5    which requires ███████████████████████████████████████████████████████████

6    ████████████████████████████████████████

7            **B.      Quest's Capitated Contracts with IPAs**

8            Plaintiffs assert that according to Quest's own internal financial statements, sixty percent

9    of its capitated IPA contracts in California generated negative contribution margins "throughout

10   the relevant period." Opp. 7; Plandowski Decl. ¶ 14. Plaintiffs base this figure on an expert

11   analysis of data showing the performance of Quest's Southern California IPA accounts in 2008.

12   Plandowski Decl. ¶¶ 14-16. Plaintiffs' expert, Joseph Plandowski, states that it is reasonable to

13   assume that a similar percentage of Quest's Northern California IPA accounts operated with a

14   negative contribution margin. Plandowski also states that with the exception of one account (of

15   Quest's 121 accounts in Southern California), each of the accounts with a negative contribution

16   margin in 2008 maintained a negative contribution margin into 2014. *Id.* at ¶ 16. In other words,

17   "the losers remained losers and the winners remained winners." *Id.* In addition to Plandowski's

18   testimony, plaintiffs emphasize that Quest admits (in Moverley's declaration) that at least some of

19   its capitated contracts with IPAs have resulted in negative contribution margins. Opp. 6;

20   Moverley Decl. ¶ 19 ("On some occasions, [Quest's] profit margins on particular IPA accounts

21   have yielded negative profit margins.").

22           In response to Moverley's statement that Quest has tried to bring IPA accounts with

23   negative contribution margins "into the black as quickly as practicable," plaintiffs note that

24   Moverley admitted at his deposition that one of Quest's IPA accounts maintained a negative

25   contribution margin for approximately seven years. Moverley Dep. 185 (Lambrinos Decl. Ex. 1).

26   The deposition excerpt does not make clear when that seven year period occurred. *See id.* In

27   response to Moverley's statement that Quest has not approved any new capitated contracts with

28   negative contribution margins since at least 2006, plaintiffs assert that many of the capitated

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1   contracts that were approved before 2006 continued to generate negative contribution margins

2   "well after 2006."  Opp. 7.

3        To show that Quest has entered below-cost capitated IPA contracts, plaintiffs also point to

4   Quest's SEC filings.  Plaintiffs contend the filings disclose sufficient information to conduct a

5   "simple calculation of fully-allocated costs per requisition."[3]  Opp. 7.  Plaintiffs assert that

6   according to the filings, Quest's average fully-allocated costs per capitated requisition exceeded its

7   average revenue per capitated requisition in each year from 2008 to 2013.  Opp. 7-8; Plandowski

8   Decl. Ex. 16.  According to plaintiffs, this national data indicates the existence of an "even greater

9   disparity" between fully-allocated costs and revenue in California, "where costs for labor, real

10  estate, and other items . . . are generally higher than the national average."  Opp. 7.

11       Plaintiffs allege that Quest's purpose in underpricing its capitated contracts with IPAs is to

12  obtain lucrative fee-for-service business from physicians belonging to the IPAs.  Quest's "IPA

13  Capitated Pricing Guidelines" (effective July 1, 2006) state that ████████████████████

14  ████████████████████████████████████████████████████

15  ████████████████████████████████████ Lambrinos Decl. Ex. 7.

16  ████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████

23       Plandowski states that "[u]sing below-cost capitated contracts to obtain [fee-for-service]

24  work from referring physicians is damaging to competition because it artificially deprives smaller

25

26  ────────────────────

27  [3] Plaintiffs state that a "requisition" is a group of tests ordered at the same time for a single patient, usually two or three tests.  SAC ¶ 61.

28  █████████████████████████████████████████

independent laboratories access to this [fee-for-service] revenue stream." Plandowski Decl. ¶ 24. Mike Armstrong of Sharp Health Care, another regional laboratory, testified at his deposition that once a physician does a "significant volume" of capitated business with a particular laboratory, "the office staff are going to start wanting to have one-stop shopping. They are not going to want to have a bunch of different systems." Armstrong Dep. 21 (Lambrinos Decl. Ex. 23).

On the basis of this evidence, plaintiffs claim that Quest knew that its capitated IPA contracts resulted in significant amounts of fee-for-service revenues, and that Quest "used below-cost pricing in its capitated IPA contracts for the purpose of injuring competitors and destroying competition in both the capitated and fee-for-service markets." Opp. 9.

**C.      General Fee-For-Service Market**

Plaintiffs assert that Quest sells its tests below-cost in the general fee-for-service market as well. Plaintiffs point to the following data regarding the revenue generated by Quest's top 100 tests by volume in California for the years 2008 to 2014, excluding revenue from government payors:

| Year | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|------|------|------|------|------|------|------|------|
| **Percent of revenue (generated by top 100 tests) with negative gross margin** | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| **Percent of revenue (generated by top 100 tests) with negative contribution margin** | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| **Percent of revenue (generated by top 100 tests) with negative operating margin** | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

Opp. 10; Regan Rpt. 7-8, Ex. 2.6.1 (Lambrinos Decl. Ex. 46).

Quest tracks the profitability of its tests through a system called "e-account." Opp. 10;

Miller Dep. 109 (Lambrinos Decl. Ex. 6).  According to e-account, Quest has approved the sales

of tests with negative gross margins, meaning that these sales also had negative contribution and

operating margins.  *See* Plandowski Decl. ¶ 28, Ex. 18.

### D.     Quest's "Network Narrowing" Contracts

Plaintiffs identify three "network narrowing" contracts secured by Quest through the use of

below-cost pricing: one with Aetna, one with Blue Shield, and one with Partnership Health Plan.

#### 1.     Aetna

Plaintiffs assert that Quest caused Aetna to exclude Hunter from its network by offering

Aetna a discounted fee schedule that included tests priced below-cost.  Opp. 11.  Plaintiffs do not

assert that any of the other plaintiffs were injured in this way, although plaintiffs do claim that

PBP was prevented from ever attaining in-network status as a result of Quest's contract with

Aetna.  *See id.*

Effective April 1, 2012, the Seventeenth Amendment to Quest's contract with Aetna

includes a provision requiring Aetna to

Lambrinos Decl. Ex. 29 at 8.  To comply with this provision,

Gentleman Dep. 68-69 (Lambrinos Decl.

Ex. 30).  Richard Gentleman[5] stated at his deposition that Aetna

*Id.* at 194.

Plaintiffs acknowledge that Quest's contract with Aetna was profitable overall[6] but

contend that a careful analysis of the associated fee schedule reveals that the contract includes

---

[5] Gentleman is the head of "National Ancillary Contracting" at Aetna.  Dkt. No. 123-1.

[6] Quest's Executive Director of Health Plans, Gary McCabe, submitted a declaration stating that the overall contribution margin on Quest's contract with Aetna has ranged from ████ percent, while the operating margin has ranged from ████ percent.  McCabe Decl. ¶ 8.  He states that Quest has earned over ████████ dollars on the contract each year.  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1    numerous below-cost prices for individual tests.  Opp. 11.  Plaintiffs' expert, Greg Regan, states

2    that the evidence indicates that Quest offered Aetna prices on certain tests that were below-cost

3    even according to the gross margin measure.  Regan Rpt. 8-9 (Lambrinos Decl. Ex. 46).  Regan

4    specifically identifies several tests with costs of testing significantly higher than the prices offered

5    to Aetna.  *Id.*  For example, Quest test code ▮▮▮ had a cost of testing of ▮▮▮ in Q1 2012 but

6    was offered to Aetna for ▮▮▮; likewise, Quest test code ▮▮▮ had a cost of testing of ▮▮▮

7    in Q1 2012 but was offered to Aetna for ▮▮▮  *Id.*  Plaintiffs contend that in light of this

8    evidence of below-cost pricing, the Seventeenth Amendment "represents a purposeful act by

9    Quest to use below-cost prices to injure competitors by having them excluded from Aetna's

10   network." Opp. 11.

          **2.    Blue Shield**

12        Plaintiffs assert that Quest also induced Blue Shield to terminate Hunter from its network

13   by offering a fee schedule with below-cost test pricing.  Opp. 11-12.  Plaintiffs again do not assert

14   that any of the other three plaintiffs were injured in this way, except to claim that PBP was

15   prevented from ever attaining in-network status as a result of Quest's contract with Blue Shield.

16   *See id.*

17        In April 2009, Quest and Blue Shield entered an amendment to their contract.  *See*

18   Lambrinos Decl. Ex. 31.  The amendment provides that Blue Shield will ▮▮▮



Regan states that the evidence indicates that Quest offered Blue Shield prices on certain tests that were below-cost even according to the gross margin measure.[7]  Regan Rpt. 8.  Regan specifically identifies several tests with costs of testing significantly higher than the prices offered to Blue Shield.  *Id.*  Plaintiffs contend that in light of this evidence of below-cost sales, the 2009 amendment to the Blue Shield contract "represents a purposeful act by Quest to use below-cost pricing to injure competition."  Opp. 12.

### 3.    Partnership Health Plan

Plaintiffs claim that Hunter and SPA lost business from four existing accounts as a result of a capitated contract that Quest entered with Partnership Health Plan in 2009.  Opp. 14; Laboratory Services Agreement at 1 (Sandrock Decl. Ex. 6); C. Reidel Dep. 268-69 (Sandrock Decl. Ex. 3).  The accounts are Alexander Valley, Chanate Health Center, Petaluma Health Center, and Southwest Community Clinic.  Opp. 14; C. Reidel Dep. 268-69 (Sandrock Decl. Ex. 3).  Hunter lost its business with each of these accounts shortly after the contract took effect on October 1, 2009.  *See* Opp. 14; Fuchs Decl. ¶¶ 2-3 (Sandrock Decl. Ex. 35); C. Reidel Dep. 268-69 (Sandrock Decl. Ex. 3); Prendergast Dep. 50-51 (Lambrinos Decl. Ex. 42).  SPA likely lost its business with the accounts at or around the same time, although this is not clear from the record.[8]

Naomi Fuchs, CEO of Santa Rosa Community Health Centers, of which Chanate Health

---

[7] Plaintiffs concede that Quest's contract with Blue Shield, like its contract with Aetna, was profitable overall.  McCabe states in his declaration that the contribution margin on the Blue Shield contract has ranged from ▮▮ to ▮▮ percent, and the operating margin has ranged from ▮▮ to ▮▮ percent.  McCabe Decl. ¶ 7.  He states that Quest has earned over ▮▮▮▮▮ on the contract each year.  *Id.*

[8] At oral argument, when asked to identify evidence in the record indicating when SPA lost its business with the four accounts allegedly lost as a result of Quest's capitated contract with Partnership Health Plan, Quest pointed to its contract with Partnership Health Plan, attached as Exhibit 6 to the Declaration of Ryan Sandrock in Support of Quest's Motion for Summary Judgment, Dkt. No. 217-1.  *See* Tr. 28, 51 (Dkt. No 266).  Quest did identify any evidence showing when SPA actually lost its business with the four accounts.  *See id.*

United States District Court
Northern District of California

Center and Southwest Community Clinic are now a part, states in a declaration that Quest's contract with Partnership Health Plan required Chanate Health Center and Southwest Community Clinic to use Quest for diagnostic testing services for Partnership Health Plan's members. Fuchs Decl. ¶ 4 (Sandrock Decl. Ex. 35). Fuchs also states that "if not for [Quest's contract with Partnership Health Plan] and had Hunter continued to offer competitive pricing and services, [Chanate Health Center and Southwest Community Clinic] would . . . probably have continued to use Hunter for diagnostic testing services." *Id.* at ¶ 5.

