1   NIALL P. McCARTHY (SBN 160175)
    nmccarthy@cpmlegal.com
2   ANNE MARIE MURPHY (SBN 202540)
    amurphy@cpmlegal.com
3   JUSTIN T. BERGER (SBN 250346)
    jberger@cpmlegal.com
4   DEMETRIUS X. LAMBRINOS (SBN 246027)
    dlambrinos@cpmlegal.com
5   **COTCHETT, PITRE & McCARTHY, LLP**
    840 Malcolm Road
6   Burlingame, California  94010
    Tel:  (650) 697-6000 / Fax:  (650) 692-3606
7

8   *Attorneys for Plaintiffs*

9

10                **IN THE UNITED STATES DISTRICT COURT**

11             **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12                    **SAN FRANCISCO DIVISION**

13  **RHEUMATOLOGY DIAGNOSTICS**          Case No. 3:12-cv-05847-WHO
    **LABORATORY, INC.**, et al.
14
                    Plaintiffs,           **DECLARATION OF DEMETRIUS**
15                                        **LAMBRINOS IN SUPPORT OF**
            v.                            **PLAINTIFFS' OPPOSITION TO QDI'S**
16                                        **MOTIONS** *IN LIMINE*
    **AETNA, INC.**, et. al. ,
17
                    Defendants.
18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF DEMETRIUS LAMBRINOS IN SUPPORT OF PLAINTIFFS'**
**OPPOSITION TO QDI'S MOTIONS** *IN LIMINE*; Case No. 3:12-cv-05847-WHO

## DECLARATION OF DEMETRIUS LAMBRINOS

I, DEMETRIUS LAMBRINOS, declare as follows:

1.      I am an attorney duly admitted to practice before all courts of the State of California, and am an attorney with the law firm of Cotchett, Pitre & McCarthy, LLP ("CPM"), attorneys for Plaintiffs in this matter.  I make this of my own personal knowledge and, if called to testify as a witness, could and would competently testify to the matters stated herein.

1.      Attached hereto as Exhibit 1 is a true and correct copy of Plaintiff Hunter Laboratories' Fourth Supplemental Responses and Objections to Defendant QDI's Interrogatories, Set One.

2.      Attached hereto as Exhibit 2 is a true and correct copy of the "ZELLERnator" that was produced by QDI in State of California v. Quest Diagnostics, Inc., et al., Sacramento Superior Court, Case No. CIV 34-2009-00048046.

3.      Attached hereto as Exhibit 3 is a true and correct copy of the Declaration of Naomi Fuchs, dated November 5, 2014.

4.      Attached hereto as Exhibit 4 is are true and correct copies of excerpts from the deposition of Michael J. Armstrong, dated December 9, 2014.

5.      Attached hereto as Exhibit 5 are true and correct copies of excerpts from the deposition of Joseph Plandowski, dated May 8, 2015.

6.      Attached hereto as Exhibit 6 are true and correct copies of excerpts from the deposition of Richard J. Gentleman, dated November 18, 2014.

7.      Attached hereto as Exhibit 7 is a true and correct copy of the news press release titled "Attorney General Kamala D. Harris Announces $241 Million Settlement with Quest Diagnostics."

8.      Attached hereto as Exhibit 8 is a true and correct copy of an email from Jeff Craven to Michael Lukas, et al. Subject: FW: Aetna Executive Summary and Financial Model, Bates range QDIRDL0434301-QDIRDL0434413.

9.      Attached hereto as Exhibit 9 are true and correct copies of excerpts from the Expert Report of Greg J. Regan, dated April 22, 2015.

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

**DECLARATION OF DEMETRIUS LAMBRINOS IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO QDI'S MOTIONS *IN LIMINE*;** Case No. 3:12-cv-05847-WHO                    1

1           10.      Attached hereto as <u>Exhibit 10</u> are true and correct copies of excerpts from the

2  deposition of Vincent A. Thomas, dated June 2, 2015.

3           11.      Attached hereto as <u>Exhibit 11</u> are true and correct copies of excerpts from the

4  Expert Report of Vincent A. Thomas, dated May 19, 2015.

5          I declare under the penalty of perjury pursuant to the laws of the United States that the

6  foregoing is true and correct.  Executed on this 10th day of July, 2015, at Burlingame, California.

7

8                                */s/ Demetrius X. Lambrinos*

9                              DEMETRIUS X. LAMBRINOS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

1  NIALL P. McCARTHY (SBN 160175)
   nmccarthy@cpmlegal.com
2  ANNE MARIE MURPHY (SBN 202540)
   amurphy@cpmlegal.com
3  DEMETRIUS X.  LAMBRINOS (SBN 246027)
   dlambrinos@cpmlegal.com
4  **COTCHETT, PITRE & McCARTHY, LLP**
   840 Malcolm Road
5  Burlingame, California  94010
   Telephone:    (650) 697-6000
6  Facsimile:    (650) 692-3606

7  *Attorneys for Plaintiffs*

8

9

10              **IN THE UNITED STATES DISTRICT COURT**

11            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12                    **SAN FRANCISCO DIVISION**

13
   **RHEUMATOLOGY DIAGNOSTICS**              Case No. 3:12-cv-05847-WHO
14 **LABORATORY, INC., et al.**

15              Plaintiffs,                  **PLAINTIFF HUNTER LABORATORIES'**
                                            **FOURTH SUPPLEMENTAL**
16       v.                                 **RESPONSES AND OBJECTIONS TO**
                                            **DEFENDANT QDI'S**
17 **AETNA, INC., et. al. ,**               **INTERROGATORIES, SET ONE**

18              Defendants.

19

20

21

22

23

24

25

26

27

28

Law Offices
COTCHETT, PITRE
& McCARTHY, LLP

| | | |
|---|---|---|
| 1 | **PROPOUNDING PARTY:** | DEFENDANT QUEST DIAGNOSTICS INCORPORATED |
| 2 | | AND QUEST DIAGNOSTICS CLINICAL LABORATORIES INCORPORATED |
| 3 | **RESPONDING PARTY:** | PLAINTIFF HUNTER LABORATORIES |
| 4 | **SET NUMBER:** | ONE |

5

6                                    **PRELIMINARY STATEMENT**

7          Responding Party has not fully completed investigation of the facts relating to this case,

8  has not fully completed discovery in this action, and has not completed preparation for trial.  All

9  of the responses contained herein are based only upon such information and documents which are

10 presently available and specifically known to Responding Party.  Responding Party anticipates

11 that further discovery, independent investigation, legal research, and analysis may supply

12 additional facts, add meaning to existing facts, as well as establish new factual conclusions, legal

13 conclusions, and legal contentions.

14         The following responses are given without prejudice to Responding Party's right to

15 produce evidence of any subsequently discovered facts or documents which Responding Party

16 may later discover or recall.  Responding Party accordingly reserves the right to change any and

17 all responses herein as additional facts or documents are ascertained and/or recalled and analyses

18 thereof are made.  However the responding party does not undertake any obligation to amend,

19 modify, supplement, or otherwise change these responses except as may be required by law.

20         The responses contained herein are made in a good faith effort to supply as much factual

21 information as is presently known, but should in no way prejudice Responding Party in relation to

22 further discovery, research, investigation, or analysis.

23                                         **INTERROGATORIES**

24 **INTERROGATORY NO. 1:**

25         Identify any damages or injury You have suffered as a result of QDI's alleged below-cost

26 pricing or any other conduct of QDI alleged in the Complaint.

27

28

**PLAINTIFF HUNTER LABORATORIES' FOURTH SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT QDI'S INTERROGATORIES, SET ONE; Case No. 3:12-cv-05847-WHO**                    1

1  **RESPONSE TO INTERROGATORY NO. 1:**

2        Plaintiff objects to this interrogatory to the extent that it seeks information protected by

3  attorney/client communication and attorney work product.  Additionally, Plaintiff objects on the

4  grounds that this interrogatory calls for premature disclosure of expert opinions.  Plaintiff reserves

5  the right to use at trial factual information and to call additional witnesses which are discovered in

6  the ongoing investigation.  Subject to and without waiving these objections, Plaintiff responds

7  that it was damaged by the Quest Defendants' below cost pricing for diagnostic testing in

8  California.  Due to these practices, Plaintiff was locked out of key markets and client accounts,

9  and its revenues were impacted accordingly.

10  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

11        There are five relevant product markets that are impacted by Defendants' conduct as

12  alleged in this complaint.  Each of those markets has a distinct geographic market.  The relevant

13  product markets and corresponding geographic markets are as follows:

14      1.  **Routine Clinical Laboratory Testing:**  Routine clinical laboratory testing generally

15         involves the chemical analysis of bodily fluids.  Routine clinical laboratory tests include

16         thousands of individual procedures in the areas of hematology, blood chemistry, urine

17         chemistry, endocrinology, and microbiology, among others. Commonly ordered tests

18         include red and white blood cell counts, blood chemistry panels, urinalyses, microbiology

19         cultures, HIV screening tests, and pregnancy tests.  Most of these high-volume tests are

20         performed by automated equipment and the results are generally reported electronically to

21         the physician within a 24-hour period.  As physicians tend to prefer to have routine testing

22         specimens performed in laboratories that do not require air transportation of specimens to

23         the laboratory, the relevant geographic markets for routine diagnostic testing services are

24         regional in nature.  Physicians can reasonably turn to laboratories in these regional areas

25         for needed routine diagnostic testing.  The Routine Clinical Laboratory Testing market

26         does not include laboratory testing for hospital inpatients conducted by in-hospital

27         laboratories.

