# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

RHEUMATOLOGY DIAGNOSTICS LABORATORY, INC., et al,

Plaintiffs,

v.          Case No. 3:12-cv-05847-WHO

AETNA, INC., et al,

Defendants.

_____

EXPERT REPORT OF

VINCENT A. THOMAS, CPA/ABV/CFF, CVA

IN REPLY TO THE EXPERT REPORT OF GREG J. REGAN

Submitted May 19, 2015

Highly Confidential – Attorneys' Eyes Only

**TABLE OF CONTENTS**

I.      INTRODUCTION ....................................................................................1

II.     SCOPE OF ASSIGNMENT AND INFORMATION RELIED UPON....................1

III.    EXPERIENCE AND CREDENTIALS ........................................................2

IV.     SUMMARY OF OPINIONS ......................................................................3

V.      CRITIQUE OF MR. REGAN'S CALCULATION OF DAMAGES ......................4

        A.      Overview ...................................................................................... 4

        B.      Hunter Lost Profits ....................................................................... 7

        C.      Hunter Lost Business Value ........................................................ 10

        D.      SPA Lost Profits ........................................................................ 13

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

## I.    INTRODUCTION

1.      Rheumatology Diagnostics Laboratory, Inc. ("RDL"), Pacific Breast Pathology Corporation ("PBP"), Hunterheart, Inc. ("Hunter"), and Surgical Pathology Associates ("SPA") (collectively "Plaintiffs") alleged that Quest Diagnostics Incorporated and Quest Diagnostics Clinical Laboratories Incorporated (collectively, "QDI" or "Defendants") have engaged in below-cost pricing in violation of the California Unfair Practices Act ("UPA") and the Unfair Competition Law ("UCL"). Plaintiffs also allege that as a result of Defendants' actions, Plaintiffs experienced certain damages related to lost profits and lost business value.

2.      On behalf of Plaintiffs and as an exhibit to Plaintiffs' Motion for Summary Judgment, Greg J. Regan ("Mr. Regan") issued a report ("Initial Regan Report") in which he opines on the amounts of economic damages he believes QDI would owe Plaintiffs if Defendants are found liable of engaging in below-cost pricing practices. In the Initial Regan Report, Mr. Regan calculates damages for all Plaintiffs. I understand that certain of these Plaintiffs' claims have been dismissed pursuant to Judge Orrick's Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment dated April 15, 2015 ("the Order"). Subsequent to the Order, Mr. Regan submitted an expert report ("Regan Expert Report") that limits his damages calculations to the following: Hunter's lost profits, Hunter's lost business value, and SPA's lost profits.

## II.    SCOPE OF ASSIGNMENT AND INFORMATION RELIED UPON

3.      I have been retained by Sidley Austin ("Counsel"), counsel for QDI in this matter, to respond to the analysis and opinions set forth by Mr. Regan in the Regan Expert Report and also to provide an opinion on the amount of damages QDI would owe Plaintiffs if QDI is found liable for below-cost pricing practices.[1]

4.      This report and the opinions and conclusions reached herein are based on my review of documents produced in this matter as well as my knowledge, education, experience and training. During the course of my work in this matter, I have examined documents provided to me by Counsel and

---

[1] FTI has been engaged for this assignment at the hourly billing rates of the individuals assigned plus expenses. My personal rate is $595 per hour. The amount of fees is not contingent upon the opinions expressed herein or the outcome of this matter.

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

other information I obtained from public sources.   A listing of the specific documents I considered is contained in the attached **Appendix B**.[2]

## III.   EXPERIENCE AND CREDENTIALS

5.      I am a Senior Managing Director in the Forensic & Litigation Consulting ("FLC") practice of FTI Consulting, Inc. ("FTI"), a multidisciplinary international financial advisory and consulting firm.  I am a member of the FLC National Leadership Team and also co-lead FTI's National Intellectual Property Practice. Before joining FTI, I was a partner with the international professional services firm, KPMG, LLP.

6.      I have significant experience assisting companies and clients with complex accounting, corporate finance and litigation issues.  I focus on the preparation of sophisticated economic analyses and the assessment of damages in various types of commercial disputes; and over the course of my career I have analyzed economic and financial issues in more than one hundred commercial disputes, many of which involved patent, copyright, trade secret, and trademark infringement.     In addition to preparing damages studies in commercial litigation, I also have significant experience in corporate, financial, and accounting management positions, including Analyst and Director as well as Chief Financial Officer for a high-tech company.

7.      I graduated *cum laude* from DePauw University with a Bachelor of Arts degree in Economics and subsequently received a Masters of Business Administration degree from Indiana University.  I am a Certified Public Accountant, Certified Valuation Analyst, and am Certified in Financial Forensics and Accredited in Business Valuation.  I am also a member of the American Institute of Certified Public Accountants and National Association of Certified Valuation Analysts.  **Appendix A** contains a summary of my education, experiences, prior testimony, and publications/seminars that I have authored.

---

[2] Please note that this report has been prepared in connection with the above referenced lawsuit and contains my opinions based on the results of my investigations to date.  They are to be used for the specific purposes of this lawsuit and are not to be used for any other purpose without the express written consent of FTI.  And, to the extent that additional information becomes available, I reserve the right to update or amend my opinions.

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

## IV.    SUMMARY OF OPINIONS

8.    In my opinion, the analysis and conclusions set forth by Mr. Regan are flawed, overreaching, and unsupported. Mr. Regan fails to establish any causal link between QDI's alleged below-cost pricing practices and Hunter's loss of in-network status with Aetna and Hunter's loss of the Partnership Health Plan ("Partnership") contract, which Mr. Regan links to damages for SPA. It is unclear if Mr. Regan has an opinion on liability or causation in this matter. Mr. Regan states that his assignment was not to form an opinion on causation,[3] yet he performs several calculations that resemble an attempt to determine causation. To the extent that Mr. Regan does have opinions on causation, they are incomplete and not based in reality.

9.    If Plaintiffs did suffer any damages as a result of Hunter being an out-of-network provider for Aetna and Partnership, Mr. Regan has calculated amounts that are overstated and out of line with economic reality. I have analyzed the three categories of damages that Mr. Regan has calculated. I have concluded that, if QDI is found liable,[4] damages without trebling would amount to no more than $91,900, not $928,351 as Mr. Regan opines.

| Table 1 Summary of Total Damages | | |
|---|---|---|
| Category of Damages | Mr. Regan | Mr. Thomas |
| Hunter Lost Profits | $    138,368 | $    21,040 |
| Hunter Lost Business Value | 470,574 | - |
| SPA Lost Profits | 319,409 | 70,860 |
| Total Damages | $    928,351 | $    91,900 |

10.    In calculating Hunter's lost profits, Mr. Regan wrongfully calculates lost Aetna revenues for all accounts rather than accounts that Hunter has identified as affected by losing in-network status with Aetna. He compounds this error by understating the variable costs needed to deduct in arriving at lost profits. For Hunter's lost business value, Mr. Regan has failed to connect Hunter's loss of in-network

---

[3] Regan Deposition of April 29, 2015, 79: 6 – 7.
[4] I assume liability for purposes of calculating alleged damages that result from QDI's alleged wrongdoing.

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

status with Aetna to any lost business value as part of BioReference's acquisition. Moreover, even if the business value was in any way impacted by the alleged wrongdoing, Mr. Regan utilizes an overstated lost revenues amount in his discounted cash flow approach. He then performs a flawed market value approach in an attempt to corroborate the value calculated in his discounted cash flow approach.

11.     Lastly, Mr. Regan overstates SPA's lost profits in applying an unsubstantiated assumption regarding SPA's revenues as a derivative of Hunter's revenues. Mr. Regan also inflates SPA's lost profits by including damages related to Aetna and Blue Shield in spite of the Order's instruction that these certain damages are no longer recoverable. In Section V. below, I further elaborate on these critiques of Mr. Regan's calculations of damages.

## V.     CRITIQUE OF MR. REGAN'S CALCULATION OF DAMAGES

### A.   Overview

12.     Mr. Regan attributes QDI's below-cost pricing as the sole reason that Hunter lost its in-network status with Aetna. Mr. Regan fails to consider additional factors that may have contributed to Hunter's out-of-network status with Aetna. Richard Gentleman ("Mr. Gentleman") led negotiations for Aetna on the contract with QDI as well as the 17th Amendment to the agreement with QDI ("the 17th Amendment").[5] Mr. Gentleman asserts that a term provision of Hunter's contract allowed Aetna the ability to terminate the contract.[6] Mr. Gentleman considered several factors unrelated to any of QDI's alleged below-cost pricing practices that caused Hunter to lose its in-network status with Aetna. Primarily, Mr. Gentleman determined that without Hunter, clinical tests and services could be provided by other labs without detriment to Aetna's patients.[7] Hunter was a smaller clinical lab with limited scope of services.[8] Specifically, Hunter did not provide certain lab services like GenPath and GeneDx.[9] Furthermore, in addition to these limitations, Chris Riedel ("Mr. Riedel"), Hunter's CEO and Chairman, threatened Aetna with a lawsuit.[10] Mr. Gentleman acknowledges that this method of coercion dissuaded

---

[5] Gentleman Deposition of November 18, 2014, 16: 23 – 24, 27: 7 – 8, 38: 3 – 10.
[6] Gentleman Deposition of November 18, 2014, 181: 21 – 23.
[7] Gentleman Deposition of November 18, 2014, 181: 23 – 182: 1.
[8] Gentleman Deposition of November 18, 2014, 182: 10 – 11.
[9] Gentleman Deposition of November 18, 2014, 182: 14 – 17.
[10] Gentleman Deposition of November 18, 2014, 184: 24 – 185: 22.

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

Aetna from putting Hunter back in network.[11] When Hunter was acquired by BioReference, Hunter's in-network status with Aetna resumed.[12]

13.     Despite wrongly assuming that QDI's alleged below-cost pricing led to Hunter's loss of in-network status with Aetna, Mr. Regan evaluates the historical profitability of QDI's testing. As part of his analysis of QDI's alleged below-cost pricing practices, Mr. Regan attempts to determine which of QDI's top tests generated negative operating margins at the time of the 17th Amendment.[13] He first identifies the price of QDI's top tests according to the Aetna fee schedule effective through June 30, 2012. From these prices, he deducts each test's actual average cost of testing ("COT") from Q1 2013.[14] To determine additional variable and fixed costs to deduct in arriving at operating margin on a per-test basis, Mr. Regan reviews QDI's actual financial performance on the Aetna contract. Because he utilizes the actual COT for each of the tests, he attempts to strip out these costs embedded in the total variable costs reported on QDI's financial summary. To approximate this portion of variable costs, he assumes that the variable cost structure of Partnership and Alameda are a proxy for the Aetna contract. These costs are reported on a per-requisition basis. To convert to a per-test basis, Mr. Regan divides these marginal costs by an estimate of four tests per requisition. As a result, Mr. Regan calculates that an additional $███ must be deducted from the tests' prices in order to arrive at operating margin on a per-test basis.

