# EXHIBIT 3

```
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4
 5   RHEUMATOLOGY DIAGNOSTICS
 6   LABORATORY, INC., et al.
 7         Plaintiffs,                   Case No.
 8   vs.                                 3:12-cv-05847-WHO
 9   AETNA, INC., et al.,
10         Defendants.
11   _____
12
13      VIDEOTAPED DEPOSITION OF GREG J. REGAN
14               Burlingame, California
15             Wednesday, April 29, 2015
16                     Volume I
17
18
19
20   Reported By:
21   TAVIA A. MANNING
22   CSR No. 13294, RPR, CLR, CCRR
23   Job No. 2061050
24
25   PAGES 1 - 256
```

Page 1

**Page 38**

1  Q. Okay.  10:17:09
2     MR. RASKIN: Okay.
3     Why don't we take a short break, and we'll
4  get back to it.
5     THE VIDEOGRAPHER: We're going off the  10:17:57
6  record at 10:18 a.m.
7     (Recess taken.)
8     THE VIDEOGRAPHER: We're back on the record
9  at 10:25 a.m.
10 BY MR. RASKIN:  10:25:09
11 Q. Okay.
12    Looking at Exhibit 1, your expert report,
13 let's start on page 2, where there's a table that --
14 or a Figure 1 that summarizes some of your opinions.
15    And I -- I -- I want to go through the --  10:25:28
16 the damages amount, if you will. On number two, you
17 say, Hunter -- "Hunter's lost profits are
18 $.14 million."
19    And -- and when I turn to page 13 of your
20 report, it looks to me like that's sort of a  10:25:52
21 rounding of this $138,000 figure that you determine
22 on Exhibit 2.0 for Hunter's lost profits; is that
23 correct?
24 A. Yes.
25 Q. And, next, in Figure 1, you state that  10:26:10

**Page 39**

1  "Hunter's lost business value is $.47 million," and  10:26:14
2  that -- I'm looking at page 23 now, which indicates
3  the estimate of $.47 million, and also states that
4  it -- that that's using the discounted cash flow
5  method, and that you find that that's confirmed by  10:26:49
6  the Guideline Merged and Acquired Company Method,
7  which found a range of $.17 million to $.55 million
8  with a median of $.33 million; correct?
9  A. Yes.
10 Q. And, next, going back to Figure 1, you find  10:27:15
11 the lost profits for SPA of $.32 million, which on
12 page 24 -- I don't think there's any rounding on
13 that one. It seems to be the same figure stated on
14 page 24, $.32 million, which appears to be the --
15 the sum of $.27 million from the Partnership  10:27:37
16 accounts, $10,000 from the Aetna accounts, and
17 $37,000 from the Blue Shield accounts; correct?
18 A. Yes.
19 Q. So were those figures then, the -- that
20 appear in Figure 1, those three figures, the  10:28:02
21 $.14 million, the $.47 million and the $.32 million,
22 the full scope of plaintiffs' damages currently in
23 the case --
24    MS. MURPHY: Objection; form.
25 //

**Page 40**

1  BY MR. RASKIN:  10:28:17
2  Q. -- according to your report?
3  A. Yes, based upon my understanding.
4  Q. Okay. So nothing further beyond what's in
5  Figure 1 here?  10:28:23
6  A. Not that I have analyzed.
7  Q. Okay. Turning to page 8 of your report,
8  you state here -- I'm sorry, page 8 of your report
9  or is it Regan 8? Yeah.
10    No, it's page 8 of your report, which is  10:28:57
11 Regan 11.
12    Well, you've looked at the Aetna
13 contract -- for the contract between Aetna and
14 Quest; correct?
15 A. Yes.  10:29:23
16 Q. With respect to its profitability?
17 A. That's part of the analysis, yes.
18 Q. Okay. You know that Quest has taken the
19 position in the case, and I -- your report states
20 that Quest -- Quest takes the position that the  10:29:36
21 operating margins on the contract are profitable;
22 correct?
23 A. Yes.
24 Q. Do you agree or disagree with that
25 assessment?  10:29:57

