# EXHIBIT 4

1            UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF CALIFORNIA
3               SAN FRANCISCO DIVISION
4

RHEUMATOLOGY DIAGNOSTICS   .
5  LABORATORY, INC., a California
   corporation; PACIFIC BREAST
6  PATHOLOGY MEDICAL CORPORATION, a
   California corporation; HUNTER
7  LABORATORIES, INC., a California
   corporation; SURGICAL PATHOLOGY
8  ASSOCIATES, a California
   partnership,
9            Plaintiffs,
         vs.                     No.  3:12-cv-05847-WHO
10 CALIFORNIA PHYSICIANS' SERVICES,
   INC., d/b/a BLUE SHIELD OF
11 CALIFORNIA ("BLUE SHIELD OF
   CALIFORNIA"), a California
12 corporation; BLUE CROSS AND BLUE
   SHIELD ASSOCIATION, an Illinois
13 corporation; AETNA, INC., a
   Pennsylvania corporation; QUEST
14 DIAGNOSTICS INCORPORATED, a
   Delaware corporation; QUEST
15 DIAGNOSTICS CLINICAL LABORATORIES,
   INC., a Delaware corporation; and
16 Does 1-100, inclusive,
            Defendants.
17 _____
18
        A PORTION OF THIS TRANSCRIPT IS CONFIDENTIAL
19              ATTORNEYS' EYES ONLY
             PURSUANT TO PROTECTIVE ORDER
20
        VIDEOTAPED DEPOSITION OF CHRIS RIEDEL
21              Burlingame, California,
             Friday, September 19, 2014
22                   Volume I
   Reported by:
23 STACEY M. DIODATI
   CSR No. 11925
24 Job No. #1932846
   Pages:  1 - 366
25 Pages:  86 - 111 ATTORNEYS' EYES ONLY & BOUND SEPARATELY

                                        Page 1

ATTORNEYS EYES ONLY

1      A     Yes.

2      Q     Was Partnership doing business prior to 2009?

3      A     Not in Sonoma County.

4      Q     Okay.  Are all of these first four lost

5  accounts on Page 7 of the rog. responses in Sonoma

6  County?

7      A     Yes.

8      Q     Okay.  I see.  So Partnership was doing

9  business elsewhere in the state, but not in Sonoma

10  County?

11      A     I don't know for sure.

12      Q     Okay.

13      A     I know it's rolled out to other counties in

14  Northern California since then, but I don't know where

15  else it might have been operating.

16      Q     Okay.  Do you know what the terms of Quest's

17  agreement with Partnership are?

18      A     No.

19      Q     Did you ever see any agreement?

20      A     No.

21      Q     Has anyone ever told you what the terms are?

22      A     Um, well, a little bit about the terms.

23      Q     What have they told you?

24      A     All of these clinics told me that, for

25  whatever reason, they were going to make more money if

Page 270

ATTORNEYS EYES ONLY

1    they signed this partnership health agreement than if

2    they just stayed with regular Medi-Cal; and for that

3    reason, they signed the agreement.

4         Q    And in what fashion were they going to make

5    more money?

6         A    I never understood it.  But they were

7    convinced they were going to make a lot more money.

8         Q    And you're talking about the referring

9    physicians?

10        A    Well, the actual clinic, Petaluma Health

11   Center.  Maybe it was individual physicians; maybe it

12   was the clinic.  I don't know.

13        Q    Okay.

14        A    But for them, it was, you know, we hate Quest

15   but we want to make more money.

16        Q    Okay.  So they signed the deal with

17   Partnership?

18        A    Right.

19        Q    And at that point, they started sending the

20   work to Quest?

21        A    Correct.

22        Q    Okay.

23        A    We had patient service centers in all these

24   places.  They kicked us out.

25        Q    When you say they "kicked [you] out," what do

                                    Page 271

```
 1    you mean by that?
 2        A     Just that.  Get out; we're bringing Quest in.
 3        Q     In the patient service centers?
 4        A     Yes.
 5        Q     I guess -- oh, I see.
 6              Were those within the clinic?
 7        A     Yes.
 8        Q     The PSCs were actually located within the
 9    clinic?
10        A     Yes.
11        Q     Did each of these have one clinic or were
12    there multiple?
13              MR. LAMBRINOS:  Compound.
14              THE WITNESS:  I think that a couple of them
15    were related, but they were all -- they had separate
16    facilities.  I don't know how they were related.
17    Probably ownership.
18              Q     BY MR. RASKIN:  Okay.  Did you reach out
19    to Partnership in any way to talk to them about --
20        A     It was a done deal.  There was nothing we
21    could do.  We didn't know about it until the contract
22    had been signed.  But it was capitation.  We -- you
23    know, we couldn't have successfully bid for it anyway.
24        Q     Because you wouldn't be willing to go low
25    enough to get the contract; right?
```

Page 272

ATTORNEYS EYES ONLY

1      A     Right.

2      Q     Anything further that resulted in the loss of

3   any of these first four accounts, other than the

4   Partnership deal?

5      A     No.

6      Q     Are these all -- are each of these separate

7   and independent entities from one another?

8      A     Well, as I said, I think a couple of them are

9   related, but they all have separate facilities.

10     Q     Okay.  Are they under any kind of joint

11  management, to your knowledge?

12     A     I don't know.

13     Q     Okay.  But they all signed, to your

14  understandings, laboratory participation agreements with

15  Partnership in -- for Sonoma County?

16     A     Medi-Cal participation agreements --

17     Q     Yes.

18     A     -- with Partnership.

19     Q     Yes.  So the -- so Partnership was operating a

20  Medi-Cal Managed Care plan --

21     A     Right.

22     Q     -- correct?  This was covering --

23     A     Right.

24     Q     -- the Medi-Cal business?

25           MR. LAMBRINOS:  You're still talking over each

Page  273

ATTORNEYS EYES ONLY

1    other.

2         Q    BY MR. RASKIN:  And would you -- was it your

3    understanding then that all of the Medi-Cal business

4    covered by Partnership was to go to Quest?

5         A    Yes.

6         Q    Were the physicians at those clinics still

7    free to send other business, non-Medi-Cal, to other

8    labs?

9         A    Yes.

10        Q    Did you continue to get some business from

11   those labs?

12        A    We tried very hard --

13        Q    Okay.

14        A    -- and effectively got de minimis specimens.

15        Q    Let's go to Number 5 on the list -- oh, well,

16   really, let's go to Diagnostic Labs.

17        A    Right.

18        Q    We'll call that one 4A, 'cause -- so we can --

19   so we can stick it in the middle there.  Okay?

20        A    Okay.

21        Q    Okay?  'Cause I -- then I won't renumber all

22   of those?

23             MR. LAMBRINOS:  I say we can number 15 if you

24   want.

25             MR. RASKIN:  Yeah, we could do that.  Let's --

                                            Page  274