### E. Damages Allegedly Caused by Quest's Below-Cost Pricing

Plaintiffs claim that Quest's below-cost pricing caused Hunter and SPA to lose business from a number of existing accounts. Opp. 12; Regan Rpt. 14-18; 35-37. Plaintiffs also claim that Quest's below-cost pricing has caused each of them to lose business from potential accounts. Opp. 12; Regan Rpt. 18-23; 34-38. Because Quest's summary judgment motion is largely focused on causation and damages issues, I review the damages alleged by each of the four plaintiffs.

#### 1. Hunter

Hunter was founded in 2003. As of November 14, 2012, the date this case was filed, Hunter offered "Routine Clinical Laboratory Testing" in Northern California and "Advanced Lipid Testing" throughout the country. SAC ¶ 13. On August 7, 2013, Hunter finalized a sale of 80 percent of its assets to BioReference, which plaintiffs describe as the largest privately owned clinical laboratory in Northern California. SAC ¶¶ 7, 13; Regan Rpt. 23.

Hunter claims that it lost business from sixty-three accounts due to the termination of its in-network status with Aetna and Blue Shield following execution of the Seventeenth Amendment to the Aetna contract and the 2009 amendment to the Blue Shield contract. *See* Opp. 12-15; Quest's Appendix A (Dkt. No. 216-3). As noted above, Hunter claims that it lost business from four accounts as a result of Quest's contract with Partnership Health Plan. Opp. 14; C. Reidel Dep. 268-69 (Sandrock Decl. Ex. 3). Hunter also claims that it lost business from at least the following seven accounts as a result of Quest's below-cost capitated IPA contracts: Alta Bates Medical Group, Bolinas Community Health Center, Diagnostic Labs, Elsie Allen Health Center, Lombardi Medical, Point Reyes Community Health Center, Stinson Beach Medical Center. Opp.

United States District Court
Northern District of California

12-15; Regan Rpt. Ex. 2.1.2.

Regan states that Hunter began to lose business from existing accounts in September 2012 as a result of the termination of its in-network status with Aetna, and in May 2010 as a result of the termination of its in-network status with Blue Shield.  Regan Rpt. 17.  Regan also states that Hunter lost business from existing accounts when it was precluded from obtaining the fee-for-service business associated with Quest's below-cost capitated IPA contracts.  Regan Rpt. 14-16.  Regan emphasizes that his calculations regarding this lost fee-for-service business do not assume that Hunter, or any other plaintiff, would have obtained capitated business from the IPAs that contracted with Quest.  *Id.*

In addition to these damages, Regan opines that Hunter suffered damages in the form of "lost opportunity revenue."  Regan Rpt. 18-23.  Regan attributes Hunter's lost opportunity revenue to Quest's below-cost capitated IPA contracts, and to its below-cost sales in the general fee-for-service market.  *Id.*

Regan calculates Hunter's overall damages from lost profits at between $3.4 million and $6.9 million, depending on what measure of profit margins (i.e., gross margins, contribution margins, or operating margins) is applied to Quest's below-cost sales.  Regan Rpt. at 23.  Regan also finds that Quest's below-cost sales caused Hunter several million dollars in damages from "lost business value."  *Id.* at 23-33.

Declarations from three physician members of the IPA, "Physicians Medical Group," state that absent the capitated contract between Quest and Physicians Medical Group, they would send more of their non-capitated business to Hunter and SPA.  Lambrinos Decl. Exs. 37-39.  Each declaration uses the same language: "I have never considered using [Hunter] or [SPA], or have offered these entities only limited business, because [Physicians Medical Group] has a capitated contract with Quest.  If not for this contract, I would send a greater amount of my non-capitated business" to Hunter and SPA.  *Id.* at ¶ 1.[9]

---

[9] Quest points out that the wording of the Physicians Medical Group declarations is odd given that the declarations were signed in fall 2014, well after Hunter had finalized the sale of the majority of its assets to BioReference.  Reply 9 n.13.

### 2.   SPA

SPA provided pathological testing services for a number of entities, in particular Hunter, from which SPA procured approximately fifty percent of its business.  Weiss Dep. 42-43 (Sandrock Decl. Ex. 12); Regan Rpt. 35.  SPA did not operate its own laboratories, instead relying on Hunter's infrastructure.  *Id.*  SPA claims to have lost business from four existing accounts as a result of Quest's below-cost pricing: (i) Alexander Valley Health Center Diagnostic Labs; (ii) Chanate Health Center; (iii) Petaluma Health Center; (iv) Southwest Community Clinic.  Sandrock Decl. Ex. 13 at 5-6.  These are the same four accounts that Hunter claims to have lost as a result of Quest's contract with Partnership Health Plan.

Regan states that given the close relationship between Hunter and SPA, any economic damages suffered by Hunter had a "corollary impact" on SPA.  Regan Rpt. 35.  Regan also states that it is reasonable to expect that SPA's performance absent Quest's below-cost sales would have "mirrored" Hunter's performance in that scenario.  *Id.* at 36.  Regan calculates SPA's damages at between $0.3 million and $0.9 million, depending on what measure of profit margins is applied to Quest's below-cost sales.  *Id.* at 37 n.177.

### 3.   RDL

RDL offers "Specialty Rheumatological Diagnostic Testing" across the country, with the majority of its business coming from Southern California.  SAC ¶ 12; Morris Dep. 117 (Sandrock Decl. Ex. 15).  RDL asserts that it lost business from twelve potential accounts as a result of Quest's below-cost sales: (i) Amin Attia; (ii) Andre Babajanians; (iii) Michael Fabricant / Michael Sugarman; (iv) Kenneth Hsu; (v) Sam Metyas; (vi) Bruce Dreyfus; (vii) Elyse Rubenstein; (viii) Barry Shibuya; (ix) Marilyn Solsky; (x) Boniske / Watrous; (xi) Christian Dequet; and (xii) Neville Udwadia.  Quest's Appendix A at 6-7.

Regan states that RDL was damaged by Quest's below-cost sales in the form of lost opportunity revenue.  Regan Rpt. 34-35.  Regan attributes RDL's lost opportunity revenue both to Quest's capitated contracts with IPAs, and to Quest's other below-cost sales in the general fee-for service market.  *Id.*  Regan calculates RDL's damages at between approximately $2.9 and $6.3 million, depending on what measure of profit margins is applied to Quest's below-cost sales.  *Id.*

at 35 n.167.

### 4.    PBP

PBP offers "Specialty Breast Pathology Testing" throughout California.  SAC ¶ 12.  PBP has never had more two employees.  Dutt Dep. 16 (Sandrock Decl. Ex. 18).  Dr. Philip Dutt is PBP's only current employee and conducts the business out of his home.  Dutt Dep. 96.  Since its formation, PBP has generated a total of $7,800 in revenue.  *Id.* at 54.  Plaintiffs assert that PBP lost business from two accounts as a result of Quest's below-cost sales: (ii) RadNet and (ii) Imaging Healthcare Specialists ("Imaging Healthcare").  Sandrock Decl. Ex. 19.  Dutt stated at his deposition that the extent of PBP's attempts to obtain business from Imaging Healthcare was three approximately five-minute conversations with Imaging Healthcare's chief financial officer.  Dutt Dep. 104-05 (Sandrock Decl. Ex. 18).

Regan calculated PBP's damages based on the assumptions that PBP was unable to obtain fee-for-service sales due to Quest's capitated contracts with IPAs, and that Quest's below-cost sales precluded PBP from obtaining in-network status with either Aetna and Blue Shield.  Regan Rpt. 37-38.  Regan bases these assumptions on various excerpts from Dutt's deposition transcript.  *See id.* at 38 n.178-79.  In one excerpt, Dutt states that Quest's "capitated contracts inhibit doctors from sending specimens to us."  Dutt Dep. 25 (Lambrinos Decl. Ex. 45).  In another excerpt, after being asked why PBP was unable to secure business with Radnet, Dutt states, "I think it primarily had to do with the lack of being in the big insurance networks."  Dutt Dep. 40 (Sandrock Decl. Ex. 18).  Neither Regan nor Dutt provide additional details regarding how or why PBP's damages are attributable to Quest's below-cost sales.  Regan states that PBP's damages are between approximately $0.01 and $.20 million, depending on what measure of profit margins is applied to Quest's below-cost sales.  *Id.* at 38 n.187.

### F.    Evidence of Quest's Improper Purpose

Plaintiffs submit a number of documents in support of their claim that Quest considered them a competitive threat in California and thus perpetrated its below-cost sales with the improper purpose of injuring competitors or destroying competition.  *See* Opp. 5.  The documents include:



None of the documents submitted by plaintiffs as evidence of Quest's improper purpose specifically refer to any plaintiff other than Hunter.

## II.     PROCEDURAL BACKGROUND

Plaintiffs filed this action on November 14, 2012, asserting claims for violations of federal and California antitrust laws, interference with prospective economic advantage, and violations of the UPA and UCL.  Dkt. No. 1.  In addition to Quest, the initial complaint named Aetna, Blue Shield, and the Blue Cross and Blue Shield Association as defendants.  *Id.*  After several iterations of the complaint and several rulings on motions to dismiss, all but the UPA and certain UCL claims against Quest were dismissed with prejudice.

The UPA claims are brought under  California Business & Professions Code sections 17043 and 17044.  SAC ¶ 151.  The remaining UCL claims are brought under the statute's unlawful and unfair prongs and are derivative of the UPA claims.  *See* Dkt. No. 147 at 27-28. Under the UPA cause of action, plaintiffs seek compensatory and trebled damages and an

1    injunction against Quest.  SAC at 51.  Under the UCL cause of action, plaintiffs seek restitutionary

2    damages and an injunction against Quest.  *Id.*

3        Quest filed this motion for summary judgment on January 16, 2015.  Dkt. No. 216.  I heard

4    argument from the parties on March 11, 2015.  Dkt. Nos. 264, 266.