28

Law Offices
COTCHETT, PITRE
& McCARTHY, LLP

2. **Anatomic Pathology Laboratory Testing:** Anatomic pathology laboratories generally analyze tissue samples in connection with the diagnosis of disease. As with routine Clinical Laboratory Testing, the relevant geographic markets for routine anatomic pathology testing services are regional in nature.

3. **Specialty Rheumatological Laboratory Testing:** Several sub-specialties of modern medicine rely for diagnosis and treatment on specialized laboratory tests that are performed less frequently and require more sophisticated and specialized knowledge or equipment not provided by most Routine Clinical Laboratory Testing companies. One category of such specialty or "esoteric" testing is Specialty Rheumatological Laboratory Testing, which includes highly specialized tests utilized by rheumatologists in diagnosing and treating disorders of the autoimmune system.

4. **Advanced Lipid Testing:** Advanced Lipid Testing is another form of specialized, esoteric laboratory testing, requiring sophisticated and specialized knowledge or equipment not provided by most Routine Clinical Laboratory Testing companies. Advanced lipid Testing helps identify coronary heart disease risk factors that standard cholesterol and other basic blood tests do not, and provides more information to guide the most efficacious course of therapy to prevent or reverse heart disease.

5. **Specialty Breast Pathology Testing:** Breast Pathology focuses on highly specialized analysis of breast biopsy tissue for the diagnosis and prognosis primarily of breast cancer.

**INTERROGATORY NO. 2:**

Identify any test or service that You provide for which you claim lost sales or any other injury or damages resulting from QDI's alleged conduct, including identification of Your total number of units performed and revenue received in each of the last four years for each such test.

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff objects to this interrogatory to the extent that it seeks information protected by attorney/client communication and attorney work product. Additionally, Plaintiff objects on the grounds that this interrogatory calls for premature disclosure of expert opinions. Plaintiffs reserve

**PLAINTIFF HUNTER LABORATORIES' FOURTH SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT QDI'S INTERROGATORIES, SET ONE; Case No. 3:12-cv-05847-WHO**

1    the right to use at trial factual information and to call additional witnesses which are discovered in

2    the ongoing investigation.  Plaintiff further objects that the interrogatory is compound, and

3    contains multiple subparts.  Subject to, and without waiving the following objections, Plaintiff

4    will meet and confer on this Request.

5    **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

| CPT CODES | | | | |
|---|---|---|---|---|
| 1.  85025 | 2.  80061 | 3.  80053 | 4.  84443 | 5.  87591 |
| 6.  87491 | 7.  83036 | 8.  87086 | 9.  81001 | 10. 84153 |
| 11. 80048 | 12. 86592 | 13. 80076 | 14. 85652 | 15. 87184 |
| 16. 87340 | 17. 84439 | 18. 81003 | 19. 84550 | 20. 83540 |
| 21. 82947 | 22. 84436 | 23. 87081 | 24. 82728 | 25. 84403 |
| 26. 82977 | 27. 84460 | 28. 84450 | 29. 87070 | 30. 82670 |
| 31. 86762 | 32. 86803 | 33. 86901 | 34. 86900 | 35. 86850 |
| 36. 86706 | 37. 84702 | 38. 83001 | 39. 84402 | 40. 82270 |
| 41. 84144 | 42. 83698 | 43. 86141 | 44. 82043 | 45. 82570 |
| 46. 83701 | 47. 82664 | 48. 83695 | 49. 82172 | 50. 83090 |
| 51. 82947 | 52. 84075 | 53. 84450 | 54. 84520 | 55. 88305 |
| 56. 82465 | 57. 83735 | 58. 84479 | 59. 86361 | 60. 87076 |
| 61. 82533 | 62. 83880 | 63. 84480 | 64. 86376 | 65. 87077 |
| 66. 82550 | 67. 83891 | 68. 84481 | 69. 86430 | 70. 87081 |
| 71. 82570 | 72. 83892 | 73. 84484 | 74. 86592 | 75. 87084 |
| 76. 82565 | 77. 83896 | 78. 84520 | 79. 86593 | 80. 87088 |
| 81. 82607 | 82. 83898 | 83. 84550 | 84. 86618 | 85. 87101 |
| 86. 82627 | 87. 83903 | 88. 84681 | 89. 86644 | 90. 87102 |
| 91. 82670 | 92. 83908 | 93. 84702 | 94. 86645 | 95. 87109 |
| 96. 82728 | 97. 83912 | 98. 84703 | 99. 86663 | 100. 87168 |
| 101. 82731 | 102. 83930 | 103. 85007 | 104. 86664 | 105. 87185 |

**PLAINTIFF HUNTER LABORATORIES' FOURTH SUPPLEMENTAL
RESPONSES AND OBJECTIONS TO DEFENDANT QDI'S
INTERROGATORIES, SET ONE; Case No. 3:12-cv-05847-WHO**                    4

Law Offices
COTCHETT, PITRE
& McCARTHY, LLP

| | | | | |
|---|---|---|---|---|
| 106. 82746 | 107. 83935 | 108. 85014 | 109. 86665 | 110. 87186 |
| 111. 82784 | 112. 83970 | 113. 85018 | 114. 86665 | 115. 87220 |
| 116. 82785 | 117. 84075 | 118. 85025 | 119. 86677 | 120. 87328 |
| 121. 82875 | 122. 84100 | 123. 85027 | 124. 86695 | 125. 87329 |
| 126. 82943 | 127. 84132 | 128. 85045 | 129. 86696 | 130. 87338 |
| 131. 82947 | 132. 84144 | 133. 85379 | 134. 86703 | 135. 87340 |
| 136. 82950 | 137. 84146 | 138. 85384 | 139. 86704 | 140. 87400 |
| 141. 82951 | 142. 84153 | 143. 85610 | 144. 86705 | 145. 87420 |
| 146. 82952 | 147. 84154 | 148. 85651 | 149. 86706 | 150. 87430 |
| 151. 82977 | 152. 84155 | 153. 85730 | 154. 86708 | 155. 87449 |
| 156. 83001 | 157. 84156 | 158. 86003 | 159. 86709 | 160. 87480 |
| 161. 83002 | 162. 84165 | 163. 86038 | 164. 86735 | 165. 87510 |
| 166. 83021 | 167. 84166 | 168. 86063 | 169. 86762 | 170. 87522 |
| 171. 83036 | 172. 84270 | 173. 86140 | 174. 86765 | 175. 87536 |
| 176. 83090 | 177. 84295 | 178. 86141 | 179. 86777 | 180. 87621 |
| 181. 83525 | 182. 84402 | 183. 86157 | 184. 86787 | 185. 87660 |
| 186. 83540 | 187. 84403 | 188. 86160 | 189. 86800 | 190. 87899-59 |
| 191. 83550 | 192. 84305 | 193. 86300 | 194. 86803 | 195. 88104 |
| 196. 83615 | 197. 84403 | 198. 86301 | 199. 86850 | 200. 88108 |
| 201. 83655 | 202. 84436 | 203. 86304 | 204. 86900 | 205. 88141 |
| 206. 83690 | 207. 84439 | 208. 86308 | 209. 86901 | 210. 88164 |
| 211. 83698 | 212. 84443 | 213. 86309 | 214. 87040 | 215. 88175 |
| 216. 83701 | 217. 84450 | 218. 86334 | 219. 87045 | 220. 89320 |
| 221. 83718 | 222. 84460 | 223. 86335 | 224. 87070 | 225. 89321 |
| 226. 83721 | 227. 84478 | 228. 86359 | 229. 87075 | 230. 88305TC |

**PLAINTIFF HUNTER LABORATORIES' FOURTH SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT QDI'S INTERROGATORIES, SET ONE; Case No. 3:12-cv-05847-WHO**                5

Law Offices
COTCHETT, PITRE
& McCARTHY, LLP

| 231. 86360 | | | | |
|---|---|---|---|---|

**INTERROGATORY NO. 4:**

For each test or service identified in response to Interrogatory No. 2, identify for each of the last four years Your usual and customary charge for the test or service, any charge other than your usual and customary charge that you have submitted to any Payer or Client, and the lowest amount that you have agreed to accept as payment from any Payer or Client.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff objects to this interrogatory to the extent that it seeks information protected by attorney/client communication and attorney work product.  Additionally, Plaintiff objects on the grounds that this interrogatory calls for premature disclosure of expert opinions.  Plaintiffs reserve the right to use at trial factual information and to call additional witnesses which are discovered in the ongoing investigation.  Subject to, and without waiving the following objections, Plaintiff directs defendant the FEE SCHEDUELS produced in response to Defendants' First Set of Document Requests No. 5.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff charges according to the fee schedule produced.

**INTERROGATORY NO. 6:**

Identify any accounts You have lost to or taken from another competitor in the last four years, along with the name of the competitor, and provide the complete factual basis for any claim that You lost any account as a result of QDI's pricing.