14.     From the above analysis, Mr. Regan concludes that 42 of QDI's top tests generated negative operating margins.[15] Of these 42 tests, only two – CPT Codes 81001 and 87070 – were in the top 30 tests for Hunter.[16] Regardless, Mr. Regan's analysis of QDI's pricing under the Aetna agreement is flawed. Mr. Regan erroneously assumes that the average requisition on the Aetna contract consisted of four tests. In actuality, during 2012, the average requisition consisted of 4.25 tests.[17] Dividing the total marginal fixed and variable costs by the 4.25 tests – rather than the 4.00 tests that Mr. Regan

---

[11] Gentleman Deposition of November 18, 2014, 185: 8 – 14.
[12] Gentleman Deposition of November 18, 2014, 182: 2 – 18; Prendergast Deposition of October 28, 2014, 103: 9 – 14.
[13] Regan Expert Report, Exhibit 2.3.
[14] Mr. Regan's decision to use this data set is curious since there is relevant COT data available at Q3 2013. Nevertheless, these two sets of COT data are materially consistent.
[15] Regan Expert Report, Exhibit 2.3.
[16] Initial Regan Report, Exhibit 2.1.4.
[17] QDIRDL0467892.

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

erroneously applies – reduces the additional costs from $▇▇ per test to $▇▇ per test.[18] This $▇▇ reduction is significant, for Mr. Regan inflates the number of below-cost tests that QDI offered when applying the incorrect number of tests per requisition. Correcting for this error reduces the number of tests to 37 rather than the 42 that Mr. Regan mistakenly concludes.[19] Furthermore, CPT Code 87070, one of the CPT Codes in Hunter's top 30 tests, flips from a below-cost test to an above-cost test. Incidentally, for the other CPT Code in Hunter's top 30 tests, CPT Code 81001, Hunter priced this test below cost as well. From 2010 through July 2013, this test's price ranged from $6.21 to $7.90,[20] yet Hunter's fully-allocated costs per test were approximately $20.23 for this same period.[21,22] All of these facts reinforce that any alleged below-cost pricing practice by QDI did not substantially impact Hunter.[23] Mr. Regan's analysis of below-cost pricing is overreaching, unsupported, and wrong. Additionally, it is unlikely that any alleged below-cost pricing practices resulted in Hunter's exclusion from Aetna since Mr. Regan's and my analyses show that any individual tests that were priced below cost pre-dated the 17th Amendment as well as Hunter's exclusion from Aetna.

15.     Mr. Regan glosses over the fact that at least 73 of QDI's top tests generated positive operating margins as well as the entire suite of QDI's tests generated profits for QDI. In spite of QDI's alleged below-cost pricing practices, Mr. Regan ignores that QDI's contract with Aetna was extremely profitable for QDI. While Mr. Regan focuses on profitability from a per-test basis, he fails to perform any analysis of QDI's profitability on a per-requisition basis. Though only one-third of QDI's top tests appear to be priced below costs, on average, there are roughly 4.25 tests per requisition.[24]  On an overall basis, the average requisition generates a profit margin of at least ▇▇%. Thus, it is unlikely that a requisition would be priced below cost. From 2009 through September 2014, QDI enjoyed operating margins of at

[18] See **Exhibit 1.1**.
[19] See **Exhibit 1**.
[20] Initial Regan Report, Exhibit 2.1.4.
[21] I recognize that Hunter's COT data is not available on a per-test basis such that I can only calculate fully-allocated costs or operating margin on an aggregate basis. Nevertheless, it is reasonable to assume that marginal variable and fully-allocated fixed costs exceed this test's price given the disparity between price and aggregate cost.
[22] Per Initial Regan Report, Exhibit 2.8.2, Hunter's total costs per requisition were $78.06. To convert to total costs per test, I calculated the average number of tests per requisition that Hunter performed over this same timeframe. From 2010 through July 2013, Hunter performed 4,354,769 tests (TOPCPT2010 through TOPCPT2013) on 1,128,509 requisitions (Initial Regan Report, Exhibit 2.8.3), which amounts to 3.86 tests per requisition. $78.06 total costs per requisition / 3.86 tests per requisition = $20.23 total costs per test.
[23] See **Exhibit 1**.
[24] QDIRDL0467892.

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

least ▇ % on an annual basis.[25] See **Table 2** below regarding QDI's actual operating margin per test and operating margin per requisition for the Aetna contract.



16.     Similarly, when QDI proposed the 17th Amendment to its contract with Aetna, QDI forecasted operating margins exceeding ▇ % through 2018.[26] This profitability indicates that even if QDI employed a concerted below-cost pricing practice as Plaintiffs allege, this practice was insignificant such that it did not impact the overall profitability of the contract with Aetna. Mr. Regan provides no evidence that ████████████████████████████████████ ██ ██████████ ████████████████████████████ ██ ████████████████████████████ ███████████████████████.[27] As such, it is no more than unsupported speculation for Mr. Regan to assume that QDI's pricing practices on certain tests, but not its entire suite of tests, would result in Hunter's lost in-network status with Aetna.

B.  **Hunter Lost Profits**

17.     In spite of overreaching in directly linking QDI's alleged below-cost pricing to Hunter losing in-network status with Aetna, Mr. Regan compounds this flaw by significantly overstating any lost profits that Hunter sustained from losing this in-network status with Aetna. To calculate revenues in the but-for scenario, Mr. Regan includes Aetna revenues for *all* accounts that Hunter serviced regardless of the cause for decline in revenues. In Hunter's Fourth Supplemental Responses and Objections to

---

[25] QDIRDL0467892.
[26] QDIRDL0467892.
[27] McCabe Deposition of January 13, 2015, 317: 8 – 19; Gentleman Deposition of November 18, 2014, 194: 13 – 18.

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

Defendant QDI's Interrogatories, Set One, Hunter identifies 94 specific accounts that it claims it lost to QDI and/or provided limited or no business to Hunter as a result of certain alleged conduct of QDI.[28] This population decreases to 57 accounts when limiting the population to accounts that were affected by the lost in-network status with Aetna.[29,30] Nevertheless, Mr. Regan includes 1,593 distinct Client IDs (i.e. accounts) in his calculation to evaluate lost profits sustained by Hunter.[31] The inclusion of over 27-times the relevant, identified accounts demonstrates Mr. Regan's disconnect from economic reality and the facts and circumstances of the matter.

18.     It is worth noting that in the Initial Regan Report, Mr. Regan neglected to calculate any lost profits for accounts where Hunter lost its in-network status with Aetna. Furthermore, in calculating Hunter's lost profits in the Initial Regan Report, Mr. Regan relied on Monthly CPA Reports (i.e. account listings) that merely presented a select number of known accounts that Hunter had identified as lost. Mr. Regan's attempt to include *all* accounts in the Regan Expert Report is wholly inconsistent with his previous position and only serves to inflate damages.

19.     Mr. Regan calculates lost revenues as $206,520, yet I have appropriately corrected these lost revenues to reflect only lost revenues for the identified accounts. These total lost revenues decrease to $31,403 as demonstrated in **Table 3** below.[32]

---

[28] Plaintiff Hunter Laboratories' Fourth Supplemental Responses and Objections to Defendants QDI's Interrogatories, Set One, dated February 11, 2015, p. 7 – 12.

[29] Plaintiffs' Opposition to Defendant QDI's Motion for Summary Judgment, dated February 11, 2015, p. 12 – 15; QDI's Notice of Motion and Motion for Summary Judgment, dated January 16, 2015, Appendix A; and the Order, p. 10.

[30] In **Exhibit 2.2**, there are 61 accounts listed. I was unable to discern the specific accounts from the interrogatory responses and client listing reports, so as a conservative measure, I included additional accounts to ensure that I captured the appropriate population of accounts. Interrogatory Response No. 6 #52 is reported as Indman and Olender Medical Group yet is presented as two distinct Client IDs in the client listing reports: 9096 and 9123. There are two client IDs for Interrogatory Response No. 6 #65 Susie Suh, MD in the client listing reports: 2059 and 2268. There are two client IDs for Interrogatory Response No. 6 #69 Ryan Ranch Medical: 7171 and 9908. Interrogatory Response No. 6 is not specific on the location of #84 CA Skin Institute, yet there are two client IDs that appear related to this account: 2054 and 9626.

[31] Distinct Client IDs are derived from the following client listing reports produced: CPA2009_AE_ALLCL, CPA2010_AE_ALLCL, CPA2011_AE_ALLCL, CPA2012_AE_ALLCL, CPA2012_AE_ALLCL_OCT-DEC, and CPA2013_AE_ALLCL.

[32] See **Exhibit 2.1**.

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

| Table 3 Hunter Lost Revenues Related to Losing In-Network Status with Aetna | | |
| --- | --- | --- |
| Description | Mr. Regan | Mr. Thomas |
| Lost Revenues | $      206,520 | $      31,403 |

20.    In addition to wrongly including Aetna revenues derived from all accounts, Mr. Regan understates the variable costs to deduct in arriving at lost profits. Mr. Regan applies a variable cost percentage of ▮% to these lost revenues, yet his methodology of determining this percentage lacks any basis in economic reality. He starts with *QDI's* variable costs at ▮% of total costs per requisition and adjusts that percentage by ▮% assuming that Hunter could achieve that ratio with certain inefficiencies as a small clinical laboratory. Mr. Regan provides no factual basis to support that Hunter would have reached QDI's cost structure, nor for his adjustment of ▮%. Rather than utilize the variable costs that Hunter has experienced historically, Mr. Regan believes that Hunter's variable costs for these incremental revenues would mimic those of QDI's. He abandons and disregards the comprehensive review he performed in the Initial Regan Report where he determined that Hunter's variable costs are, in fact, approximately 50% of its revenues, which is the appropriate measure to apply in this instance.[33]

21.    Even more confounding than Mr. Regan abandoning his comprehensive review of Hunter's variable costs, Mr. Regan applies his variable cost percentage to the improper base. The ▮% variable cost percentage of QDI that Mr. Regan utilizes is a percentage of total costs per requisition rather than a percentage of revenues.[34] If Mr. Regan were to capture Hunter's cost structure, he should apply 60%, which equals Hunter's variable costs as a percentage of total costs per requisition, as he calculated in the Initial Regan Report.[35,36] To clarify, Mr. Regan's variable cost percentage is calculated as a percentage of *costs* and applied as a percentage of *revenues*. The proper variable cost percentage

---

[33] Initial Regan Report, Exhibit 2.8.3.
[34] Initial Regan Report, Exhibit 2.8.2.
[35] Initial Regan Report, Exhibit 2.8.2.
[36] By calculating variable costs as a percentage of revenues, Mr. Regan insinuates that revenues are equal to costs, which is incorrect for both QDI and Hunter.

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

should be calculated as a percentage of *revenues* and applied as a percentage of *revenues*. After applying an appropriate variable cost percentage of approximately 50% to the proper base of corrected lost revenues, Hunter's lost profits would be $15,570. If one were to apply Mr. Regan's flawed 33% variable cost rate to corrected lost revenues, lost profits would total $21,040, as I have presented in **Table 4** below.

| Table 4 Hunter Lost Profits Related to Losing In-Network Status with Aetna | | |
|---|---|---|
| **Description** | **Mr. Regan** | **Mr. Thomas** |
| Lost Revenues | $ 206,520 | $ 31,403 |
| Less: Variable Costs | | |
| Variable Cost % | 33% | 33% |
| Variable Costs | $ 68,152 | $ 10,363 |
| Lost Profits | $ 138,368 | $ 21,040 |

C.   **Hunter Lost Business Value**

22.     As the second component of damages, Mr. Regan calculates lost business value that Hunter suffered in its sale to BioReference. Mr. Regan claims that because Hunter had lost its in-network status with Aetna, it lost revenues, and as a result, BioReference paid less for Hunter's business than it would have but for the lost in-network status. Without knowledge of how BioReference determined the eventual purchase price, Mr. Regan assumes that BioReference performed a discounted cash flow analysis based on the prior year's revenues. By extension, Mr. Regan assumes that if Hunter had increased revenues, albeit minimal, as calculated in Section V.B. above, BioReference, or any sophisticated buyer for that matter, would have increased its purchase price.