**Page 41**

1  A. I don't know that I have an opinion on  10:30:08
2  that. I think that's what the Quest document says,
3  and I've cited the document. I cited their motion.
4  But there is also a -- a schedule that represents
5  its analysis of the Aetna profitability, and I cited  10:30:22
6  to it.
7  Q. Do you have any reason to question the
8  accuracy of that document or of the conclusion by
9  Quest that the Aetna contract is profitable?
10    MS. MURPHY: Objection; form.  10:30:41
11    THE WITNESS: I don't have any evidence on
12 that, on an overall basis, it's anything other than
13 the document represents.
14 BY MR. RASKIN:
15 Q. Meaning that it's profitable?  10:30:58
16 A. On an overall basis.
17 Q. Yes.
18    And on an operating margin basis; correct?
19 A. Overall, on an operating margin basis.
20 Q. Okay. Now, you also found in your report  10:31:09
21 that there were instances of below-cost testing at a
22 test lab in the Aetna fee schedule for Quest; is
23 that correct?
24 A. Yes.
25 Q. And you -- your own analysis looked at two  10:31:31

**Page 78**

```
1      (Recess taken.)                          11:28:22
2      (Deposition Exhibit 4 was marked for
3   identification.)
4      THE VIDEOGRAPHER:  We're on the record at
5   11:38 a.m.                                  11:38:21
6      This is the beginning of Tape 2 in the
7   deposition of Greg J. Regan.
8   BY MR. RASKIN:
9   Q.  Mr. Regan, do you have an opinion as to
10  whether below-cost pricing by Quest caused Hunter's   11:38:32
11  termination from the Aetna network?
12  A.  I think I approached my opinion from --
13  from the -- from the other way, which was my -- my
14  hypothesis was -- the test that I was doing was to
15  see whether there was evidence that it -- it wasn't  11:39:14
16  the cause, and -- and/or if it was the cause.
17      And so based upon the evidence available to
18  me and the plaintiffs' claims, my understanding of
19  those claims, the culmination of the pricing that I
20  think we've talked about before that resulted in the 11:39:36
21  Amendment 17, which was connected to Hunter's
22  termination from the Aetna contract, I didn't see
23  any evidence that Hunter's exclusion wasn't caused
24  by the below-cost pricing.
25  Q.  I'm not sure if I got an answer or not.  11:39:57
```

**Page 79**

```
1      You say that you're not aware of the      11:40:10
2   evidence that it wasn't caused.
3      Do you have an opinion as to whether his
4   termination was caused by any below-cost pricing of
5   Quest?                                       11:40:22
6   A.  I wasn't -- my -- my assignment wasn't to
7   form an opinion on causation.  But I didn't want to
8   approach that analysis uncritically, and I was
9   looking for any evidence that could undermine the
10  theory that it was caused by below-cost pricing.  11:40:43
11      I did not see any evidence that would cause
12  me not to be able to reach the conclusion that
13  Hunter's losses were connected to the below-cost
14  pricing.
15  Q.  Okay.  You -- you stated that your      11:40:55
16  assignment wasn't to form an opinion on causation.
17      Was your assignment then limited to
18  damages?
19  A.  You used the word "limited" by.
20      My assignment was to perform a damages   11:41:12
21  calculation.  I'm familiar with the requirement that
22  the plaintiff has the burden of proving causation.
23  I understand the plaintiffs' allegations.  I
24  understand that below-cost pricing is -- is a
25  component of their theory.                  11:41:27
```