5                                    **LEGAL STANDARD**

6        A party is entitled to summary judgment where it "shows that there is no genuine dispute

7    as to any material fact and [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A

8    dispute is genuine if it could reasonably be resolved in favor of the nonmoving party.  *Anderson v.*

9    *Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A fact is material where it could affect the

10   outcome of the case.  *Id.*

11       The moving party has the initial burden of informing the court of the basis for its motion

12   and identifying those portions of the record that demonstrate the absence of a genuine dispute of

13   material fact.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986).  Once the movant has

14   made this showing, the burden shifts to the nonmoving party to identify specific evidence showing

15   that a material factual issue remains for trial.  *Id.*  The nonmoving party may not rest on mere

16   allegations or denials from its pleadings, but must "cit[e] to particular parts of materials in the

17   record" demonstrating the presence of a material factual dispute.  Fed. R. Civ. P. 56(c)(1)(A); *see*

18   *also Liberty Lobby,* 477 U.S. at 248.  The nonmoving party need not show that the issue will be

19   conclusively resolved in its favor.  *Id.* at 248-49.  All that is required is the identification of

20   sufficient evidence to create a genuine dispute of material fact, thereby "requir[ing] a jury or judge

21   to resolve the parties' differing versions of the truth at trial."  *Id.* (internal quotation marks

22   omitted).  If the nonmoving party cannot produce such evidence, the movant "is entitled to . . .

23   judgment as a matter of law because the nonmoving party has failed to make a sufficient showing

24   on an essential element of her case."  *Celotex*, 477 U.S. at 323.

25       On summary judgment, the court draws all reasonable factual inferences in favor of the

26   nonmoving party.  *Liberty Lobby,* 477 U.S. at 255.  "Credibility determinations, the weighing of

27   the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those

28   of a judge."  *Id.*  However, conclusory and speculative testimony does not raise a genuine factual

United States District Court
Northern District of California

15

1    dispute and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE*

2    *Corp.,* 594 F.2d 730, 738-39 (9th Cir. 1979).

3                                              **DISCUSSION**

4          California Business & Professions Code section 17043 makes it "unlawful for any person

5    engaged in business within [California] to sell any article or product at less than the cost thereof to

6    such vendor, or to give away any article or product, for the purpose of injuring competitors or

7    destroying competition."  Cal. Bus. & Prof. Code § 17043.  Section 17044 makes it "unlawful for

8    any person engaged in business within [California] to sell or use any article or product as a 'loss

9    leader' as defined in section 17030."  Cal. Bus. & Prof. Code § 17044.

10         Section 17030 defines "loss leader" to mean "any article or product sold at less than

11   cost . . . [w]here the purpose is to induce, promote, or encourage the purchase of other

12   merchandise; or . . . [w]here the effect is to divert trade from or otherwise injure competitors."

13   Cal. Bus. & Prof. Code § 17030.  "Article" and "product," as used in both section 17043 and

14   section 17044, are defined by section 17024 to include "any article, product, commodity, thing of

15   value, service or output of a service trade."  Cal. Bus. & Prof. Code § 17024; *see also W. Union*

16   *Fin. Servs., Inc. v. First Data Corp.*, 20 Cal. App. 4th 1530, 1536 (1993).

17         "[T]he prohibitions in the UPA on below-cost sales are designed to protect a competitor

18   whose more powerful neighbor is attempting to drive him out of business."  *Fisherman's Wharf*

19   *Bay Cruise Corp. v. Superior Court*, 114 Cal. App. 4th 309, 322 (2003) (internal quotation marks,

20   citations, and modifications omitted).

21         Quest makes five principle arguments in connection with its motion for summary

22   judgment: (1) that plaintiffs violated the protective order in this case by disclosing Quest's

23   confidential information to one of their experts; (2) that plaintiffs cannot establish a causal

24   connection between Quest's alleged below-cost pricing and most, if not all, of their claimed

25   harms; (3) that plaintiffs' cannot establish that Quest's alleged below-cost pricing was done with

26   an improper purpose, as required to impose liability under sections 17043 and 17044; (4) that the

27   majority of Hunter's claims are barred by a May 19, 2011 settlement agreement between Hunter

28   and Quest; and (5) that the majority of plaintiffs' claims are barred by the statute of limitations.  I

United States District Court
Northern District of California

address each argument in turn.

## I.       ALLEGED PROTECTIVE ORDER VIOLATION

On March 4, 2015, the parties submitted a joint letter regarding a dispute over plaintiffs' alleged violation of the protective order in this case.  Ltr. 1 (Dkt. No. 260).  Quest accuses plaintiffs of violating the protective order by disclosing Quest's "highly confidential – attorney's eyes only" information to their expert, Joseph Plandowski.  *Id.*

The protective order sets out specific restrictions on which experts may be given access to another party's highly confidential information.  *See* Dkt. No. 101 at § 7.4.  Section 7.4(a)(3) of the protective order prohibits the disclosure of "highly confidential – attorney's eyes only" information to any expert (i) who either is or is anticipated to become a current officer, director, or employee of a party or competitor of a party; or (ii) who is involved in "competitive decisionmaking," as defined in *U.S. Steel v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984), on behalf of a party or competitor of a party.  *Id.* at § 7.4(a)(3).

Quest asserts that Plandowski's business, In-Office Pathology LLC ("IOP"), and the "physicians' office laboratories" ("POLs") that IOP helps to install and operate are competitors of Quest.  Ltr. 2-5.  Quest requests an order (i) striking Plandowski's declaration; (ii) prohibiting plaintiffs from any further disclosure of Quest's highly confidential information to Plandowski; (iii) requiring Plandowski to return to Quest within three days all of Quest's highly confidential information in his possession, as well as "all documents derived therefrom;" (iv) prohibiting Plandowski from providing "advice, analysis, or recommendations" to any competitor of Quest concerning the matters at issue in this litigation while it remains pending; and (v) awarding Quest its attorney's fees and costs expended in preparing and filing the parties' joint letter.  Ltr. 5.

Plaintiffs counter that neither IOP nor its POL clients compete with Quest, and that even if POLs do qualify as Quest's competitors, Plandowski is not involved in competitive decisionmaking on their behalf.  Ltr. 6-10.

"[T]o determine whether or not a protective order has been violated, courts focus on the terms of the order itself."  *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 U.S. Dist. LEXIS 11778, 33 (N.D. Cal. Jan. 29, 2014); *see also Biovail Labs., Inc. v. Anchen Pharm., Inc.*, 463 F. Supp. 2d

United States District Court
Northern District of California

1073, 1080-81 (C.D. Cal. 2006).  "A protective order should be read in a reasonable and common

sense manner so that its prohibitions are connected to its purpose."  *On Command Video Corp. v.*

*LodgeNet Entm't Corp.*, 976 F. Supp. 917, 921 (N.D. Cal. 1997).

The protective order in this case does not define "competitor."  One court in this circuit has

explained that, "in the traditional sense," competitors are "persons endeavoring to do the same

thing and each offering to perform the act, furnish the merchandise, or render the service better or

cheaper than his rival."  *Summit Tech., Inc. v. High-Line Med. Instruments, Co.*, 933 F. Supp. 918,

939 n.14 (C.D. Cal. 1996) (internal quotation marks and modifications omitted).  Another court in

this circuit has similarly defined "competitor" to mean "a rival" or "one selling or buying goods or

services in the same market as another."  *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1104

(C.D. Cal. 2004).  Both parties rely on these definitions and appear to agree they accurately

convey the meaning of "competitor" for the purposes of the protective order.  *See, e.g.,* Ltr. 2, 7.

Plaintiffs assert that IOP does not compete with Quest because it is not a lab and does not

perform or sell lab tests.  Ltr. 6.  Rather, IOP is in the business of installing "anatomic pathology

laboratories into specialty physicians' offices."  *Id.*  This means that IOP helps physicians hire

their own pathologists and set up their own laboratories so that they can perform their own lab

work.  Ltr. 1, 6.  These physicians' office laboratories ("POLs") are legally prohibited (under 42

U.S.C. § 1395nn(b)(1) and 42 C.F.R. § 411.355) from seeking referrals from doctors other than

those belonging to the particular physicians' practice group.  Ltr. 6.  Thus, plaintiffs assert, the

POLs that IOP works with do not compete with Quest either.  POLs "run lab tests strictly for their

own patients . . . They have simply internalized a process that Quest used to perform."  Ltr. 6-7.

Plaintiffs further assert that even if the POLs do qualify as competitors of Quest, IOP

merely acts as a "consultant" for its POL clients and is not involved in competitive

decisionmaking on their behalf.  In *U.S. Steel*, the Federal Circuit used the term "competitive

decisionmaking" to describe a situation where an in-house counsel participates in decisions

regarding matters, such as pricing and product design, "made in light of similar or corresponding

information about a competitor."  730 F.2d at 1468 n.3; *see also Brown Bag Software v. Symantec*

*Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992) ("A crucial factor in the *U.S. Steel* case was whether

1   in-house counsel was involved in competitive decisionmaking; that is, advising on decisions about

2   pricing or design made in light of similar or corresponding information about a competitor.")

3   (internal quotation marks omitted).  Plaintiffs state that once IOP has helped a physicians' office

4   set up a POL, "the physicians are in charge of operating the lab and making decisions about the

5   lab . . . IOP provides general advice concerning reimbursement [from managed care plans], but

6   does not make strategic decisions for the [POL], does not set [its] prices . . . , and does not dictate

7   product design."  Ltr. 9.

8        Quest does not dispute plaintiffs' general descriptions of IOP's business model and the

9   operation of POLs but contends that both IOP and POLs compete with Quest.  Quest emphasizes

10  that the creation of a POL "allows [a physicians' practice group] to stop referring [its laboratory

11  tests] to Quest and similar labs, and instead to self-refer those services to the pathologist hired by

12  the practice."  Ltr. 1.  The managed care plans that previously reimbursed Quest for laboratory

13  services for the physicians' practice group's patients then begin reimbursing the practice instead.

14  In this way, Quest contends, POLs compete with (and take business from) Quest.

15       Quest points to its SEC filings, which cite POLs as a significant threat to its bottom line.

16  Ltr. 3.[10]  For example, Quest's 2013 annual report states, "If our customers continue to internalize

17  testing that we currently perform, the demand for our testing services may be reduced and our

18  revenues may be materially adversely impacted."  *Id.*  Quest also notes that in a July 2010

19  interview, Plandowski stated that the entities "hur[t] the most" by the growth of POLs are

20  "national pathology labs."  Ltr. 3.  A posting on IOP's website regarding lobbying efforts "to kill

21  off" POLs likewise describes a zero-sum relationship between POLs and large-scale clinical

22  laboratories like Quest:

23          Remember, the stakeholders spreading the word of our demise are the following:
            hospital-based pathologists, private pathology laboratories, specialty pathology
24          laboratories, and the very large commercial laboratories.  They would all benefit
            from the demise of our business model.
25

26

27  _____

28  [10] Neither party objects to any of the materials submitted by the other in connection with the joint
    letter.

United States District Court
Northern District of California

Ltr. 3.  Quests asserts that in light of this relationship between POLs and Quest, the fact that POLs cannot seek referrals from doctors outside the particular physicians' practice group is irrelevant. Ltr. 4.  According to Quest, "the competition at issue" is the competition to provide testing services to the patients of physicians' practice group's that create POLs; that is enough to make both IOP and POLs competitors of Quest.