**RESPONSE TO INTERROGATORY NO. 6:**

Plaintiff objects to this interrogatory to the extent that it seeks information protected by attorney/client communication and attorney work product.  Additionally, Plaintiff objects on the grounds that this interrogatory calls for premature disclosure of expert opinions.  Plaintiffs reserve the right to use at trial factual information and to call additional witnesses which are discovered in the ongoing investigation.

Law Offices
COTCHETT, PITRE
& McCARTHY, LLP

**PLAINTIFF HUNTER LABORATORIES' FOURTH SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT QDI'S INTERROGATORIES, SET ONE; Case No. 3:12-cv-05847-WHO**

6

1  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

2        Plaintiff objects to this interrogatory on the grounds that it is overly broad and unduly

3  burdensome, and exceeds the scope of appropriate discovery.  Plaintiff further objects that

4  discovery is ongoing, and reserved the right to supplement these answers as more information

5  becomes available.

6        Subject to and without waiving the foregoing objections, Plaintiff responds that there are

7  no available records concerning what accounts have been taken from competitors.  Plaintiff

8  further responds that the following accounts were lost to Quest, or provided limited or no business

9  to Plaintiffs, as a result of the alleged conduct[1]:

10        1.  Petaluma Health Center

11        2.  Southwest Community Clinic

12        3.  Chanate Health Center

13        4.  Alexander Valley Health Center

14        5.  Diagnostic Labs[2]

15        6.  Alameda Alliance

16        7.  Hill Physicians

17        8.  Molina LIHP

18        9.  Partnership Advantage

19        10. Physician Medical Group Santa Cruz

20        11. Partnership Health Plan

21        12. Partnership Sonoma

22        13. PMG-San Jose Bonevtr

23        14. San Jose Medical Group

24        15. Sonoma County Primary Care

25

26

_____

27  [1] The term "cap" has been removed from items 6, 10, and 11 above.  This was a typographical error.

28  [2] This entry was listed in the initial response on the same line as No. 4.  It is now on its own line.

**PLAINTIFF HUNTER LABORATORIES' FOURTH SUPPLEMENTAL**                                    7
**RESPONSES AND OBJECTIONS TO DEFENDANT QDI'S**
**INTERROGATORIES, SET ONE; Case No. 3:12-cv-05847-WHO**

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

Plaintiff objects to this interrogatory on the grounds that it is overly broad and unduly burdensome, and exceeds the scope of appropriate discovery.  Plaintiff further objects that discovery is ongoing, and reserved the right to supplement these answers as more information becomes available.

Subject to and without waiving the foregoing objections, Plaintiff responds that the following accounts were lost to Quest, or provided limited or no business to Plaintiffs, as a result of the alleged conduct:

16. Martin Leong

17. Nikola Lozanov

18. Lemi Medical

19. Burlingame Family

20. Bay OBGYN

21. Peter Franklin

22. Ranadive, Inc.

23. Manjul Patwardhan

24. Amador Valley

25. Choong Ang

26. Los Robles Medical

27. Alan Kaplan

28. Allergy & Asthma

29. James Nagel

30. Quality of Life

31. Elliot Light

32. Margaret Chu[3]

33. Newcomer & Assoc.

---

[3] This entry was listed in the initial response on the same line as No. 4.  It is now on its own line.

**PLAINTIFF HUNTER LABORATORIES' FOURTH SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT QDI'S INTERROGATORIES, SET ONE; Case No. 3:12-cv-05847-WHO**

8

Law Offices
COTCHETT, PITRE
& McCARTHY, LLP

34. Josel Cabaccan[4]

35. Generation of Women

36. Clear Center

37. Denise Mark

38. Hirschfeld, Gold, Siegel and Kuppahally

39. Eleanor Martinez

40. Dr. Gardner

41. Curtis Robinson

42. North Bay Internal

43. Newcomer & Associates[5]

44. Owen Med Group

45. David Charp

46. Elena Ashby[6]

47. Sarah Azad[7]

48. Thin Nguyen[8]

49. Steven Batanides

50. Jacqueline Nguyen

51. Naeem Hashmi

52. Indman and Olender Medical Group[9]

53. Joe Rod

54. Oskie Peds

---

[4] Repeated entry deleted.

[5] Complete name of medical group added.

[6] First name added.

[7] First name added.

[8] First name added.

[9] Complete name of medical group added.

**PLAINTIFF HUNTER LABORATORIES' FOURTH SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT QDI'S INTERROGATORIES, SET ONE; Case No. 3:12-cv-05847-WHO**

Law Offices
COTCHETT, PITRE
& McCARTHY, LLP

1

55. CARE for the Bay Area

2

56. Juan Posada

3

57. Hamilton Medical

4

58. Lovato Heredia

5

59. Acacia Medical Group-Salinas and Prunedale[10]

6

60. Health Care for Women-Salinas

7

61. Med Carmel Valley Medical Group-Carmel

8

62. Salinas Valley Urology-Salinas

9

63. Pediatric & Adolescent-Salinas

10

64. Central Coast Head and Neck-Salinas

11

65. Susie Suh MD-Salinas

12

66. Elida Marquez MD-Salinas

13

67. OBGYN Associates-Salinas

14

68. Monterey Bay GI-Monterey and Salinas

15

69. Ryan Ranch Medical-Monterey

16

70. Choong Ang

17

71. Pacific Womens

18

72. Clayton Valley Med

19

73. Dr. Reen

20

74. Dr. Kahlid Shah[11]

21

75. Dr. Kenneth Peters

22

76. Dr. Topkins and Pamm

23

77. Dr. Kenny Chen

24

78. Generations of Women

25

79. Blake Massey

26

[10] Location added.

27

[11] First name added.

28

**PLAINTIFF HUNTER LABORATORIES' FOURTH SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT QDI'S INTERROGATORIES, SET ONE; Case No. 3:12-cv-05847-WHO**

10

1    80. Center Medical Group

2    81. Whitney Dixon

3    82. Los Robles Medical Group (7 Dr.'s)

4    83. Dr. John Rashkis

5    84. CA Skin Institute

6    85. Alta Bates Medical Group

7    86. Attached hereto as <u>Exhibit A</u> is a list of physicians and facilities connected to the

8        Partnership Health Plan.

9    87. For a list of physicians associated with PMG Santa Cruz, counsel is directed to the

10       following URL: <u>http://www.pmgscc.com/wp-</u>

11       <u>content/uploads/2014/09/PMG_Physician_List_Eng.pdf</u>

12   88. For a list of physicians associated with Alameda Alliance, counsel is directed to the

13       following URL:

14       <u>https://secure.healthx.com/PublicService/ProviderDirectoryV2/ProviderSearch.aspx?b</u>

15       <u>c=%7Bf85752f6-5c4d-4326-9ed3-1ef5525b0a18%7D</u>

16   89. For a list of physicians associated with Alta Bates, counsel is directed to the following

17       URL: <u>http://www.altabatesmd.com/abmg/index.cfm/find-a-physician/</u>,

18   <u>**FOURTH SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**</u>

19       Plaintiff objects to this interrogatory on the grounds that it is overly broad and unduly

20   burdensome, and exceeds the scope of appropriate discovery.  Plaintiff further objects that

21   discovery is ongoing, and reserved the right to supplement these answers as more information

22   becomes available.

23       Subject to and without waiving the foregoing objections, Plaintiff responds that the

24   following accounts were lost to Quest, or provided limited or no business to Plaintiffs, as a result

25   of the alleged conduct:

26   90. Lombardi Medical;

27   91. Bolinas Community Health Center;

28

**PLAINTIFF HUNTER LABORATORIES' FOURTH SUPPLEMENTAL
RESPONSES AND OBJECTIONS TO DEFENDANT QDI'S
INTERROGATORIES, SET ONE; Case No. 3:12-cv-05847-WHO**                    11

92. Point Reyes Community Health Center;

93. Elsie Allen Health Center; and

94. Stinson Beach Medical Center

Dated:  February 11, 2015          **COTCHETT, PITRE & McCARTHY, LLP**

By: _____
     DEMETRIUS X. LAMBRINOS

     *Attorney for Plaintiffs*

PLAINTIFF HUNTER LABORATORIES' FOURTH SUPPLEMENTAL
RESPONSES AND OBJECTIONS TO DEFENDANT QDI'S
INTERROGATORIES, SET ONE; Case No. 3:12-cv-05847-WHO                    12

Law Offices
COTCHETT, PITRE
& McCARTHY, LLP

## PROOF OF SERVICE

I am employed in the County of San Mateo; I am over the age of 18 years and not a party to the within cause. My business address is the Law Offices of Cotchett, Pitre & McCarthy, LLP, San Francisco Airport Office Center, 840 Malcolm Road, Suite 200, Burlingame, California, 94010. On this day, I served the following document(s) in the manner described below:

> 1. **PLAINTIFF HUNTER LABORSTORIES FOURTH SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT QDI'S INTERROGATORIES, SET ONE**

✓   **VIA E-MAIL:** My e-mail address is jdivinagracia@cpmlegal.com. I am readily familiar with this firm's practice for causing documents to be served by e-mail. Following that practice, I caused the aforementioned document(s) to be emailed to the addressee(s) specified below.