23.     Mr. Regan's calculation of lost business value lacks foundation and departs from any basis in reality. While Mr. Regan constructs a but-for world of other hypothetical buyers to manufacture additional damages, he is misguided, as he fails to identify any other prospective buyers. Furthermore, Mr. Riedel, CEO and Chairman of Hunter, was unable to identify any other prospective buyers. Aside

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

from BioReference, Mr. Riedel admits that "[Hunter] had no offers."[37] In 2012, Hunter engaged Provident Healthcare Partners ("Provident") to find prospective buyers of Hunter.[38] After 2012 yet prior to BioReference's acquisition in August 2013, Provident was unable to find any buyers as well.[39]

24.     Mr. Regan assumes that any increase in sales related to the in-network status at Aetna would translate to an increased purchase price no matter how minimal the lost revenues are. He lacks specifics on how BioReference evaluated the acquisition of Hunter. Mr. Regan states, "But I don't recall other details of the discussion, including whether – how BioReference valued the cash flow stream."[40] BioReference's Chief Information Officer emphasized that the acquisition was strategic and aids in eliminating overhead costs required to ship specimens from California to its testing facilities in New Jersey.[41] As such, ascribing any lost business value directly to lost sales is inconsistent with the facts and circumstances of the case, as BioReference valued additional synergistic benefits from the acquisition apart from solely revenues.[42] In fact, in its 10-K for the year ended October 31, 2013, BioReference allocated $8.6 million of the $15.2 million purchase price to goodwill, which signifies the value that BioReference placed on these synergistic and strategic benefits.[43]

25.     BioReference is the third-largest full service clinical diagnostic laboratory in the United States.[44] BioReference boasts that it is contracted with virtually all national health plans, including Aetna.[45] Mr. Gentleman recognized that, after Hunter was acquired by BioReference, Aetna restored Hunter's in-network status pursuant to Aetna's contractual terms with BioReference.[46] Richard Prendergast, part-owner of Hunter and regional sales manager at BioReference, also confirms that Hunter resumed its in-network status after the BioReference acquisition.[47] It is unreasonable for Mr. Regan to assume that BioReference did not (or any sophisticated buyer would not) incorporate this

---

[37] Riedel Deposition of September 19, 2014, 153: 11.
[38] Riedel Deposition of September 19, 2014, 112: 1 – 113: 12.
[39] Riedel Deposition of September 19, 2014, 114: 1 – 2.
[40] Regan Deposition of April 29, 2015, 192: 13 – 15.
[41] http://www.northjersey.com/news/local-laboratory-purchases-california-company-california-firm-as-west-coast-base-1.569710
[42] Any increased sales would be minimal compared to the $614 million that BioReference generated for the fiscal year ended October 31, 2012 (BioReference 10-K for the fiscal year ended October 31, 2013, p. 21).
[43] BioReference 10-K for the fiscal year ended October 31, 2013, p. 62.
[44] http://www.bioreference.com/company-profile/
[45] http://www.bioreference.com/company-profile/
[46] Gentleman Deposition of November 18, 2014, 182: 2 – 18.
[47] Prendergast Deposition of October 28, 2014, 103: 9 – 14.

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

restored in-network status in its cash flow projections and thus in its purchase price when acquiring Hunter.

26.     In addition to this oversight, Mr. Regan commits several other errors in calculating Hunter's lost business value. First and foremost, in performing his discounted cash flow approach, Mr. Regan plugs in the inflated lost revenues that he calculated above. As I stressed earlier, Mr. Regan overstates lost revenues by including all accounts rather than the relevant accounts that Hunter identified as losing in-network status with Aetna. Secondly, he performs a flawed market value approach with the aim to corroborate his discounted cash flow approach. Mr. Regan collects 20 transactions that he deems comparable to the transaction at issue and calculates the implied price-to-revenue multiple. From these 20 multiples, he establishes quartiles and observes that the value calculated in his discounted cash flow approach falls within the interquartile range. He wrongly concludes that his discounted cash flow analysis is confirmed by the market value approach.

27.     In identifying comparable transactions, Mr. Regan omits the specific transaction most relevant in this matter – BioReference's acquisition of Hunter. BioReference paid approximately $15.2 million for Hunter in August 2013.[48] For the seven months ending July 31, 2013, Hunter generated revenues of $10,962,240,[49] which translates to $18,792,411 when annualized.[50] Based on these annualized revenues and the implied enterprise value of $15.2 million, the implied price-to-revenue multiple that BioReference paid was 0.81, if BioReference did in fact pay for Hunter's revenues rather than its strategic laboratory location.[51] This implied multiple falls below the interquartile range that Mr. Regan observed and further discredits the inflated figure he calculated with his discounted cash flow approach. If one applies the implied multiple of 0.81 to Mr. Regan's calculated lost revenues of $179,784 for 2013, the market value approach returns a lost business value of $145,416, which is approximately 31% of Mr. Regan's calculated lost business value. This value *does not* confirm Mr. Regan's calculated value from his discounted cash flow approach; it contradicts his calculated value.

28.     Mr. Regan's connection of losing in-network status with Aetna to any lost business value is tenuous at best. I have calculated lost business value at $0, as any reasonable, informed, and

---

[48] Initial Regan Report, p. 23.
[49] Initial Regan Report, Exhibit 2.1.5.
[50] ($10,962,240 / 7 months) * 12 months = $18,792,411.
[51] $15,200,000 / $18,792,411 = 0.81.

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

sophisticated willing buyer would account for Hunter's restored in-network status with Aetna upon acquisition.[52]

| Table 5 | | |
| Hunter Lost Business Value | | |
| Description | Mr. Regan | Mr. Thomas |
| Lost Business Value | $    470,574 | $          - |

### D.  SPA Lost Profits

29.     Mr. Regan calculates SPA's lost profits for Partnership, Aetna, and Blue Shield. The inclusion of damages related to Aetna and Blue Shield demonstrates Mr. Regan's blatant disregard for the Order, as the Order solely allowed for SPA's claims based on the Partnership contract to proceed.[53] As such, I have been instructed to exclude any calculation of SPA's lost profits related to Aetna and Blue Shield. For the claim that remains, Mr. Regan grossly overstates SPA's damages as they relate to Partnership.

30.     Mr. Regan represents that SPA's revenues correlate with those of Hunter. Hunter provides referrals to SPA, as their distinct operations share the same laboratory. While SPA's damages claim related to Partnership remains, factors other than QDI's alleged below-cost pricing practices contributed to SPA's lost profits. Of note, Hunter lost its contract with Partnership because it does not perform capitated contracts. I understand that the State of California chose to switch to capitated

---

[52] If one were to even calculate any lost business value, Mr. Regan applies an inflated lost revenue figure such that a more appropriate, albeit still improper amount, would be the corrected revenue figure I calculated in **Exhibit 2.1**. Plugging in the lost revenues of $24,282, and accepting every flawed assumption of Mr. Regan's lost business value damages theory and discounted cash flow approach, Hunter's lost business value would total $63,557, per **Exhibit 3**. While non-exhaustive, examples of these flaws in Mr. Regan's discounted cash flow approach include the following: an inflated growth rate, a depressed marginal tax rate for the relevant acquisition, and a depressed discount rate.
[53] The Order, p. 33.

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

contracts for Medi-Cal. QDI won this contract with Partnership effective October 1, 2009.[54] Hunter failed to submit a bid, for Hunter does not perform capitated contracts. Mr. Riedel admits as much:

> Q: Okay did you reach out to Partnership in any way to talk to them about –
>
> A: It was a done deal. There was nothing we could do. We didn't know about it until the contract had been signed. But it was capitation. We – you know, we couldn't have successfully bid for it anyway.
>
> Q: Because you wouldn't be willing to go low enough to get the contract, right?
>
> A: Right.
>
> Q: Anything further that resulted in the loss of any of these four accounts, other than the Partnership deal?
>
> A: No.[55]

31.     Mr. Regan makes a leap from purpose, causation, and injury to Hunter and links that to purpose, causation, and injury to SPA. He assumes that any injury to Hunter translates directly to injury to SPA. I understand that SPA was not precluded from continuing to perform clinical laboratory services for Partnership accounts. In spite of Hunter losing its contract with Partnership in 2009, SPA's total revenues grew 32% in 2010 and an additional 50% in 2011.[56]

32.     In calculating lost profits for SPA, Mr. Regan disregards the fact that Hunter lost its contract with Partnership for reasons unrelated to QDI's alleged below-cost pricing. This is significant because, as noted above, Mr. Regan posits that SPA's revenues are a derivative of Hunter's revenues. In addition to medical directorship fees that Hunter pays to SPA, Mr. Regan assumes that 50% of SPA's testing revenues are derived from Hunter referrals. Mr. Regan reviewed no data to confirm this assumption and relied entirely on his discussions with Dr. Gerald Weiss ("Dr. Weiss").[57] Mr. Regan admits that he reviewed no account-specific information for SPA, as it appears this level of detail was unavailable. "[I]t was difficult to get specific data as it relates to how Hunter comprised SPA's revenue."[58] This lack of data on SPA's part and lack of due diligence on Mr. Regan's part is evident, for Mr. Regan also blindly adopts the assumption that SPA's revenues are 8% of Hunter's revenues.[59] He

---

[54] QDI's Notice of Motion and Motion for Summary Judgment, dated January 16, 2015, Exhibit 6.
[55] Riedel Deposition of September 19, 2014, 272: 18 – 273: 5.
[56] See **Exhibit 4.2**.
[57] Regan Deposition of April 29, 2015, 227: 11 – 14.
[58] Regan Deposition of April 29, 2015, 224: 5 – 7.
[59] Regan Expert Report, p. 23.

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

performed no due diligence on this assumption and accepted Mr. Riedel's and Dr. Weiss's estimates.[60] Based on my review of SPA's total Hunter-related revenues[61] compared to Hunter's total revenues, this figure is 1.90%, approximately one-fourth of Mr. Regan's assumption.[62] Once again, Mr. Regan's calculation is not based in economic reality and his assumptions only serve to inflate damages. Applying the appropriate 1.90% factor to Hunter's Partnership-related revenues decreases SPA's lost profits from $272,076 to $70,860.[63] See **Table 6** below for a comparison of Mr. Regan's calculation of SPA's lost profits and my corrections.

| Table 6 SPA Lost Profits | | |
|---|---|---|
| **Description** | **Mr. Regan** | **Mr. Thomas** |
| Partnership Health Plan | $      272,076 | $      70,860 |
| Aetna | 9,913 | - |
| Blue Shield | 37,419 | - |
| Total Lost Profits | $      319,408 | $      70,860 |

---

[60] Regan Deposition of April 29, 2015, 226: 12 – 18.
[61] I have excluded any "SPAMG – Other" testing revenues, for Mr. Regan describes this as "business [SPA] generated on its own." (Regan Deposition of April 29, 2015, 232:1)
[62] See **Exhibit 4.2**.
[63] See **Exhibit 4**.

United States District Court for the Northern District of California, San Francisco Division
Case No. 3:12-cv-05847-WHO
Rheumatology Diagnostics Laboratory, Inc., et al v. Aetna, Inc., et al

****

My report, with supporting schedules and exhibits, is contained herein, and presents my opinion and the bases and reasons thereof.  To the extent any additional information is produced by either party, I reserve the right to incorporate such additional information into my report.  This report was prepared solely for the above-captioned matter and should not be used for any other purpose without prior written authorization.