**Page 80**

```
1      So again, I'm not approaching it          11:41:30
2   uncritically, is -- is what I am saying.  I was
3   looking for any evidence that might undermine that
4   and thereby undermine the damage calculation.
5   Q.  Okay.  In the course of making that     11:41:40
6   assessment, did you become aware of any evidence
7   that would -- that would support a conclusion that
8   Hunter's termination by Aetna was caused by
9   below-cost pricing in the Quest-Aetna agreement?
10     MS. MURPHY:  Objection; form.            11:42:12
11     THE WITNESS:  Not in addition to the other
12  evidence that you and I have already discussed;
13  including Mr. Gentleman's testimony that would
14  have -- that Aetna would have continued to use
15  Hunter's services.                          11:42:38
16     So that was part of my analysis of
17  assessing whether there was evidence undermining the
18  causation theory.
19  BY MR. RASKIN:
20  Q.  Will you agree with me that Mr. Gentleman  11:42:46
21  stated no view whatsoever as to whether there was
22  below-cost pricing in the contract?
23  A.  Again, I -- I'd be glad to look at it --
24  look at his transcript if -- if -- if you have it
25  and you want to look at it --               11:43:11
```

**Page 81**

```
1   Q.  So --                                    11:43:12
2   A.  -- but I don't recall the specific
3   testimony you're referring to.
4   Q.  So I -- I -- I -- we could -- we could do
5   that, but do you recall anything in his testimony  11:43:17
6   that addressed, one way or another, whether the
7   pricing and the contract was below Quest's costs?
8   A.  I don't recall that, and -- and I don't
9   know that he would have that information in any
10  event.                                       11:43:34
11  Q.  Do you recall that he testified that he did
12  not have that information?
13  A.  I don't recall it, but it wouldn't surprise
14  me, as I just testified.
15  Q.  Right.                                   11:43:43
16     So what is it about Mr. Gentleman's
17  testimony that you think would support a conclusion
18  that below-cost pricing in the Quest-Aetna agreement
19  caused Hunter's termination from the Aetna network?
20  A.  Again, from Aetna's perspective, lower   11:44:08
21  costs are preferable, and the negotiation culminated
22  in those lower prices.  And as part of the
23  negotiation, there was simultaneous network
24  narrowing that resulted in Hunter's termination.
25     So in my view, that's consistent with the  11:44:25
```

**Page 238**

1  and so that was the data point that I had to follow    17:05:06
2  BY MR. RASKIN:
3      Q. Did you have access to SPA's data relating
4  to work that it actually did receive relating to
5  Partnership?    17:05:18
6      A. No, I did not.
7      Q. Okay. And so you needed to derive an
8  estimate based on Hunter's business?
9      A. After discussing it with the two
10 individuals, that was identified as the -- as the    17:05:34
11 best way and perhaps the only way to go about
12 estimating the amount of revenue.
13     Q. Okay. So looking, for example, at 2009,
14 the grand -- the -- the $1.43 million figure that
15 appears as the grand total would actually be    17:06:16
16 Hunter's grand total of business from these four
17 entities; correct?
18     A. Yes.
19     Q. And so then you apply the 8 percent
20 assumption and come up with $114,651 as an estimate    17:06:31
21 of what may have flowed to SPA; correct?
22     A. Yes.
23     Q. And then it looks like, going back to
24 Exhibit 40, that becomes the basis for your
25 calculation of lost revenues to SPA; correct?    17:06:55

**Page 239**

1      A. Yes.    17:07:01
2      Q. And where do the -- where does the
3  figure -- the $1.43- figure on Exhibit 9 for Hunter,
4  were does that come from? What files?
5      A. Earlier today -- earlier today, we talked    17:07:23
6  about the nuances of the file naming mechanisms,
7  but --
8      Q. Right.
9      A. -- here you can see the -- the aggregate of
10 the -- each -- each specific file that was used to    17:07:30
11 identify those numbers.
12        And I should reiterate that one test I was
13 able to perform is that the full value of the
14 amounts expressed in these files can be agreed to.
15 Financial statement data for Hunter, like the one    17:07:43
16 that we described earlier today that had the
17 three-year periods ended March 2012, those reports
18 can be tied to that data.
19     Q. And why are the full files used here; in
20 other words, the files ending in the letters F-U-L-L    17:08:07
21 rather than the all client files that we talked
22 about earlier?
23     A. The all client files were related to the
24 naming scheme that Brett Hunt at SeaCoast used when
25 he provided me the Aetna files. These are full as    17:08:25