Quest further asserts that, contrary to plaintiffs' claim, IOP is involved in "competitive decisionmaking" on behalf of its POL clients.  Quest quotes IOP's website, which states that IOP provides its clients with, among other things, (i) "[c]redentialing and reimbursement services so you get paid by managed care plans;" and (ii) "[o]ngoing advice on legal, reimbursement, operations, technology transfer, and business issues."  Ltr. 2.  Quest also notes that IOP's revenues are directly linked to those of its clients; IOP's website states that "[a]ll IOP agreements are 'at risk' – if you do not get paid neither does IOP."  *Id.*

Plaintiffs have the better of these arguments.  IOP's business model is too distinct from Quest's for the entities to qualify as competitors within the meaning of the protective order.  IOP helps physicians install and operate their own clinical laboratories; Quest provides physicians with clinical laboratory services.  While these endeavors are similar, they are not "the same thing." *Summit Tech.,* 933 F. Supp. at 939 n.14; *see also Fuller Bros. v. Int'l Mktg., Inc.*, 870 F. Supp. 299, 302-03 (D. Or. 1994) (parties were not "endeavoring to do the same thing," despite plaintiff's allegation that sales of defendant's product, EQUAL, reduced demand for its product, TIRE LIFE, where "EQUAL is a tire balancing product[;] TIRE LIFE is not a tire balancing product").

I am also unconvinced that the evidence indicating that IOP's business model may adversely impact Quest's bottom line is enough to make IOP and Quest "rival[s] . . . selling or buying goods or services in the same market as another."  *New.Net*, 356 F. Supp. 2d at 1104. Characterizing every entity whose activities have an economic effect on Quest as a competitor goes far beyond what is necessary to serve the purposes of the protective order.  Such a broad definition of competitor would threaten to capture, at the very least, every entity that participates in some way in the clinical laboratory industry, ensnaring plaintiffs in a Catch-22 wherein anyone "qualified to offer an expert opinion [would be] disqualified from reviewing the confidential

20

1    information necessary to form that opinion." *Frazier v. Layne Christensen Co.*, No. 04-cv-00315,

2    2005 WL 372253, at *3 (W.D. Wis. Feb. 11, 2005).  That would not be a sensible reading of a

3    protective order designed to allow the parties to obtain and rely on expert testimony.

4            Whether POLs qualify as Quest's competitors is a closer question.  But even if they do,

5    Quest has not shown that Plandowski is involved in "competitive decisionmaking" on their behalf.

6    A "competitive decisionmaker"[11] is one who "advis[es] on decisions about pricing or design made

7    in light of similar or corresponding information about a competitor."  *Brown Bag*, 960 F.2d at 1470

8    (internal quotation marks omitted).  It is a shorthand label for a person who, because of her

9    position and the particular decisions in which she is involved, cannot help but inadvertently rely on

10   the confidential information at issue in discussing or reaching those decisions.  *See Santella v.*

11   *Grizzly Indus., Inc.*, No. 12-cv-00013, 2012 WL 5399970, at *6 (D. Or. Nov. 5, 2012) (competitive

12   decisionmaker is someone "in a position to effectuate or direct decisions made using knowledge

13   that is tainted by . . . confidential information"); *accord Isis Pharm., Inc. v. Santaris Pharma A/S*

14   *Corp.*, No. 11-cv-02214, 2013 WL 3367575, at *5-6 (S.D. Cal. July 5, 2013).  Prohibitions on

15   disclosure to persons involved in competitive decisionmaking recognize that it "is very difficult for

16   the human mind to compartmentalize and selectively suppress information once learned, no matter

17   how well-intentioned the effort may be to do so."  *F.T.C. v. Exxon Corp.*, 636 F.2d 1336, 1350

18   (D.C. Cir. 1980); *see also Brown Bag*, 960 F.2d at 1471 (inquiring into whether in-house counsel

19   "could lock-up [the confidential information] in his mind, safe from inadvertent disclosure to his

20   employer, once he had read the documents").  "In the classic scenario, a decisionmaker may learn

21   how a competitor prices its product and despite the decisionmaker's best conscious effort his or her

22   future pricing decisions may be made in partial reliance on that information."  *Santella*, 2012 WL

23   5399970, at *5.

24

25   _____

26   [11] Courts construing "competitive decisionmaking" as used in *U.S. Steel* generally do not
     distinguish between a "person involved in competitive decisionmaking" and a "competitive
     decisionmaker."  *See, e.g., Isis*, 2013 WL 3367575, at *5-6; *Santella*, 2012 WL 5399970, at *5-6;

27   *Applied Signal Tech., Inc. v. Emerging Markets Commc'ns, Inc.*, No. 09-cv-02180-DMR, 2011
     WL 197811, at *4-5 (N.D. Cal. Jan. 20, 2011); *Nazomi Commc'ns, Inc. v. Arm Holdings PLC*, No.

28   02-cv-02521-JF, 2002 WL 32831822, at *2-3 (N.D. Cal. Oct. 11, 2002).

United States District Court
Northern District of California

The record here does not indicate that Plandowski is likely to inadvertently disclose Quest's information to his POL clients. Even assuming that POLs qualify as Quest's competitors, "[a] competitive relationship alone . . . is not sufficient to find that [Plandowski] will inadvertently disclose [Quest's] confidential information." *Santella*, 2012 WL 5399970, at *6.

The relevant question remains whether Plandowski is "in a position to effectuate or direct decisions made using knowledge that is tainted by [Quest's] confidential information." *Id.* The record does not indicate that he is. The only information that Quest is concerned about being inadvertently disclosed is information regarding its pricing and costs. Quest asserts this information will give IOP and its POL clients a "competitive advantage against Quest." Ltr. 4. But Quest has been unable to articulate a concrete scenario in which information regarding its pricing and costs would be useful to POLs, much less one in which such information would give POLs a competitive advantage.[12] Because POLs cannot seek referrals from doctors other than those belonging to the particular physicians' practice group, POLs do not compete for referrals with clinical laboratories like Quest, and thus have little reason to attempt to underprice such entities. It is conceivable that POLs would rely on information about Quest's pricing and costs in negotiating reimbursement rates with the insurance providers that pay them. However, given that these reimbursement rates are generally set according to pre-established fee schedules, it is not clear how such information would benefit POLs even in this context. *See* Ltr. 9-10. That the confidential information at issue is not directly relevant to the regular operations of POLs weighs heavily against a finding that Plandowski will be unable to "lock-up [that information] in his mind" in advising his POL clients. *See Brown Bag*, 960 F.2d at 1471.

Moreover, there is no indication that Plandowski makes pricing or other decisions on behalf of the POLs he works with. At most, Plandowski advises POLs regarding such decisions. This makes inadvertent disclosure even less likely. If Plandowski were empowered to make

---

[12] In the joint letter, Quest provided no explanation of how its pricing and cost information would be useful to POLs. At oral argument, counsel for Quest vaguely asserted that Plandowski and IOP "can help physicians undercut Quest's pricing. They can help them deal with their future strategies. They can help them with how to . . . negotiate with third party payers about reimbursement." Tr. 52 (Dkt. No. 266).

United States District Court
Northern District of California

1   decisions on behalf of his POL clients, "then he could, perhaps, be in a position to inadvertently

2   use [Quest's confidential information] in reaching a decision because it would be irrevocably

3   present in his mind." *Santella*, 2012 WL 5399970, at *6. But as a third-party consultant,

4   Plandowski "may only communicate, or in any other way use, that information through an

5   affirmative act." *Id.* I am satisfied that Plandowski will be able to prevent himself from taking

6   any affirmative act which inadvertently discloses Quest's confidential information to a POL.

7       Quest's request for relief on the protective order issue is DENIED.

8   **II.    PLAINTIFFS' UPA CLAIMS: CAUSATION**

9       Quest argues that it is entitled to summary judgment on plaintiffs' UPA claims because

10  plaintiffs cannot establish that their alleged injuries were caused by any actionable below-cost

11  pricing by Quest. Mot. 17-22; Reply 6-11. Quest contends that, at best, plaintiffs' alleged injuries

12  are traceable to underpricing that is nonactionable pursuant either to the May 19, 2011 settlement

13  agreement between Hunter and Quest, or to the statute of limitations.

14      A plaintiff must show a causal connection between its harms and the defendant's below-

15  cost sales to recover damages under sections 17043 and 17044.[13] *See Fisherman's Wharf*, 114

16  Cal. App. 4th at 330 (noting that "for [plaintiff] to maintain its price predation claim [under section

17  17043], it must be able to link [defendant's] below-cost pricing to a competitive injury"); *Dealers*

18  *Wholesale Supply, Inc. v. Pac. Steel & Supply Co.*, 6 ITRD 1563, at *8-9 (N.D. Cal. 1984)

19  (granting summary judgment for defendants on section 17043 claims where plaintiff "failed to

20  establish the existence of any causal link between actions taken by the defendants and harm caused

21  to the plaintiff"); Judicial Council of California Civil Jury Instruction 3301, "Below Cost Sales –

22  Essential Factual Elements" (requiring plaintiff to prove "[t]hat it was harmed" and "[t]hat

23

24  ─────────────────

25  [13] The UPA does not require a showing of "actual injury" to obtain injunctive relief under sections
    17043 and 17044. *See* Cal. Bus. & Prof. Code § 17082 ("In any action under this chapter, it is not

26  necessary to allege or prove actual damages or the threat thereof, or actual injury or the threat
    thereof, to the plaintiff. But, in addition to injunctive relief, any plaintiff in any such action shall

27  be entitled to recover three times the amount of the actual damages, if any, sustained by the
    plaintiff."). In federal court, however, the Article III standing requirement precludes an uninjured

28  plaintiff from maintaining a UPA action, whether for damages or for injunctive relief alone. *See*
    *Solinger v. A&M Records, Inc.*, 586 F.2d 1304, 1309 (9th Cir. 1978).

United States District Court
Northern District of California

1 [defendant's] conduct was a substantial factor in causing [plaintiff's] harm"); Judicial Council Of

2 California Civil Jury Instruction 3302, "Loss Leader Sales – Essential Factual Elements" (same).

3          California courts have warned against imposing an "unduly rigorous standard of proving

4 antitrust injury." *Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*, 16 Cal. App.

5 4th 202, 219-20 (1993) (holding that plaintiff bringing claims under Cal. Bus. & Prof. Code §

6 17045, the UPA's secret discount provision, produced sufficient evidence of causation to justify

7 presentation of expert testimony on damages at trial).  An antitrust plaintiff "seeking damages for

8 loss of profits is required to establish only with reasonable probability the existence of some causal

9 connection between defendant's wrongful act and some loss of . . . anticipated revenue."

10 *Suburban Mobile Homes, Inc. v. Amfac Communities, Inc.*, 101 Cal. App. 3d 532, 545 (1980).