### [SEE ATTACHED SERVICE LIST]

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct. Executed at Burlingame, California, on February 11, 2015

_____
Jackie Divinagracia

**PLAINTIFF HUNTER LABORATORIES' FOURTH SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT QDI'S INTERROGATORIES, SET ONE; Case No. 3:12-cv-05847-WHO**

13

## SERVICE LIST

| | |
|---|---|
| Robert E. Bloch | **COUNSEL FOR DEFENDANT:** |
| Scott P. Perlman | BLUE SHIELD OF CALIFORNIA |
| **MAYER BROWN LLP** | |
| 1999 K Street, N.W. | |
| Washington, D.C. 20006 | |
| Direct: (202) 263-3203 | |
| Fax:    (202) 263-5203 | |
| rbloch@mayerbrown.com | |
| sperlman@mayerbrown.com | |

Christopher J. Kelly
**MAYER BROWN LLP**
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306
Tel:    (650) 331-2025
Fax:    (650) 331-4525
cjkelly@mayerbrown.com

John J. Hamill                           **COUNSEL FOR DEFENDANT:**
Jason M. Bradford                      BLUE CROSS AND BLUE SHIELD
**JENNER & BLOCK LLP**            ASSOCIATION
353 N. Clark Street
Chicago, IL 60654
Tel:    (312) 222-9350
Fax:    (312) 527-0484
jhamill@jenner.com
jbradford@jenner.com

Kenneth K. Lee
Jean M. Doherty
**JENNER & BLOCK LLP**
633 West 5th Street, Suite 3600
Los Angeles, CA  90071
Tel:    (213) 239 5100
Fax:    (213) 239 5199
klee@jenner.com
jdoherty@jenner.com

Robert A. Mittelstaedt                **COUNSEL FOR DEFENDANT:**
Craig A. Waldman                      AETNA, INC.
David C. Kiernan
**JONES DAY**
555 California Street, 26th Floor
San Francisco, CA  94104
Tel:    (415) 626-3939
Fax:    (415) 875-5700
ramittelstaedt@jonesday.com
cwaldman@JonesDay.com
dkiernan@JonesDay.com

1   Richard D. Raskin
    Scott D. Stein
2   Allison W. Reimann
    Menesh Patel
3   **SIDLEY AUSTIN LLP**
    One South Dearborn
4   Chicago, IL 60603
    Tel:    (312) 853-7000
5   Fax:    (312) 853-7036
    rraskin@sidley.com
6   sstein@sidley.com
    areimann@sidley.com
7   menesh.patel@sidley.com

8   Ryan Sandrock
    **SIDLEY AUSTIN LLP**
9   555 California St, Suite 2000
    San Francisco, CA 94104-1715
10  Tel:    (415) 772-1200
    Fax:    (415) 772-7400
11  rsandrock@sidley.com

**COUNSEL FOR DEFENDANTS:**
QUEST DIAGNOSTICS, INC.
QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF HUNTER LABORATORIES' FOURTH SUPPLEMENTAL
RESPONSES AND OBJECTIONS TO DEFENDANT QDI'S
INTERROGATORIES, SET ONE; Case No. 3:12-cv-05847-WHO**

15

**Exhibit 2**

REDACTED - DOCUMENT FILED UNDER SEAL

# Exhibit 3

## DECLARATION OF NAOMI FUCHS

I, Naomi Fuchs, hereby declare as follows:

1. I am the Chief Executive Officer of Santa Rosa Community Health Centers, which was formerly called Southwest Community Health Center and Southwest Community Clinic ("Southwest"). Southwest and Chanate Health Center ("Chanate") are now part of Santa Rosa Community Health Centers.

2. From 2007 to 2009, I routinely contracted with third-party vendors for diagnostic testing services on behalf of Southwest and Chanate. Prior to 2009, Southwest and Chanate used Hunter Laboratories, Inc., ("Hunter") for diagnostic testing services.

3. In 2009, Southwest and Chanate ceased using Hunter for diagnostic testing services because Southwest and Chanate entered into a contract with Partnership Health Plan ("Partnership) who has a capitated contract with Quest Diagnostics, Inc. ("Quest").

4. This contract between Quest and Partnership required Southwest and Chanate to use Quest for diagnostic testing services for Partnership's enrollees.

5. If not for this contract and had Hunter continued to offer competitive pricing and services, Southwest and Chanate would have probably have continued to use Hunter for diagnostic testing services.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct and that this declaration was executed on this 5 day of November, 2014, at Santa Rosa , California.

**Exhibit 4**

# In The Matter Of:

## *RHEUMATOLOGY DIAGNOSTICS LABORATORY, INC., et al.*
## *v.*
## *CALIFORNIA PHYSICIANS' SERVICES, INC., et al.*

---

## *MICHAEL J. ARMSTRONG - Vol. 1*

## *December 9, 2014*

---

## *CONFIDENTIAL*

**MERRILL CORPORATION**

**LegaLink, Inc.**

27 Maiden Lane
Suite 300
San Francisco, CA 94108
Phone: 415.357.4300
Fax: 415.357.4301

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


- - - - - - - - - - - - - - - - - -
```
                                    )
RHEUMATOLOGY DIAGNOSTICS            )
LABORATORY, INC., et al.,          )
                                    )   CASE NO.
          Plaintiffs,              )   3:12-cv-05847-WHO
                                    )
          vs.                      )
                                    )
CALIFORNIA PHYSICIANS' SERVICE     )
d/b/a/ BLUE SHIELD OF CALIFORNIA,  )
et al.,                            )
                                    )
          Defendants.              )
                                    )
```
- - - - - - - - - - - - - - - - - -


C O N F I D E N T I A L


VIDEOTAPED DEPOSITION OF MICHAEL J. ARMSTRONG


TAKEN ON: Tuesday, December 9, 2014

TAKEN AT: 8899 University Center Lane
          Suite 200
          San Diego, California

REPORTED BY:   KATHRYN B. CONNELL
               CSR NO. 3079, RPR, CRR


SF-018161

CONFIDENTIAL
MICHAEL J. ARMSTRONG - 12/9/2014

Page 27

| | | |
|---|---|---|
| 1 | that you had that account pretty -- you know, you had | 13:49:59 |
| 2 | deep hooks into the account. | 13:50:02 |
| 3 | And that made it even more difficult, because | 13:50:03 |
| 4 | you not only had the lower pricing but -- you know, at | 13:50:05 |
| 5 | least at Sharp, we just didn't have the money to do | 13:50:07 |
| 6 | that.  We couldn't go in and -- you know, it's -- Sharp | 13:50:10 |
| 7 | is such a bureaucracy.  As far as their IT, too, we | 13:50:13 |
| 8 | couldn't move quick enough to keep up with, you know, | 13:50:18 |
| 9 | the LabCorps and Quest.  And they were very quick to | 13:50:20 |
| 10 | jump on those things and move on that. | 13:50:23 |
| 11 | So I would say from that early time period | 13:50:25 |
| 12 | through -- I mean, you know, it's -- the electronic | 13:50:27 |
| 13 | medical record stuff just changed in the beginning of | 13:50:30 |
| 14 | 2014.  But, yeah, these same things.  And I think in the | 13:50:33 |
| 15 | later years and currently it's all about limited access. | 13:50:36 |
| 16 | I mean, you know, they are going up to the -- to the | 13:50:39 |
| 17 | Blues and some of the big payers, and actually the | 13:50:41 |
| 18 | little guys are being pushed -- being pushed out. | 13:50:44 |
| 19 | You know, the thought was that the -- the ACOs | 13:50:46 |
| 20 | were going to help that for the hospital systems.  And | 13:50:49 |
| 21 | it may for some, but it also could backfire, too; | 13:50:53 |
| 22 | because I think that -- this is just my opinion, but I | 13:50:56 |
| 23 | do think that with the ACOs, in some areas it's going to | 13:50:58 |
| 24 | drive the cost thing even more and it's going to give | 13:51:02 |
| 25 | the large guys even a bigger chance to get more of that. | 13:51:05 |

CONFIDENTIAL
MICHAEL J. ARMSTRONG - 12/9/2014

Page 28

| | | |
|---|---|---|
| 1 | BY MR. LAMBRINOS: | 13:51:08 |
| 2 | Q.   Yeah.  Can you expand a little bit on Quest's | 13:51:08 |
| 3 | interaction with the health insurance companies and how | 13:51:10 |
| 4 | they are approaching the health insurance? | 13:51:13 |
| 5 | MR. SANDROCK:  Objection; form. | 13:51:15 |
| 6 | THE WITNESS:  Yeah, I've never been involved | 13:51:16 |
| 7 | in any direct that way; but, you know, it doesn't -- you | 13:51:17 |
| 8 | don't have to be a rocket scientist to see that in the | 13:51:21 |
| 9 | market out there that -- you know, there would be | 13:51:24 |
| 10 | letters that we would get ahold of where, you know, | 13:51:25 |
| 11 | Quest was the preferred -- you know, in some cases the | 13:51:26 |
| 12 | exclusive lab provider for different payors.  And that | 13:51:30 |
| 13 | was -- you know, again, it's part of access. | 13:51:34 |
| 14 | There is a fine line between preferred and | 13:51:36 |
| 15 | exclusive that I think some of the -- I'm not going to | 13:51:39 |
| 16 | blame Quest on this, but I think some of the sales reps | 13:51:43 |
| 17 | on probably both sides get a little bit excessive with. | 13:51:46 |
| 18 | And so there was a constant battle with making sure the | 13:51:50 |
| 19 | office staff knew that it was okay for them to send this | 13:51:53 |
| 20 | work over here.  But that's just -- that's just part of | 13:51:56 |
| 21 | the clinical laboratory game.  I mean, that game gets | 13:51:58 |
| 22 | played out a lot. | 13:52:01 |
| 23 | BY MR. LAMBRINOS: | 13:52:02 |
| 24 | Q.   And so if there is a patient that has | 13:52:02 |
| 25 | insurance with, say, Aetna and Aetna has an agreement -- | 13:52:03 |