Respectfully,

*Vincent Thomas*

Vincent A. Thomas

Dated:  May 19, 2015

# APPENDIX A



## Vincent A. Thomas, CPA / ABV / CFF, CVA

Senior Managing Director — Forensic and Litigation Consulting

vince.thomas@fticonsulting.com

**FTI Consulting, Inc.**

227 W. Monroe Street

Suite 900

Chicago, IL 60606

(312) 252-9329

**Education**
MBA – Finance -Indiana University

BA – Economics (*Cum Laude*) -DePauw University

**Certifications**
Certified Public Accountant

Certified Valuation Analyst

Accredited in Business Valuation

Certified in Financial Forensics

**Professional Affiliations**
AICPA

American Society of Appraisers

National Association of Certified Valuation Analysts

Vince is Senior Managing Director in FTI's Forensic and Litigation Consulting Practice. Prior to joining FTI Consulting, he was a partner with KPMG LLP. Mr. Thomas is nationally recognized consultant and expert with more than 25 years of experience assisting companies and clients with complex accounting, finance and litigation issues.  He was recently named by *Intellectual Asset Management* magazine as one of the world's leading damages experts.

Mr. Thomas has analyzed economic and financial issues in hundreds of disputes and has provided expert testimony in state and federal courts across the country.  Such testimony has focused on valuation and damages issues in several industries with an emphasis on matters involving healthcare and life sciences.  Mr. Thomas has also provided expert testimony for various International Trade Commission 337 investigations on issues related to domestic industry, remedy, bonding and exclusion orders.

Mr. Thomas has conducted seminars to various groups across the country and has participated in various panel discussions on topics involving economic damages, valuation methods and techniques for increasing shareholder value.  He has also published articles on valuation and damage issues, co-authored a book on economic damages and served as a guest lecturer to forensic accounting students at Indiana University.

Mr. Thomas is a Certified Public Accountant ("CPA") and Certified in Financial Forensics ("CFF") and has obtained the valuation credentials of Certified Valuation Analyst ("CVA") and Accredited in Business Valuation ("ABV").  He has utilized the experience and education he has gained in obtaining those credentials in valuing businesses and various types of intellectual property for both litigation and transactional purposes.

In addition to serving as a consultant and testifying expert, Mr. Thomas also has significant experience in corporate, financial, and accounting management positions, including Analyst, Controller, Director of Credit and Collections and Chief Financial Officer. In those roles, Mr. Thomas was responsible for developing the strategic focus and direction for all areas of both a high-tech start-up company as well as a large distributor of wine and spirits. This included raising capital, implementing information technology systems, managing purchasing and distribution, developing the budgeting and forecasting process, preparing financial statements, managing cash flow, maintaining legal and banking relationships, developing incentive pay systems and managing an intellectual property portfolio.



CRITICAL THINKING
AT THE CRITICAL TIME™

| Publications/Seminars | Date |
|---|---|
| *"Daubert in Cross Examination",* American Conference Institute | December 2013 |
| *"Pocket MBA: Finance for Lawyers",* Practicing Law Institute | September 2010 |
| Panelist – Defense Trial Counsel of Indiana Business Valuation Seminar | September 2009 |
| Panelist – The John Marshall School of Law Center for Intellectual Property 52nd Annual Intellectual Property Law Conference – *"Recent Developments in Patent, Trademark, Copyright & Trade Secret Law"* | February 2008 |
| Co-Author – *"Economic Damages in Intellectual Property: A Hands-On Guide to Litigation",* John Wiley & Sons | 2006 |
| *"Patenting Business Methods and Potential Damages",* Wisconsin Intellectual Property Association | December 2006 |
| *"Calculating Damages in Commercial Litigation"*, Presenter at Cleveland Bar Association | June 2003 |
| *"Using Your IP to Increase Shareholder Value"*, Presenter at Indiana Chamber of Commerce Forum | April 2002 |
| *"The Last 20 Years of Patent and Trademark Damages: A Litigation Evolution"*, Presenter at the Midwestern Intellectual Property Symposium (sponsored by the Indiana Continuing Legal Education Forum) | September 2001 |
| *"Calculating Damages in Complex Litigation"*- Presenter at Ohio Association of Civil Trial Attorneys Meeting | April 2000 |
| *"Business Valuation Issues in Litigation"* - Presenter at Indiana Continuing Legal Education Forum | April 2000 |
| *"Damage Analysis–determining lost revenues and Daubert considerations"* – published article in The Indiana Lawyer | 2000 |
| *"Forensic Accounting"* – Guest lecturer at Indiana University | 2002, 2003 |



Vincent A. Thomas, CPA / ABV/ CFF, CVA

**Expert Testimony**

| Plaintiff | Defendant | Case No. | Forum |
|---|---|---|---|
| Tela Corporation | Nokia, Inc., HTC Corporation, HTC America, Motorola Mobility LLC, LG Electronics, Inc., LG Electronics U.S.A., LG Electronics MobileComm U.S.A., Pantech Co., Ltd. | Investigation No. 337-TA-873 | U.S. International Trade Commission *(Deposition)* |
| Eastman Kodak Company | Ricoh Company Ltd. | C.A. No. 12-CV-3109 | U.S. District Court for the Southern District of New York *(Deposition)* |
| State of Louisiana | Par Pharmaceutical Companies, Inc. et al. | No. 596164 | State of Louisiana Parish of East Baton Rouge, 19th Judicial District *(Deposition)* |
| The People for the State of Illinois | Par Pharmaceutical Companies, Inc. et al. | No. 05 CH 2474 | Circuit Court of Cook County, Illinois, County Department, Chancery Division |
| Interactive Marketing, L.L.C. | Amway Corp. et al | Arbitration | Arbitration, Wichita, KS *(Deposition and Trial)* |
| Baker Hughes Incorporated | National Oil Well Varco et al. | Arbitration | Arbitration, Houston, TX *(Trial)* |
| Eastman Kodak Company | Kyocera Corporation | C.A. No. 10-CV-6334-CJS-MWP | U.S. District Court for the Western District of New York *(Deposition)* |
| Generac Power Systems, Inc. | Kohler Company | C.A. No. CV 2:11-cv-1120 | U.S. District Court for the Eastern District of Wisconsin *(Deposition and Trial)* |
| Amway Corp. and Amway Canada Corporation | bHIP Global, Inc. et al. | C.A. No. 4:10-CV-549 | U.S. District Court for the Eastern District of Texas Sherman Division *(Deposition and Trial)* |
| Patent Harbor, LLC | Funai Corporation, Inc. et al. | C.A. No. 6:10-CV-00361 LED | U.S. District Court for the Eastern District of Texas Tyler Division *(Deposition and Trial)* |



Vincent A. Thomas, CPA / ABV/ CFF, CVA

| Plaintiff | Defendant | Case No. | Forum |
|---|---|---|---|
| Millennium Import, LLC | Reed Smith, LLP et al. | Index No. 603350-07 | Supreme Court of the State of New York, County of New York *(Deposition)* |
| X2Y Attenuators, Inc. | Intel Corp., Apple, Inc., Hewlett Packard Co. | Investigation No. 337-TA-781 | U.S. International Trade Commission *(Deposition and Trial)* |
| CDW LLC, et al. | Netech Corporation | Case No. 1:10-cv-0530-SEB DML | U.S. District Court for the Southern District of Indiana *(Deposition)* |
| Gore Enterprise Holdings, Inc. | Medtronic, Inc. | No. 10-cv-004441-MSD-DEM | U.S. District Court for the Eastern District of Virginia *(Deposition and Trial)* |
| Genentech, Inc. | GlaxoSmithKline, LLC | C.A. No. CV 10-02764 MRP (FMOx) | U.S. District Court for the Central District of California *(Deposition)* |
| The Lincoln Electric Company, et al. | National Standard, LLC | 1:09-cv-018886-DCN | U.S. District Court for the Northern District of Ohio *(Deposition)* |
| Remy, Inc. | Tecnomatic S.P.A. | 1:08-cv-1227-SEB-JMS | U.S. District Court for the Southern District of Indiana *(Deposition)* |
| Sleep Science Partners, Inc | Sleeping Well, LLC | Civil Action No. CV09-4200CW | U.S. District Court for the Northern District of California *(Deposition)* |
| Stoughton Trailers, Inc. | Great Dane Limited Partnership | Case No. 3:09-cv-00570-slc | U.S. District Court for the Western District of Wisconsin *(Deposition and Trial)* |
| Nokia Corporation | Apple, Inc. | Investigation 337-TA-701 | U.S. International Trade Commission *(Deposition and Trial)* |
| Thomson Inc. | Gemstar-TV Guide International, Inc., et al. | Cause No. 29D02-0808-PL-001004 | State of Indiana, Hamilton County Superior Court *(Deposition)* |
| Centillion Data Systems, LLC | Qwest Corporation | Case No. 1:04 CV-00073-LJM-WTL | U.S. District Court for the Southern District of Indiana *(Deposition)* |



Vincent A. Thomas, CPA / ABV/ CFF, CVA

| Plaintiff | Defendant | Case No. | Forum |
|---|---|---|---|
| Ronald A. Katz Technology Licensing, L.P. | Fifth Third Bancorp, et al. | 07-ML-01816-C-RGK (FFMx) | U.S. District Court for the Central District of California *(Deposition)* |
| Zenith Electronics Corp. | PDI Communication Systems, Inc. | Civil Action No. 04 CV 4796 | U.S. District Court for the Northern District of Illinois *(Deposition)* |
| Thomson, Inc. | Praxair, Inc., et al. | Case No. 2005 CI 123 | Court of Common Pleas; Pickaway County, Ohio *(Deposition and Trial)* |
| Centocor Ortho-Biotech, Inc. | Genentech and City of Hope | C.A. No. CV 08-03573 MRP (CTX) | U.S. District Court for the Central District of California *(Deposition)* |
| Shareholders of Transkaryotic Therapies | Shire Pharmaceuticals | Consolidated C.A. No. 2776 - CC | Court of Chancery of the State of Delaware *(Deposition)* |
| State of Texas and Ven-A-Care, Inc. | Par Pharmaceutical, et al. | Cause No. D-1-GV-08-001566 | District Court of Travis County, Texas *(Deposition)* |
| Dey, Inc., et al | Sepracor, Inc. | C.A. No. 07-cv-2353 | U.S. District Court for the Southern District of New York *(Deposition)* |
| Commonwealth of Kentucky | Par Pharmaceutical, et al. | Civil Action No. 04-CI-1487 | Commonwealth of Kentucky, Franklin Circuit Court *(Deposition)* |
| The State of Alabama | Par Pharmaceutical, et al. | 05cv219 | Circuit Court of Montgomery County, Alabama *(Deposition)* |
| Valdemar Portney | CIBA Vision Corporation | SACV 07-854-AG (MLGx) | U.S. District Court for the Central District of California *(Deposition)* |
| Medtronic Sofamor Danek USA, Inc. | Globus Medical, Inc. | C.A. 06-cv-04248-JG | U.S. District Court for the Eastern District of Pennsylvania *(Deposition and Trial)* |
| Boston Scientific | Conor Medsystems, Inc. and Cordis Corporation | 1:10-cv-00315-SLR | U.S. District Court for the District of Delaware *(Deposition)* |
| Spectralytics, Inc. | Cordis Corporation and Norman Noble, Inc. | Civil Action No. 05-1464 (PJS/RLE) | U.S. District Court for the District of Minnesota *(Deposition and Trial)* |