**Page 240**

1  in all of the -- entirety of the Hunter business.    17:08:30
2      Q. Okay.
3      A. In other words, it doesn't try to delineate
4  different payees.
5      Q. I see.    17:08:38
6         (Pause in the proceedings.)
7  BY MR. RASKIN:
8      Q. Do you know -- I'll ask on the record: Do
9  you know whether those files have -- were produced
10 to us along with your work papers, the F-U-L-L    17:09:05
11 files?
12     A. I believe so.
13     Q. Okay.
14        MR. PATEL: We do have them.
15        MR. RASKIN: Okay. Thanks. Thank you    17:09:15
16 both.
17        THE WITNESS: You're welcome.
18        MR. PATEL: Likewise.
19 BY MR. RASKIN:
20     Q. So let's look at Exhibit 4.1, Regan 78.    17:09:44
21        So we discussed earlier, a few minutes ago,
22 that -- and -- okay. For 2011, you could sum up two
23 figures to get SPA's revenue from Hunter in a
24 particular year.
25        So if you took 2011, you would add $199,333    17:10:23

**Page 241**

1  to $348,607.    17:10:29
2         Do you see that?
3         Do you remember that?
4      A. To get Hunter's related revenue, is that
5  what you're asking?    17:10:41
6      Q. Yes, to get SPA's Hunter-related revenue.
7      A. Yes.
8      Q. All right. And that -- you know, that is
9  going to result in a sum of a little less than
10 $550,000; correct?    17:10:50
11     A. Yes.
12     Q. So now let's turn to page 3.6 of your
13 report, which is Regan 73.
14        And Hunter's revenues for 2011 were
15 $19,067,445.    17:11:24
16        Do you see that?
17     A. Yes.
18     Q. So for 2011, using those amounts, SPA's
19 revenue from testing flowing from Hunter would be
20 about a little less than $550,000 divided into a    17:11:52
21 little more than $19 million; correct?
22     A. Correct.
23     Q. And that would come, I will tell you, to
24 about a little less than 3 percent of Hunter's
25 revenues, 2.9 percent, and not 8 percent; correct?    17:12:11

**Page 242**

1  A. Yes.  17:12:15
2  Q. So why not use those figures rather than
3  the, you know, 8 percent that was reported to you by
4  Drs. Weiss -- Dr. Weiss and Mr. Riedel.
5  A. That -- that is an alternative input that  17:12:35
6  could be used. I inquired about that with Dr. Weiss
7  and Mr. Riedel, and their analysis to me is that
8  would understate the volume -- or, excuse me, the
9  sales that would be generated by SPA from, in
10 particular, these types -- these accounts from --  17:12:54
11 from Partnership.
12     And that was based upon their history of
13 operating their relationship. And, you know, I
14 recognize that that's an alternative way of doing
15 it, but here I relied upon their particular  17:13:08
16 expertise with their business.
17 Q. Did you calculate that ratio and consider
18 using it?
19 A. I certainly observed it. But I don't know
20 that I calculated it with -- but I can eyeball  17:13:38
21 the -- the percentage close enough, and that's what
22 stemmed my inquiry of Mr. Riedel and Dr. Weiss in
23 that regard.
24 Q. So why did you choose to use the 8 percent
25 reported to you rather than the 2.9 percent that  17:13:50