11 "Once that has been accomplished, the jury will be permitted to act upon probable and inferential

12 proof . . . and render its verdict accordingly." *In re Wholesale Elec. Anti-Trust Cases I & II*, 147

13 Cal. App. 4th 1293, 1309 (2007) (internal quotation marks and citations omitted).  Evidence

14 demonstrating "a reasonable probability that there was some causal connection between

15 defendant's wrongful act and the damages alleged" is thus generally sufficient to withstand a

16 motion for summary judgment.  *Id.*  That said, "damages cannot be awarded in antitrust cases upon

17 sheer guesswork or speculation." *Diesel*, 16 Cal. App. 4th at 219 (internal quotation marks

18 omitted).  "[T]he plaintiff must show with reasonable certainty that he has suffered damages by

19 reason of the wrongful act of the defendant." *Suburban*, 101 Cal. App. 3d at 545.

20          Two cases help illustrate a plaintiff's evidentiary burden in this context.  In *Diesel*, the

21 California Court of Appeal found that the trial court had erred in excluding, for failure to show

22 causation, the testimony of the UPA plaintiff's damages expert.  16 Cal. App. 4th at 218-20.  The

23 court stated: "[Plaintiff] showed its gross sales drastically declined and profits fell after [defendant]

24 entered the market and received secret, unearned discounts.  Further, [plaintiff] introduced the

25 testimony of two customers who chose to do business with [defendant] rather than [plaintiff] due

26 to [defendant's] lower pricing.  Such evidence is sufficient to show causation of antitrust injury."

27 *Id.* at 219.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

In contrast, in *Dealers Wholesale*, the court granted summary judgment for the defendants on the plaintiff's section 17043 claims where the plaintiff submitted no testimony from former customers "indicating that defendants' conduct caused them to cease patronizing" the plaintiff's business, and no statistics, expert analysis, or other evidence "linking defendants' actions to [the plaintiff's] lost sales." 6 ITRD 1563, at *5. The plaintiff did submit its own financial statements, several excerpts from the deposition of its former president, and a declaration by the former president. *Id.* at *3. However, the plaintiff made "no attempt to explain the financial statements" through expert testimony and made "no effort to break down any of the statements to show . . . figures attributable to [the particular products at issue]." *Id.* The court found that this failure rendered the statements "virtually meaningless" because the plaintiff also sold a large variety of other products. *Id.* The court stated: "At most [the] statements establish that [the plaintiff] became less profitable and went out of business. They do not show how any of [defendants'] actions caused this decline." *Id.* at *5.

The former president's deposition testimony was likewise inadequate because, while he asserted that defendant's conduct had caused the plaintiff to lose two accounts and had adversely impacted the vast majority of its other accounts, he made this assertion "without presenting any analysis of the comparative prices offered by [defendants] and [the plaintiff], and without presenting any statements or documentary evidence . . . to the effect that actions taken by [defendants] caused [customers] to cease doing business with [the plaintiff]." 6 ITRD 1563, at *5. Similarly, the former president's declaration failed to create a genuine dispute of fact on causation because it "d[id] not explain how [defendant's alleged misconduct] caused the loss . . . , or how he k[new] other factors were not responsible." *Id.* at *4. The court concluded that the plaintiff's evidence in support of causation "fail[ed] to connect particular actions with particular effects" and was thus insufficient to withstand summary judgment. *Id.* at *3, *8-9.

Quest contends that plaintiffs have not produced sufficient evidence to establish a reasonable probability of some causal connection between Quest's below-cost pricing (to the extent that below-cost pricing is actionable) and their claimed harms. I address each plaintiff in turn.

25

**A.  Hunter**

Quest identifies four deficiencies in Hunter's alleged injuries.

**1.  Overall Profitability of the Aetna and Blue Shield Contracts**

First, Quest observes that Hunter traces the bulk of its alleged injuries back to its loss of in-network status with Aetna and Blue Shield.  The record shows, however, that Quest's contracts with Aetna and Blue Shield both generated positive margins overall.  According to Quest, this evidence of overall profitability precludes Hunter from showing that its claimed harms resulting from its loss of in-network status are attributable to Quest's below-cost sales.  Mot. 19.

The problem with this argument is that plaintiffs have produced evidence indicating that while the Aetna and Blue Shield contracts generated positive margins overall, each contract included a number of tests that were priced below-cost, even according to the gross margin measure.  *See* Regan Rpt. 8.  Regan identifies several tests from both contracts with mere costs of testing significantly higher than the prices offered to either Aetna and Blue Shield.  The obvious inference is that once fully-allocated costs are considered, as they must be under the UPA, *see First Data*, 20 Cal. App. 4th at 1537, the extent of below-cost sales involved in the Aetna and Blue Shield contracts will only increase.

In addition, Quest's head of compliance, Timothy Sharpe, confirmed at his deposition that Quest



Sharpe Dep. 26-27.

Under the UPA, whether the defendant's "overall price structure [is] predatory" is not dispositive.  *Fisherman's Wharf*, 114 Cal. App. 4th at 324.  Indeed, it is not even relevant.

United States District Court
Northern District of California

"[C]ourts in state predatory price cases brought under the UPA focus literally on whether the defendant sold 'any article or product' at less than cost." *Id.* at 326. Under this "individual item approach," courts analyze the sales at issue based on the "actual below-cost prices charged for a product or service, without regard to whether other above-cost sales . . . made the overall enterprise profitable." *Id.* (internal emphasis omitted).

Quest does not challenge this general rule but argues that plaintiffs have failed to produce sufficient evidence of any individual tests that were part of the Aetna or Blue Shield contracts being priced below-cost. Reply 7-8. Quest points to excerpts from the deposition testimony of McCabe, in which he states that he has never heard of a Quest pricing strategy according to which certain tests are priced below-cost for the purpose of harming regional labs. *See* McCabe Dep. 304, 326 (Sandrock Decl. Exs. 25, 33). McCabe's testimony certainly favors Quest, but in light of Regan's expert report and Sharpe's deposition testimony, it is hardly enough to establish as a matter of law that the Aetna and Blue Shield contracts did not include individual tests priced below-cost.

Quest emphasizes that the only relevant evidence on file indicates that the Aetna and Blue Shield contracts were not negotiated ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████ But Quest does not explain why this matters. The analysis in a UPA action for below-cost pricing "focus[es] literally on whether the defendant sold 'any article or product' at less than cost." *Fisherman's Wharf*, 114 Cal. App. 4th at 324. Quest offers no authority for the proposition that, in this case, the analysis should instead focus on the particular manner in which the Aetna and Blue Shield

United States District Court
Northern District of California

1    contracts were negotiated.

2         Finally, Quest attempts to distinguish *Fisherman's Wharf* on the ground that the products

3    at issue in that case were two separate types of tickets (wholesale and retail) for which there were

4    two separate groups of customers.  *See* 114 Cal. App. 4th at 323.  Quest contends this case is

5    distinguishable because its position on the overall profitability of the Aetna and Blue Shield

6    contracts "does not involve any price averaging across separate products, but instead looks at a

7    single product (laboratory tests) purchased by a single customer," i.e., either Aetna or Blue Shield.

8    Reply 8.  Even assuming this distinction exists, it appears to be one without a difference.  Quest

9    offers no explanation as to why "price averaging" across a single product sold to a single customer

10   should be legal under the UPA, when "price averaging" across different products sold to different

11   customers is not.  In any event, Quest's attempt to characterize all laboratory tests sold to Aetna

12   and Blue Shield as a single "product" is unconvincing.  Quest's business with both insurance

13   providers involved the sale of dozens, if not hundreds, of different tests.  Quest does not explain

14   why the different types of tickets in *Fisherman's Wharf*  are properly characterized as different

15   products, but the different types of tests at issue here are not.

16        In sum, the fact that Quest's contracts with Aetna and Blue Shield were profitable overall

17   does not preclude Hunter's theory that it was harmed as a result of Quest's below-cost pricing of

18   individual tests to Aetna and Blue Shield.  Quest is not entitled to summary judgment on this

19   ground.

20              **2.       Harms Barred by the May 19, 2011 Settlement Agreement**

21        As discussed in Section IV below, on May 19, 2011, Hunter and Quest settled a prior

22   lawsuit brought by Hunter.  In the settlement agreement, Hunter agreed to a broad release of "any

23   and all claims, . . . whether known or unknown," against Quest.  The second flaw Quest identifies

24   in Hunter's claimed harms in the present case is that Hunter asserts it lost business from four

25   accounts – Alexander Valley, Chanate Health Center, Petaluma Health Center, and Southwest

26   Community Clinic – as a result of Quest's contract with Partnership Health Plan.  Hunter lost each

27   of these accounts in or around October 2009, long before the May 19, 2011 settlement agreement

28   in which Hunter released "any and all claims" against Quest arising from conduct occurring before

United States District Court
Northern District of California

28

that date.  Accordingly, Quest argues, claims arising from a loss of business from the four accounts are barred.  Mot. 19.

Quest is right.  As discussed in Section IV below, to the extent that Hunter's claims are founded on a loss of business from Alexander Valley, Chanate Health Center, Petaluma Health Center, and Southwest Community Clinic, they are barred by the settlement agreement and are nonactionable.  Quest's motion for summary judgment on these claims is GRANTED.

The same is true of Hunter's claims arising from the 2009 amendment to Quest's contract with Blue Shield.  It is undisputed that the amendment was executed in 2009, and that Hunter began to suffer damages at least by May 2010 as a result of losing its in-network status with Blue Shield.  *See* Regan Rpt. 17.  Accordingly, to the extent that Hunter's claims are founded on the Blue Shield contract, they are also barred by the settlement agreement.  Quest's motion for summary judgment on these claims is also GRANTED.

### 3.    Damages Caused by Quest's Capitated IPA Contracts

The third flaw Quest identifies in Hunter's alleged injuries is that Hunter asserts it has suffered damages as a result of Quest's capitated IPA contracts.  Mot. 21-22.  Quest contends this theory fails as a matter of law because Hunter did not compete for capitated business.  *Id.*  Quest states that Hunter thus has no basis for asserting it was harmed by Quest's capitated IPA contracts, even assuming the contracts were below-cost.  *Id.*

Hunter responds that it does not trace its injuries to lost capitated business.  *See, e.g.,* Regan Rpt. at 14 ("My calculations do not assume that Hunter, or any other plaintiff, would have obtained revenue from those tests subject to the capitation portion of [Quest's capitated IPA contracts].").  Rather, Hunter's theory is that "the existence of capitated contracts between Quest and IPAs requires individual physicians who are members of [the] IPAs to send their [fee-for-service] work to Quest."  Opp. 22.  Thus, according to Hunter, in the "but-for world" where Quest does not enter below-cost capitated contracts with IPAs, "the discretionary [fee-for-service] work associated with those contracts is open for competition."  *Id.*  Quest counters that, whether or not this theory makes sense in the abstract, Hunter has failed to produce sufficient evidence in support of it to withstand summary judgment.  *See* Reply 8-11.