CONFIDENTIAL
MICHAEL J. ARMSTRONG - 12/9/2014

| | | |
|---|---|---|
| 1 | FURTHER EXAMINATION | 14:47:04 |
| 2 | BY MR. LAMBRINOS: | 14:47:05 |
| 3 | Q.   Do you recall there was a little bit of | 14:47:06 |
| 4 | testimony where you talked about not wanting to price | 14:47:08 |
| 5 | below one's costs? | 14:47:10 |
| 6 | A.   Yeah.  Correct.  Right. | 14:47:11 |
| 7 | Q.   Okay.  Can you tell me what level of cost and | 14:47:12 |
| 8 | what -- what the full plate of costs are that you're | 14:47:16 |
| 9 | adding up together that you don't want to go below when | 14:47:21 |
| 10 | you do your pricing for lab work? | 14:47:24 |
| 11 | A.   Okay.  So this is what's really interesting, | 14:47:26 |
| 12 | because cost accounting in laboratory is really kind of | 14:47:28 |
| 13 | critical for that -- that piece, you know, because you | 14:47:31 |
| 14 | are going to have -- you are going to have your reagent | 14:47:33 |
| 15 | piece, you know, which is actually, you know, more | 14:47:36 |
| 16 | expensive than you might think, you know, because when | 14:47:40 |
| 17 | you have a reagent -- I mean, when you look at that -- | 14:47:43 |
| 18 | that, you know, it's usually made -- in lots of cases | 14:47:45 |
| 19 | it's made by the vendor of the piece of equipment.  So | 14:47:51 |
| 20 | there could be a maintenance piece that's on that. | 14:47:54 |
| 21 | There could be the cost of calibrating the test. | 14:47:57 |
| 22 | The cost of these things can be tricky when | 14:47:59 |
| 23 | you really start drilling down to, you know, like the | 14:48:01 |
| 24 | minute level of how many pipette tips does it take.  You | 14:48:04 |
| 25 | can drill down on this to the point where it's -- you | 14:48:09 |

CONFIDENTIAL
MICHAEL J. ARMSTRONG - 12/9/2014

Page 72

| | | |
|---|---|---|
| 1 | know, and most people don't do that.  Most people will | 14:48:11 |
| 2 | take a look at what their cost per test is.  They will | 14:48:14 |
| 3 | take a look at the reagent.  They will estimate how much | 14:48:16 |
| 4 | labor is in there, and then they will add a pretty good | 14:48:18 |
| 5 | little factor on top of that. | 14:48:20 |
| 6 | You can get what Medicare -- and a lot of | 14:48:22 |
| 7 | people will compare that to the fee schedules that are | 14:48:25 |
| 8 | posted out there.  So they look at Medicaid and then | 14:48:27 |
| 9 | look at Medicare.  They look at what they have come up | 14:48:30 |
| 10 | with are their costs.  And that's why a lot of people | 14:48:32 |
| 11 | will use the Medicaid, because, you know, you are more | 14:48:35 |
| 12 | likely going to get yourself in trouble with Medicaid | 14:48:37 |
| 13 | than you are with anybody, even Medicare.  You know, if | 14:48:40 |
| 14 | you go below, you can get -- especially in California, | 14:48:41 |
| 15 | that's -- you want to be really, really careful. | 14:48:44 |
| 16 | So I think you have to -- you have to take a | 14:48:46 |
| 17 | look at all those factors when you are -- when you are | 14:48:49 |
| 18 | adding that up.  And it's not -- you know, it's not as | 14:48:52 |
| 19 | simple as most people, you know, think it is. | 14:48:54 |
| 20 | Q.  When you are negotiating with a lab, would you | 14:48:56 |
| 21 | have an expectation that their compliance department | 14:48:58 |
| 22 | would be exercising independent oversight over their | 14:49:01 |
| 23 | cost accounting to make sure it's compliant? | 14:49:04 |
| 24 | MR. SANDROCK:  Objection; form, foundation. | 14:49:06 |
| 25 | THE WITNESS:  You know, from the -- most | 14:49:09 |

CONFIDENTIAL
MICHAEL J. ARMSTRONG - 12/9/2014

```
 1     STATE OF CALIFORNIA   )

 2                           :  SS.

 3     COUNTY OF SAN DIEGO   )

 4

 5          I, Kathryn B. Connell, Certified Shorthand

 6     Reporter No. 3079 for State of California, do hereby

 7     certify:

 8          That prior to being examined, the witness named

 9     in the foregoing deposition was duly sworn to testify to

10     the truth, the whole truth, and nothing but the truth;

11          That said deposition was taken down by me in

12     shorthand at the time and place therein named and

13     thereafter reduced by me to typewritten form and that

14     the same is a true, correct, and complete transcript of

15     said proceedings.

16          Before completion of the deposition, a review of

17     the transcript [ X ] was [  ] was not requested.  If

18     requested, any changes made by the deponent (and

19     provided to the reporter) during the period allowed are

20     appended hereto.

21          I further certify that I am not interested in the

22     outcome of the action.

23          Witness my hand this 18th day of December 2014.

24

25          Kathryn B. Connell, CSR No. 3079
```

**Exhibit 5**

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4

5   RHEUMATOLOGY DIAGNOSTICS          )

    LABORATORY, INC., et al.,         )

6                                     )

            Plaintiffs,               )

7                                     ) Case No.

       vs.                            ) 3:12-cv-05847-

8                                     ) WHO

    CALIFORNIA PHYSICIANS' SERVICE    )

9   d/b/a BLUE SHIELD OF CALIFORNIA,  )

    et al.,                           )

10                                    )

            Defendants.               )

11

12

13

14       The deposition of JOSEPH PLANDOWSKI, taken

15   before Maria S. Winn, CSR, RPR and CRR, pursuant

16   to the Federal Rules of Civil Procedure for the

17   United States District Courts pertaining to the

18   taking of depositions, at Sidley Austin LLP, One

19   South Dearborn Street, Chicago, Illinois,

20   commencing at 9:09 a.m. on May 8, 2015.