Vincent A. Thomas, CPA / ABV/ CFF, CVA

| Plaintiff | Defendant | Case No. | Forum |
|---|---|---|---|
| Brike International | Invacare Corporation | Civil Action No. 05-CV-1754-KI | U.S. District Court for the District of Oregon *(Deposition)* |
| Boston Scientific Corporation | Cordis Corporation | Civil Action No. 10-315-SLR-LPS | U.S. District Court for the District of Delaware *(Deposition and Trial)* |
| Advanced Stent Technologies, Inc. | Boston Scientific Corporation | Case No. 65-180-Y-00290-08; 65-489-292-08 | American Arbitration Association (New York, NY) *(Deposition)* |
| Meritor Heavy Vehicle Systems, LLC | Ikerd's, Inc. and Pentaflex, Inc. | Case No.: IP02-1095-C-M/S | State of Indiana in the County of Lawrence, Lawrence Superior Court *(Deposition)* |
| Jeff Koehlinger, et al. | The State Lottery Commission of Indiana | Cause No. 49COI-0701-CT-730 | State of Indiana in the County of Marion, Marion Superior Court *(Deposition)* |
| Molten Metal Equipment Innovations | Pyrotek, Inc. | Arbitration | American Arbitration Association (Cleveland, OH) *(Deposition and Trial)* |
| Quixtar, Inc. | TEAM, Inc. | Arbitration | American Arbitration Association (Detroit, MI) *(Deposition and Trial)* |
| Amway, Inc. | MonaVie LLC | 2:08-cv-00204-BSJ (consolidated 2:08-cv-209 DB) | U.S. District Court for the District of Utah *(Deposition and Trial)* |
| High Voltage Beverages, LLC | The Coca-Cola Company | Civil Action No. 3:08-CV-367-GCM-DLH | U.S. District Court for the Western District of North Carolina *(Deposition)* |
| Westridge Estates, LLC | The Town of Plainfield | Cause No: 32D01-0603-PL-15 | State of Indiana in the County of Hendricks, Hendricks Superior Court *(Deposition and Trial)* |
| Construction Crane & Tractor, Inc. | Wirtgen America, Inc. | Cause No.: 07-215/-I | Chancery Court of Davidson County, Tennessee *(Deposition and Trial)* |



Vincent A. Thomas, CPA / ABV/ CFF, CVA

| Plaintiff | Defendant | Case No. | Forum |
|---|---|---|---|
| Joovy LLC and Albert T. Fairclough | Baby Trend, Inc. and Target Corporation | Case no. 3:06-CV-0616(P) | U.S. District Court for the Northern District of Texas *(Deposition)* |
| Agilysys, Inc. | Keith Gordon, Michael W. Malone and Bryan Krohn | Case No: 1:06CV1665 | U.S. District Court for the Northern District of Ohio *(Deposition and Trial)* |
| Quixtar, Inc. | Orrin Woodward, et al. | Arbitration | American Arbitration Association (Detroit, MI) *(Deposition and Trial)* |
| Stewart & Associates, Inc., et al. | Quixtar, Inc. | Arbitration | American Arbitration Association, Washington, D.C. *(Deposition and Trial)* |
| Sofpool LLC | Intex Recreation Corp | Case No. 2:07-CV-097 | U.S. District Court for the Eastern District of Texas *(Deposition and Trial)* |
| Carpenters Pension Trust Fund-Detroit & Vicinity | Capri Capital LLC et al. | Case No: 06-7039-CK | State of Michigan, Crawford County Superior Court *(Deposition and Trial)* |
| Pergo, Inc. | Alloc, Inc., Armstrong World Industries and Berry Finance | Civil Action No: 02-CV-0736V | U.S. District Court for the Eastern District of Wisconsin *(Deposition and Trial)* |
| Murata Manufacturing Company, Inc. | Bel Fuse, Inc. | 03 C 2934 | U.S. District Court for the Northern District of Illinois *(Deposition)* |
| Wyers Product Group, Inc. | Masterlock Company | Civil Action No. 1:06-cv-00619-LBT | U.S. District Court for the District of Colorado *(Deposition and Trial)* |
| Dalia Genger | Arie Genger | Arbitration | American Arbitration Association (New York, NY) *(Deposition and Trial)* |
| Joel Goldman | Healthcare Management Systems, Inc. and Thomas E. Givens | Civil No: 1:05CV0035 | U.S. District Court for the Western District of Michigan *(Deposition)* |
| CoalCo Corporation, et al. | Headwaters, Inc. | Civil No. 1:09-CV-10195-WGY | U.S. District Court for the District of Massachusetts *(Deposition and Trial)* |



Vincent A. Thomas, CPA / ABV/ CFF, CVA

| Plaintiff | Defendant | Case No. | Forum |
|---|---|---|---|
| Philip Boynton et al. | Headwaters, Inc. | Case No. 1-02-1111 | U.S. District Court for the Western District of Tennessee *(Deposition and Trial)* |
| Scienton Technologies et al. | Computer Associates International, Inc. | CV 04 2652 | U.S. District Court for the Eastern District of New York *(Deposition)* |
| Levi Strauss North America | Spiece Sales Company | 85C01-1110-CC-829 | State of Indiana In The Wabash Circuit Court *(Deposition and Trial)* |
| Newport Corporation | Lighthouse Photonics, Inc. | C.A. No. 8:12-cv-00719 | U.S. District Court for the Central District of California *(Deposition)* |
| Hoyt A. Fleming | Escort, Inc. | No. 1:09-CV-00105-BLW | U.S. District Court for the District of Idaho *(Trial)* |
| Pharmathene, Inc. | SIGA Technologies, Inc. | C.A. No. 2627-VCP | Court of Chancery in the State of Delaware *(Deposition and Trial)* |
| State of Indiana | International Business Machines, Inc. | Cause No. 49D10-1005-PL-021451 | State of Indiana in the County of Marion, Marion Superior Court *(Deposition and Trial)* |
| Matthews International Corporation et al. | Batesville Casket Company, Inc. et al. | No. 2:10-cv-01078-JFC | U.S. District Court for the Western District of Pennsylvania *(Deposition)* |
| Target Corporation | Destination Maternity Corporation | No. IPR2013-00530 | U.S. P.T.O. Before the Patent Trial and Appeal Board *(Deposition)* |
| TransData, Inc. | Centerpoint Energy, LLC, Denton County Electric Cooperative, Denton Municipal Electric, Oklahoma Gas & Electric, Oncor Electric Company, San Diego Gas & Electric, Texas-New Mexico Power Company, Tri-County Electric Cooperative, Inc. | C.A. No.5:12-ml-02309C | U.S. District Court for the Western District of Oklahoma *(Deposition)* |



Vincent A. Thomas, CPA / ABV/ CFF, CVA

| Plaintiff | Defendant | Case No. | Forum |
|---|---|---|---|
| Glovia International, Inc. | Actuant Corporation and Maxima Technologies & Systems, Inc. | No. BC 498779 | Los Angeles Superior Court *(Deposition)* |
| United States of America ex rel. Bernard Lisitza et al. | Par Pharmaceutical Companies, Inc. | No. 06 C 6131 | U.S. District Court for the Northern District of Illinois *(Deposition)* |
| Bristol-Myers Squibb Company | Genentech, Inc. and City of Hope | No. 2:13-CV-05400-MRP | U.S. District Court for the Central District of California Western Division *(Deposition)* |
| The California Institute Of Technology | Hughes Communications, Inc., Hughes Network Systems, LLC, DISH Network Corp., DISH Network L.L.C. and DishNET Satellite Broadband L.L.C. | No. 2:13-CV-07245-MRP-JEM | U.S. District Court for the Central District of California *(Deposition)* |
| Hospira, Inc. and Hospira Healthcare Corp. | ICU Medical Sales, Inc. | Arbitration | International Institute for Conflict Prevention & Resolution (New York, NY) *(Trial)* |
| Enterprise Systems Technologies, S.a.r.l. | Apple Inc., HTC Corporation, HTC America, Inc., LG Electronics, Inc., LG Electronics U.S.A., Inc., LG Electronics MobileComm U.S.A., Inc., and Google Inc. | Investigation No. 337-TA-925 | U.S. International Trade Commission *(Deposition)* |
| Levi Strauss De Espana S.A | Ganaderia Brasil Industria E Comercio De Acessorios De Moda Ltda. | Arbitration | American Arbitration Association *(Trial)* |



# APPENDIX B

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Appendix B**
**Documents Considered**

Legal & Other Documents

| |
|---|
| QDI's Notice of Motion and Motion for Summary Judgment, dated January 16, 2015 |
| Appendix A to QDI's Notice of Motion and Motion for Summary Judgment, dated January 16, 2015 |
| Plaintiffs' Opposition to Defendant QDI's Motion for Summary Judgment, dated February 11, 2015 |
| Declaration of Joseph Plandowski in Support of Plaintiffs' Opposition to Motion for Summary Judgment, dated February 10, 2015 |
| Exhibit 46, Report of Greg J. Regan in Support of Plaintiffs' Opposition to Motion for Summary Judgment, dated February 10, 2015 |
| Declaration of Joseph Plandowski in support of Plaintiffs' Motion for Summary Judgment, dated April 1, 2015 |
| Declaration of Demetrius Lambrinos in Support of Plaintiffs' Motion for Summary Judgment and Exhibits, dated April 1, 2015 |
| Declaration of Joseph Alan Safran on behalf of Third Party Subpoena Recipient Blue Shield of California, dated November 19, 2014 |
| Declaration of Greg Regan in support of Plaintiffs' Motion for Summary Judgment, dated March 27, 2015 |
| [Proposed] Order Granting Plaintiffs' Administrative Motion to Conditionally File Under Seal the Motion for Summary Judgment, Portions of the Exhibits Appendix A and Declarations |
| Plaintiffs' Administrative Motin to Conditionally File Under Seal the Motion for Summary Judgment, Portions of the Exhibits, Plaintiffs' Appendix A and Other Declarations Pursuant to Local Rule 79-5 |
| Proof of Service re Administrative Motion to File Under Seal and Appendix A thereto |
| Plaintiffs' Notice of Motion for Summary Judgment, dated April 1, 2015 |
| Declaration of Demetrius Lambrinos in Support of Plaintiffs' Administrative Motion to Conditionally File Under Seal the Motion for Summary Judgment, Portions of the Exhibits Appendix A and Declarations Pursuant to Local Rule 79-5(e) |
| Exhibits 4, 5, 20, 21, 49, 50, 51, and 52 to Lambrinos Declaration in Support of Plaintiffs' Opposition to Summary Judgment |
| Ruiz Declaration |
| 2014.09.29 Hunter's 2nd Supplemental Responses to QDI's Rogs, Set 1.pdf |
| Baori, Balakrishnan and Fishenfeld Declarations.pdf |
| Fuchs Declaration.pdf |
| Hunter Third Supplemental Responses, Set One.pdf |
| Summary Judgment Order, dated April 15, 2015 |
| Report of Joseph Plandowski, dated April 22, 2015, with exhibits, workpapers and supporting documents in native format |
| Expert Report of Greg J. Regan, dated April 22, 2015, with exhibits, workpapers and supporting documents in native format |
| Plaintiffs' Expert Disclosure, dated April 22, 2015 |
| Plaintiff Hunter Laboratories' Fourth Supplemental Response and Objections to Defendant QDI's Interrogatories, Set One, dated February 11, 2015 |
| Complaint for Damages, Restitution, and Injunctive Relief, dated November 14, 2012 |
| Declaration of Gary McCabe, dated January 16, 2015 |

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Appendix B**
**Documents Considered**