**Page 243**

1  was, you know, revealed by the data?  17:13:54
2  A. Because this is a gross -- or, excuse me, a
3  net revenue number, but it relates to the entirety
4  of Hunter's business, and the particular factors
5  that pertain to particular Partnership accounts.  17:14:10
6     They made the representation to me that the
7  reliable range to use would be 8 to 10 percent, and
8  using this metric would understate it. And so I
9  followed -- I think I was clear in terms of -- of my
10 reliance on their representation in that way.  17:14:26
11 Q. Well, let me make sure I understand what
12 you're saying.
13     Are you saying that the 8 to 10 percent
14 that was reported to you by Mr. Riedel and Dr. Weiss
15 pertained specifically to the Partnership accounts?  17:14:41
16 A. It was certainly part of the nature of the
17 inquiry. I can't -- let me see how I wrote it.
18     My recollection of my discussion with them
19 is -- was that in those accounts where losses were
20 experienced, their representation was that the  17:15:22
21 volume of business that SPA would receive from
22 Hunter was higher than using this metric, which
23 would be SPA's historical revenue divided by
24 Hunter's historical revenue.
25     At the moment, I -- I can't recall the  17:15:48

**Page 244**

1  reasons that they -- they provided.  17:15:49
2  Q. So you calculated lost profits for SPA in
3  connection with not only Partnership, but also Blue
4  Shield and Aetna.
5     So did Dr. Weiss and Mr. Riedel indicate to  17:16:05
6  you that there was some reason why those three lines
7  of business, Blue Shield, Aetna and Partnership,
8  differed significantly from all the rest of the
9  Hunter business?
10 A. I'm trying to remember the particular  17:16:22
11 nature of our discussion.
12    I think that Dr. Weiss was certainly
13 working with or attempting to work with the data
14 service provider to attempt to restore old data,
15 something, to give me metrics to support that, but  17:16:47
16 was quite confident that the actual relevant
17 volume -- I keep using that term -- the actual
18 amount of revenue the SPA would be expected to
19 derive, and Mr. Riedel was consistent, was in the 8
20 to 10 percent range.  17:17:06
21    That's -- that's the number that they were
22 representing to me, and given their knowledge of the
23 business, I ultimately, you know, used in the
24 analysis here, and described it on page 26 -- excuse
25 me, Regan 26.  17:17:25

**Page 245**

1  Q. Would you agree that had you used a ratio  17:17:31
2  derived from the relationship between SPA's revenue
3  and Hunter's revenue, your -- your estimates of
4  SPA's lost profits would have gone down?
5  A. Yes.  17:17:48
6  Q. Would you view it as unreasonable to
7  calculate SPA's lost profits in that fashion using
8  the actual ratio between their revenues in a
9  particular year and Hunter's revenues rather than
10 using the amounts reported to you by Dr. Weiss and  17:18:11
11 Mr. Riedel?
12 A. I think that that would be another data
13 input to use, and that hearing testimony that
14 Mr. Riedel and Dr. Weiss may be able to offer on
15 this point would support using the higher end of the  17:18:41
16 range.
17    But in -- in the absence of that testimony
18 or the explanation, I think that's a -- a reasonable
19 alternative data input.
20 Q. So setting aside any future testimony they  17:18:56
21 might give, based on what they've said to you to
22 date, what would explain the pretty sizeable gap
23 between what the revenue figures show as a ratio and
24 the recollection that they have or that they
25 reported to you without an apparent source of an 8  17:19:13

**Page 246**

1 to 10 percent figure? 17:19:18
2     MS. MURPHY: Objection; form.
3     THE WITNESS: Again, their -- their
4 knowledge of the particular mix of testing relative
5 to these accounts, their experience with these 17:19:29
6 accounts. It could be the fact that SPA's financial
7 reporting mechanisms don't allow the identification
8 of -- or association of all of the Hunter revenue in
9 its financial statements and its documents.
10 There -- there could be explanations. 17:19:48
11     So I have to turn to them and their
12 experience working with these accounts and their
13 knowledge of the business. I -- I think that's
14 a -- a reasonable source of data for me.
15 BY MR. RASKIN: 17:20:00
16     Q. Well, it might be in the absence of this
17 data. And I -- what I'm wondering is what the
18 knowledge of the business contributes unless the
19 overall revenue data is just wrong; right?
20     I mean, you got the overall revenue data 17:20:13
21 from them, too, and the ratio is the ratio. It --
22 it -- it isn't -- it isn't particularized to
23 particular accounts. It's the overall revenues of
24 the business. It's just a flat-out, straight ratio.
25     So what possible explanation could there be 17:20:29