1    I agree with Quest.  Contrary to Hunter's assertion, there is no evidence on file indicating

2    that Quest "requires" individual physicians belonging to IPAs that enter capitated contracts with

3    Quest to send their discretionary fee-for-service business to Quest.  Opp. 22.  The only

4    declarations on file submitted by IPA members are those from the Physicians Medical Group

5    doctors.  None of them state they are contractually required or have in any way been pressured to

6    use Quest for their fee-for-service testing.  *See* Lambrinos Decl. Exs. 37-39.  It is true that Fuchs

7    states that Quest's contract with Partnership Health Plan required Chanate Health Center and

8    Southwest Community Clinic to use Quest for diagnostic testing services for Partnership Health

9    Plan's members.  Fuchs Decl. ¶ 4.  But neither Partnership Health Plan nor Chanate Health Center

10   nor Southwest Community Clinic is an IPA.  And, in any event, the harms that Hunter traces to the

11   Partnership Health Plan are barred by the May 19, 2011 settlement agreement.

12         Plaintiffs' experts also fail to demonstrate a causal connection between Quest's capitated

13   IPA contracts and Hunter's claimed damages.  Plandowski opines that "[u]sing below-cost

14   capitated contracts to obtain [fee-for-service] work from referring physicians is damaging to

15   competition because it artificially deprives smaller independent laboratories access to this [fee-for-

16   service] revenue stream."  Plandowski Decl. ¶ 24.  Plandowski cites no authority for this

17   proposition, however, and he makes no attempt to explain how it applies to Hunter or the other

18   plaintiffs.  *See id.*  Regan calculates the amount of revenue lost by Hunter "when it was foreclosed

19   from obtaining fee-for-service testing associated with Quest's capitated accounts."  Regan Rpt. 14.

20   But Regan, like Plandowski, offers no explanation as to why it is appropriate to assume that

21   Quest's capitated IPA contracts, whether below-cost or not, have deprived Hunter of fee-for-

22   service business.  *See id.* at 14-23.  His report is completely silent on the subject of causation, with

23   one exception: he states that he was "asked to assume" that PBP suffered damages as a result of

24   Quest's underpricing.  Regan Rpt. 37.  While Regan does not make the same statement with

25   respect to Hunter's alleged injuries resulting from Quest's capitated IPA contracts, there is nothing

26   in his report to indicate that his "finding" of causation on this theory is anything more than another

27   unsupported assumption he was asked to make in conducting his analysis.

28         Plaintiffs' opposition does not help substantiate a causal link between Quest's capitated

United States District Court
Northern District of California

United States District Court
Northern District of California

IPA contracts theory and Hunter's alleged injuries either.  The brief's half-page discussion of this issue admits that plaintiffs' "current damages calculations *assume* that absent Quest's below-cost sales, each plaintiff would have had greater access to the [fee-for-service] market."  Opp. 22 (emphasis added).  Plaintiffs then make their assertion that "the existence of capitated contracts between Quest and IPAs requires individual physicians who are members of [the] IPAs to send their [fee-for-service] work to Quest."  *Id.*  But plaintiffs cite no evidence to support this claim,[14] and as stated above, there is none in the record.  Quest accurately observes that the bulk of plaintiffs' opposition is devoted to addressing an issue that Quest does not dispute for the purposes of this motion – namely, whether Quest sold any of its tests below-cost.  Reply 1.  The minimal portion of the opposition focused on causation does not meaningfully contribute to creating a genuine dispute on whether Quest's alleged below-cost capitated IPA contracts in fact caused Hunter harm.

While Hunter's burden to show causation at this juncture is not "unduly rigorous," it must produce sufficient evidence to show that its damages theories are more than "sheer guesswork or speculation."  *Diesel*, 16 Cal. App. 4th at 219 (internal quotation marks omitted).  The near total absence of evidence of a causal connection between Quest's capitated IPA contracts and Hunter's alleged injuries does not satisfy this standard.  To the extent Quest's motion for summary judgment is aimed at Hunter's claims arising from Quest's alleged below-cost capitated IPA contracts, the motion is GRANTED.

### 4.    Damages Caused by Below-Cost Sales in the General Fee-For Service Market

Quest contends that Hunter has also failed to establish causation with respect to its claimed harms arising from Quest's alleged below-cost sales in the general fee-for service market.  Reply 11.  I agree.  Hunter's theory that it lost business as a result of Quest's below-cost sales in the general fee-for-service market is no better supported than Hunter's capitated IPA contracts theory.

---

[14] In fact, plaintiffs cite nothing at all in support of this claim.  Following the quoted statement, plaintiffs insert an "*Id.*" cite.  Opp. 22.  However, the "*id.*" cite is preceded by an unaccompanied "*Supra*" cite that contains no reference to a particular source or page number.  Nothing in the preceding pages supports the quoted statement.

United States District Court
Northern District of California

1    If anything, it is supported by even less evidence.  Hunter submits no declarations in support of the

2    theory, instead relying exclusively on the Plandowski and Regan opinions.  The Plandowski and

3    Regan opinions, however, make no attempt to link Quest's below cost sales in the general fee-for-

4    service market with Hunter's injuries.  Plandowski opines extensively on Quest's alleged below-

5    cost pricing, including in the general fee-for-service market, but provides no opinion regarding a

6    causal connection between such underpricing and Hunter's (or any other plaintiff's) claimed

7    damages.[15]  Similarly, Regan calculates Hunter's "lost opportunity revenue" attributable to

8    Quest's underpricing in the general fee-for-service market, but does not explain why it is

9    appropriate to assume that such underpricing caused the damages he calculates.  *See* Regan Rpt.

10   21.  The closest Regan comes to doing so is to observe that Hunter performed many of the same

11   tests that are among Quest's "top 100 tests."  *See id.*  But the mere fact that Quest offered the same

12   services as Hunter, standing alone, does not establish a genuine dispute of material fact on

13   causation.  To the extent that Quest's motion for summary judgment is aimed at Hunter's claims

14   arising from Quest's alleged below-cost sales in the general fee-for-service market, the motion is

15   GRANTED.

16      **B.    SPA**

17      The parties agree that "SPA's claims are derivative of Hunter's claims."  Mot. 20; *see also*

18   Regan Rpt. 35-36.  Accordingly, SPA's claims based on Quest's alleged underpricing in

19   connection with its capitated IPA contracts, and in the general fee-for-service market, fail for the

20   reasons discussed above with respect to Hunter's claims based on these theories.  Quest's motion

21   for summary judgment on these claims is GRANTED.

22      Quest also moves for summary judgment on SPA's claims arising from the Partnership

23   Health Plan contract.  Mot. 20.  While Hunter's claims arising from the Partnership Health Plan

24   _____

25   [15] Indeed, Plandowski explains at the outset of his declaration that he was retained to determine
     whether Quest has sold tests at below-cost, while Regan was tasked with delivering an opinion on

26   causation and injury.  Plandowski Decl. ¶ 8.  He states: "I was retained by plaintiffs to review
     [Quest's] lab data from their California operations.  The scope of my work included an

27   examination [of] Quest's pricing to its [IPAs] as well as to its fee-for-service clients to determine
     if those prices and corresponding sales were below-cost.  [Regan] has done a detailed quantitative

28   assessment of the 'but for' world, the market foreclosure resulting from Quest's below-cost sales,
     and the resulting damages."  *Id.*

contract are barred by the May 19, 2011 settlement agreement, SPA was not a party to that agreement.  *See* Settlement Agreement and Release at 1-2 (Sandrock Decl. Ex. 1).  Quest argues that SPA's claims arising from the Partnership Health Plan contract are nonetheless barred by the UPA's three-year statute of limitations.  *Id.*  Quest has not established as a matter of law, however, that the four lost accounts that SPA attributes to the Partnership Health Plan contract were lost before November 14, 2009, the cutoff date for the three-year limitations period.  *See G.H.I.I.*, 147 Cal. App. 3d at 279 n.16 ("When applying the one and three year periods of limitation for any continuing violations of the Unfair Practice Act, damages accrue from the date they are suffered and certain.").  Accordingly, Quest is not entitled to summary judgment on this ground.  SPA's claims based on the Partnership Health Plan contract may proceed.

**C.      RDL**

RDL does not identify any existing accounts from which it lost business as a result of Quest's alleged underpricing but asserts that it lost business from the following potential accounts: (1) Amin Attia; (2) Andre Babajanians; (3) Michael Fabricant / Michael Sugarman; (4) Kenneth Hsu; (5) Sam Metyas; (6) Bruce Dreyfus; (7) Elyse Rubenstein; (8) Barry Shibuya; (9) Marilyn Solsky; (10) Boniske / Watrous; (11) Christian Dequet; (12) Neville Udwadia.  Quest's Appendix A at 6-7 (Dkt. No. 216-3).  Regan attributes RDL's loss of potential business from these accounts both to Quest's capitated contracts with IPAs and to Quest's other below-cost sales in the general fee-for-service market.  *Id.*  Quest contends that RDL has not presented any evidence linking these claimed injuries to the alleged misconduct.  Mot. 20.

Quest is right.  RDL submits even less evidence than Hunter in support of its theory that it was harmed by Quest's below-cost sales.  RDL submits no declarations from any former or potential customers, IPA members or otherwise, and instead relies exclusively on the Plandowski and Regan opinions.  Plandowski and Regan offer no more guidance regarding RDL's damages in connection with Quest's alleged underpricing than they do regarding Hunter's.  Quest's motion for summary judgment on RDL's claims under the UPA is GRANTED.

**D.      PBP**

Plaintiffs assert that PBP lost business from two accounts as a result of Quest's below-cost

United States District Court
Northern District of California

United States District Court
Northern District of California

1   sales: (1) RadNet and (2) Imaging Healthcare.  Sandrock Decl. Ex. 19.  Regan calculated PBP's

2   damages based on the assumptions that PBP was unable to obtain fee-for-service sales due to

3   Quest's capitated contracts with IPAs, and that Quest's below-cost sales precluded PBP from

4   obtaining in-network status with either Aetna or Blue Shield.  Regan Rpt. 37-38.  Quest contends

5   that PBP has failed to produce sufficient evidence in support of these assumptions to create a

6   genuine issue of material fact regarding causation.

7          Quest is correct again.  PBP's evidence regarding causation is more or less identical to

8   RDL's.  PBP relies exclusively on the Plandowski and Regan opinions to show causation, neither

9   of which provide any meaningful analysis of the issue.  The only evidence cited by Regan in

10   support of his assumption that PBP was harmed by Quest's capitated IPA contracts is an excerpt

11   from Dutt's deposition transcript in which he asserts that Quest's "capitated contracts inhibit

12   doctors from sending specimens to us."  Dutt Dep. 25 (Lambrinos Decl. Ex. 45).  This

13   unsupported assertion by PBP's own employee is not enough to create a genuine issue of material

14   fact on whether Quest's capitated IPA contracts caused PBP's alleged injuries.