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 2

```
 1    PRESENT:
 2
 3         COTCHETT, PITRE & McCARTHY LLP
 4         By MR. ERIC J. BUESCHER
               ebuescher@cpmlegal.com
 5
               840 Malcom Road
 6
               Burlingame, California   94010
 7
               (650) 697-6000
 8
                   appeared on behalf of the Plaintiffs
 9                 Hunter Laboratories, LLC, Pacific Breast
                   Pathology Medical Corporation;
10                 Rheumatology Diagnostics Laboratory,
                   Inc.; and Surgical Pathology Associates;
11
12
13         SIDLEY AUSTIN, LLP
14         By MR. RICHARD D. RASKIN
               rraskin@sidley.com
15
               MS. BEVIN SEIFERT
16             bseifert@sidley.com
17         One South Dearborn Street
18         Chicago, Illinois   60603
19         (312) 853-7384
20
                   appeared on behalf of the Defendants
21                 Quest Diagnostics Incorporated and
                   Quest Diagnostics Clinical Laboratories
22                 Incorporated;
23
24    ALSO PRESENT:
25         MR. MICHAEL PRAGER, Legal Videographer.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 58

1      cutoff point.

2              Clinical is pretty good, other than a few

3      instances where it's probably touch and go.

4          Q    When you say touch and go, do you have in

5      mind the big lab or the little lab?

6          A    All labs.

7          Q    Okay.

8          A    All labs.

9          Q    Is it a rational business behavior for a

10     lab to accept prices on some of its tests that

11     might be below its fully-loaded costs?

12         A    Depending on the circumstance, it might

13     make sense.

14         Q    Can you describe for me a circumstance --

15         A    Sure.

16         Q    -- in which it would make sense?

17         A    Not a problem.

18              I'm going to sell a urinalysis test to

19     you for one penny and I'm going to sell everything

20     else for a hundred dollars.  It's the best deal in

21     the world.

22         Q    Okay.  Good for who?  Good for the

23     laboratory?

24         A    Excellent for the laboratory.

25         Q    If I'll agree to pay it?                    1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 65

1      Q    What does that mean?

2      A    That means I took Quest's variable costs

3    and their fixed costs, and added them together and

4    that was the costs that they were incurring for

5    those California operations.

6      Q    And where did you obtain the figures for

7    variable and fixed costs?

8      A    They came out of one of the documents.

9    And it was a document that -- it was a really

10   interesting document, because it was a one-pager

11   and it was just up at the top.  And it had

12   northern California and southern California, and

13   it listed the costs, in whatever documents.  It's

14   in the pile of documents.  I pulled that one out

15   and I used that one for the analysis.

16      Q    Okay.

17      A    And it was for the appropriate time

18   period in my analysis.

19      Q    Do you know whether it was for a

20   particular customer?

21      A    No, it was overall.  It was overall

22   costs.  Not for a customer, overall for WHC, which

23   is, I think, Woodland Hills, which is southern

24   California and northern California.

25      Q    Do you know whether Quest attributed

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 186

1      Q      And what do you base that on, when you

2   say, Clean out the area and be the sole ruler?

3      A      The fact that they had pricing so low,

4   that they had a squeeze on the laboratories that

5   were in the area.  And if you go back and look at

6   the last, probably ten years in California, there

7   used to be a lot of labs in California.  They're

8   all gone.  The pricing is so low that they've just

9   been either acquired or just folded up the tent.

10     Q      So if that were the strategy, would you

11  expect to see prices come up at some point?

12     A      When the bleeding is over with, yes.

13     Q      How long has the bleeding been going on?

14     A      The bleeding has been going on for 15

15  years.

16     Q      When do you think the bleeding will stop?

17     A      Another five.

18     Q      Then what?

19     A      And then there will be two labs in the

20  country.

21     Q      Okay.  And?

22     A      And it won't matter what their fee

23  schedule is, because we're going to be on a

24  national fee schedule of some sort.

25     Q      Dictated by who?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 194

1   STATE OF ILLINOIS )

                    ) SS:

2   COUNTY OF C O O K )

3

4           The within and foregoing deposition of

5   the aforementioned witness was taken before

6   MARIA S. WINN, CSR, RPR and CRR, at the place,

7   date and time aforementioned.

8           There were present during the taking of

9   the deposition the previously named counsel.

10          The said witness was first duly sworn and

11  was then examined upon oral interrogatories; the

12  questions and answers were taken down in shorthand

13  by the undersigned, acting as stenographer; and

14  the within and foregoing is a true, accurate and

15  complete record of all of the questions asked of

16  and answers made by the aforementioned witness, at

17  the time and place hereinabove referred to.

18          The signature of the witness was not

19  waived, and the deposition was submitted,

20  pursuant to Rule 30(e) and 32(d)4 of the Rules

21  of Civil Procedure for the United States District

22  Courts, to the deponent per copy of the attached

23  letter.

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 195

1          The undersigned is not interested in the

2     within case, nor of kin or counsel to any of the

3     parties.

4          In witness whereof, I have hereunto set

5     my hand and seal of office this day, May 15, 2015.

6

7

8

9

10    CSR No. 084-003784 - Expiration Date: May 31, 2017

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 6**

# In The Matter Of:

## *RHEUMATOLOGY DIAGNOSTICS LABORATORY, INC., et al.*
### *v.*
## *AETNA, INC., et al.*

---

## *RICHARD J. GENTLEMAN - Vol. 1*

### *November 18, 2014*

---

# *CONFIDENTIAL*
# *ATTORNEYS' EYES ONLY*

**MERRILL CORPORATION**

**LegaLink, Inc.**

27 Maiden Lane
Suite 300
San Francisco, CA 94108
Phone: 415.357.4300
Fax: 415.357.4301

CONFIDENTIAL—ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
CASE NO. 3:12-cv-05847-WHO

RHEUMATOLOGY DIAGNOSTICS
LABORATORY, INC., et al.,

    Plaintiff

  vs

AETNA, INC., et al.,

    Defendant

    Transcript of the videotape deposition of Richard J. Gentleman, called for Oral Examination in the above-captioned matter, said deposition taken by and before SUSAN D. GUNELSON, Certified Court Reporter (License No. 30XI00076300), Registered Professional Reporter, Certified Realtime Reporter, Certified LiveNote Reporter and Notary Public of New Jersey, Pennsylvania and Delaware, at the offices of Elliott, Greenleaf & Siedzikowski, P.C., 925 Harvest Drive, Blue Bell, Pennsylvania on Tuesday, November 18, 2014, commencing at 9:44 a.m.

(SF-016500)

CONFIDENTIAL – ATTORNEYS' EYES ONLY
RICHARD J. GENTLEMAN – 11/18/2014

Page 75

| | | |
|---|---|---|
| 1 | A.      Like I said, before my discussion | 10:58:44 |
| 2 | here is that we were looking to reduce some of the | 10:58:47 |
| 3 | labs.  We were, prior to this time period, adding | 10:58:53 |
| 4 | labs, and we added more labs than we -- we took out | 10:58:56 |
| 5 | of our network. | 10:59:01 |
| 6 | Q.      Over what period of time were you | 10:59:03 |
| 7 | adding labs? | 10:59:04 |
| 8 | A.      Prior to this, 2010, 2011. | 10:59:09 |
| 9 | Q.      And then starting in April 2012, you | 10:59:14 |
| 10 | started to cut labs? | 10:59:16 |
| 11 | MR. KIERNAN:  Object to form. | 10:59:18 |
| 12 | A.      Prior to April 2012. | 10:59:20 |
| 13 | Q.      Prior to this agreement you started | 10:59:22 |
| 14 | to cut the labs? | 10:59:24 |
| 15 | A.      We were doing this rationalization, | 10:59:25 |
| 16 | yes. | 10:59:26 |
| 17 | Q.      When did you start negotiating this | 10:59:27 |
| 18 | provision that went into effect in April of 2012? | 10:59:29 |
| 19 | A.      Sometime in 2011. | 10:59:33 |
| 20 | Q.      Do you know if it was early or late | 10:59:36 |
| 21 | 2011? | 10:59:38 |
| 22 | A.      I would say summer of 2011. | 10:59:39 |
| 23 | Q.      With Mr. Shorten? | 10:59:43 |
| 24 | A.      Correct. | 10:59:46 |
| 25 | Q.      So starting in the summer of 2011, | 10:59:50 |

CONFIDENTIAL – ATTORNEYS' EYES ONLY
RICHARD J. GENTLEMAN – 11/18/2014

Page 196

# C E R T I F I C A T E

I, SUSAN D. GUNELSON, Certified Court
Reporter, License No. 30XI00076300, Registered
Professional Reporter, Certified Realtime Reporter,
Certified LiveNote Reporter, and Notary Public of
the Commonwealth of Pennsylvania, do hereby certify
that prior to the commencement of the examination,
the witness was duly sworn by me.

I DO FURTHER CERTIFY, that the foregoing
is a true and accurate transcript of the testimony
as taken stenographically by and before me at the
date, time, and place aforementioned.

I DO FURTHER CERTIFY that I am neither a
relative nor employee, nor attorney or counsel to
any parties involved; that I am neither related to,
nor employed by any such attorney or counsel, and
that I am not financially interested in the action.

SUSAN D. GUNELSON, CCR, RPR, CRR, CLR
COMMONWEALTH OF PENNSYLVANIA NOTARY PUBLIC
My Commission Expires 12/5/15

Date:  November 21, 2014

**Exhibit 7**

Case 3:13-cv-05847-WHO   Document 348-1   Filed 09/01/15   Page 47 of 67

State *of* California ∼ Department *of* Justice

# OFFICE *of the* ATTORNEY GENERAL

### KAMALA D. HARRIS

# Attorney General Kamala D. Harris Announces $241 Million Settlement with Quest Diagnostics

Thursday, May 19, 2011
Contact: (415) 703-5837, agpressoffice@doj.ca.gov

SACRAMENTO --- Attorney General Kamala D. Harris today announced a $241 million settlement - the largest recovery in the history of California's False Claims Act - with Quest Diagnostics, the state's biggest provider of medical laboratory testing, of a lawsuit alleging illegal overcharges to the state's medical program for the poor.

"In a time of shrinking budgets, this historic settlement affirms that Medi-Cal exists to help the state's neediest families rather than to illicitly line private pockets,' said Attorney General Harris. 'Medi-Cal providers and others who try to cheat the state through false claims and illegal kickbacks should know that my office is watching and will prosecute.'

The settlement with Quest is the result of a lawsuit filed under court seal in 2005 by a whistleblower and referred to the Attorney General's office. The lawsuit alleged that Quest systematically overcharged the state's Medi-Cal program for more than 15 years and gave illegal kickbacks in the form of discounted or free testing to doctors, hospitals and clinics that referred Medi-Cal patients and other business to the labs.

California law states that 'no provider shall charge [Medi-Cal] for any service more than would have been charged for the same service to other purchasers of comparable services under comparable circumstance.' Yet, Quest charged Medi-Cal up to six times as much as it charged some other customers for the same tests. For example, Quest charged Medi-Cal $8.59 to perform a complete blood count test, while it charged some of its other customers $1.43.

California law also prohibits Medi-Cal providers from soliciting and receiving 'any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in valuable consideration of any kind [in] return for the referral, or promised referral, of any individual for the furnishing of any service' paid for by Medi-Cal.

According to the attorney general's complaint, Quest systematically offered doctors, hospitals and clinics low prices for lab tests in return for referrals to Quest of patients, including Medi-Cal patients. Quest then allegedly charged Medi-Cal a higher price to make up the difference - resulting in the loss of millions of dollars to the Medi-Cal program.

Under the state's False Claims Act, any person with previously undisclosed information about a fraud, overcharge, or other false claim can file a sealed lawsuit on behalf of California to recover the losses, and is entitled to a share of the recovery in some cases. Such individuals become plaintiffs and are known as 'whistleblowers,' 'qui tam plaintiffs,' or 'relators.'

In this case, the whistleblowers were Chris Riedel and his company Hunter Laboratories. Hunter Laboratories found it could not compete in a significant segment of the marketplace where major medical laboratories such as Quest offered doctors, hospitals and clinics far lower rates than they were charging Medi-Cal. Riedel and Hunter were represented by Niall P. McCarthy of Cotchett, Pitre & McCarthy, LLP.

The Attorney General's Bureau of Medi-Cal Fraud and Elder Abuse conducted an intensive three-year investigation that uncovered widespread abuse of Medi-Cal by medical testing laboratories in California.

Based on allegations in the complaints, the California Department of Health Care Services, which administers the Medi-Cal program, launched an independent statewide audit of medical laboratories. Through reform of industry pricing practices stemming from this case, Medi-Cal is expected to save hundreds of millions of dollars.

"This agreement sends a strong message that fraud against the state and its Medi-Cal program will not be tolerated,' said Toby Douglas, director of the Department of Health Care Services. 'I commend our department's employees and the Department of Justice for working successfully in pursuit of compensation and justice for the state and its important health care programs.'

Besides providing compensation to the whistleblower under statutory guidelines, the settlement is designed to reimburse the state's Medi-Cal program and the Attorney General for expenses in investigating and prosecuting false claims actions. The total that will flow to the state is $171 million.

The settlement also requires Quest to report information to assist the state in determining Quest's future compliance with Medi-Cal's pricing rules.

Similar cases are still pending against four other defendants, including Laboratory Corporation of America, commonly known as LabCorp, the second largest medical laboratory service provider in California. Trial is scheduled for early next year.

Also assisting in the case was the Office of the Inspector General of the U.S. Department of Health and Human Services.

Among those in the Attorney General's office who were instrumental in this case: Aviva Burmas, Doug Cantrell, Sharon Crotteau, Vincent DiCarlo, Dennis Fenwick, J. Timothy Fives, Brian Frankel, Alissa Gire, Jennifer Gregory, David Guon, Sharon Harris, Brian Keats, Eileen Landon, Linda McCrackin, Larry Menard, Kelli O'Neill, Susan Park, Kim Reed, Marcy Rodriguez, James Shannon, Annette Silva, Jill Spitz, Tom Temmerman, Claude Vanderwold, Kenneth Vo, Lawrence Wold, Mark Zahner, and Gary Zerbey.

A copy of the original complaint can be found at http://oag.ca.gov/news/press_release?id=1705&y=2009.

To report fraud or abuse, call the Bureau of Medi-Cal Fraud and Elder Abuse hotline at (800) 722-0432.

### # #

**Attachment**
 n2518_quest_settlement.pdf

**Size**
627.85 KB

# Exhibit 8

# REDACTED - DOCUMENT FILED UNDER SEAL

**Exhibit 9**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

RHEUMATOLOGY DIAGNOSTICS LABORATORY, INC., et al.

Plaintiffs,

v.

AETNA, INC., et. al. ,

Defendants.

Case No. 3:12-cv-05847-WHO


**EXPERT REPORT OF GREG J. REGAN**

analysis identified approximately 40 tests, or 35% of tests, where the Aetna price was below Quest's fully-allocated cost.[32]

Next, I compared these results to the Aetna Fee Schedule that became effective July 1, 2012.[33] This data was only produced in a PDF-format that was not easily convertible to machine-readable format. Therefore, I manually associated the tests that I had identified as being priced below fully-allocated cost as of June 30, 2012 to the prices on those same tests subsequent to that time. In all instances, the prices as of July 1, 2012 were less than the prices as of June 30, 2012 by approximately 7%. In other words, the analysis that I performed was conservative because it is likely the case that additional tests would also be below cost following Quest's price reduction for Aetna effective on July 1, 2012 (shortly before the termination of Hunter's in-network status).

### iv. Quest Pricing Generally Decreased from 2009 to 2013

I also used the Top 100 Test data to address Quest's assertion that its "strategy was to *increase* prices where market conditions permitted, not decrease them."[34] ███████ For example, Figure 5 summarizes the frequency that the AWR for Quest's Top 100 Tests in Northern California decreased:[35]



This analysis is consistent with the observation above that Quest's ability to have a higher percent of tests be above-cost (measured using COT only) subsequent to 2011 appears to result from a shifting of variable costs to fixed costs rather than increased pricing.

### 2. Analysis of Hunter's Lost Profits

---

[32] The price percentage varies by quarter due to fluctuation in Quest's COT, but this percentage is typical during the relevant periods of 3Q12 to 2Q13 (*i.e.*, the period after the termination of the Aetna contract but before the acquisition of Hunter by BioReference).
[33] AET-SUBP0000136 (AEO).
[34] QDI's Notice of Motion and Motion for Summary Judgment, 15:8-9. (emphasis in original)
[35] QDIRDL0467940. *See* Miller Tr., 56:7-8 for definition of AWR.
[36] The "NC_" regions represent Northern California. The transaction data is generally limited to these periods for these entities (*i.e.*, Quest migrated the regions in which the Northern California data was maintained).

The following sub-section of this Expert Report addresses my calculation of Hunter's lost profits attributable to the Plaintiff's allegations.

   a.   <u>Quest Considered Hunter to be a Top Competitor in the Northern California Market</u>

   Mr. Moverly identified several factors that are critical to effective competition in clinical laboratory services.[37] These factors include price, quality, location, and access to insurance networks.[38] Quest's contemporaneous documents clearly identify Hunter as a principal competitor in the Northern California market. For example, when Quest listed its competitors in "rank order" in Northern California, it listed 1) Sutter Health, 2) small regional labs including Hunter, and 3) Lab Corp.[39]

   I have reviewed numerous other contemporaneous Quest documents that specifically identify Hunter as a top competitor in Northern California, and in some instances, set forth strategies to target Hunter. For example:

---

[37] QDI's Notice of Motion and Motion for Summary Judgment, 9:23-10:7.
[38] *Id.*
[39] QDIRDL0106272 at tab "LabOps & Major Mkt Dynamics."
[40] QDIRDL0106272 at tab "Competitor Detail- Physician."
[41] McCabe Tr., 68:14-69:21 referencing Ex. 652, "'A. Our diagnostic testing information improves patient outcomes and reduced total cost of healthcare. We work hard to deliver higher quality and better service there by earning fees commensurate to the value we bring. We set our fees to be [highly] competitive versus hospital and small regional or boutique labs and at a modest premium to other select national competitors.' Q. And what do you take that last sentence to mean? [Objection]...A. Yeah, I would call it guiding principle, yes.

[43] QDIRDL0106272 at tab "Competitor Detail- Physician."
[44] QDIRDL0106272 at tab "Competitor Detail- Physician."
[45] QDIRDL0050615.
[46] *Id.*

Expert Report of Greg J. Regan CPA/CFF                     Page **9** of **25**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 22nd day of April, 2015, at San Mateo, California.

**Greg J. Regan**
April 22, 2015

**Exhibit 10**

# In the Matter of:

## *RHEUMATOLOGY DIAGNOSTICS LABORATORY, INC., et al.*
## *v.*
## *AETNA, INC.*

*VINCENT A. THOMAS - Vol. 1*
*June 2, 2015*

**MERRILL CORPORATION**

**LegaLink, Inc.**

27 Maiden Lane
Suite 300
San Francisco, CA 94108
Phone: 415.357.4300
Fax: 415.357.4301

VINCENT A. THOMAS - 6/2/2015

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

RHEUMATOLOGY DIAGNOSTICS          )
LABORATORY, INC., et al.,         )
                                  )
        Plaintiffs,               )
                                  )        Case No.
        vs.                       ) 3:12-cv-05847-WHO
                                  )
AETNA, INC.,                      )
                                  )
        Defendants.               )

        Deposition of VINCENT A. THOMAS, taken before

NADINE J. WATTS, CSR, RPR, and Notary Public, pursuant

to the Federal Rules of Civil Procedure for the United

States District Courts pertaining to the taking of

depositions, at Suite 3800, One South Dearborn Street,

in the City of Chicago, Cook County, Illinois, at 10:10

o'clock a.m. on the 2nd day of June, A.D., 2015.

SF-042784