<u>**Depositions and/or Deposition Exhibits**</u>
Chris Riedel Deposition of September 19, 2014
Exhibits 145 - 153 to Chris Riedel Deposition of September 19, 2014
Chris Riedel Deposition of December 19, 2014
Exhibit 147 to Chris Riedel Deposition of December 19, 2014
Greg Regan Deposition of April 29, 2015
Gary McCabe Deposition of January 13, 2015
Exhibit 652 to Gary McCabe Deposition of January 13, 2015
Albert Miller Deposition of October 23, 2014
Exhibit 309 to Albert Miller Deposition of October 23, 2014
Michael Armstrong Deposition of December 9, 2014
Phil Dutt Deposition of July 25, 2014
Halbout Exhibit 54.pdf
Halbout Exhibit 56.pdf
Mark Hayes Deposition of August 13, 2014
Valentine Exhibit 250.pdf
Gerald Weiss Deposition of June 13, 2014
Joseph Plandowski Deposition of May 8, 2015 (rough transcript)
Richard Gentleman Deposition of November 18, 2014
Richard Prendergast Deposition of October 28, 2014

<u>**Document - Public or No Bates Stamps**</u>
Apr 2012 Financial Reports.pdf
Financial Key Indicators - FY 2010 - 2012.xlsx
June 2012 Financial Reports.pdf
Mar 2012 Financial Reports.pdf
May 2012 Financial Reports.pdf
Profit and Loss long statement for 2012 March 31 fiscal year.xls
Tax Returns FY 2008.pdf
Tax Returns FY 2009.pdf
Tax Returns FY 2010.pdf
Three year Financial Summary (070512).pdf
CPA2007_AE_ALLCL
CPA2007_BS_ALLCL
CPA2008_AE_ALLCL

Expert Report of Vincent A. Thomas, CPA/ABV/CFF, CVA
Highly Confidential - Attorneys' Eyes Only

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Appendix B**
**Documents Considered**

CPA2008_BS_ALLCL
CPA2009_AE_ALLCL
CPA2009_BS_ALLCL
CPA2010_AE_ALLCL
CPA2010_BS_ALLCL
CPA2011_AE_ALLCL
CPA2011_BS_ALLCL
CPA2012_AE_ALLCL
CPA2012_BS_ALLCL
CPA2013_AE_ALLCL
CPA2013_BS_ALLCL
Appended 2007-2013
CPA2007_FULL
CPA2008_FULL
CPA2009_FULL
CPA2010_FULL
CPA2011_FULL
CPA2012_FULL
CPA2013_FULL
Aetna Fee Schedule 12.31.2007
Aetna Fee Schedule 12.31.2008
Aetna Fee Schedule 12.31.2009
Aetna Fee Schedule 12.31.2010
Aetna Fee Schedule 12.31.2011
Aetna Fee Schedule 12.31.2012
Hunter Aetna Fee Schedules - 2007 - 2012
Diag lab client signed copy Nov 2012.pdf
TOPCPT2007
TOPCPT2008
TOPCPT2009
TOPCPT2010
TOPCPT2011
TOPCPT2012
TOPCPT2013
http://www.bioreference.com/company-profile/

Expert Report of Vincent A. Thomas, CPA/ABV/CFF, CVA
Highly Confidential - Attorneys' Eyes Only

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Appendix B**
**Documents Considered**

http://www.northjersey.com/news/local-labratory-purchases-california-company-california-firm-as-west-coast-base-1.569710
BioReference 10-K for the fiscal year ended October 31, 2013

**Bates-Stamped Documents**
AET0000003 - 20
AET-SUBP0000017
AET-SUBP0000101 - 135
AET-SUBP0000171
CPS-0000055
CPS-0000620 - 905
PLAINTIFF-HUNTER LABS001026
PLAINTIFF-HUNTER LABS001027
PLAINTIFF-HUNTER LABS001031
PLAINTIFF-HUNTER LABS001032
PLAINTIFF-HUNTER LABS001040
PLAINTIFF-HUNTER LABS001042
PLAINTIFF-HUNTER LABS001055
PLAINTIFF-HUNTER LABS001056
PLAINTIFF-HUNTER LABS0012236
PLAINTIFF-HUNTER LABS011958 - 11969
PLAINTIFF-HUNTER LABS011972 - 11977
PLAINTIFF-HUNTER LABS011980 - 11982
QDIRDL0001404
QDIRDL0001458
QDIRDL0001498
QDIRDL0001505
QDIRDL0001512
QDIRDL0001555
QDIRDL0001558
QDIRDL0001584
QDIRDL0001587
QDIRDL0001604
QDIRDL0001646
QDIRDL0009010

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Appendix B**
**Documents Considered**

QDIRDL0009014
QDIRDL0009064
QDIRDL0009078
QDIRDL0009184
QDIRDL0010082
QDIRDL00126162
QDIRDL0032289
QDIRDL0032291
QDIRDL0032326
QDIRDL0032327
QDIRDL0032328
QDIRDL0032329
QDIRDL0032330
QDIRDL0032350
QDIRDL0032356
QDIRDL0032360
QDIRDL0032371
QDIRDL0032378
QDIRDL0050211
QDIRDL0050615
QDIRDL0050776
QDIRDL0051002
QDIRDL0051109
QDIRDL0063348
QDIRDL0094836
QDIRDL0094854
QDIRDL0101462
QDIRDL0103071
QDIRDL0104560
QDIRDL0104718
QDIRDL0106272
QDIRDL0106534
QDIRDL0110617
QDIRDL0111637

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Appendix B**
**Documents Considered**

QDIRDL0112198
QDIRDL0115219
QDIRDL0117606
QDIRDL0117901
QDIRDL0119681
QDIRDL0126161
QDIRDL0147016
QDIRDL0147269
QDIRDL0149562
QDIRDL0149780
QDIRDL0153868
QDIRDL0154270
QDIRDL0155367
QDIRDL0156135
QDIRDL0157558
QDIRDL0169565
QDIRDL0178029
QDIRDL0178157
QDIRDL0178485
QDIRDL0179386
QDIRDL0179793
QDIRDL0180161
QDIRDL0181372
QDIRDL0183168
QDIRDL0185259
QDIRDL0189285
QDIRDL0197737
QDIRDL0199165
QDIRDL0200876
QDIRDL0201496
QDIRDL0216149
QDIRDL0224476
QDIRDL0227799
QDIRDL0227817
QDIRDL0242021

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Appendix B**
**Documents Considered**

QDIRDL0242440
QDIRDL0286206
QDIRDL0287640
QDIRDL0295138
QDIRDL0330843
QDIRDL0346695
QDIRDL0346696
QDIRDL0346697
QDIRDL0346698
QDIRDL0346699
QDIRDL0346779
QDIRDL0346780
QDIRDL0348262
QDIRDL0348271
QDIRDL0348272
QDIRDL0348273
QDIRDL0348274
QDIRDL0348278
QDIRDL0348279
QDIRDL0348280
QDIRDL0348281
QDIRDL0348282
QDIRDL0349169
QDIRDL0352517
QDIRDL0352545
QDIRDL0362524
QDIRDL0363641
QDIRDL0363642
QDIRDL0364208
QDIRDL0364609
QDIRDL0364696
QDIRDL0365563
QDIRDL0365564
QDIRDL0374736
QDIRDL0374807

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Appendix B**
**Documents Considered**

QDIRDL0374845
QDIRDL0374956
QDIRDL0375025
QDIRDL0375063
QDIRDL0375301
QDIRDL0375458
QDIRDL0375543
QDIRDL0375628
QDIRDL0375666
QDIRDL0375705
QDIRDL0375943
QDIRDL0376224
QDIRDL0376321
QDIRDL0376482
QDIRDL0376664
QDIRDL0376784
QDIRDL0376881
QDIRDL0377047
QDIRDL0377229
QDIRDL0377453
QDIRDL0377746
QDIRDL0377837
QDIRDL0377925
QDIRDL0378389
QDIRDL0378478
QDIRDL0378559
QDIRDL0378571
QDIRDL0378643
QDIRDL0378721
QDIRDL0378761
QDIRDL0378801
QDIRDL0378841
QDIRDL0378883
QDIRDL0378923
QDIRDL0378974

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Appendix B**
**Documents Considered**

QDIRDL0379387
QDIRDL0379430
QDIRDL0379473
QDIRDL0379516
QDIRDL0379559
QDIRDL0379571
QDIRDL0379588
QDIRDL0380110
QDIRDL0380334
QDIRDL0380613
QDIRDL0380755
QDIRDL0381043
QDIRDL0381446
QDIRDL0382297
QDIRDL0382364
QDIRDL0382529
QDIRDL0382694
QDIRDL0382772
QDIRDL0382813
QDIRDL0382852
QDIRDL0383166
QDIRDL0383252
QDIRDL0383412
QDIRDL0383572
QDIRDL0383732
QDIRDL0383889
QDIRDL0384720
QDIRDL0384881
QDIRDL0385238
QDIRDL0385462
QDIRDL0385644
QDIRDL0385826
QDIRDL0386666
QDIRDL0387688
QDIRDL0387873

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Appendix B**
**Documents Considered**

QDIRDL0388058
QDIRDL0388439
QDIRDL0388723
QDIRDL0388919
QDIRDL0389688
QDIRDL0389785
QDIRDL0389872
QDIRDL0390057
QDIRDL0390199
QDIRDL0390341
QDIRDL0390483
QDIRDL0390625
QDIRDL0390767
QDIRDL0390947
QDIRDL0391089
QDIRDL0391274
QDIRDL0391378
QDIRDL0391481
QDIRDL0391584
QDIRDL0391741
QDIRDL0391961
QDIRDL0392190
QDIRDL0392332
QDIRDL0392517
QDIRDL0392629
QDIRDL0392741
QDIRDL0392853
QDIRDL0392965
QDIRDL0393165
QDIRDL0393277
QDIRDL0393829
QDIRDL0393956
QDIRDL0394210
QDIRDL0394337
QDIRDL0394591

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Appendix B**
**Documents Considered**

QDIRDL0395441
QDIRDL0395568
QDIRDL0397716
QDIRDL0397783
QDIRDL0397850
QDIRDL0397917
QDIRDL0399170
QDIRDL0400423
QDIRDL0400585
QDIRDL0400750
QDIRDL0400915
QDIRDL0401080
QDIRDL0401245
QDIRDL0401624
QDIRDL0402004
QDIRDL0402383
QDIRDL0402762
QDIRDL0403141
QDIRDL0403306
QDIRDL0403347
QDIRDL0403588
QDIRDL0403705
QDIRDL0403747
QDIRDL0403912
QDIRDL0404195
QDIRDL0404236
QDIRDL0404277
QDIRDL0404433
QDIRDL0404473
QDIRDL0404633
QDIRDL0404753
QDIRDL0404795
QDIRDL0404837
QDIRDL0404947
QDIRDL0404990

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Appendix B**
**Documents Considered**

QDIRDL0405455
QDIRDL0405496
QDIRDL0405538
QDIRDL0405949
QDIRDL0406091
QDIRDL0406233
QDIRDL0406345
QDIRDL0406672
QDIRDL0407129
QDIRDL0407275
QDIRDL0407315
QDIRDL0407512
QDIRDL0407543
QDIRDL0407548
QDIRDL0407565
QDIRDL0407601
QDIRDL0407619
QDIRDL0407632
QDIRDL0407648
QDIRDL0407662
QDIRDL0407683
QDIRDL0407696
QDIRDL0407717
QDIRDL0407735
QDIRDL0407743
QDIRDL0407755
QDIRDL0407772
QDIRDL0407795
QDIRDL0407808
QDIRDL0407817
QDIRDL0407830
QDIRDL0407843
QDIRDL0407852
QDIRDL0407865
QDIRDL0407882