**Page 247**

1 that would make -- that -- that could explain the -- 17:20:31
2 the gap between the reported 8 to 10 percent and the
3 actual 2.9 percent for -- for 2011?
4     MS. MURPHY: Objection; form.
5     THE WITNESS: That's not a question I can 17:20:53
6 answer sitting here today.
7     I've discussed that with Dr. Riedel and --
8 excuse me, Dr. Weiss and Mr. Riedel and I'm relying
9 on them to be able to establish that -- that
10 evidence. 17:21:05
11 BY MR. RASKIN:
12     Q. So they didn't give you an answer to that
13 in your discussions?
14     MS. MURPHY: Objection; form.
15     THE WITNESS: I -- I think that misstates 17:21:12
16 what I've said previously.
17     We -- we talked about it. I was familiar
18 with this particular metric. We discussed that.
19 And they represented to me that the nature of this
20 particular business was such that the sales that 17:21:29
21 could be anticipated or would be anticipated would
22 be in the 8 to 10 percent range.
23 BY MR. RASKIN:
24     Q. Right.
25     So what they said was, "Notwithstanding 17:21:37

**Page 248**

1 that the actual ratio is approximately 3 percent, we 17:21:40
2 think it's 8 to 10 percent," and you went with that;
3 right?
4     A. That's -- there was more to the discussion
5 than that, and -- 17:21:51
6     Q. But do you not recall it?
7     Because all you're saying is the nature of
8 the business, and I'm saying, it -- you know, the
9 obvious follow-up question is: Well, what about the
10 nature of the business would explain that gap? 17:21:59
11     A. I recall having similar discussions to this
12 with Mr. Riedel and Dr. Weiss, and I can't recall
13 right now for all of the reasons that they described
14 as to those reasons.
15     But their recommendation and -- was to rely 17:22:18
16 upon that analysis, and given their familiarity with
17 the business, that, to me, seemed a reasonable
18 alternative.
19     Q. So you deferred to them even though the
20 data said otherwise because they're more experienced 17:22:37
21 in the business.
22     MS. MURPHY: Objection; form.
23 BY MR. RASKIN:
24     Q. Is that fair?
25     A. I think that's what I've testified to. 17:22:43

**Page 249**

1     Q. Okay. So looking again at -- I think it's 17:22:45
2 4.0, but I seem to have misplaced it.
3     A. Yes.
4     Q. Looking at Exhibit 4.0, which is Regan 77,
5 is your calculation of SPA lost profit. 17:23:50
6     You imported the 115 -- 100 --
7 approximately $115,000 figure as your estimate of
8 lost revenue for 2011, '12, and '13.
9     What accounts for the slight difference in
10 2010? 17:24:19
11     A. I'm sorry, for Partnership?
12     Q. Yes.
13     A. It -- it was on Exhibit -- excuse me, on
14 Exhibit 9, it was a fact that some revenue was being
15 generated from those accounts in 2010. 17:24:31
16     Q. Okay. So -- so you offset the actual
17 revenues received against the anticipated -- or the
18 amount that you had modeled?
19     A. Yes.
20     Q. Okay. Did SPA earn any revenues from these 17:24:45
21 accounts in 2011, '12, or '13?
22     A. No, not to my knowledge.
23     Q. Had it earned any revenues from those
24 accounts in those years, would it be appropriate to
25 apply those as an offset? 17:25:10