15          With regard to the theory that Quest's below-cost sales precluded PBP from obtaining in-

16   network status with either Aetna or Blue Shield, Regan explicitly states that he was "asked to

17   assume" that PBP suffered damages due to Quest's contracts with insurance providers.  Regan

18   Rpt. 37.  Following the "asked to assume" sentence, Regan cites the Seventeenth Amendment to

19   Quest's contract with Aetna and two excerpts from Dutt's deposition transcript.  *Id.* at 37 n.179.

20   In the first excerpt, when asked what Quest did to damage PBP, Dutt vaguely refers to the Aetna

21   contract, stating that Quest "apparently" has a contract with Aetna according to which Aetna does

22   not allow "small labs" into its network.  Dutt Dep. 25 (Lambrinos Decl. Ex. 45).  The second

23   excerpt from Dutt's deposition transcript was not submitted by either party as an exhibit and is not

24   in the record.  Neither the mere existence of the Aetna contract nor Dutt's vague reference to it

25   during his deposition is sufficient to satisfy PBP's burden on causation at this juncture.  Quest's

26   motion for summary judgment on PBP's claims under the UPA is GRANTED.

27   **III.    PLAINTIFFS' UPA CLAIMS: IMPROPER PURPOSE**

28          The UPA does not make all below-cost and loss-leader sales illegal.  To commit a UPA

34

violation under sections 17043 and 17044, a defendant "must act with the purpose, i.e., the desire, of injuring competitors or destroying competition." *Cel-Tech*, 20 Cal.4th at 169; *see also Bay Guardian Co. v. New Times Media LLC*, 187 Cal. App. 4th 438, 456-57 (2010) ("[T]he very gravamen of the [section 17043] offense is the purpose underlying the anticompetitive act, rather than the actual or threatened harm to competition. The . . . purpose of the below-cost sale is at the heart of the statute and distinguishes the violation from a below-cost pricing strategy undertaken for legitimate, nonpredatory business reasons."). "Mere knowledge that . . . below-cost or loss-leader sales will injure competitors or destroy competition is not sufficient." *Sub Corp., Ltd. v. Best Buy Co.*, 365 F. Appx. 767, 768 (9th Cir. 2010). The defendant must have acted with the "conscious object" or "positive desire" of injuring competitors or destroying competition. *Cel-Tech*, 20 Cal.4th at 173.

Under California Business & Professions Code section 17071, improper purpose is presumed where there is "proof of one or more acts of selling or giving away any article or product below cost . . . , together with proof of the injurious effect of such acts." Cal. Bus. & Prof. Code § 17071. "[T]his presumption may be rebutted . . . by showing that the sales were made in good faith and not for the purpose of injuring competitors or destroying competition." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1049 (9th Cir. 1981). A plaintiff may also prove improper purpose independently without the aid of the statutory presumption. *Bay Guardian*, 187 Cal. App. 4th at 457. Under this approach, improper purpose "may be proved the same way as any other fact, by direct or circumstantial evidence." *Id.* at 466.

Quest argues that plaintiffs cannot show improper purpose. Mot. 14-17. Quest contends that because plaintiffs have not produced evidence of injurious effect resulting from the alleged below-cost pricing, the section 17071 presumption does not apply, and even if it did, Quest has rebutted it. According to Quest, plaintiffs cannot prove improper purpose independently either.

The improper purpose issue is vastly simplified in light of plaintiffs' failure to establish either viability under the May 19, 2011 settlement agreement or causation with respect to the following of plaintiffs' UPA claims: (i) Hunter's claims arising from Quest's contract with Partnership Health Plan; (ii) Hunter's claims arising from the 2009 amendment to Quest's contract

35

1    with Blue Shield; (iii) Hunter's claims arising from Quest's alleged below-cost capitated IPA

2    contracts; (iv) Hunter's claims arising from Quest's alleged below-cost sales in the general fee-

3    for-service market; (v) SPA's claims arising from Quest's contract with Partnership Health Plan;

4    (vi) SPA's claims arising from Quest's alleged below-cost sales in the general fee-for-service

5    market; (vii) all of RDL's claims; and (viii) all of PBP's claims.

6            Without establishing causation, RDL and PBP cannot establish improper purpose either.

7    The section 17071 presumption arises only upon proof of an "injurious effect" that is caused by

8    the defendant's underpriced sales. *See Sub Corp.*, 365 F. Appx. at 768-69 ("Injurious effect

9    cannot be established from the mere fact that the plaintiff claims to have lost business without a

10   showing that plaintiff's lost sales are attributable to the defendant's actions."). RDL and PBP's

11   failure to show causation thus precludes them from relying on section 17071.

12           RDL and PBP could still prove improper purpose independently, but they have not

13   produced sufficient evidence to create a genuine dispute on this issue. Plaintiffs' only evidence

14   regarding improper purpose is a series of documents indicating that Quest views Hunter as a

15   competitor. *See* Opp. 5. To a lesser extent, the same documents also indicate that Quest views

16   other, unidentified regional labs as competitors. *See, e.g.,* Lambrinos Decl. Exs. 49-51. Whether

17   or not RDL and PBP are included in this group, however, evidence that Quest views such

18   laboratories as competitors is not equal to evidence that Quest acted with the intent to injure or

19   destroy them. *See Cel-Tech*, 20 Cal.4th at 168-70 (affirming finding that defendant lacked

20   improper purpose where it "intended merely to compete"); *Fisherman's Wharf*, 114 Cal. App. 4th

21   at 330 n.6 (noting that loss-leader sales expose businesses to liability under section 17044 only

22   where they are "undertaken with an intent to injure competitors or to destroy competition, and not

23   simply to increase sales"); *First Data Corp.*, 20 Cal. App. 4th at 1540 (reading sections 17043 and

24   17044 "to require an injurious intent (a specific intent to injure or destroy) and not just an intent to

25   divert customers from a competitor"). RDL and PBP's failure to demonstrate a genuine dispute as

26   to improper purpose provides additional grounds for granting Quest's summary judgment motion

27   on their UPA claims.

28           On the other hand, because Hunter and SPA have established a causal connection between

United States District Court
Northern District of California

36

Quest's alleged underpricing and at least some of their claims, they may rely on the section 17071 presumption as to those claims. Quest does not contest Hunter's claim that it lost a number of existing accounts as a result of the Seventeenth Amendment to the Aetna contract. Nor does Quest contest SPA's claim that it lost four existing accounts as a result of Quest's contract with Partnership Health Plan. Even if Quest did dispute these causal connections, plaintiffs' causation evidence with respect to these claims is far stronger than their causation evidence with respect to the claims discussed above. Richard Gentleman, Aetna's head of "National Ancillary Contracting," stated at his deposition that ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████ Gentleman Dep. 164, 194 (Lambrinos Decl. Ex. 30). Naomi Fuchs, CEO of Santa Rosa Community Health Centers, states in her declaration that Quest's contract with Partnership Health Plan required Chanate Health Center and Southwest Community Clinic to use Quest for diagnostic testing services for Partnership Health Plan's members. Fuchs Decl. ¶ 4. This evidence of the "injurious effect" of Quest's alleged underpricing is sufficient to trigger the section 17071 presumption.

Quest argues it is nonetheless entitled to summary judgment on these claims because it has rebutted the section 17071 presumption. Quest points to Moverley's statement that Quest has made an effort since 2009 to increase the pricing and profitability of its capitated IPA contracts. Mot. 15; Moverley Decl. ¶ 21. Quest also points to various deposition excerpts in which Moverley and other Quest employees state that Quest focuses primarily on competition with LabCorp, not with regional labs like plaintiffs. *See, e.g.,* Moverley Dep. 229, 244-45 (Sandrock Decl. Ex. 21); Farley Dep. 290 (Sandrock Decl. Ex. 29); Funk Dep. 76 (Sandrock Decl. Ex. 30). Quest argues this testimony is sufficient to conclusively rebut the section 17071 presumption. *See, e.g.,* Reply 4-5.

I disagree. The section 17071 presumption is one affecting the burden of proof. *Bay Guardian*, 187 Cal. App. 4th at 462-63. "Once a presumption affecting the burden of proof comes into play, that is an issue which must be presented to the trier of fact." *Id.* at 463 (internal quotation marks and modifications omitted). "If contrary evidence is introduced, the jury has the

right to weigh the evidence and determine whether it sufficiently contradicts the presumption." *Id.* (internal quotation marks omitted). The section 17071 presumption may be contradicted by a showing that the underpriced sales "were made in good faith and not for the purpose of injuring competitors or destroying competition," or by establishing one of the UPA's affirmative defenses. *Id.* at 465. However, unless the defendant is able to produce "conclusive proof that negate[s] unlawful purpose as a matter of law," a plaintiff who triggers the section 17071 presumption is entitled to a corresponding jury instruction at trial. *Id.*

In light of these principles, the fact that Quest denies any purpose to injure competitors and has produced some evidence of good faith efforts to compete in the marketplace does not deprive Hunter and SPA of their right to rely on the statutory presumption. "Quest may have offered rebuttal evidence, but [it] did not negate the presumption by conclusive proof." *Id.* at 465.[16]

## IV.    HUNTER'S UPA AND UCL CLAIMS: SETTLEMENT AGREEMENT AND RELEASE

Quest asserts that Hunter previously released all claims against Quest arising from conduct occurring before May 19, 2011. Mot. 22. On November 7, 2005, Hunter filed a qui tam action against Quest in the Superior Court of California for the County of San Mateo, alleging among other things that Quest had submitted false claims to Medi-Cal. Settlement Agreement and Release at 1-2 (Sandrock Decl. Ex. 1). In a settlement agreement dated May 19, 2011, Quest agreed to the release of

> any and all claims, rights, demands, suits, matters, issues, actions or causes of action, liabilities, damages, losses, obligations, and judgments of any kind or

---

[16] Quest's reliance on *Sub Corp. v. Best Buy Co.*, 2008 U.S. Dist. LEXIS 75080 (C.D. Cal. Aug. 5, 2008), is not persuasive. *See* Reply 4-5. The court in *Sub Corp.* granted summary judgment for the defendant upon finding that the plaintiff was not entitled to the section 17071 presumption, and that even if the plaintiff were entitled to the section 17071 presumption, the defendant had rebutted it through various declarations by its employees professing their good faith. *Id.* at *9-12. The court stated: "A qualified employee's declaration concerning the [defendant's] intent is adequate to conclusively rebut a presumption of injurious intent." *Id.* at *11. While this statement does support Quest's position, it does not appear to be an accurate description of the law. The case cited in *Sub Corp.* in support of the statement holds that a qualified employee's testimony at trial may support a finding of no improper purpose; it does not hold that such testimony is sufficient at summary judgment to negate the section 17071 presumption. *See Tri-Q, Inc. v. Sta-Hi Corp.*, 63 Cal.2d 199, 207-209 (1965).

United States District Court
Northern District of California

> nature whatsoever, from the beginning of time through the Effective Date of this Settlement Agreement, whether known or unknown, contingent or absolute, suspected or unsuspected, disclosed or undisclosed, matured or unmatured, for damages, injunctive relief, or any other remedy against [Quest].