```
 1              I identify the fact that he glosses over the
 2    positive operating margins and ignores that QDI's
 3    contract with Aetna was profitable.
 4              I identify the fact that he fails to do things
 5    on a per requisition basis.  And that likely that on a
 6    per requisition basis the likelihood is that certainly
 7    those were by and large profitable.
 8              And I believe concedes in his deposition that
 9    ██████████████████████████████████████████████████
10    ██████████████████████████████████████████████████
11    ████████████████████        And if you look at his analysis where
12    he identifies below-cost tests, the reduction is
13    consistent with the roughly ████  percent that was
14    identified.
15              I think -- And, again, I would refer to the
16    entirety of my report, but I think, as I sit here, those
17    are the things that I come up with.
18         Q   All right.  So looking again at your paragraph
19    14, you state that Mr. Regan found that 42 out of a
20    hundred tests were priced below cost, correct?
21         A   Well, I don't know if it was out of a hundred.
22    I think that there was more than a hundred because of
23    the number of years over which he made the tests -- or
24    tested the top 100.  I think those changed year over
25    year.  It may have been more like 130, somewhere in that
```

VINCENT A. THOMAS - 6/2/2015

1    vicinity.

2        Q    Using that same set of tests, how many did you

3    find were below cost?

4        A    Well, again, I'm responding to the analysis and

5    methodology set forth by Mr. Regan.  By making certain

6    corrections to that analysis, I believe there were 37 or

7    38 that still remained as being under that -- that

8    assessment as being below cost.

9        Q    What is your understanding of whether an

10   analysis can be done on a per requisition basis as

11   opposed to a per test basis under California's

12   below-cost price statute?

13       A    Well, again --

14       MR. RASKIN:  Objection.  Objection to form, calls

15   for a legal conclusion.  But go ahead.

16       THE WITNESS:  Yes, I was going to say, if you're

17   asking me for a legal assessment, I don't know that I

18   can provide that.  But if you're asking me if the intent

19   is to measure things based on how things are sold, tests

20   are typically sold based on a requisition, not on an

21   individual test basis.

22            So if that's in fact how the statute should be

23   interpreted, then I think that -- if it's interpreted

24   based on how it's sold, then I think it would be

25   appropriate to view it from a per -- on a per

VINCENT A. THOMAS – 6/2/2015