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Appendix B**
**Documents Considered**

QDIRDL0407903
QDIRDL0407921
QDIRDL0407938
QDIRDL0407955
QDIRDL0407989
QDIRDL0408008
QDIRDL0408032
QDIRDL0408056
QDIRDL0408073
QDIRDL0408092
QDIRDL0408120
QDIRDL0408126
QDIRDL0408133
QDIRDL0408140
QDIRDL0408147
QDIRDL0408154
QDIRDL0408167
QDIRDL0408180
QDIRDL0408193
QDIRDL0408218
QDIRDL0408258
QDIRDL0408267
QDIRDL0408305
QDIRDL0408340
QDIRDL0408357
QDIRDL0408374
QDIRDL0408382
QDIRDL0408398
QDIRDL0408410
QDIRDL0408422
QDIRDL0408434
QDIRDL0408446
QDIRDL0408458
QDIRDL0408470
QDIRDL0408482

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Appendix B**
**Documents Considered**

QDIRDL0408494
QDIRDL0408505
QDIRDL0408556
QDIRDL0408578
QDIRDL0408591
QDIRDL0408600
QDIRDL0408613
QDIRDL0408626
QDIRDL0408660
QDIRDL0408704
QDIRDL0408748
QDIRDL0408852
QDIRDL0408887
QDIRDL0408922
QDIRDL0409609
QDIRDL0409626
QDIRDL0409661
QDIRDL0410136
QDIRDL0410138
QDIRDL0410561
QDIRDL0410565
QDIRDL0410573
QDIRDL0410576
QDIRDL0410584
QDIRDL0410839
QDIRDL0414103
QDIRDL0419504
QDIRDL0419516
QDIRDL0419517
QDIRDL0419518
QDIRDL0419519
QDIRDL0419520
QDIRDL0419521
QDIRDL0433321
QDIRDL0440511

Expert Report of Vincent A. Thomas, CPA/ABV/CFF, CVA
Highly Confidential - Attorneys' Eyes Only

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Appendix B**
**Documents Considered**

QDIRDL0449181
QDIRDL0467891
QDIRDL0467892
QDIRDL0467937
QDIRDL0467938
QDIRDL0467939
QDIRDL0467940
QDIRDL0467942
QDIRDL0467978
QDIRDL0468163
QDIRDL0468671
QDIRDL0469114
QDIRDL0469129
QDIRDL0469245
QDIRDL0469263
QDIRDL0469439
QDIRDL0469440
Quest_RDL_00078486_Valentine250.xls

# EXHIBIT 1

# EXHIBIT 2

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Exhibit 2**
**Lost Profits Summary - Hunter**

| Description | | | 2012 | 2013 | Total |
|---|---|---|---|---|---|
| Lost Revenue [1] | _A_ | $ | 7,121 $ | 24,282 $ | 31,403 |
| | | | | | |
| Less Variable Costs: | | | | | |
| Variable Costs as a % of Revenue [2] | _B_ | | 33% | 33% | 33% |
| Variable Costs | _C = A * B_ | | 2,350 | 8,013 | 10,363 |
| | | | | | |
| Hunter's Lost Profit | _D = A - C_ | $ | 4,771 $ | 16,269 $ | 21,040 |

Notes:
[1] Exhibit 2.1.
[2] Regan Expert Report, Exhibit 2.0.

Expert Report of Vincent A. Thomas, CPA/ABV/CFF, CVA
Highly Confidential - Attorneys' Eyes Only

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Exhibit 2.1**
**Estimated "But-For" Aetna Revenue**

| Description | | 2009 | 2010 | 2011 | 2012 | Average |
|---|---|---|---|---|---|---|
| Actual Revenue [1] | | | | | | |
| Identified Aetna Clients (Full Year) | A | $ 71,545 | $ 86,567 | $ 76,497 | $ 69,669 | |
| Less: Identified Aetna Clients (Oct-Dec Only) | B | | | | 11,897 | |
| | | | | | | |
| Adjusted Aetna Revenue | C = A - B | $ 71,545 | $ 86,567 | $ 76,497 | $ 57,772 | |
| Divide by: Number of Months | D | 12 | 12 | 12 | 9 | |
| | | | | | | |
| Average Monthly Revenue | E = C / D | $ 5,962 | $ 7,214 | $ 6,375 | $ 5,806 | $ 6,339 |

| | | 2012 | 2013 | Total |
|---|---|---|---|---|
| Projected Revenue | | | | |
| Number of Months | F | 3 | 8 | 11 |
| Multiply by: Average Monthly Revenue | G = E | $ 6,339 | $ 6,339 | $ 6,339 |
| | | | | |
| Estimated Revenue (# of Months * Average Monthly Revenue) | H = F * G | 19,017 | 50,713 | 69,731 |
| Less: Actual Revenue [1] | I | 11,897 | 26,431 | 38,328 |
| | | | | |
| Lost Revenue | J = H - I | $ 7,121 | $ 24,282 | $ 31,403 |

Notes:
[1] Exhibit 2.2.

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Exhibit 2.2**
**Hunter Lost Account Specific Revenue - Aetna Out-of-Network Accounts [1]**

| Client ID | Account Name | 2009 [2] | 2010 [3] | 2011 [4] | 2012 [5] | 2012 - Oct - Dec [6] | 2013 - Jan - Jul [7] |
|---|---|---|---|---|---|---|---|
| 2012 | PEDIATRIC & ADOLESCENT MEDICAL | - | - | 33 | 79 | 12 | - |
| 2034 | JOHN M. RASHKIS, M.D. | 1,743 | 1,751 | 1,431 | 645 | - | - |
| 2059 | SUSIE SUH, M.D. | - | - | 315 | 349 | 28 | - |
| 2139 | ALLERGY & ASTHMA ASSOC. | 9,149 | 5,304 | 3,505 | 2,933 | 133 | 1,517 |
| 2228 | JOE L. ROD, M.D. | - | 22 | 516 | 90 | - | - |
| 2235 | JOSEL CABACCAN, M.D. | 253 | 23 | 1,006 | 490 | 102 | - |
| 2268 | SUSIE SUH, M.D. | - | - | - | - | - | - |
| 2454 | RANADIVE M.D.s, INC. | 562 | 281 | 367 | - | - | - |
| 2504 | CA SKIN INSTITUTE MOUNTAIN VIEW | 4 | 236 | 250 | - | - | - |
| 2767 | AMADOR VALLEY MEDICAL CENTER | 63 | 128 | 917 | - | - | - |
| 5009 | DR. NEWCOMER & ASSOCIATES | - | - | - | 2,099 | - | 1,260 |
| 5094 | NIKOLA LOZANOV, M.D., INC. | 2,720 | 503 | 149 | - | - | - |
| 5109 | BLAKE MASSEY, PA-C | 999 | 827 | 1,123 | 732 | 273 | 200 |
| 5191 | QUALITY OF LIFE MEDICINE | 767 | 3,053 | 1,216 | 303 | - | - |
| 5290 | OWEN MEDICAL GROUP | 2,998 | 2,573 | 1,640 | 140 | - | - |
| 5427 | OSKIE PEDIATRICS | 12 | 794 | 905 | 338 | 125 | 202 |
| 5756 | THE BURLINGAME CENTER | - | - | 1,145 | 1,395 | 65 | 833 |
| 5906 | KENNY K. CHEN, M.D. | - | - | 226 | 176 | - | - |
| 6500 | KHALIQ SHAH, M.D. | - | - | - | 1,558 | 695 | 275 |
| 6888 | A. ELAINE ASHBY, M.D. | - | - | 252 | 1,900 | 900 | 892 |
| 6921 | SARAH AZAD, M.D. | - | - | 20 | 1,993 | 547 | 329 |
| 7171 | RYAN RANCH - EL DORADO | - | - | 322 | 52 | - | - |
| 7427 | CLAYTON VALLEY MEDICAL GROUP | - | - | 1,697 | 950 | - | - |
| 7447 | TOPKIS & PAMMI, M.D.s | - | - | - | 463 | - | 95 |
| 7925 | CHOONG-ANG MEDICAL CENTER | - | - | 560 | 2,887 | - | - |
| 7936 | NAEEM I. HASHMI, M.D. | - | - | 437 | 353 | - | 396 |
| 8085 | WHITNEY D. DIXON, M.D. | 10 | 324 | - | - | - | - |
| 8093 | KENNETH PETERS, M.D. | - | - | - | 151 | - | - |
| 8144 | THINH V. NGUYEN, M.D. | - | - | 1,949 | 1,088 | - | - |
| 8205 | MID CARMEL VALLEY MED CLINIC | 124 | 156 | 1,656 | 1,055 | 360 | 38 |
| 8263 | JAMES C. GARDNER, M.D. | 160 | 179 | 305 | 3,968 | 1,315 | 1,465 |
| 8341 | MARGARET CHU, M.D. | 8,797 | 8,364 | 7,741 | 8,144 | 197 | 40 |
| 8388 | GENERATIONS OF WOMEN | 2,376 | 3,850 | 2,076 | 2,129 | 160 | 298 |
| 8846 | MANJUL PATWARDHAN, M.D. | 201 | 10,652 | 7,747 | 1,849 | - | 39 |
| 9011 | CLEAR CENTER OF HEALTH | 13,212 | 12,720 | 11,628 | 6,809 | 1,946 | 8,204 |
| 9055 | DENISE R. MARK, MD | 4,270 | 6,028 | 1,667 | 3,084 | 408 | - |
| 9096 | PAUL INDMAN, M.D. | - | 56 | - | 422 | - | - |
| 9123 | IRVING W. OLENDER, M.D. | - | - | 3 | 77 | - | - |
| 9177 | PETER E. FRANKLIN, M.D. | 5,175 | 4,993 | 757 | 86 | - | - |
| 9218 | RANJIT REEN, M.D. | - | - | - | - | - | - |
| 9225 | HIRSCHFELD & GOLD, M.D.s | - | 95 | 259 | 436 | 145 | 59 |
| 9335 | STEVEN BATANIDES, M.D. | 4,248 | 9,305 | 4,100 | 1,235 | 516 | - |

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Exhibit 2.2**
**Hunter Lost Account Specific Revenue - Aetna Out-of-Network Accounts [1]**

| Client ID | Account Name | 2009 [2] | 2010 [3] | 2011 [4] | 2012 [5] | 2012 - Oct - Dec [6] | 2013 - Jan - Jul [7] |
|-----------|--------------|----------|----------|----------|----------|----------------------|----------------------|
| 9432 | ELEANOR MARTINEZ, M.D. | 2,251 | 2,881 | 1,183 | 1,168 | 200 | 797 |
| 9467 | SALINAS VALLEY UROLOGY ASSOC. | 41 | - | 10 | 540 | 241 | 85 |
| 9535 | MONTEREY BAY GI CONSULTS | 44 | 215 | 210 | 54 | 24 | 62 |
| 9622 | LOVATO & HEREDIA | 513 | 312 | 447 | - | - | - |
| 9624 | ACACIA - SALINAS | 2,616 | 2,834 | 921 | 583 | - | 243 |
| 9626 | CA SKIN INSTITUTE SAN JOSE | 1,816 | 1,005 | 1,720 | 794 | 141 | 262 |
| 9661 | POSADA FAMILY PRACTICE | 138 | 192 | 3,078 | 4,583 | 1,069 | 1,051 |
| 9684 | HEALTH CARE FOR WOMEN | 160 | 22 | 1,587 | 1,875 | 748 | 926 |
| 9712 | ELIDA MARQUEZ, M.D. | 30 | 649 | 241 | 55 | - | 4,159 |
| 9729 | OBGYN ASSOC. CENTRAL COAST | 266 | 390 | 493 | 28 | - | 206 |
| 9752 | CENTRAL COAST HEAD & NECK | - | 165 | 149 | 113 | 88 | 118 |
| 9757 | JACQUELINE TRANG NGUYEN, M.D. | - | - | 360 | 950 | 13 | - |
| 9767 | CENTER MEDICAL GROUP | 2,171 | 1,085 | 2,395 | 2,008 | - | - |
| 9794 | JAMES S. NAGEL, M.D. | 2,954 | 2,184 | 437 | 316 | 186 | 174 |
| 9816 | CURTIS ROBINSON, M.D. | 317 | 394 | 202 | 339 | 39 | 77 |
| 9908 | RYAN RANCH MEDICAL GROUP | 214 | 1,514 | 979 | 2,244 | 780 | 1,155 |
| 9909 | LEMI MEDICAL CENTER | - | - | 9 | 189 | - | - |
| 9961 | DAVID CHARP, M.D. | 173 | 325 | 132 | 24 | - | - |
| 9978 | HAMILTON MEDICAL GROUP | - | 183 | 4,028 | 3,349 | 440 | 975 |
| | **GRAND TOTAL** | $ 71,545 | $ 86,567 | $ 76,497 | $ 69,669 | $ 11,897 | $ 26,431 |