*Id.* at 15.  In the October 18, 2013 order on the multiple motions to dismiss the first amended complaint, I found this language broad enough to encompass claims brought in this action and dismissed with prejudice all claims barred by the settlement agreement.  Dkt. No. 113 at 36.  Quest asserts that in light of the settlement agreement and the October 18, 2013 order, Hunter may only rely on claims based on below-cost pricing occurring after May 19, 2011.  According to Quest, this means that Hunter's claims arising from the Partnership Health Plan contract and the 2009 amendment to the Blue Shield contract are barred, as are Hunter's claims arising from any capitated IPA contract that Quest entered into before May 19, 2011.  Mot. 22.

Hunter agrees that the May 19, 2011 settlement agreement bars all claims arising from conduct occurring before that date.  Opp. 24-25.  Hunter disagrees that this means that claims arising from contracts executed before May 29, 2011 are necessarily barred.  *Id.*  According to Hunter, the dates of execution of the underlying contracts are irrelevant; what matters is when the below-cost sales themselves occurred.  *See* Opp. 24-25.

This issue is largely mooted by the rulings discussed above regarding causation.  Because Hunter has failed to produce sufficient evidence of causation with respect to its claims arising from Quest's capitated IPA contracts, Quest is entitled to summary judgment on those claims on the merits.  The only other claims that Quest contends are barred by the settlement agreement are Hunter's claims arising from the Partnership Health Plan and Blue Shield contracts.  These claims are plainly barred.  It is undisputed that Hunter began to suffer damages as a result of the Partnership Health Plan contract in or around October 2009, and as a result of the Blue Shield contract in or around May 2010.  *See* Opp. 14; Fuchs Decl. ¶¶ 2-3 (Sandrock Decl. Ex. 35); C. Reidel Dep. 268-69 (Sandrock Decl. Ex. 3); Prendergast Dep. 50-51 (Lambrinos Decl. Ex. 42); Regan Rpt. 17.  Given that by the date of the settlement agreement these contracts had already been executed and Hunter had already suffered damages as a result, Hunter's argument that it did not forfeit these claims as part of the settlement agreement is unconvincing.  Claims based on

United States District Court
Northern District of California

United States District Court
Northern District of California

1    alleged misconduct that had already occurred and that had already manifested itself in damages fall

2    unambiguously within the scope of "any and all claims . . . from the beginning of time through the

3    Effective Date of this Settlement Agreement, whether known or unknown, contingent or absolute,

4    suspected or unsuspected, disclosed or undisclosed, matured or unmatured."  Settlement

5    Agreement and Release at 15 (Sandrock Decl. Ex. 1).  Quest's motion for summary judgment on

6    Hunter's claims arising from the Partnership Health Plan and Blue Shield contracts is GRANTED.

7    **V.    STATUTE OF LIMITATIONS**

8          Quest argues that plaintiffs' claims are time-barred to the extent they accrued more than

9    three years before the filing of this action, or before November 14, 2009.  Mot. 23.  The general

10   limitations period for UPA violations is three years; the limitations period for treble damages is

11   one year.  *See* Cal. Code Civ. P. §§ 338(a), 340(a); *see also G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d

12   256, 279 (1983).

13         The parties' arguments regarding this issue mirror those regarding the settlement

14   agreement.  Quest contends that plaintiffs' claims arising from Quest's capitated IPA contracts are

15   untimely, because plaintiffs have not identified any such contract that was executed after

16   November 14, 2009.  Quest contends that plaintiffs' claims arising from the Partnership Health

17   Plan and Blue Shield contracts are also untimely.  According to Quest, plaintiffs' only actionable

18   claims are those arising from alleged below-cost sales in the general fee-for-service market

19   occurring after November 14, 2009, and those arising from the Seventeenth Amendment to the

20   Aetna contract.  Mot. 23.

21         Plaintiffs challenge Quest's position that conduct performed under a contract executed

22   before the applicable limitations period is automatically immune from liability.  Plaintiffs also

23   point out that while the UPA has a three year statute of limitations, the limitations period for UCL

24   violations is four years.  *See* Cal. Bus. & Prof. Code § 17208 ("Any action to enforce any cause of

25   action pursuant to this chapter shall be commenced within four years after the cause of action

26   accrued.").

27         The parties do not dispute the applicable limitations periods for UPA and UCL claims.

28   Quest concedes in its reply that the limitations period for UCL violations is four years.  Reply 14.

The California Supreme Court has recognized that even where a UCL claim is founded on conduct prohibited by another statute with a shorter limitations period, the four year limitations period still applies to the UCL claim. *See Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 178-79 (2000) ("[A]n action to recover wages that might be barred if brought pursuant to [the Labor Code] still may be pursued as a UCL action seeking restitution . . . if the failure to pay constitutes a business practice."). Thus, the only dispute over the limitations period is whether plaintiffs' UPA claims based on conduct performed under contracts executed before November 14, 2009 – and their UCL claims based on conduct performed under contracts executed before November 14, 2008 – are time-barred.

Like the settlement agreement issue, the statute of limitations issue is largely mooted by the rulings discussed above on the merits of plaintiffs' claims. The only claims that survive Quest's arguments on the settlement agreement and causation are Hunter's claims based on the Aetna contract, and SPA's claims based on the Partnership Health Plan contract. Quest does not dispute that claims arising from the Aetna contract are timely for the purposes of both the UPA and the UCL. *See* Mot. 23. Quest does contend that SPA's claims based on the Partnership Health Plan contract are untimely. As noted above, however, Quest has not established as a matter of law when SPA lost the four accounts it attributes to the contract. Accordingly, I cannot say at this juncture that SPA's claims arising from the contract are time-barred. To the extent Quest's motion for summary judgment is aimed at those claims, the motion is DENIED.[17]

## VI.   UCL CLAIMS

Quest's arguments regarding causation and the settlement agreement apply with equal force to plaintiffs' UCL claims. Accordingly, Hunter's UCL claims arising from the Aetna contract, and SPA's claims arising from the Partnership Health Plan contract, may proceed. *See Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 837 (2006) (UCL's unlawful prong

---

[17] On April 10, 2015, Quest filed a Statement of Recent Decision pursuant to Civil Local Rule 7-3(d)(2) bringing to my attention Judge Koh's recent decision in *In re Animation Workers Antitrust Litig.*, No. 14-cv-04062-LHK, 2015 WL 1522368 (N.D. Cal. Apr. 3, 2015). Dkt. No. 280. The opinion includes a discussion of statute of limitations issues under the Sherman Act, the Cartwright Act, and the UCL. 2015 WL 1522368, at *9-17. Having read the opinion, I do not find that its analysis materially impacts the outcome in this case.

United States District Court
Northern District of California

"borrows violations of other laws and treats them as independently actionable"); *Bardin v. Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1271 (2006) (UCL's unfair prong applies to business practices which offend public policy, where the predicate public policy is "tethered to specific constitutional, statutory or regulatory provisions") (internal quotation marks omitted). Quest's motion for summary judgment on the rest of plaintiffs' UCL claims is GRANTED.

## VII.   ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

The parties filed a number of administrative motions to file under seal in connection with Quest's summary judgment motion.

On February 24, 2015, I denied without prejudice Quest's motion to seal portions of its summary judgment motion and associated materials. Dkt. No. 249. I gave Quest until March 3, 2015 to file an amended motion, which Quest timely filed. Dkt. No. 258. The amended motion is GRANTED with respect to all materials that Quest seeks to seal on its own behalf, except for the following two items: (1) Moverley Decl. ¶ 19 (all); (2) Moverley Decl. ¶ 21 (from "Since 2009, QDI has made an effort" to "have been quite successful"). The amended motion is DENIED WITH PREJUDICE as to those items.

The amended motion is DENIED WITHOUT PREJUDICE with respect to all materials that Quest seeks to seal on behalf of plaintiffs and third-party Diagnostic Laboratories. *See* Dkt. No. 258-1 at 11. Although plaintiffs submitted a declaration per Civil Local Rule 79-5(e), that declaration is not adequate to justify sealing. It relies primarily on the fact that plaintiffs designated the materials sought to be sealed as "confidential" or "highly confidential – attorneys' eyes only" under the protective order. *See* Dkt. No. 262. That is not a proper basis for sealing under the "good cause" standard applicable to nondispositive motions, much less the "compelling reasons" standard that applies here. *See* Civil L.R. 79-5(d)(1)(A) ("Reference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable."). Diagnostic Laboratories did not submit a declaration at all. If plaintiffs and/or Diagnostic Laboratories still want the relevant portions of Quest's summary judgment motion and associated materials to remain under seal, they shall file an amended declaration within seven days of the date of this order articulating

42

"compelling reasons supported by specific factual findings" to justify sealing. *Kamakana v. City & Cnty. of Honolulu,* 447 F.3d 1172, 1178 (9th Cir. 2006) (internal quotation marks and modifications omitted). Quest need not refile its amended motion. As plaintiffs consider what portions of the materials sought to be sealed, if any, are in fact sealable, they are advised that none of the unredacted information referenced and/or quoted in this order is sufficiently sensitive to warrant sealing under the compelling reasons standard.

Also on February 24, 2015, I denied without prejudice Quest's request for several portions of plaintiffs' opposition and associated materials to be sealed. Dkt. No. 248. Quest submitted an amended declaration on March 3, 2015. Dkt. No. 259. The following materials identified in the amended declaration are not sealable: (1) Moverley Dep. 185 (Lambrinos Decl. Ex. 1) (all); (2) Lambrinos Decl. Ex. 9 at 1512 (all); (3) Lambrinos Decl. Ex. 11 at 1558 (from "Note: Cost of Testing" to "NTC 3529"); (4) Opp. 6 (all); (5) Opp. 7 (lines 7-12). The rest of the materials identified in the amended declaration shall remain sealed.

Finally, on February 25, 2015, Quest moved to seal various portions of its reply brief and associated materials. Dkt. No. 252. That motion is GRANTED.

## CONCLUSION

For the foregoing reasons:

(i) Quest's request for relief in connection with plaintiffs' alleged violation of the protective order is DENIED. Dkt. No. 260.

(ii) Quest's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Dkt. No. 216.

(iii) Quest's amended administrative motion to file under seal portions of its summary judgment motion and associated materials is GRANTED IN PART, DENIED WITH PREJUDICE IN PART, and DENIED WITHOUT PREJUDICE IN PART, as discussed above. Dkt. No. 258.

(iv) Quest's amended declaration in support of sealing portions of plaintiffs' opposition brief and associated materials is sufficient to justify sealing, except as to the materials discussed above. The rest of the materials identified in the amended declaration shall remain sealed. Dkt. No. 259.

United States District Court
Northern District of California

(v)  Quest's administrative motion to file under seal portions of its reply brief and associated materials is GRANTED.  Dkt. No. 252.

**IT IS SO ORDERED**.

Dated: Apri1 15, 2015



WILLIAM H. ORRICK
United States District Judge