```
 1    STATE OF ILLINOIS  )
                         )  SS:
 2    COUNTY OF C O O K  )

 3

 4         The within and foregoing deposition of the

 5    aforementioned witness was taken before NADINE J. WATTS,

 6    CSR, RPR and Notary Public, at the place, date and time

 7    aforementioned.

 8         There were present during the taking of the

 9    deposition the previously named counsel.

10         The said witness was first duly sworn and was

11    then examined upon oral interrogatories; the questions

12    and answers were taken down in shorthand by the

13    undersigned, acting as stenographer and Notary Public;

14    and the within and foregoing is a true, accurate and

15    complete record of all of the questions asked of and

16    answers made by the forementioned witness, at the time

17    and place hereinabove referred to.

18         Before completion of the deposition, review of

19    the transcript { } was {X} was not requested.  If

20    requested, any changes made by the deponent (and

21    provided to the reporter) during the period are appended

22    hereto.

23         The undersigned is not interested in the

24    within case, nor of kin or counsel to any of the

25    parties.
```

1               Witness my official signature and seal as

2     Notary Public in and for Cook County, Illinois on this

3     _____  day of  _____ , A.D. 2015.
              12TH                     JUNE

4

5                       _____
                         NADINE J. WATTS, CSR, RPR
6                        License No. 084-002736
                         Notary Public
7

8

9

10                                  OFFICIAL SEAL
                                    NADINE J WATTS
11                          NOTARY PUBLIC - STATE OF ILLINOIS
                            MY COMMISSION EXPIRES:05/05/19

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 11**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---

RHEUMATOLOGY DIAGNOSTICS LABORATORY, INC., et al,


Plaintiffs,


v.          Case No. 3:12-cv-05847-WHO


AETNA, INC., et al,

Defendants.

---

EXPERT REPORT OF

VINCENT A. THOMAS, CPA/ABV/CFF, CVA

IN REPLY TO THE EXPERT REPORT OF GREG J. REGAN


Submitted May 19, 2015

Highly Confidential – Attorneys' Eyes Only

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

Aetna from putting Hunter back in network.[11] When Hunter was acquired by BioReference, Hunter's in-network status with Aetna resumed.[12]

13.     Despite wrongly assuming that QDI's alleged below-cost pricing led to Hunter's loss of in-network status with Aetna, Mr. Regan evaluates the historical profitability of QDI's testing. As part of his analysis of QDI's alleged below-cost pricing practices, Mr. Regan attempts to determine which of QDI's top tests generated negative operating margins at the time of the 17th Amendment.[13] He first identifies the price of QDI's top tests according to the Aetna fee schedule effective through June 30, 2012. From these prices, he deducts each test's actual average cost of testing ("COT") from Q1 2013.[14] To determine additional variable and fixed costs to deduct in arriving at operating margin on a per-test basis, Mr. Regan reviews QDI's actual financial performance on the Aetna contract. Because he utilizes the actual COT for each of the tests, he attempts to strip out these costs embedded in the total variable costs reported on QDI's financial summary. To approximate this portion of variable costs, he assumes that the variable cost structure of Partnership and Alameda are a proxy for the Aetna contract. These costs are reported on a per-requisition basis. To convert to a per-test basis, Mr. Regan divides these marginal costs by an estimate of four tests per requisition. As a result, Mr. Regan calculates that an additional ▇▇▇▇▇ must be deducted from the tests' prices in order to arrive at operating margin on a per-test basis.

14.     From the above analysis, Mr. Regan concludes that 42 of QDI's top tests generated negative operating margins.[15] Of these 42 tests, only two – CPT Codes 81001 and 87070 – were in the top 30 tests for Hunter.[16] Regardless, Mr. Regan's analysis of QDI's pricing under the Aetna agreement is flawed. Mr. Regan erroneously assumes that the average requisition on the Aetna contract consisted of four tests. In actuality, during 2012, the average requisition consisted of 4.25 tests.[17] Dividing the total marginal fixed and variable costs by the 4.25 tests – rather than the 4.00 tests that Mr. Regan

---

[11] Gentleman Deposition of November 18, 2014, 185: 8 – 14.
[12] Gentleman Deposition of November 18, 2014, 182: 2 – 18; Prendergast Deposition of October 28, 2014, 103: 9 – 14.
[13] Regan Expert Report, Exhibit 2.3.
[14] Mr. Regan's decision to use this data set is curious since there is relevant COT data available at Q3 2013. Nevertheless, these two sets of COT data are materially consistent.
[15] Regan Expert Report, Exhibit 2.3.
[16] Initial Regan Report, Exhibit 2.1.4.
[17] QDIRDL0467892.

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

erroneously applies – reduces the additional costs from ██████ per test to ██████ per test.[18] This ████████ reduction is significant, for Mr. Regan inflates the number of below-cost tests that QDI offered when applying the incorrect number of tests per requisition. Correcting for this error reduces the number of tests to 37 rather than the 42 that Mr. Regan mistakenly concludes.[19] Furthermore, CPT Code 87070, one of the CPT Codes in Hunter's top 30 tests, flips from a below-cost test to an above-cost test. Incidentally, for the other CPT Code in Hunter's top 30 tests, CPT Code 81001, Hunter priced this test below cost as well. From 2010 through July 2013, this test's price ranged from $6.21 to $7.90,[20] yet Hunter's fully-allocated costs per test were approximately $20.23 for this same period.[21,22] All of these facts reinforce that any alleged below-cost pricing practice by QDI did not substantially impact Hunter.[23] Mr. Regan's analysis of below-cost pricing is overreaching, unsupported, and wrong. Additionally, it is unlikely that any alleged below-cost pricing practices resulted in Hunter's exclusion from Aetna since Mr. Regan's and my analyses show that any individual tests that were priced below cost pre-dated the 17th Amendment as well as Hunter's exclusion from Aetna.

15.     Mr. Regan glosses over the fact that at least 73 of QDI's top tests generated positive operating margins as well as the entire suite of QDI's tests generated profits for QDI. In spite of QDI's alleged below-cost pricing practices, Mr. Regan ignores that QDI's contract with Aetna was extremely profitable for QDI. While Mr. Regan focuses on profitability from a per-test basis, he fails to perform any analysis of QDI's profitability on a per-requisition basis. Though only one-third of QDI's top tests appear to be priced below costs, on average, there are roughly 4.25 tests per requisition.[24] On an overall basis, the average requisition generates a profit margin of at least ██████ Thus, it is unlikely that a requisition would be priced below cost. From 2009 through September 2014, QDI enjoyed operating margins of at

---

[18] See **Exhibit 1.1.**

[19] See **Exhibit 1.**

[20] Initial Regan Report, Exhibit 2.1.4.

[21] I recognize that Hunter's COT data is not available on a per-test basis such that I can only calculate fully-allocated costs or operating margin on an aggregate basis. Nevertheless, it is reasonable to assume that marginal variable and fully-allocated fixed costs exceed this test's price given the disparity between price and aggregate cost.

[22] Per Initial Regan Report, Exhibit 2.8.2, Hunter's total costs per requisition were $78.06. To convert to total costs per test, I calculated the average number of tests per requisition that Hunter performed over this same timeframe. From 2010 through July 2013, Hunter performed 4,354,769 tests (TOPCPT2010 through TOPCPT2013) on 1,128,509 requisitions (Initial Regan Report, Exhibit 2.8.3), which amounts to 3.86 tests per requisition. $78.06 total costs per requisition / 3.86 tests per requisition = $20.23 total costs per test.

[23] See **Exhibit 1.**

[24] QDIRDL0467892.

---

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

**** 

My report, with supporting schedules and exhibits, is contained herein, and presents my opinion and the bases and reasons thereof.  To the extent any additional information is produced by either party, I reserve the right to incorporate such additional information into my report.  This report was prepared solely for the above-captioned matter and should not be used for any other purpose without prior written authorization.

Respectfully,

Vincent A. Thomas

Dated:  May 19, 2015