Notes:
[1] Accounts lost as a result of change in Aetna network status, as
identified by Plaintiff in response to Interrogatory 6.
[2] CPA2009_AE_ALLCL
[3] CPA2010_AE_ALLCL
[4] CPA2011_AE_ALLCL
[5] CPA2012_AE_ALLCL
[6] CPA2012_AE_ALLCL_OCT-DEC
[7] CPA2013_AE_ALLCL

# EXHIBIT 3

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Exhibit 3**
**Hunter Lost Business Value Analysis Assuming Appropriate Lost Revenues Utilized**

| Discounted Cash Flow Approach | Source | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Adjusted 2018 | Terminal Value |
|---|---|---|---|---|---|---|---|---|---|
| *Growth Rate [1]* | Regan Ex. 3.6 & 3.4 | | *5.9%* | *5.9%* | *5.9%* | *5.9%* | *5.9%* | | *4.5%* |
| Lost Revenue | Thomas Ex. 2 | $ 24,282 | $ 25,715 | $ 27,232 | $ 28,839 | $ 30,540 | $ 32,342 | | |
| Less: Avoided Variable Cost | | | $ 8,486 | $ 8,987 | $ 9,517 | $ 10,078 | $ 10,673 | | |
| *Hunter Variable Cost Percentage* | Regan Ex. 2.0 | | *33.0%* | *33.0%* | *33.0%* | *33.0%* | *33.0%* | | |
| Lost Net Income Before Depreciation and Amortization | | | $ 17,229 | $ 18,245 | $ 19,322 | $ 20,462 | $ 21,669 | $ 21,669 | |
| Less: Avoided Depreciation | | | $ - | $ - | $ - | $ - | $ - | $ 526 | |
| *Long-term Depreciation and Amortization as a Percentage of* | Regan Ex. 3.2 | | | | | | | *1.6%* | |
| Lost Net Income Before Income Tax | | | $ 17,229 | $ 18,245 | $ 19,322 | $ 20,462 | $ 21,669 | $ 21,143 | |
| Less: Avoided Tax | | | $ 6,030 | $ 6,386 | $ 6,763 | $ 7,162 | $ 7,584 | 7,400 | |
| *Marginal Tax Rate* | Regan Ex. 3.5 | | *35.0%* | *35.0%* | *35.0%* | *35.0%* | *35.0%* | *35.0%* | |
| Lost Net Income After Taxes | | | $ 11,199 | $ 11,859 | $ 12,559 | $ 13,300 | $ 14,085 | 13,743 | |
| Plus: | | | | | | | | | |
| Avoided Non-Cash Charges (Depreciation, Amortization, Deferred | | | $ - | $ - | $ - | $ - | $ - | $ 526 | |
| *Long-term Depreciation and Amortization as a Percentage of* | Regan Ex. 3.2 | | | | | | | *1.6%* | |
| Avoided New Debt Principal | | | $ - | $ - | $ - | $ - | $ - | $ - | |
| Less: | | | | | | | | | |
| Avoided Debt Repayment | | | $ - | $ - | $ - | $ - | $ - | $ - | |
| Avoided Incremental Working Capital to Support Growth | | | $ 2,498 | $ 2,645 | $ 2,802 | $ 2,967 | $ 3,142 | 3,142 | |
| *Working Capital to Revenue Ratio* | Regan Ex. 3.3 | | *9.7%* | *9.7%* | *9.7%* | *9.7%* | *9.7%* | *9.7%* | |
| Avoided Anticipated Capital Expenditures to Support Growth | | | $ - | $ - | $ - | $ - | $ - | $ 526 | |
| *Long-term CAPEX as a percentage of Revenue* | Regan Ex. 3.2 | | | | | | | *1.6%* | |
| Lost Net Cash Flow to Equity | | | $ 8,701 | $ 9,214 | $ 9,758 | $ 10,333 | $ 10,943 | $ 10,601 | 79,131 |
| Discount Rate | Regan Ex. 3.7 | | *18.5%* | | | | | | |
| Discount Factor | | | 0.844 | 0.712 | 0.601 | 0.507 | 0.428 | | 0.428 |
| Present Value of Lost Net Cash Flow to Equity | | | $ 7,342 | $ 6,562 | $ 5,864 | $ 5,240 | 4,683 | $ | 33,865 |
| Net Present Value of Lost Net Cash Flow to Equity | | | $ 63,557 | | | | | | |
| | | | 2.6  *x Revenue* | | | | | | |

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Exhibit 3**
**Hunter Lost Business Value Analysis Assuming Appropriate Lost Revenues Utilized**

**Market Value Approach**

| | Implied Multiple from BioReference Acquisition [2] | Quartile 1 | Median | Quartile 3 |
|---|---|---|---|---|
| Lost Revenue | $ 24,282 | $ 24,282 | $ 24,282 | $ 24,282 |
| Price / Revenue Multiple          Regan Ex. 3.8.1 | 0.81 | 0.93 | 1.82 | 3.09 |
| Lost Business Value | $ 19,640 | $ 22,605 | $ 44,193 | $ 74,926 |

Notes:
[1] I have used the 10-year CAGR in the first 5 years.
[2] Implied price-to-revenue multiple from BioReference acquisition calculated as implied enterprise value divided by annualized revenues from seven months ending July 2013 ($15.2 million / $18.8 million).

# EXHIBIT 4

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Exhibit 4**
**SPA Lost Profits**

| Description | | 2010 | | 2011 | | 2012 | | 2013 | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Partnership Accounts Revenue [1] | $ | 29,847 | $ | 29,847 | $ | 29,847 | $ | 29,847 | $ | 119,387 |
| Actual Revenues [1] | | 1,220 | | 41 | | 17 | | 9 | | 1,286 |
| | | | | | | | | | | |
| Lost Revenues | | 28,627 | | 29,806 | | 29,830 | | 29,838 | | 118,101 |
| Contribution Margin Rate [2] | | 60% | | 60% | | 60% | | 60% | | 60% |
| | | | | | | | | | | |
| Total Lost Profits | $ | 17,176 | $ | 17,884 | $ | 17,898 | $ | 17,903 | $ | 70,860 |

```
Notes:
[1] Exhibit 4.1.
[2] Regan Expert Report, Exhibit 4.1.
```

Expert Report of Vincent A. Thomas, CPA/ABV/CFF, CVA
Highly Confidential - Attorneys' Eyes Only

United States District Court for the Northern District of California San Francisco Division
Case No. 3:12-cv-05847-WHO
RDL, et al v. Aetna, et al

**Exhibit 4.1**
**Estimate of SPA Revenue from Partnership Accounts**

| Client ID | Description | 2007 [1] | 2008 [2] | 2009 [3] | 2010 [4] | 2011 [5] | 2012 [6] | 2013 [7] | Average 2008 - 2009 |
|---|---|---|---|---|---|---|---|---|---|
| 2550 | CHANATE HEALTH CENTER | $   34,058 | $   579,508 | $   543,510 | $   4,354 | $   320 | $   170 | $   - | $   561,509 |
| 2730 | PETALUMA HEALTH CENTER | 618,337 | 953,483 | 707,517 | 32,767 | 1,487 | 403 | 335 | 830,500 |
| 6985 | CHANATE HALL PROGRAMS | - | - | - | 62 | 64 | 165 | - | - |
| 8222 | ALEXANDER VALLEY REGIONAL | 129,998 | 179,726 | 182,110 | 27,111 | 274 | 159 | 125 | 180,918 |
| | Total Hunter Partnership Revenues | 782,394 | 1,712,717 | 1,433,137 | 64,294 | 2,145 | 897 | 460 | 1,572,927 |
| | SPA Revenues as % of Hunter [8] | | 1.90% | 1.90% | 1.90% | 1.90% | 1.90% | 1.90% | 1.90% |
| | SPA Revenues | | $   32,499 | $   27,194 | $   1,220 | $   41 | $   17 | $   9 | $   29,847 |

Notes:
[1] CPA2007_FULL
[2] CPA2008_FULL
[3] CPA2009_FULL
[4] CPA2010_FULL
[5] CPA2011_FULL
[6] CPA2012_FULL
[7] CPA2013_FULL
[8] Exhibit 4.2.

United States District Court for the Northern District of California San Francisco Division

Case No. 3:12-cv-05847-WHO

RDL, et al v. Aetna, et al

**Exhibit 4.2**
**SPA Revenues as a Percentage of Hunter Revenues**

| Description [1] | Calculation | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2008 - 2012 |
|---|---|---|---|---|---|---|---|---|
| Hunter Lab [2] | A | $ 102,000 | $ 185,279 | $ 220,000 | $ 199,333 | $ 147,000 | $ 111,000 | 853,612 |
| SPAMG - Hunter [2] | B | $ 127,346 | $ 131,204 | $ 187,509 | $ 348,607 | $ 308,150 | $ 344,092 | 1,102,816 |
| SPAMG - Other [2] | C | $ 127,346 | $ 131,204 | $ 187,509 | $ 348,607 | $ 308,150 | $ 344,092 | 1,102,816 |
| Total SPA Fees | D = A + B + C | $ 356,692 | $ 447,687 | $ 595,018 | $ 896,547 | $ 763,300 | $ 799,184 | 3,059,244 |
| Total SPA - Hunter-Related Revenues | E = A + B | $ 229,346 | $ 316,483 | $ 407,509 | $ 547,940 | $ 455,150 | 455,092 | 1,956,428 |
| Total Hunter Revenues [3] | F | $ 20,129,773 | $ 20,568,081 | $ 19,067,445 | $ 22,480,893 | $ 20,857,635 | $ 103,103,827 | |
| SPA - Hunter-Related Revenues as % of Hunter Revenues | G = E / F | 1.14% | 1.54% | 2.14% | 2.44% | 2.18% | | 1.90% |

Notes:
[1] Hunter operates on a fiscal year ending March 31 whereas SPA's fiscal year is the calendar year. I have aligned fiscal years in a way so that nine month's of Hunter's fiscal year overlap with the respective calendar year. For example, Hunter 2008 data is for fiscal year 2009 that runs from April 1, 2008 - March 31, 2009.
[2] Regan Expert Report, Exhibit 4.1.
[3] Regan Expert Report, Exhibit 2.8.